Emhart now tries to argue that Judge Gibney's decision in Baxendale was "flawed," and that Judge Gibney did not consider "the Morrow decision as a whole."[8] In fact, it is Emhart's reading, not Judge Gibney's, that fails to consider Morrow "as a whole" – in light of the facts of the case, the coverage positions of the defendant insurer, and the subsequent treatment of the decision in Mendez and Robinson. Judge Gibney's reading of Morrow, while not binding on this Court, is both persuasive and legally correct.

## II. The Cases That Emhart Cites From Outside Rhode Island Are Inapplicable to the Case at Bar.

Having failed to distinguish Baxendale, or to identify any countervailing Rhode Island authority that would permit it to circumvent the plain language of R.I. Gen. Laws § 27-7-2, Emhart devotes the majority of its brief to a broad, and largely irrelevant, recitation of case law authority from other states.[9] Most of the cases that Emhart cites are from jurisdictions that have no statutory equivalent to R.I. Gen. Laws § 27-7-2. They were decided under the common law of these other states, or under direct-action statutes that bear no resemblance to the one enacted by the Rhode Island legislature. They are,

[8] Id.

[9] Along the same lines, Emhart makes the irrelevant and misleading argument that because courts have held a declaratory judgment action not to be a "direct action" of the sort that Congress voted to exclude from federal diversity jurisdiction, see 28 U.S.C. § 1332(c)(1), White v. United States Fidelity and Guaranty Co., 356 F.2d 746 (1st Cir. 1966), Government Employees Ins. Co. v. LeBleu, 272 F.Supp. 421, 425 (E.D. La. 1967), it was the intent of the Rhode Island legislature to exempt declaratory judgments from the plain language of § 27-7-2. Emhart's argument ignores the distinct congressional purpose in enacting § 1332(c). That purpose, as described by the First Circuit, was to avoid "overloading the federal courts" in Louisiana and Wisconsin – two states with direct-action statutes that "permitted virtually all claimants to bypass a suit against an insured and sue an insurer directly." See Opp. Mem., p. 19 n.7 (citing White, 356 F.2d at 747); Government Employees, 272 F.Supp. at 425 ("[t]he avowed and obvious purpose of [§1332(c)(1)] was and is to deny resort to the federal judicial system by plaintiffs in two states in which the peculiar device of 'direct action' statutes had resulted in an ever-increasing flood of litigation against insurance companies against which injured parties traditionally had no recourse directly"). The Rhode Island statute was enacted under different circumstances, for an entirely different purpose. Travelers is at a loss to see how the intent of the Rhode Island legislature, in enacting § 27-7-2, is revealed, or even clarified, by the intent of the federal Congress in amending a federal statute to relieve clogged federal dockets in Louisiana and Wisconsin.

quite simply, inapplicable to the issue of statutory construction presented by R.I. Gen. Laws § 27-7-2.

Moreover, a significant number of the cases that Emhart cites turn out, on examination, to be red herrings. Although some of these cases involve claims for declaratory judgment, the decisions of the courts in these cases do not turn on the distinction between a declaratory judgment suit and a suit for damages. In allowing these cases to proceed, the courts focus on other factors – factors that would often be sufficient to bring them within the statutory exceptions to R.I. Gen. Laws § 27-7-2 in any event.[10]

Finally, to the extent that the authorities cited by Emhart are in any way relevant to the issue of statutory construction before this court, those cases represent a *minority* common-law view.[11] The *majority* view – even in jurisdictions that have no statutory equivalent to R.I. Gen. Laws § 27-7-2 – is that "the absence of privity of contract between an injured-party claimant and the alleged tortfeasor's insurer bars not only a direct damages action but also a declaratory-judgment action against that insurer." Mendez, 849

---

10 See, e.g., Harford Mutual Insurance Co. v. Woodfin Equities Corp., 687 A.2d 652, 654 (Md. 1997) (default judgment for fixed amount entered against insured and insured was insolvent); Fortson v. St. Paul Fire and Marine Insurance, 751 F.2d 1157, 1159 (11th Cir. 1985) (separate action against insurer for bad faith).

11 The one case that Emhart cites most prominently to support its position, Bankers Trust v. Old Republic Ins. Co., 959 F.2d 677, 679-681 (7th Cir. 1992), was decided under the law of Illinois – a jurisdiction which, unlike Rhode Island, has no statutory limitations on actions against insurers. Bankers Trust arose in the context of a "tangled" fact pattern in which the policyholder first defaulted on a loan to the plaintiff, then entered into an allegedly collusive settlement with its insurer establishing the maximum amount to which the policyholder would be entitled in any insurance proceeds or settlement. Id. at 679-80. Although the Seventh Circuit permitted the plaintiff's declaratory judgment suit to proceed against the insurer, it emphasized the district court's "equitable discretion to grant or withhold declaratory relief" in these circumstances, id. at 680, 681, and acknowledged the "general rule" at common law that "a suit to determine an insurer's obligations to indemnify its insured is premature until the insured has been determined to be liable to somebody." Id. at 680. In the present case, if this Court is inclined to apply Banker's Trust, the most appropriate exercise of this Court's "equitable discretion" would be to apply the Rhode Island statute as written, dismiss this action, and reject Emhart's attempt to circumvent Rhode Island law by joining Travelers and its policyholder in a single, consolidated proceeding.

A.2d at 331 n.2. See generally 15 Appleman on Insurance 2d § 112.10 at 338 (2000); 7 Russ et al., Couch on Insurance 3d § 104:2, 104:10 -11 (1997)).

This majority view is consistent with the legitimate public policy concerns that Rhode Island courts, and courts in other jurisdictions, have articulated in the past. As Rhode Island courts repeatedly have acknowledged, the preclusion of direct actions against insurers serves several purposes, including courts' concern "to protect the insurance company against the well-known tendency of jurors to fail to consider the merits if a defendant . . . is insured." Miller v. Metropolitan Cas. Ins. Co., 146 A. 412, 414 (R.I. 1929); Collier v. Travelers Ins. Co., 197 A.2d 493, 496 (R.I. 1964). That concern is present whether a claimant's suit is for damages, or simply for a declaratory judgment that "if there is liability, the [insurer's] policies provide coverage." See Opp. Mem., p. 12. In either case, the jury learns that the defendant is insured. In either case, the defendant and the insurance company must face "the well-known tendency of jurors to fail to consider the merits" in these circumstances.

## CONCLUSION

Emhart's proposed construction of R.I. Gen. Laws § 27-7-2 – distinguishing actions for declaratory judgment from actions for damages – is contrary to the plain language of the Rhode Island statute, and the Rhode Island courts' well-founded concern to avoid prejudice to insurers. By contrast, Travelers proposed construction of the statute is consistent with the clear statutory language, with Judge Gibney's decision in Baxendale, with the majority position acknowledged by Mendez, and with the important public policy concerns that have been articulated by the Rhode Island courts. This Court should grant Travelers Motion, and should dismiss Counts VII, IX and XI of Emhart's

Complaint.[12]

Respectfully submitted,
THE TRAVELERS CASUALTY AND SURETY COMPANY,
By its Attorneys,

/s/ R. Kelly Sheridan
R. Kelly Sheridan, Esq. # 1976
Jason C. Preciphs, Esq. # 6727
ROBERTS, CARROLL, FELDSTEIN & PEIRCE, LLC
10 Weybosset Street
Providence, RI 02903
Tel: (401) 521-7000; (401) 521-1328 (fax)

Of Counsel:

John A. Nadas (pro hac vice)
Eric Bradford Hermanson (pro hac vice)
Julie C. Rising (pro hac vice)
Choate, Hall & Stewart
Two International Place
Boston, MA 02110
Phone: (617) 248-5000
Fax: (617) 248-4000

Dated: September 1, 2006

---

[12] Count XI of Emhart's complaint is independently deficient, for the reasons set forth on pp. 6-7 of Travelers Memorandum. In Count XI, Emhart seeks to enjoin Travelers and its policyholder from entering into any compromise or settlement with respect to coverage matters in dispute between Travelers and NECC. However, Emhart fails to articulate any "irreparable harm" to it that would be averted by forcing Travelers and NECC to litigate, rather than compromising, their separate coverage disputes. Cf. Hall v. Knudson, 535 A.2d 772, 775 (R.I. 1988) (acknowledging Rhode Island "public policy favoring settlement of lawsuits"). In any event, even if one assumes, *arguendo*, that R.I. Gen. Laws § 27-7-2 can be read as Emhart argues – to permit it to pursue the declaratory relief sought in Counts VII and IX – Emhart has provided no reasoned argument as to how the Rhode Island statute would permit Travelers to be "joined as a defendant" for purposes of a Count that seeks purely *injunctive* relief.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of September, 2006 the within document was filed electronically through the ECF System, where it is available for viewing and downloading and will be sent electronically to the counsel of record listed below who are registered participants identified on the Notice of Electronic Filing:

Craig M. Scott, Esq.
DUFFY, SWEENEY & SCOTT, LTD
One Turks Head, Suite 1200
Providence, RI 02903
cscott@duffysweeney.com

Todd D. White, Esq.
Jaime J. LaPorte, Esq.
ADLER POLLOCK & SHEEHAN, PC
2300 Financial Plaza
Providence, RI 02903
jlaporte@apslaw.com
ldunne@apslaw.com
twhite@apslaw.com

/s/ Jason C. Preciphs

4112914v3

# TAB

# E

CERTIFIED COPY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| GOODRICH CORPORATION,<br><br>PLAINTIFF,<br><br>VS.<br><br>EMHART INDUSTRIES, INC., ET AL.,<br><br>DEFENDANTS. | CASE ED CV 04-759-VAP(SS)<br><br>LOS ANGELES, CALIFORNIA<br><br>JUNE 14, 2005 |

TELEPHONIC HEARING
BEFORE THE HONORABLE SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR GOODRICH: GIBSON DUNN & CRUTCHER
BY: JEFFREY D. DINTZER
KIMBERLY GILCHRIST
ATTORNEYS AT LAW
333 SOUTH GRAND AVENUE
45TH FLOOR
LOS ANGELES, CALIFORNIA 90071

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING; TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

APPEARANCES: (CONTINUED)

FOR CITY OF RIALTO: MILLER STARR & REGALIA
BY: JULIE MACEDO
ATTORNEY AT LAW
1331 NORTH CALIFORNIA BOULEVARD
FIFTH FLOOR
WALNUT CREEK, CALIFORNIA 94596

FOR EMHART INDUSTRIES: ALLEN MATKINS LECK GAMBLE
AND MALLORY
BY: JAMES L. MEEDER
ATTORNEY AT LAW
THREE EMBARCADERO CENTER
12TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

COURTROOM DEPUTY/ RECORDER: KIMBERLY CARTER

TRANSCRIBER: DOROTHY BABYKIN
COURT HOUSE SERVICES
1218 VALEBROOK PLACE
GLENDORA, CALIFORNIA 91740
(626) 963-0566

INDEX

CASE NO. ED CV 04-759-VAP(SS) JUNE 14, 2005

HEARING: TELEPHONIC HEARING RE DISCOVERY.

LOS ANGELES, CALIFORNIA; JUNE 14, 2005

THE CLERK: CASE NUMBER ED CV 04-759, GOODRICH CORPORATION VERSUS EMHART INDUSTRIES.

COUNSEL, WOULD YOU PLEASE STATE YOUR NAMES FOR THE RECORD.

MR. DINTZER: GOOD MORNING -- OR GOOD AFTERNOON, YOUR HONOR. THIS IS JEFFREY DINTZER. AND WITH ME IS KIMBERLY GILCHRIST ON BEHALF OF PLAINTIFF GOODRICH CORPORATION.

THE COURT: GOOD AFTERNOON.

MR. MEEDER: GOOD AFTERNOON, YOUR HONOR.

JAMES MEEDER ON BEHALF OF EMHART INDUSTRIES.

MS. MACEDO: AND JULIE MACEDO ON BEHALF OF THE CITY OF RIALTO.

THE COURT: GOOD AFTERNOON.

OKAY. SO, I'VE HAD AN OPPORTUNITY TO REVIEW ALL THE PAPERS.

AND I WANTED TO ASK MR. DINTZER, MY VIEW OF THE PAPERS LEADS ME TO BELIEVE THAT AS SOON AS THE COURT ENTERS THE PROPOSED PROTECTIVE ORDER, THE ONE THAT EMHART SUBMITTED IN ITS LAST SERIES OF DOCUMENTS, THAT GOODRICH'S MOTION WILL BE MOOT.

IS THAT CORRECT?

MR. DINTZER: I DON'T BELIEVE THAT'S TRUE, YOUR HONOR. AND IF I MAY EXPLAIN WHY?

THE COURT: SURE.

MR. DINTZER: I SPOKE WITH MR. MEEDER EARLIER TODAY AFTER HAVING HAD AN OPPORTUNITY TO REVIEW THE PROPOSED PROTECTIVE ORDER. AND THERE'S SOME THINGS WE NEED TO WORK OUT IN TERMS OF THE TERMS OF THAT PROPOSED PROTECTIVE ORDER, BUT I DON'T THINK THAT WILL BE AN ISSUE.

AND I UNDERSTAND THAT AT THAT POINT MR. MEEDER WILL THEN PRODUCE THE NOVEMBER 1998 AGREEMENT TO COUNSEL IN THIS CASE SUBJECT TO THE TERMS OF THAT PROTECTIVE ORDER.

HOWEVER, THIS MOTION COVERS MORE THAN SIMPLY THE NOVEMBER 1998 AGREEMENT.

IF YOU LOOK AT THE DOCUMENT REQUEST THAT IS PRINCIPALLY AT ISSUE AND THAT IS BRIEFED IN OUR PAPERS, THAT IS REQUEST NUMBER 15.

IT ASKS FOR "ALL DOCUMENTS THAT REFER OR RELATE TO ANY INSURANCE POLICIES, CLAIMS, SETTLEMENTS, APPLICATIONS FOR INSURANCE OR BENEFITS OF AND FROM SUCH INSURANCE POLICIES, CLAIMS, SETTLEMENTS OR APPLICATIONS FOR INSURANCE THAT REFER OR RELATE TO YOUR OPERATIONS AT THE 160-ACRE PROPERTY."

NOW, IF YOU TAKE A LOOK AT THE RULE 26 DISCLOSURE -- AND THIS IS ON EXHIBIT R TO THE PAPERS OF THE DECLARATION OF KIMBERLY GILCHRIST --

THE COURT: OKAY.

MR. DINTZER: -- ^ 2(C) IS THAT UNDER THE SECTION

ON PAGE 2, RULE 26(A)(1)(D) DISCLOSURES --

THE COURT: JUST GIVE ME ONE SECOND TO GET THERE.

MR. DINTZER: YES.

THE COURT: WHAT PAGE ARE YOU ON? I'M SORRY.

MR. DINTZER: ON PAGE 2. IT'S --

THE COURT: OKAY.

MR. DINTZER: -- 330 CONSECUTIVELY NUMBERED.

AND WHAT IT SAYS THERE IS THAT, YOU KNOW, HERE ARE THE INSURANCE POLICIES THAT EMHART IS IDENTIFYING UNDER ITS RULE 26 DISCLOSURE OBLIGATIONS.

AND IF YOU GO THROUGH THESE, PUTTING THE FIRST ONE ASIDE, WHICH IS AN UNDERLYING POLICY, IT'S A CGL POLICY, THE OTHER POLICIES THAT ARE IDENTIFIED HERE, 2, 3, 4, 5, ALL THE WAY THROUGH NUMBERS 9, ARE FOR SUBSTANTIAL SUMS.

THOSE INSURANCE POLICIES IN EVERY SINGLE INSTANCE IDENTIFY AS AN INSURED WEST COAST LOADING CORPORATION. IF YOU LOOK, IT'S THE FIRST ONE IDENTIFIED ON EVERY ONE OF THESE.

NOW, WHAT WE ALL KNOW IS TRUE, AND IT CANNOT BE DISPUTED FROM THE RECORD, IS THAT WEST COAST LOADING CORPORATION OPERATED ON THIS SITE BETWEEN ROUGHLY 1952/'53 TO 1956, BEGINNING OF 1957.

WEST COAST LOADING, AS FAR AS I KNOW, IN THE DISCOVERY THAT HAS BEEN TAKEN, NEVER HAD ANY BUSINESS AT ANY OTHER PLACE. IT ONLY HAD OPERATIONS AT THE 160-ACRE PARCEL.

IT LOADED MUNITIONS THERE AS A WHOLLY OWNED SUBSIDIARY, AT LEAST FOR A PERIOD OF TIME, OF KWIKSET LOCKS.

SO, WHEN WE ASKED FOR ALL OF THE DOCUMENTS RELATING TO THE CLAIMS AND THE POLICIES AND THE SETTLEMENTS AND ALL THE REST OF THAT INFORMATION THAT RELATED TO THE OPERATIONS OF THE 160-ACRE PARCEL, WE WERE ASKING FOR ALL THE DOCUMENTS THAT RELATED TO WEST COAST LOADING CORPORATION'S INSURANCE AND ANY SETTLEMENTS THAT IT HAD, ANY NEGOTIATIONS IT HAD WITH THE INSURANCE COMPANY, ALL THOSE TYPES OF DOCUMENTS.

IN RESPONSE TO REQUEST NUMBER 15, IF YOU LOOK AT EXHIBIT -- IT'S S, AS IN SAM, TO THE MOVING PAPERS, THE GILCHRIST DECLARATION. TAKE A LOOK AT PAGE -- CONSECUTIVELY NUMBERED 357, ^ OS BEGINS TO THIS REQUEST. WE BELIEVE THERE ARE SOME OBJECTIONS TO YOU AND YOUR. WE'VE ALREADY DEALT WITH THAT ISSUE.

AND THEN AT THE VERY END IT SAYS:

"TO THE EXTENT GOODRICH SEEKS THROUGH THIS REQUEST DOCUMENTS THAT REFER OR RELATE TO WEST COAST LOADING CORPORATION AND/OR KWIKSET LOCKS, INC., E.I.I. RESPONDS THAT ALL KNOWN, RELEVANT, NON-PRIVILEGED, OR OTHERWISE DISCOVERABLE DOCUMENTS THAT ARE IN ITS POSSESSION, CUSTODY OR CONTROL THAT HAVE NOT ALREADY BEEN PRODUCED WILL BE PRODUCED AND MADE AVAILABLE."

NOW, THE DOCUMENTS THAT RELATE TO SETTLEMENT OF THE POLICIES THAT ARE THE SUBJECT OF THE RULE 26 DISCLOSURE, WHICH HAD AS AN INSURED WEST COAST LOADING CORPORATION, HAVE NOT BEEN PRODUCED IN THIS LITIGATION.

NOT ONLY WERE THEY NOT PRODUCED IN RESPONSE TO REQUEST NUMBER 15 FOR PRODUCTION --

THE COURT: OKAY. I'M GOING TO STOP YOU BECAUSE I DIDN'T UNDERSTAND WHAT YOU JUST SAID.

MR. DINTZER: OKAY.

THE COURT: GO BACK.

MR. DINTZER: OKAY. LET ME SAY THIS. ALL OF THE DOCUMENTS THAT RELATE TO THE SETTLEMENT OF THE INSURANCE POLICIES THAT NAME WEST COAST LOADING HAVE NOT BEEN PRODUCED TO THE PARTIES.

THE COURT: ARE YOU TALKING ABOUT THE NOVEMBER 1998 SETTLEMENT?

MR. DINTZER: CORRECT. AT LEAST FROM WHAT I UNDERSTAND FROM WHAT I'VE SEEN SO FAR IN THE PAPERS THAT HAVE BEEN FILED BY EMHART IN MR. MEEDER'S DECLARATIONS, IT DISTINGUISHES THOSE CLAIMS. ALTHOUGH I HAVE A VERY SERIOUS QUESTION ABOUT THAT, AND I'LL EXPLAIN TO THE COURT WHAT THAT IS.

WHAT DO I UNDERSTAND FROM MR. MEEDER'S DECLARATION -- I HAVE NOT SEEN THE AGREEMENT OBVIOUSLY, BUT WHAT I UNDERSTAND MR. MEEDER'S DECLARATION IS IS THAT TWO COMPANIES

WHICH ARE BLACK & DECKER ENTITIES ENTERED INTO AGREEMENTS -- YES, I GUESS IT'S MULTIPLE AGREEMENTS REALLY -- WITH VARIOUS LONDON CARRIERS AND OTHER INSURERS. AND THAT AS PART OF THOSE INSURANCE -- AS PART OF THAT AGREEMENT TO SETTLE A LAWSUIT, THEY EXTINGUISHED THE POLICIES HELD BY A SUBSIDIARY IN 1998 THAT WAS NOT A DISSOLVED CORPORATION AT THAT TIME. IT WAS AN ACTIVE CORPORATION, EMHART INDUSTRIES, INC., WHICH IS A DEFENDANT IN THIS CASE, ALLEGED TO BE A SUCCESSOR. AND THAT THEY EXTINGUISHED POLICIES THAT APPARENTLY THEY DIDN'T KNOW ABOUT, THAT THEY WERE IN DEAD STORAGE. ALL RIGHT. AND THAT THEY DIDN'T DISCOVER UNTIL 2002.

THE REASON I HAVE SOME SERIOUS DOUBTS ABOUT WHETHER OR NOT THAT AGREEMENT COULD EXTINGUISH THE LIABILITIES OF THE SUBSIDIARIES IS BECAUSE IN ORDER FOR THAT TO HAPPEN, BECAUSE E.I.I. WAS A SEPARATE CORPORATION AT THE TIME, E.I.I. WOULD HAVE TO ENTER INTO SOME TYPE OF AN AGREEMENT WITH BLACK & DECKER. AND THERE WOULD HAVE TO BE CONSIDERATION PAID TO EXTINGUISH THOSE POLICIES. BECAUSE THOSE POLICIES WERE HELD BY E.I.I., NOT BY BLACK & DECKER.

AND I HAVE SEEN ABSOLUTELY NOTHING THAT INDICATES THAT THERE IS ANY TYPE OF AGREEMENT BETWEEN THOSE TWO CORPORATIONS WHERE E.I.I. SURRENDERS ITS RIGHTS TO THOSE POLICIES TO THE BLACK & DECKER ENTITIES.

AND I'M QUITE CONFIDENT, ALTHOUGH I DON'T KNOW IT BECAUSE I HAVEN'T SEEN THE AGREEMENT, BUT I'M GOING TO BET,

THAT THERE'S A REP AND WARRANTY PROVISION IN THAT NOVEMBER 1998 AGREEMENT, WHERE THE BLACK & DECKER ENTITIES REPRESENTED THEY HAVE AUTHORITY TO RELINQUISH THOSE POLICIES, WHICH IS GOING TO PLAY DIRECTLY INTO THIS SUCCESSOR ISSUE THAT WE HAVE BEEN DEBATING.

SO, THERE ARE A WHOLE BUNCH OF DOCUMENTS THAT POTENTIALLY RELATE TO THIS SETTLEMENT THAT RELATE TO THE EXTINGUISHMENT OF POLICIES THAT ARE UNKNOWN, THAT ARE HELD BY A SEPARATE CORPORATION. NONE OF THOSE DOCUMENTS HAVE BEEN PRODUCED TO US.

THE COURT: SO, WHAT YOU'RE LOOKING FOR -- IN ADDITION TO THE 1998 SETTLEMENT AGREEMENT ITSELF, WHAT YOU'RE LOOKING FOR ARE CORRESPONDENCE THAT LED UP TO THE SETTLEMENT AGREEMENT, DRAFTS OF THE AGREEMENT.

WHAT ELSE?

MR. DINTZER: THE OTHER DOCUMENTS -- I'LL TELL YOU WHAT WE DID. AND, SO, THE COURT CAN LOOK AT THIS. IF YOU LOOK AT THE SUPPLEMENTAL FILING THAT WE FILED WITH THE COURT AFTER OUR ORIGINAL FILING, I'VE ATTACHED AS EXHIBIT -- LET ME MAKE SURE I HAVE THE RIGHT ONE HERE -- EXHIBIT B -- NO, I'M SORRY, IT'S EXHIBIT A, EXHIBIT A TO OUR SUPPLEMENTAL -- IT'S THE RESPONSE OF EMHART TO OUR FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS.

AFTER THIS ISSUE OF THE NOVEMBER 1998 AGREEMENT SURFACED IN MID-APRIL -- I THINK APRIL 11TH WE READ MR.

MEEDER'S DECLARATION -- WE PROMPTLY SERVED ON EMHART COMPREHENSIVE DISCOVERY, WHICH IS THE FOURTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS, SEEKING ALL OF THE DOCUMENTS THAT WOULD RELATE TO NOT ONLY THE CORRESPONDENCE, BUT ALSO, FOR EXAMPLE, ANY TYPE OF DILIGENCE THAT WAS UNDERTAKEN TO ASSESS WHETHER OR NOT -- OR TO ASSESS WHAT THE VALUE OF THOSE INSURANCE POLICIES THAT WERE BEING EXTINGUISHED BY THE AGREEMENT WOULD BE.

TYPICALLY WHAT HAPPENS WHEN YOU HAVE AN EQUITAS TYPE OF BUY-OUT IS THAT THE COMPANY THAT IS SELLING THE INSURANCE COMPANIES BACK TO THE LONDON CARRIERS WOULD GO ABOUT CONDUCTING SOME TYPE OF DILIGENCE TO EVALUATE WHAT LIABILITIES THOSE INSURANCE POLICIES POTENTIALLY COVER. BECAUSE THEY WANT TO MAXIMIZE THE VALUE OF THE BUY-OUT SO THAT THEY COULD COME BACK TO THE LONDON CARRIERS AND SAY, HEY, YOU KNOW, WE HAVE ALL THESE POTENTIAL LIABILITIES, AND WE HAVE ALL THESE SUBSIDIARIES AND FORMER SUBSIDIARIES AND THE LIKE, AND, SO, YOU KNOW, HERE IS THE PARADE OF HORRIBLES THAT COULD HIT US AND WE WANT DOLLARS, LOTS OF DOLLARS TO PUT IN OUR POCKETS TO ESSENTIALLY SELF-INSURE OURSELVES BECAUSE WE'RE NOW GOING TO EXTINGUISH YOU --

THE COURT: OKAY.

MR. DINTZER: I WANT ALL THOSE DOCUMENTS TOO. PARTICULARLY, IF THEY WERE TO IDENTIFY, FOR EXAMPLE, ANY LIABILITIES HAVING TO DO WITH THE FORMER KWIKSET OPERATIONS.

THE COURT: ALL RIGHT. SO, THE DOCUMENTS THAT YOU'RE SEEKING BEYOND THE NOVEMBER 1998 AGREEMENT ITSELF ARE THOSE DOCUMENTS DESCRIBED IN YOUR FOURTH SET OF REQUESTS FOR PRODUCTION?

MR. DINTZER: THEY ARE. AND I THINK THAT'S A VERY COMPREHENSIVE SET OF REQUESTS.

AND THEY'VE DENIED -- THEY'VE REFUSED TO PRODUCE ANY OF THOSE DOCUMENTS. ALL OF THE DOCUMENTS RELATING TO THE NOVEMBER 1998 AGREEMENT EMHART HAS TAKEN THE POSITION THEY WILL NOT PRODUCE.

THE COURT: LET ME ASK YOU THIS QUESTION.

WHAT DO YOU SAY IN RESPONSE TO EMHART'S CONTENTION THAT THIS SETTLEMENT AGREEMENT INVOLVING PRIMARILY BLACK & DECKER AND SOME INSURANCE COMPANIES REGARDING WHAT THEY CONTEND IS COVERAGE FOR A MARYLAND CONTAMINATION SITE HAS NO BEARING WHATSOEVER ON THE CITY OF RIALTO PROBLEM?

MR. DINTZER: LET ME ADDRESS THAT. IF IT WAS THE CASE THAT THE NOVEMBER 1998 AGREEMENT HAD NO BEARING ON THE ISSUES IN THIS LITIGATION, THEN, WHY IS IT THAT THE NOVEMBER 1998 AGREEMENT EXTINGUISHES EVERY SINGLE EXCESS INSURANCE POLICY THAT COVERED THE 160-ACRE PARCEL THAT THEY'VE IDENTIFIED IN THE RULE 26 DISCLOSURE.

THE FACT OF THE MATTER IS IS THAT IF THE 1998 AGREEMENT DOES, AS MR. MEEDER HAS SAID, EXTINGUISH ALL OF THESE INSURANCE POLICIES, AND MONIES WERE PAID TO BLACK &

DECKER OR EMHART -- IT'S NOT CLEAR TO ME EXACTLY WHERE ALL THE MONEY WENT. IT SEEMS TO ME SOME MONEY HAD TO HAVE GONE TO EMHART BECAUSE OTHERWISE HOW COULD BLACK & DECKER, A SEPARATE CORPORATION, EXTINGUISH THOSE INSURANCE POLICIES. THEY DIDN'T HOLD THEM. THERE HAD TO BE SOME CONSIDERATION PAID FOR THAT.

BUT IN ANY EVENT, THE NOVEMBER AGREEMENT EXTINGUISHES ALL OF THESE POLICIES. AND MONEY GOES INTO THE POCKETS OF THESE DEFENDANTS TO EXTINGUISH THOSE POLICIES.

THEN, THE RIGHTS OF THIRD-PARTY BENEFICIARIES, SUCH AS THE CITY OF RIALTO, GOODRICH, AND THE OTHER DEFENDANTS IN THIS CASE WHO HAVE ALL DEEMED TO HAVE CROSS-CLAIMED AGAINST EMHART, ALL OF THEIR RIGHTS WILL HAVE BEEN EXTINGUISHED.

AND ONE OF THE ISSUES THAT THE COURT WILL ULTIMATELY BE ADDRESSING AS WE MOVE FORWARD WITH THIS CASE, ASSUMING THE SUCCESSOR DEFENSE CONTINUES TO BE ASSERTED BY BLACK & DECKER AND ITS SUBSIDIARIES, WHICH I ASSUME WILL BE THE CASE, IS WHETHER OR NOT THE BLACK & DECKER ENTITIES, EMHART, YOU KNOW, KWIKSET CORP., WHETHER THEY AS A MATTER OF THEIR BUSINESS CONTINUED TO OPERATE THE LIABILITIES AS IT WERE OF THE ORIGINAL KWIKSET LOCKS, INC. AND WEST COAST LOADING CORPORATION.

AND IF, IN FACT, THEY DID, IF, IN FACT, THEY HELD THE INSURANCE ASSETS OF THOSE COMPANIES, IF THEY, IN FACT, EXTINGUISHED THOSE INSURANCE ASSETS AND PUT MONEY IN THEIR

POCKET THAT WAS PRESUMABLY TO BE FOR SELF-INSURANCE TO EXTINGUISH OR SATISFY CLAIMS OF THIRD PARTIES, SUCH AS GOODRICH, THE CITY, AND OTHER PARTIES, THEN, IT IS TERRIFIC EVIDENCE OF SUCCESSOR LIABILITY.

BECAUSE BY THEIR OWN ACTIONS THEY HAVE ACCEPTED THE FACT THAT THEY ARE GOING TO HAVE TO PAY OUT OF THEIR OWN RESOURCES TO COVER LIABILITIES THAT WOULD HAVE OTHERWISE BEEN COVERED BY THE LONDON CARRIERS THAT HAVE SIGNED THIS AGREEMENT.

THE COURT: OKAY.

(TAPE CHANGE FROM TAPE A TO TAPE B.)

MR. MEEDER: -- OF THOSE TWO ENTITIES, AND THOSE TWO ENTITIES WERE STRANGERS BY AT LEAST 31 YEARS, EVENTS OF SUCCESSORSHIP WHICH ARE AT ISSUE THAT ARE OCCURRED IN 1958 IN THIS CASE BETWEEN KWIKSET LOCKS, INC. AND ULTIMATELY EMHART.

THE NOTION THAT BLACK & DECKER, A PARENT OF EMHART INDUSTRIES, INC. ONCE REMOVED -- BECAUSE IT'S A WHOLLY OWNED SUBSIDIARY OR CORPORATION THAT BLACK & DECKER OWNS -- IN 1998 SETTLES A LAWSUIT THAT INVOLVED INSURANCE POLICIES THAT WERE NOT DISCOVERED UNTIL 2002 IN COLD STORAGE BECAUSE -- AND THEY RELEASED THEM -- SOMEHOW BEARS ON SUCCESSOR LIABILITY EVENTS THAT OCCURRED BACK IN 1958 WE THINK IS WITHOUT MERIT.

FURTHER, THE NOTION ALLUDED TO BY MR. DINTZER --

THE COURT: MR. MEEDER -- MR. MEEDER, CAN I ASK YOU A QUESTION?

MR. MEEDER: YES.

THE COURT: I DON'T THINK IT'S ACTUALLY BEFORE ME TO MAKE A DETERMINATION ON SUCCESSOR LIABILITY --

MR. MEEDER: OH, IT'S NOT, YOUR HONOR.

THE COURT: -- OR THE STRENGTH OF GOODRICH'S OR THE CITY OF RIALTO'S CONTENTIONS REGARDING SUCCESSOR LIABILITY.

IT IS BEFORE ME TO LOOK AT THE DOCUMENT REQUESTS AND DETERMINE WHETHER OR NOT, YOU KNOW, WITHIN THE BROAD DEFINITION OF RELEVANCE THE THINGS THAT GOODRICH AND CITY OF RIALTO ARE LOOKING FOR MIGHT BE RELEVANT TO THAT CLAIM.

SO, I UNDERSTAND YOUR POSITION IS THAT IT'S ATTENUATED, BUT WHY DON'T THEY HAVE THE RIGHT TO LOOK AT THEM?

MR. MEEDER: YOUR HONOR --

MS. MACEDO: YOUR HONOR, IF I COULD JUMP IN. JULIE MACEDO FOR THE CITY OF RIALTO.

THE COURT: IT'S ACTUALLY FOR MR. MEEDER, AND THEN I'LL LET YOU RESPOND.

MS. MACEDO: OKAY.

MR. MEEDER: THEY DON'T HAVE A RIGHT TO LOOK AT THEM, WE BELIEVE, BECAUSE THE DOCUMENTS ARE IN NO WAY RELEVANT TO ANY CLAIM THAT IS ACTIONABLE IN THIS CASE.

NOR DO WE BELIEVE THAT IT COULD LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE.

AND THE REASON THAT'S THE CASE IS BECAUSE THE

EVENTS AT ISSUE, WHICH IS THE CORE OF THE DISPUTE HERE ABOUT SUCCESSOR LIABILITY, OCCURRED IN 1958.

AND THE 1998 -- A 40-YEARS-LATER DOCUMENT, WHICH SETTLES A LAWSUIT BY A PARENT COMPANY, AND THE DOCUMENTS THAT RELATE TO THAT SETTLEMENT -- AND I'VE MADE THE OFFER OF PROOF. AND THIS IS WHERE WE DO IT BY DECLARATION BECAUSE WE CAN DO IT BY DECLARATION. AND IT'S IN MY OFFER OF PROOF AND IT IS A DECLARATION -- WHERE IT IS UNDISPUTED THAT THE SETTLEMENT THAT WENT FORWARD IN 1998 IN NO WAY -- IT DEALT WITH THE INSURANCE POLICIES THAT WERE DISCOVERED IN 2002 IN THE CATEGORY OF UNKNOWN. AND SO NO ONE KNEW ABOUT THEM WHEN THE SETTLEMENT WAS ENTERED INTO.

AND THE NOTION THAT SOMEHOW SOMETHING THAT HAPPENS 40 YEARS LATER BEARS ON AN ISSUE THAT OCCURRED IN 1958 WHEN WE HAVE A CORPORATION WHO ENGAGED IN THAT ACTIVITY 40 YEARS LATER, WHICH WAS A STRANGER TO THAT PROCEEDING FOR AT LEAST 31 YEARS. IN OTHER WORDS, BLACK & DECKER, AND IT'S UNDISPUTED, DID NOT ACQUIRE EMHART UNTIL 1989.

AND, SO, YOUR HONOR, IT'S LIKE ASKING -- AND I THINK IT'S ALMOST NO DIFFERENT THAN ASKING FOR ALL OF THE NOTES AND THE EMAILS SENT YESTERDAY, OR IN 1998, BY THE EMPLOYEES OF BLACK & DECKER U.S., INC. TO EACH OTHER. HOW WOULD THOSE BEAR ON THE ISSUES IN THIS CASE. THEY DO NOT BECAUSE THERE HAS TO BE MORE IN THE TERMS OF THE REQUEST.

AND THE NOTION THAT EVERYTHING THAT A PARENT COMPANY THEREAFTER DOES, WHETHER IT'S TO SETTLE A LAWSUIT ABOUT INSURANCE COVERAGE INVOLVING A SITE IN MARYLAND 40 YEARS AFTER EVENTS, SOMEHOW CONTAINS POTENTIAL DISCOVERABLE INFORMATION ABOUT THOSE EVENTS I THINK IS NOT WELL FOUNDED.

AND THE NOTION -- WE ARE NOT HERE LITIGATING ANY THIRD-PARTY BENEFICIARY RIGHTS TO ANY INSURANCE POLICIES OR RIGHTS TO SUE CARRIERS. AS MR. DINTZER, I'M SURE IS AWARE, THE LAW WITH REGARD TO INSURANCE COVERAGE IS THAT YOU'VE GOT TO HAVE A JUDGEMENT ENTERED. THEN, YOU CAN DECIDE IF YOU'RE A THIRD-PARTY BENEFICIARY TO THAT POLICY TO CHASE THE CARRIER WITH REGARD TO THAT.

SO, THE ISSUE OF WHETHER OR NOT THERE'S SOME THIRD-PARTY BENEFICIARY RIGHT, MR. DINTZER HAS ALLUDED TO HERE TODAY, IS NOT IN THIS CASE WHICH INVOLVES THE QUESTION OF, ONE, WHETHER WEST COAST LOADING DID SOMETHING WHEN IT WAS THERE IN THE '50S; AND, NUMBER TWO, WHETHER AFTER IT DID THAT EMHART INDUSTRIES WAS A SUCCESSOR TO THOSE LIABILITIES IN SOME WAY.

AND IT CERTAINLY HAS NOTHING TO DO WITH THE NOTION THAT SOME 31 YEARS LATER WHEN THE CORPORATION PURCHASED EMHART INDUSTRIES, INC., AFTER K.L.I. HAD BEEN DISSOLVED IN 1958, THAT THE THINGS THAT THAT CORPORATION THEREAFTER DOES, WITHOUT MORE SPECIFICITY, ARE ALL DISCOVERABLE.

BECAUSE A LAWYER WANTS TO ARGUE THAT THEY MIGHT

SHOW SOMETHING IS, I THINK, INSUFFICIENT TO COMPEL THE PRODUCTION OF DOCUMENTS ANYMORE THAN IT WOULD BE INSUFFICIENT TO COMPEL THE PRODUCTION OF EVERY EMAIL THAT WAS SENT IN 1998 BY THE EMPLOYEES OF BLACK & DECKER U.S., INC. TO THE OTHER EMPLOYEES OF THAT CORPORATION.

REMEMBER, BLACK & DECKER U.S., INC., YOUR HONOR, IS A TOOL MANUFACTURING COMPANY, WHICH IS OWNED BY ANOTHER BLACK & DECKER ENTITY, AND HAS NOTHING TO DO WITH BLACK & DECKER U.S., INC. DOESN'T EVEN OWN EMHART. SOME OTHER BLACK & DECKER ENTITY OWNS THAT.

AND, SO, WHAT WE'RE SEEING IS IS THAT THE RELEVANCE OF THESE ISSUES DEALT WITH -- AND THIS IS, I THINK, PART OF THE REASON WE'RE HERE TODAY -- IN THE ABSTRACT WITHOUT IT BEING CONCRETE IN TERMS OF THE FOURTH PRODUCTION OF DOCUMENTS AND GENERALIZED NOTIONS OF I NEED THIS BECAUSE IT WILL PROVE THIS ARE INSUFFICIENT TO ALLOW WHAT WE BELIEVE IS A GENUINE FISHING EXPEDITION AT CORPORATIONS AND WITH REGARD TO EVENTS THAT HAVE NOTHING WHATSOEVER TO DO WITH THE ISSUES IN THIS CASE.

WHETHER THERE'S INSURANCE COVERAGE OR NOT IS NOT BEING LITIGATED HERE, NOR IS IT RELEVANT TO THIS CASE.

NOW, IS THERE A CONTENTION THAT THERE MIGHT BE SOMETHING IN THIS -- IN THE COURSE OF THE SETTLEMENT OR THE RESOLUTION OF THIS 1998 AGREEMENT THAT COULD BEAR ON SUCCESSOR LIABILITY. THERE'S AN ASSERTION.

BUT THE FACT OF THE MATTER IS, YOUR HONOR, AND THIS IS WHERE WE GO BACK TO THE EMAILS TO THE EMPLOYEES, SOMEONE COULD MAKE THE ASSERTION, BUT WOULD THE COURT ORDER ALL EMAILS TO EMPLOYEES AT BLACK & DECKER U.S., INC. TO BE PRODUCED IF THEY WERE GENERATED IN 1998 OR ANYTIME. NO. THERE WOULD HAVE TO BE A MORE CONCRETE PROOF.

NOW, IF SOMEBODY ASKS ARE THERE EMAILS TALKING ABOUT K.L.I. OR W.C.L.C., A SUCCESSOR LIABILITY, AMONG THE EMPLOYEES AT BLACK & DECKER U.S., INC., THAT MIGHT BE A LEGITIMATE REQUEST. BUT THAT'S NOT THE REQUEST WE'RE FOCUSING ON.

WHAT WE'RE FOCUSING ON IS AN ACROSS-THE-BOARD REQUEST FOR ALL DOCUMENTS THAT RELATE TO ALL INSURANCE POLICIES REGARDLESS OF WHAT THEY INVOLVE OR ENTAIL AND WITHOUT REGARD TO THE ISSUES IN THIS CASE.

THE COURT: OKAY. IT WAS --

MS. MACEDO: ARE YOU ADDRESSING ME, JULIE MACEDO?

THE COURT: YES, MACEDO. I'M SORRY.

MS. MACEDO: I JUST WANTED TO RESPOND THAT, OBVIOUSLY AS A REPRESENTATIVE OF THE CITIZENS OF THE CITY OF RIALTO, WE HAVE NO DESIRE TO SEEK DOCUMENTS THAT AREN'T RELEVANT TO THIS LITIGATION.

AND GIVEN THE BROAD STANDARD UNDER THE FEDERAL SYSTEM OF REASONABLY CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE, WE ABSOLUTELY ARE ENTITLED TO THE

DOCUMENTS THAT NOT ONLY GOODRICH BUT ALSO THE CITY OF RIALTO HAVE REQUESTED.

AND MR. MEEDER'S CLAIM THAT WE'RE MAKING RANK SPECULATIONS IS IN SOME REGARDS TRUE BECAUSE THEY WON'T PRODUCE THE DOCUMENTS. AND AS SOON AS THEY DO PRODUCE THE DOCUMENTS, WE WILL, I BELIEVE, BE PROVEN CORRECT THAT THEY ARE RELEVANT TOWARD THE CORPORATE SUCCESSION ISSUE.

WE'VE BEEN REQUESTING THESE DOCUMENTS FOR SEVERAL MONTHS NOW. AND GIVEN THE WAY THAT THEY HAVE BEEN TREATED, WE THINK THEY'RE NOT ONLY RELEVANT, BUT THAT THEY WILL SUPPORT OUR POSITION.

THE COURT: MS. -- IS IT MACEDO?

MS. MACEDO: IT IS.

THE COURT: PERHAPS YOU CAN ARTICULATE FOR ME WHY YOU BELIEVE THAT THESE DOCUMENTS ARE GOING TO SHOW SUCCESSOR LIABILITY ON BEHALF OF EMHART.

MS. MACEDO: WELL, I CONCUR IN MR. DINTZER'S COMMENTS EARLIER. AND FOR DEPOSITIONS THAT HAVE BEEN GOING ON REGARDING EMPLOYEES OF EMHART-RELATED ENTITIES DATING BACK FROM THE '50S, MR. MEEDER'S CLAIM THAT BECAUSE 30 YEARS HAS PAST, IS JUST NOT WELL TAKEN.

NOT ONLY ARE THERE WITNESSES THAT HAVE INFORMATION REGARDING 30 YEARS AGO, THIS 1998 AGREEMENT OBVIOUSLY ENTERED INTO 10 YEARS AGO, HAS INFORMATION ABOUT THE CORPORATE SUCCESSION OF CERTAIN COMPANIES THAT REMAIN VIABLE AND HAVE

ASSETS AT THIS PRESENT TIME.

THE COURT: WHY DO YOU BELIEVE THAT THE AGREEMENT HAS INFORMATION ABOUT THE CORPORATE SUCCESSION? I MEAN, YOU HAVEN'T SEEN IT YET.

MS. MACEDO: WE HAVEN'T SEEN IT YET. BUT WORK DONE BY ANOTHER MEMBER OF MY FIRM, AMY MATTHEW, WHICH WAS SENT TO MR. MEEDER AND THEN FORWARDED TO MILES & STOCKBRIDGE, WHICH IS INSURANCE COVERAGE COUNSEL FOR SOME OF THE EMHART ENTITIES, INDICATED AN INSURANCE CHAIN MR. MEEDER CLAIMS WAS NEW TO HIM AND FORCED HIM TO LOOK INTO THE ISSUE.

AND, AGAIN, WE COME BACK TO THIS AGREEMENT THAT WE HAVE NOT SEEN YET, AND THAT WE NEED TO SEE.

THE COURT: OKAY. LET ME ASK MR. DINTZER AGAIN. YOU KNOW --

MR. DINTZER: YOUR HONOR --

THE COURT: -- YOU'RE LIVING WITH THIS LITIGATION SO YOUR APPRECIATION OF THE RELEVANCE OF THIS AGREEMENT TO YOUR SUCCESSOR LIABILITY CLAIMS IS PROBABLY GREATER THAN MINE.

SO, I'M GOING TO ASK YOU AGAIN, EXPLAIN TO ME WHY IT IS YOU THINK THAT THE RELATED DOCUMENTS, NOT THE AGREEMENT ITSELF, BUT THE RELATED DOCUMENTS ARE GOING TO PROVIDE RELEVANT EVIDENCE PROBATIVE OF THE SUCCESSOR LIABILITY ISSUE.

MR. DINTZER: OKAY. LET ME START OFF BY SAYING THAT MR. MEEDER ARGUES THAT THERE IS THIS TIME GAP THAT

EXISTS BETWEEN 1958 WHEN K.L.I. DISSOLVED AND 1958 WHEN THIS AGREEMENT WAS NEGOTIATED.

THE FACT THAT THERE'S A TIME GAP BETWEEN THE DOCUMENTS THAT WE ARE SEEKING BY THIS DISCOVERY AND THE DISSOLUTION OF THAT CORPORATION IS OF NO MOMENT WHEN YOU ARE LOOKING AT THE QUESTION OF SUCCESSOR LIABILITY.

AND LET ME GIVE YOU AN EXAMPLE. IF YOU LOOK AT DOCUMENTS THAT HAVE BEEN PRODUCED -- I MEAN, CURRENT DOCUMENTS, DOCUMENTS, FOR EXAMPLE, OFF A WEBSITE. OKAY. THAT CURRENT -- THEY WILL TALK ABOUT THE FACT THAT K.L.I.'S DIVISION OF KWIKSET LOCKS IS 50 YEARS OLD AND ENJOYS, YOU KNOW, 50 YEARS OF IT BEING IN THE LOCK BUSINESS. OKAY.

AND, SO, THE FACT OF THE MATTER IS IS THAT WHEN YOU'RE LOOKING AT THE DE FACTO MERGER DOCTRINE WHAT YOU'RE LOOKING AT, AMONG OTHER FACTORS -- AND YOU'RE LOOKING AT A BUNCH OF THINGS THAT HAPPENED IN 1958 UNDOUBTEDLY -- WHAT YOU'RE ALSO LOOKING AT, AND THIS IS VERY IMPORTANT, DID THE BUSINESS, THAT IS E.I.I., CARRY ON THE OPERATIONS OF KWIKSET LOCKS, AND DID IT -- DID IT ACCEPT THE LIABILITIES OF KWIKSET LOCKS AS IT CONTINUED THOSE OPERATIONS ON A DAY-TO-DAY BASIS GOING FORWARD. ALL RIGHT.

AND YOU LOOK AT THAT FOR THE ENTIRE PERIOD OF TIME AFTERWARD. DID IT BEHAVE IN A WAY AS A SUCCESSOR. DID IT TOUT ITSELF AS BEING 50 YEARS OF MAKING LOCKSETS. WELL, THOSE DOCUMENTS AREN'T GOING TO SHOW UP UNTIL THE YEAR 1998

OR WHATEVER. IT'S GOING TO BE LATER THAN THAT.

IN THIS CASE WE'RE NOT GOING AFTER DOCUMENTS RELATING TO A SETTLEMENT OF A LAWSUIT INVOLVING A MARYLAND SITE WITH BLACK & DECKER'S INSURANCE COMPANIES GRATUITOUSLY. WHY WOULD WE WASTE OUR TIME WITH THAT.

THE REASON THAT WE WANT THE DOCUMENTS IS BECAUSE MR. MEEDER HAS COME FORWARD IN HIS APRIL 11TH DECLARATION AND IN HIS OFFER OF PROOF IN RESPONSE TO THE MOTION, AND HE HAS SAID CERTAIN THINGS ABOUT THIS AGREEMENT, SOME OF WHICH HAVE RAISED SOME QUESTIONS IN OUR MINDS. BUT ENOUGH TO TELL US THAT THAT NOVEMBER 1998 AGREEMENT EXTINGUISHED INSURANCE POLICIES THAT GO BACK TO THE 1950S. AND THEY ARE SPECIFICALLY IDENTIFIED AS POLICIES THAT MAY BE -- MAY BE AVAILABLE TO THIRD-PARTY BENEFICIARIES THAT OBTAIN A JUDGMENT AGAINST EMHART CORPORATION.

THE COURT: WHERE IN THAT RECORD IS THAT?

MR. DINTZER: THAT IS ON -- THAT'S EXHIBIT R TO THE MOVING PAPERS. IT IS THE SUPPLEMENTAL TO NUMBER 1 -- SUPPLEMENTAL NUMBER 1 TO INITIAL DISCLOSURE OF DEFENDANT EMHART INDUSTRIES.

AND THE FIRST ONE AGAIN IS JUST A C.G.L. POLICY FOR A THOUSAND TO $10,000. THAT ONE IS NOT REALLY OF MUCH INTEREST. BUT THE OTHERS -- ALTHOUGH I HAVE A QUESTION ABOUT THAT ONE ACTUALLY TOO. BUT 2 THROUGH 9 --

THE COURT: SO, 2 THROUGH 9 WERE EXTINGUISHED BY

THE SETTLEMENT AGREEMENT IN 1998?

MR. DINTZER: RIGHT. SO, THESE ARE INSURANCE POLICIES THAT WERE ISSUED IN 1955, 1956, 1958. OKAY. THESE ARE POLICIES THAT GO BACK -- ALL THE WAY BACK THEN. SO, THEY HAVE ALL THESE POLICIES THAT ARE SITTING THERE.

AND HERE'S THE INTERESTING PART, YOUR HONOR, BECAUSE IT'S NOT CLEAR, BUT IT MAY VERY WELL BE THE CASE, ALL RIGHT, THAT THESE POLICIES HAVE NO AGGREGATE BECAUSE OF THE TIME THAT THEY WERE WRITTEN. NO AGGREGATE AT ALL.

MS. MACEDO: AND IF I COULD JUST ADD, YOUR HONOR, THE FACT THAT BLACK & DECKER DISCHARGED THE RELEVANT POLICIES, WHICH HAS BEEN ADMITTED BY MR. MEEDER, IS AN ADMISSION THAT THE CONTRACTING PARTIES HAD SUCH AUTHORITY TO DO SO. OTHERWISE, THE POLICIES WOULD STILL BE HELD BY K.L.I. OR EMHART.

MR. DINTZER: SO, LET ME FINISH. SO, YOU'RE LOOKING AT EXCESS INSURANCE POLICIES THAT COULD HAVE ENORMOUS VALUE AND POSE A SUBSTANTIAL RISK TO THE EQUITAS TRUST.

AND, SO, WHAT HAPPENS. 1998 COMES AROUND, AND THEY'RE SETTLING THIS CASE I GUESS IN MARYLAND ON THIS MARYLAND SITE. AND IT'S JUST TYPICAL WITH THE LONDON CARRIERS. WHAT THEY WANT TO DO IS THEY WANT TO EXTINGUISH ALL OF THEIR LIABILITIES UNDER ALL OF THE POLICIES OF THE COMPANIES. BECAUSE OF THE FACT THAT THE TRUST EXISTS AND, YOU KNOW, THERE'S SOME CLAIMS NOW THAT AT SOME POINT THE

TRUST MIGHT NOT HAVE MONEY. SO, THEY COME TO THESE COMPANIES -- IT IS ROUTINE -- AND THEY SAY, WE WANT TO CASH OUT OF EVERYTHING.

AND, SO, WHAT HAPPENS IS IS THAT THESE COMPANIES, THEY DO ARCHAEOLOGY, THEY GO OUT AND HIRE CONSULTANTS. AND THEY IDENTIFY ANY POTENTIAL LIABILITIES THAT EXIST, THAT THEY ARE GOING TO EXTINGUISH. I MEAN, A SOPHISTICATED COMPANY LIKE BLACK & DECKER IS NOT GOING TO SIGN AN AGREEMENT WITH 33 INSURANCE CARRIERS THAT COULD EXTINGUISH LITERALLY MILLIONS AND MILLIONS AND MILLIONS DOLLARS' WORTH OF INSURANCE COVERAGE. ALL RIGHT. UNLESS IT'S GOING TO DO SOME DILIGENCE ABOUT THAT.

AND ONE OF TWO THINGS IS TRUE. I DON'T KNOW YET WHICH IS TRUE, BUT WHAT I DO KNOW IS THAT EMHART APPARENTLY IS NOT IN AGREEMENT TO THIS 1998 AGREEMENT. AT LEAST, THAT'S WHAT MR. MEEDER SAYS.

HE ALSO SAYS THAT THEY DIDN'T KNOW ABOUT THESE INSURANCE POLICIES. SO, IF EMHART IS NOT A PARTY TO THE INSURANCE AGREEMENT, AND BLACK & DECKER DIDN'T KNOW ABOUT THE POLICIES WHEN THEY WERE EXTINGUISHED, HOW WERE THEY EXTINGUISHED.

UNLESS THERE'S SOME TYPE OF AN AGREEMENT BETWEEN EMHART AND BLACK & DECKER. AND IN ORDER FOR THERE TO BE AN AGREEMENT, LAST TIME I CHECKED UNDER THE CONTRACT LAWS IN THE STATES IN THIS COUNTRY, THERE HAD TO BE SOME CONSIDERATION

PAID FOR THAT.

AND ALL OF THOSE -- ALL THE PAPER TRAILS TO THAT POINT WHERE THAT SIGNATURE IS MADE BY BLACK & DECKER ON THAT NOVEMBER 1998 AGREEMENT, ALL OF THAT DOCUMENTATION IS RELEVANT TO THE SUCCESSOR LIABILITY.

THE COURT: MR. MEEDER --

MR. DINTZER: -- IT'S EITHER RELEVANT TO THE SUCCESSOR LIABILITY OF EMHART AND BLACK & DECKER, OR -- OR WHAT IT ESTABLISHES IS IS THAT THOSE POLICIES ARE ACTUALLY NOT EXTINGUISHED. BECAUSE BLACK & DECKER NEVER HAD THE AUTHORITY TO EXTINGUISH THOSE POLICIES. AND IF THAT'S THE CASE, THEN, THOSE POLICIES ARE AVAILABLE TO THIRD-PARTY BENEFICIARIES.

NOW, MR. MEEDER MAKES THE POINT, OH, WELL, WE'RE NOT -- HIS WORDS WERE WE'RE NOT HERE, I THINK, TO LITIGATE THE QUESTION OF WHETHER THERE'S INSURANCE COVERAGE.

THAT IS NOT TRUE. RULE 26(D) SPECIFICALLY SAYS THAT WE ARE HERE TO LITIGATE WHETHER OR NOT THERE'S INSURANCE COVERAGE.

IN FACT, ONE OF THE INITIAL DISCLOSURES THAT YOU HAVE TO MAKE IS YOU'VE GOT TO IDENTIFY ALL THE INSURANCE POLICIES. AND THE POINT OF THAT IS SO THAT THE OTHER PARTIES HAVE AN UNDERSTANDING AS TO WHAT INSURANCE IS AVAILABLE.

AND WE, AS DID, BY THE WAY, EMHART, OF COURSE, ASKED FOR ALL THE INSURANCE POLICIES. AND WE ASKED FOR ALL

THE SETTLEMENTS AND CLAIMS SO WE COULD ASSESS WHAT THE VALUES OF THOSE POLICIES ARE.

THE COURT: OKAY. THANK YOU, MR. DINTZER.

MR. MEEDER, I HAVE A QUESTION FOR YOU.

MR. MEEDER: YES.

THE COURT: DO YOU AGREE WITH MR. DINTZER'S STATEMENT THAT THE POLICIES IDENTIFIED IN 2 THROUGH 9 OF THE RULE 26 DISCLOSURES WERE EXTINGUISHED BY THE 1998 AGREEMENT?

MR. MEEDER: I BELIEVE THEY WERE, YOUR HONOR, YES.

THE COURT: OKAY.

MR. MEEDER: BUT LET ME GO ON WITH REGARD TO THE DISCLOSURE STATEMENT. AND IT'S SET FORTH AT PAGE 20 OF OUR RESPONSIVE -- OUR PORTION OF THE JOINT STATEMENT.

WE MADE IT REAL CLEAR BY DISCLOSING THE EXISTENCE OF THESE INSURANCE POLICIES -- BECAUSE THAT'S ALL WE HAD COPIES OF -- WE WERE NOT MAKING ANY REPRESENTATION WHATSOEVER AS TO WHETHER OR NOT THERE WAS OR WASN'T COVERAGE.

AND I WANT TO GO BACK TO YOUR QUESTION TO THE COUNSEL FOR THE CITY OF RIALTO AS WELL AS COUNSEL FOR GOODRICH, WHICH WAS, WHAT EVIDENCE -- OR WHAT IS IT -- EXPLAIN TO ME HOW THERE'S A SUCCESSOR LIABILITY PROOF BURIED IN THESE RELATED DOCUMENTS.

NEITHER OF THEM I THINK REALLY ANSWERED THAT QUESTION. AND WHAT THEY QUICKLY WENT TO WAS, OF COURSE, THERE'S INSURANCE COVERAGE, AND THERE'S SOME GREAT BENEFIT

AND WINDFALL POTENTIAL FOR THE CASE.

BUT I BELIEVE, YOUR HONOR, THAT RULE 26(D) MAKES IT CRYSTAL CLEAR THAT WE HAVE AN OBLIGATION TO DISCLOSE ANY POLICY THAT MIGHT PROVIDE COVERAGE. AND THAT THEREAFTER THAT OBLIGATION -- THERE'S A CASE CITED IN OUR PAPERS AND OUR PART OF THE JOINT STATEMENT. THEREAFTER, THE OBLIGATION WITH REGARD TO INSURANCE POLICIES CEASES BECAUSE YOU ARE NOT LITIGATING COVERAGE IN THIS CASE ^ WHERE THE CASE WITH THE POLICY IS RELEVANT.

THE EXCEPTION TO THAT RULE THAT'S PROVIDED IS UNLESS YOU CAN DEMONSTRATE THAT THERE'S SOMETHING IN THE POLICY OR THE RELATED DOCUMENTS THAT SOMEHOW RELATES TO OR IS RELEVANT TO THE ISSUES IN THE CASE TO WHICH THAT COVERAGE MIGHT HELP PROVIDE -- OR A JUDGMENT.

AND IF A PARTY WHO GETS A POLICY WANTS TO LITIGATE COVERAGE, THEY CAN GO AHEAD AND DO THAT, BUT THEY CAN'T DO ANY LAWSUIT WITH REGARD TO COVERAGE AND ALL THE DISCOVERY THAT WOULD GO WITH THAT UNTIL THEY OBTAINED A JUDGEMENT IN THE UNDERLYING CASE.

THE COURT: I DON'T DISAGREE WITH YOU --

MR. MEEDER: -- NO THIRD-PARTY BENEFICIARY RIGHT IN CALIFORNIA TO PROCEED PRIOR TO THAT TIME.

AND OUR POINT IS IS THAT WE STILL HAVE NOT HAD AN ANSWER TO THE QUESTION OF HOW -- SETTING INSURANCE COVERAGE ASIDE -- HOW SOMEHOW ALL OF THE DOCUMENTS -- AND I'LL GO BACK

TO MY EXAMPLE WITH THE EMAILS TO ALL EMPLOYEES -- SOMEHOW HAS BEARING ON THE ISSUES IN THIS CASE.

AND THE OTHER THING THAT I THINK WE STRESSED IN OUR JOINT STATEMENT WAS THAT WE ARE STILL ACCORDED, AS WELL AS COUNSEL, WAIVERING UNDER THE REALITY THAT NOBODY HAS LOOKED OR SEEN OR HAD A CHANCE TO EVALUATE THE AGREEMENT.

AND IT SEEMS TO US, AND WE'VE URGED THIS UPON THE COURT FROM THE BEGINNING, THAT NO ONE CAN MAKE A FAIR AND JUST EVALUATION WHETHER DOCUMENTS RELATE TO -- THE DOCUMENTS THAT RELATE TO ANOTHER DOCUMENT ARE SOMEHOW DISCOVERABLE AND RELEVANT IN A PROCEEDING UNTIL EVERYONE HAS HAD A CHANCE TO EXAMINE THE DOCUMENT AT ISSUE. AND WE HAVE BEEN PRESSURED AND FORCED IN THIS MOTION TO ADDRESS THESE ISSUES AS BEST WE CAN WITH THE HANDICAP OF NOT BEING ABLE TO POINT MORE TO THE DOCUMENT.

AND I THINK, YOUR HONOR, WE HAVE MADE A CLEAR DEMONSTRATION, WITHOUT EVEN GETTING INTO THE DOCUMENT, BASED ON WHAT WAS THE OFFER OF PROOF AS WELL AS THE CORPORATE HISTORY. BECAUSE THE CORPORATE HISTORY AND THE TIME IS HIGHLY RELEVANT TO THE QUESTION OF WHETHER OR NOT -- WHETHER SOME EVENT THAT OCCURS 50 YEARS LATER IS DISCOVERABLE. AND THE ANSWER IS IT MIGHT BE. BUT YOU HAVE TO DEMONSTRATE HOW.

AND MY EXAMPLE OF THE EMAILS IS THE BEST ONE I CAN COME UP WITH TO DEMONSTRATE THAT YOU CAN'T JUST ASK FOR EMAILS. IF YOU ASKED FOR EMAILS THAT DISCUSSED SUCCESSOR

LIABILITY OR MENTIONED KWIKSET LOCKS, INC., OR WHATEVER, THAT MIGHT HAVE A BEARING. BUT IT DOES NOT HERE.

AND, FINALLY, AND THIS IS IMPORTANT, EMHART INDUSTRIES INC. DISSOLVED IN THE YEAR 2002. AND UNDER CONNECTICUT LAW, THE ASSETS OF EMHART INDUSTRIES INC. THAT EXISTED AT THE TIME OF DISSOLUTION HAVE TO BE HELD IN SOME WAY TO MEET ANY THREATENED OR PENDING CLAIMS AGAINST IT.

THERE HAS BEEN SET ASIDE $716 MILLION TO COVER THE CLAIMS IN THIS LAWSUIT AND WHATEVER OTHER CLAIMS MIGHT BE PURSUED.

THE ISSUE IN THIS CASE IS NOT THE SUCCESSOR LIABILITY BETWEEN EMHART AND BLACK & DECKER, THE PARENT OF EMHART. THE ISSUE IN THIS CASE IS WHETHER OR NOT EVENTS IN 1958 BETWEEN KWIKSET LOCKS INC. AND WHAT IS NOW EMHART WAS MORE IN FACT A DE FACTO MERGER.

AND A BLANKET DEMAND FOR ALL THE EMAILS IN THE WORLD OR ALL THE INSURANCE-RELATED DOCUMENTS IN THE WORLD IS NOT A PROPER REQUEST UNLESS IT'S MORE SPECIFICALLY NARROWED AND FOCUSED ON THE ISSUES AT HAND.

AND WHEN WE GET INTO THE SUBSTANCE OF THE FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS, AND WE CAN ACTUALLY DEMONSTRATE WITH THE AGREEMENT ITSELF WHAT WE'RE TALKING ABOUT, WE WILL FIND THAT THERE'S NO REFERENCE, THERE'S NO DISCUSSION OF.

AND I WILL REPRESENT TO THE COURT THAT W.C.L.'S

OPERATIONS IN THE 1950S WITH REGARD TO A MUNITIONS BUSINESS CEASED TO EXIST -- AND MR. DINTZER AND HIS CLIENT KNOW THIS -- AT LEAST A YEAR BEFORE THE DISSOLUTION OF K.L.I. AND THE ASSERTED NOW DE FACTO MERGER IN 1958.

SO, THERE'S NO CONTINUITY OF BUSINESS ENTERPRISE HERE EVER TO TRACE ALONG A TIME LINE BECAUSE WE'RE TALKING ABOUT A MUNITIONS BUSINESS THAT CEASED TO EXIST IN 1957. AND THAT PROPERTY AND ITS FACILITIES WERE SOLD TO MR. DINTZER'S CLIENT WHO THEREAFTER ENGAGED IN MUNITIONS BUSINESS AND THOSE KINDS OF THINGS.

MR. DINTZER: YOUR HONOR, I NEED TO --

MR. MEEDER: ALL RIGHT.

MR. DINTZER: -- CLARIFY ONE POINT ON THE RECORD BECAUSE I DON'T KNOW THAT -- MR. MEEDER MAY HAVE MISSPOKE.

AS I UNDERSTAND THE TIME LINE LOOKING AT THE HISTORICAL DOCUMENTS WHAT HAPPENED IS IS THAT THERE WAS A TRADE OF SHARES BETWEEN KWIKSET LOCKS -- IN OTHER WORDS, ITS SHAREHOLDERS GAVE UP ITS SHARES TO AMERICAN HARDWARE, WHICH IS NOW E.I.I. UNDISPUTED. AND THAT THAT TOOK PLACE AND K.L.I. THEN OPERATED AS A WHOLLY OWNED SUBSIDIARY -- ESSENTIALLY A WHOLLY-OWNED SUBSIDIARY OF AMERICAN HARDWARE, NOW E.I.I.

IT WAS PART OF THAT TRANSACTION -- AND THAT TRANSACTION, BY THE WAY, WHICH TOOK ABOUT A YEAR, FINALLY ENDING WITH THE DISSOLUTION OF K.L.I. AND THE TRANSFER OF ALL

OF ITS ASSETS AND LIABILITIES TO AMERICAN HARDWARE, THAT WEST COAST LOADING CORPORATION WAS ESSENTIALLY PUT ON HOLD. IN OTHER WORDS, ITS OPERATIONS WERE PUT ON HOLD.

AND, THEN, AT THE ULTIMATELY THE DIRECTION OF AMERICAN HARDWARE CORPORATION, WEST COAST LOADING WAS MERGED INTO KWIKSET LOCKS INC.

SO, THERE IS A CONNECTION BETWEEN THAT MERGER AND AMERICAN HARDWARE.

MR. MEEDER: YOU KNOW, MR. DINTZER HAS JUST MADE THE POINT OF OUR OPPOSITION, WHICH IS THAT THE EVENTS, THE 1957, '58 PERIOD, ARE WHOLLY APPROPRIATE FOR PURPOSES OF DISCOVERY HERE AND ARE AND WILL BE THE CONTROLLING EVENTS WITH REGARD TO WHETHER OR NOT THERE WAS A DE FACTO MERGER OR A DISSOLUTION.

AND THE EVENTS OF A ONCE-REMOVED PARENT OF EMHART INDUSTRIES THAT ACQUIRED EMHART IN 1989, IN 1998 SOME 40 YEARS LATER TO SETTLE A LAWSUIT INVOLVING INSURANCE COVERAGE THAT AROSE IN CONNECTION WITH A MARYLAND SITE, AND THE DOCUMENTS THAT RELATE TO THAT SETTLEMENT AGREEMENT ARE SETTLING A LAWSUIT HERE, WE BELIEVE DO NOT TRIGGER THE RIGHT TO ENGAGE IN UNEXPLAINED DEMANDS OR ALL DOCUMENTS THAT RELATE -- IT'S NOT JUST, YOUR HONOR, THE 1998 AGREEMENT THAT'S FOCUSED ON, AND IN THE FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS, WHICH IS NOT BEFORE THE COURT, BUT IT'S ALL INSURANCE POLICIES FOR ALL TIME THAT THESE ENTITIES WERE

ENGAGED IN.

AND WE BELIEVE THAT NOT ONLY IS THE 1998 AGREEMENT IN THE DOCUMENTS -- THAT THE DOCUMENTS THAT RELATE TO THE 1998 AGREEMENT, AS I'VE EXPLAINED, AND AS WE CAN MORE FULLY EXPLAIN ONCE THE DOCUMENT IS PRODUCED, SIMPLY -- AND WE'VE SEEN NO REPRESENTATION THAT MAKES SENSE WITH REGARD TO HOW IT RELATES TO THE ISSUES THAT OCCURRED IN 1958.

THE COURT: OKAY. LET ME ASK YOU THIS, MR. MEEDER.

THE PROTECTIVE ORDER THAT YOU ATTACHED AS AN EXHIBIT, WHEN DO YOU EXPECT THAT TO BE FILED WITH THE COURT AS A SEPARATE FILING?

MR. MEEDER: YOUR HONOR, I TALKED WITH COUNSEL BACK EAST EARLIER TODAY ABOUT WHAT THE STATUS OF THE SIGN-OFF BY THE INSURANCE FOLKS IN THE 1998 AGREEMENT, AND HE SAID IT WOULD BE A FEW DAYS. THE LETTER HAD JUST GONE OUT WITH THE PROTECTIVE ORDER IN IT. I TALKED TO MR. DINTZER WHO CALLED ME EARLIER TODAY ABOUT IN MR. DINTZER'S VIEW THAT HE THOUGHT MAYBE WE SHOULD ADD A FEW THINGS TO THE PROTECTIVE ORDER. AND I HAD NO OBJECTION TO THAT. SO, WE HAVEN'T FINALIZED IT YET. AND AS SOON AS IT IS -- AND I WOULD SUGGEST TO THE COURT THAT THE ONE THING THAT WOULD GET US THERE QUICKER IS THAT IF THE COURT SAID, I'M ASKING YOU OR DIRECTING YOU, MR. MEEDER, TO FINALIZE WHATEVER PROTECTIVE ORDER YOU CAN DO BY A DATE CERTAIN.

I CAN COMMUNICATE THAT WITH THE FOLKS BACK EAST WHO

ARE IN CONTACT WITH THE VARIOUS COUNSEL FOR THESE INSURANCE CARRIERS, AND WE CAN GET IT DONE.

AND, SO, I WOULD SAY WITHIN -- IF THE COURT SAID WITHIN TEN DAYS, I WOULD GLADLY TRANSMIT THAT REQUEST TO THEM AND GET IT DONE WITHIN 10 DAYS SO WE CAN SUBMIT A FORM OF A PROTECTIVE ORDER.

THE COURT: IT SEEMS LIKE YOU MIGHT EVEN BE ABLE TO DO IT BEFORE 10 DAYS, LIKE, PERHAPS FIVE, THIS TIME NEXT WEEK.

MR. MEEDER: I'D BE GLAD TO DO THAT, YOUR HONOR.

THE COURT: OKAY. SO, LET'S FINALIZE THE PROTECTIVE ORDER. HAVE IT FILED WITH THE COURT NO LATER THAN SEVEN DAYS FROM TODAY OR BY THE 22ND OF JUNE.

AND THEN YOU WILL PRODUCE THE DOCUMENT TO GOODRICH AND CITY OF RIALTO, CORRECT?

MR. MEEDER: YES, WE WILL, YOUR HONOR.

THE COURT: OKAY.

MS. MACEDO: THE UNRELATED DOCUMENTS OR JUST THE 1998 AGREEMENT.

THE COURT: WELL, NO -- NO, NO. LET ME JUST TELL YOU, IN REVIEWING THE MOTION IT SEEMED TO ME THAT THE ESSENCE OF THE MOTION WAS OVER THE 1998 AGREEMENT AND THE ASSERTIONS THAT IT MIGHT BE PRIVILEGED IN SOME FASHION AND PERHAPS GOODRICH'S UNHAPPINESS WITH THE DELAY. IT DIDN'T AS MUCH FOCUS AS IT DID IN OUR HEARING TODAY ON THE RELATED

DOCUMENTS, WHICH I REALLY SEE AS PART OF THE FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS AND NOT RIGHT BEFORE ME AT THIS TIME.

SO, I SEE THIS MOTION AS DIRECTED TOWARDS THE 1998 AGREEMENT, WHICH EMHART HAS AGREED TO PRODUCE. SO, I DON'T SEE THAT THE MOTION IS REALLY NOT MOOT AT THIS POINT.

HAVING LOOKED AT THE FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS, YOU KNOW, AS USUAL, I AGREE AND DISAGREE WITH BOTH OF YOU. I THINK THAT THERE IS RELEVANCE TO THE DOCUMENTS -- SUBSETS OF THE DOCUMENTS THAT ARE REQUESTED.

I AGREE WITH MR. MEEDER THAT THEY ARE VERY BROADLY WORDED REQUESTS.

SO, WHAT I WOULD HOPE THAT THE PARTIES WOULD DO POST THE PRODUCTION OF THE 1998 AGREEMENT -- AND I HESITATE TO SUGGEST A MEET AND CONFER TO YOU BECAUSE THEY HAVEN'T BEEN THAT PRODUCTIVE. BUT I THINK THAT THE PARTIES NEED TO -- PARTICULARLY GOODRICH AND CITY OF RIALTO -- NARROW THEIR REQUESTS TO SPECIFIC DOCUMENTS THAT THEY THINK WOULD BE PROBATIVE IN THE CONTEXT OF THE 1998 SETTLEMENT AGREEMENT OF THE SUCCESSOR LIABILITY ISSUE.

I THINK THEY SHOULD PUT SPECIFIC TERMS ON THOSE DOCUMENTS. I THINK THEY SHOULD PUT TIME FRAMES. AND I THINK THEY SHOULD LIMIT THE SUBJECT MATTER OF THOSE DOCUMENTS.

AND IF THEY DO THAT, THEN, I THINK EMHART HAS A RESPONSIBILITY TO PRODUCE THOSE DOCUMENTS. BECAUSE I DO FIND

THAT THERE IS BASED UPON THE AGREEMENT OF THE PARTIES THAT THE 1998 AGREEMENT EXTINGUISHES THOSE INSURANCE POLICIES. I UNDERSTAND YOU'RE MAKING A REPRESENTATION ABOUT THE COVERAGE POTENTIAL OF THOSE POLICIES. BUT AS LONG AS THAT'S A LIVE ISSUE IN DISPUTE, I THINK THE DISCOVERY IS APPROPRIATE.

SO, THAT WOULD BE MY PERSPECTIVE ON THE FOURTH REQUEST. OKAY.

MR. DINTZER: WE WERE THINKING IT'S VERY HELPFUL. MR. MEEDER AND I WILL CONFER AT A CONVENIENT TIME ALONG WITH THE CITY, OF COURSE, FORTHWITH TO TRY AND NARROW THESE ISSUES DOWN AND AVOID AT ALL COSTS COMING BACK TO YOU ON THE FOURTH REQUEST.

THE COURT: LET ME JUST SAY ONE MORE THING. YOU KNOW, THERE WAS A LOT OF ALLEGATIONS FLYING BACK AND FORTH IN THE PAPERS. AND I REALLY FELT IN READING THEM THAT I DON'T BELIEVE THAT EMHART DID ANYTHING OTHER THAN LEARN LATE IN THE GAME THAT IT HAD THIS 1998 AGREEMENT.

IT DOESN'T SEEM TO ME SURPRISING OR UNUSUAL THAT A CORPORATION, PARTICULARLY A DISSOLVED ONE, MIGHT NOT REALIZE THAT THIS DOCUMENT WAS SOMEHOW RESPONSIVE TO DISCOVERY REQUESTS THAT SOUGHT INSURANCE POLICIES.

SO, I DON'T SEE ANYTHING INTENTIONALLY OR WRONGFUL IN EMHART'S CONDUCT IN PREPARING THEIR DISCOVERY RESPONSES.

SO, I WOULD HOPE THAT IN THE FUTURE DISCOVERY DISPUTES THAT ARISE, THE PARTIES WOULD WORK EVEN HARDER AT

TRYING TO RESOLVE THEM. BECAUSE THIS ONE CLEARLY WAS RESOLVED AND DIDN'T NECESSARILY NEED MY ASSISTANCE.

OKAY. AND, SO, I REALLY WOULD ENCOURAGE YOU TO TRY AND WORK OUT THE FOURTH REQUEST FOR PRODUCTION BECAUSE I THINK IT IS RESOLVABLE BY THE PARTIES.

MR. DINTZER: YOUR HONOR, I UNDERSTAND THE COURT'S VIEW, AND I WOULD JUST LIKE TO SAY ONE THING ON THAT. AND THAT IS IS THAT, YOU KNOW, IF YOU LOOK AT THE SERIES OF EVENTS THAT TOOK PLACE HERE, AND I DON'T WANT TO GET INTO WHO DID WHAT AND WHEN, BUT WHEN YOU LOOK AT THE SERIES OF EVENTS THAT TOOK PLACE HERE, THE SPARK FOR THIS WHOLE ISSUE WAS A HEARING BEFORE JUDGE PHILLIPS BACK IN JANUARY OF THIS YEAR, JANUARY 31ST OF THIS YEAR, WHEN THE ISSUE OF THE INSURANCE POLICIES WAS RAISED IN CONNECTION WITH MOTIONS TO DISMISS.

AND ACTUALLY JUDGE PHILLIPS ASKED MR. MEEDER TO ADDRESS AN ISSUE THAT HAS BEEN RAISED BY THE CITY ON THAT SUBJECT. AND MR. MEEDER MADE THE REPRESENTATION THAT HE DID NOT BELIEVE THERE WAS ANY INSURANCE.

AND IT IS NOW JUNE 14TH. AND, YOU KNOW, WITH RESPECT TO THESE DOCUMENTS, WE'RE NOT GOING TO SEE THEM FOR -- YOU KNOW, PROBABLY TILL THE END OF JULY, TILL THE END OF THE MONTH AT A MINIMUM.

THAT MEANS WE'VE WAITED FIVE AND A HALF, SIX MONTHS TO COLLECT INITIAL DISCOVERY IN THIS CASE. AND IT'S NOT AS THOUGH WE WEREN'T DILIGENT IN DOING IT. WE SENT LETTERS

IMMEDIATELY AFTER THAT HEARING ASKING TO TALK WITH MR. MEEDER ABOUT THE SUBJECT.

AND HE REPRESENTED TO JUDGE PHILLIPS ON THE RECORD THAT HE WANTED TO TALK TO GOODRICH ABOUT THIS SO THAT WE COULD MAKE SOME HEADWAY HERE.

I SENT HIM TWO LETTERS, AND HE DIDN'T WANT TO RESPOND SUBSTANTIVELY.

AFTER THE DECLARATION WAS FILED WITH THE COURT ON APRIL 11TH, I SENT A LETTER ASKING FOR AN EXPLANATION. AND WE GOT NOTHING OUT OF THE TWO AND MEET AND CONFERS THAT OCCURRED -- THAT TOOK PLACE WITH THE CITY, BOTH OF WHICH ARE ON THE RECORD BEFORE YOU.

AND WE ASKED FOR INFORMATION ABOUT THESE AGREEMENTS. AND MR. MEEDER TOLD US HE COULDN'T TELL US ANYTHING ABOUT THEM, ALTHOUGH HE THEN CAME UP WITH AN OFFER OF PROOF IN CONNECTION WITH HIS OPPOSITION.

AND I WOULD SIMPLY SAY THAT I DO UNDERSTAND THE IMPORTANCE OF TRYING TO RESOLVE DISCOVERY DISPUTES BY MEET AND CONFER. AND THAT'S WHY WE JUST DON'T SEND A LETTER AND HAVE, YOU KNOW, A QUICK LITTLE TELEPHONE CALL ABOUT THESE SUBJECTS. WE ACTUALLY TRY AND DO IT ON MULTIPLE OCCASIONS, GOING THROUGH THE REQUESTS, AND ACTUALLY HAMMER THIS STUFF OUT SO THAT WE CAN NOT HAVE THESE ISSUES BEFORE THE COURT.

BUT IT SHOULDN'T TAKE ME SIX MONTHS PLUS TO COLLECT DOCUMENTS THAT SHOULD HAVE BEEN PRODUCED BACK IN THE END OF

THE YEAR OF '04.

AND I WON'T SAY ANYTHING FURTHER ON THE SUBJECT.

THE COURT: THANK YOU BOTH VERY MUCH.

MR. DINTZER: THANK YOU, YOUR HONOR.

MS. MACEDO: THANK YOU.

MR. MEEDER: THANK YOU, YOUR HONOR.

(PROCEEDINGS CONCLUDED.)

CERTIFICATE

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

FEDERALLY CERTIFIED TRANSCRIBER
DOROTHY BABYKIN

DATED