Morrow decision, which is discussed by Judge Gibney in Baxendale. Morrow is another strange case whose facts do not apply here.

The claimant in Morrow was refused coverage by its insurer, because the claimant in that case was the insured's son, who was living in the insured's house, and the insurer said that that person had the status of an insured. Having made that bed, the insurer was quite rightly required to sleep in it. When the son sued in Federal Court, the insurer was -- he had standing as someone with the status of an insured.

But Morrow does not speak to the proposition for which Emhart cites it, which is that a declaratory judgment is somehow outside the ambit of 27-7-2.

Your Honor also asked about authority in this case. You'll see that Emhart has referred you to footnotes in two Rhode Island Supreme Court cases, the Robinson case and the Mendez case. And the footnotes are long and interesting. They talk about a conflict

D



in authority in other states where there is no statutory language that directly governs the issue.

Rhode Island, of course, does have 27-7-2, but those two decisions talk about the conflict in authority. They talk about a majority position, which I think is consistent with what I've just outlined for your Honor as to rights of third parties to an insurance contract. They talk about a minority position, which is embodied by the Bankers Trust case.

Those cases didn't find it necessary to wrestle

with the question that your Honor posed to me and that courts in other jurisdictions have had posed to them. They didn't have to deal with that, or they felt they did have the right to address it, because no one had briefed 27-7-2 in either the Robinson or the Mendez cases. So those cases are not authority for Emhart's proposition either.

I would say that there is something of an absence of authority but that this Court should, and I hope will, rest its decision on the plain statutory language here and the statutory purpose as is expressed in Miller.

THE COURT: Bankers Trust, did that involve a statute like 27-7-2?

MR. HERMANSON: Quite the contrary, your Honor.

13

Bankers Trust arose in Illinois, which as far as I can tell, as far as I've been able to determine, has no statute of any kind addressing this issue, much less a preclusive statute.

THE COURT: So there they were just dealing with a common law principle that you don't name the insurer generally?

MR. HERMANSON: Exactly right, your Honor. And to spin that out a little bit further, the Court in Bankers Trust -- Bankers Trust was a Seventh Circuit decision, Judge Posner, the Court even in Bankers Trust acknowledged that general common law rule that a declaratory judgment suit, naming an insurer alongside a policyholder, was premature, inappropriate, shouldn't

be entertained.

The one thing that Bankers Trust did say, embodying the minority position on this issue, but the one thing that it did say helpfully to Emhart is that the rule isn't ironclad, Judge Posner's word, that a Federal Court may have equitable discretion to entertain a DJ suit in certain circumstances if the circumstances warrant. And that's what Bankers Trust stands for is that there may be exceptions to what would otherwise would be an ironclad rule against naming an insurer in a DJ suit alongside its



policyholder.

I'd submit, your Honor, spinning that out just one step further, that even if Bankers Trust applied to this case, the minority rule of Bankers Trust applied, and Rhode Island statute didn't, this isn't a case where the equitable considerations would favor Emhart and the continuation of a DJ suit here.

This is a case where there is a real danger of jury prejudice if the case goes forward, and it's a case, as I think NECC has said in its briefs, it's a case where there is a parallel state proceeding going on.

THE COURT: Tell me about the parallel state proceeding.

MR. HERMANSON: The parallel state proceeding was filed a few months before this one by New England Container against Travelers. It's currently pending in Rhode Island Superior Court, informal discovery has

taken place. It raises many of the same coverage issues. In fact, as far as I can tell, it raises all of the same coverage issues that Emhart is seeking to raise against Travelers in this proceeding.

Travelers has invoked, in that case, all of the coverage defenses it would invoke if this case were to go forward in this Court.



THE COURT: Is Travelers the only defendant?

MR. HERMANSON: No. Providence-Washington is also a defendant in that suit. The suits are in many ways exactly parallel. Their only difference is that this case, Emhart is trying to step into the shoes of New England Container to litigate those issues. And in that case, New England Container, the policyholder is litigating those issues directly with its insurers, which, I think, your Honor, also speaks volumes to the notion that there's some sort of a collusive deal in the works between New England Container and its insurers.

THE COURT: Unless that suit results in a settlement.

MR. HERMANSON: Which is possible. The suit could result in a settlement. Most of these suits do result in settlements. Emhart's don't always, but this one I hope could and might.

THE COURT: Does the fact that -- you're saying that there's a potential for great prejudice if New England Container and the insurers are at the table during trial, and I suppose I could say to you that the

last trial that we just completed would suggest that that's not true. The jury found entirely for the insurers in that trial.



MR. HERMANSON: I'm aware of that finding. It's an interesting finding from the insurers' perspective, and we've been following it with some interest, obviously.

What I can say, your Honor, is that the statute -- is that there are exceptions to prove the rule. The statute was drafted against the possibility of prejudice to insurers and equally important to the insurers' policyholders sitting together at defense table.

THE COURT: See, what I'm wondering is if the statute is really designed for a very different kind of case than this case. If this is the type of case where the exception makes more sense, a complicated environmental case as opposed to the facts of Baxendale which are, you know, more common, if you will, personal injury kind of situation where there's perhaps more sympathy that flows to the plaintiff and more of an inclination to find against an insurance carrier, whereas, in this situation is very much a corporate dispute. And I think the jury, in the Emhart trial against Century and OneBeacon and North River, really saw that and had none of those biases or sympathies that you might expect in a personal injury suit.

MR. HERMANSON: Your Honor, you make what may

well be a very good point, that it would be a wonderful point for the Legislature in amending the statute. With respect, though, the Legislature has spoken clearly and unequivocally, and at least to date it hasn't made available the exception that your Honor is articulating for complicated coverage cases or cases involving declaratory judgments. It may be a good argument for the amendment of the statute at some point. We could dispute that or debate it. But at this point, the statute is what the statute is. And I'm afraid I'm not quite following how the exception you're articulating can be found in the statutory language.

THE COURT: I'm not saying it can be. I'm saying there's common law authority to suggest it that might make sense. Whether the statute completely precludes that or not, I think that's what we're here to decide. All right. Anything else you want to add or shall we move onto the next --

MR. HERMANSON: No. Thank you, your Honor. Unless the Court has any questions, we'll submit on the papers with respect to the other issues.

THE COURT: Thank you.

MR. WHITE: Your Honor, Todd White for Providence-Washington Insurance Company. It's always

18

good to go second because you can hear some of the questions the Court has, and maybe I can answer a

couple of them. I will state, for the record, that our position as far as the statutory authority is exactly the same position as Mr. Hermanson argued for Travelers. We find no difference in that.

I do want to clarify a couple of points that might be helpful.

THE COURT: You didn't make that argument, though, in your brief. You didn't make it until Travelers made it.

MR. WHITE: We made it in our reply brief. We did. You're absolutely correct, your Honor.

I believe the state court action, if I remember looking at the docket, was filed three weeks before the Federal Court action, so I wanted the Court to be aware of that. I think that's what the record indicates.

You did ask some questions of Mr. Hermanson about why the last trial, the Emhart versus Century trial, is different, and I think there's a huge difference in that case. That was a case in which Emhart was trying a case before a jury against his insurers as to whether there was insurance coverage, and there was no underlying tort issue about what happened.

19

Emhart had to be able to prove that these three insurers provided coverage. The jury sees them as parallel entities. They see an insurance company, and they see a company that arguably polluted the environment, and then they weigh the equities of that based on the evidence. It would be entirely different

if it was Emhart trying to determine if it had a tort liability against another entity or NECC trying to determine tort liability, and then having the insurer sit at the same table there, because, in that circumstance, the jury can say, boy, pollution was caused, it was Emhart that caused it, but I think that they have insurance coverage, I'm okay with finding that there's coverage on this, because that's what insurance companies do. And I think that's exactly what the Legislature 80 some odd years ago was trying to avoid is two entities sitting together in the defendant's situation having a jury say, I don't know if the facts are there, but I know there's insurance money, and we all pay for insurance so I'm going to make a decision.

Four weeks ago the jurors didn't have to do that. They just had to find between these insurance companies and Emhart.

You did mention that maybe the statute was

20

designed for a different case. I don't know. The record doesn't reflect that the statute was designed for a different case, but it's been over 80 years, and there hasn't been an amendment to the statute, nothing has changed, and there have been, I think the Court would acknowledge, a whole lot of different cases that have used this statute in that time period.

So I think the Legislature can on its own accord amend this if they want, but, ultimately, what is to occur is that we have a statute that we're relying on.

Emhart is claiming that it is either an intended or incidental beneficiary to this. The Court has said put an incidental beneficiary aside. Judge Laguëux had a decision on that. It's not an incidental beneficiary insurance company in this. And as far as an intended third-party beneficiary, you clearly have discretion when there is a parallel state court on the exact same issues, not a tort issue, but the exact same coverage issues, a declaratory judgment action and a bad faith action, the state court should make a decision on that. That's why they're there. And NECC is trying to make sure that they have insurance coverage in that particular circumstance.

Emhart posits that it's possible that NECC may enter an agreement with its insurers for an amount that



may eventually prejudice them. Judge, that's possible every case, every time there's an insurance coverage, it's always possible. Any time there's an insurance dispute between the insured and the insurer, that possibility always exists. I don't think that the statute carves that out and says, well, if that possibility exists, we will find that the statute doesn't apply.

THE COURT: Let me ask you a question.

MR. WHITE: Sure.

THE COURT: Could this case then go on if New England Container was not part of it as a declaratory judgment by Emhart against the insurers?

MR. WHITE: Could the case exist if New England

Container --

THE COURT: Sure. And what if you just separated out the two defendants. That eliminates the problem under 27-7-2, doesn't it?

MR. WHITE: Well, 27-7-2 says that you're not supposed to go after the insurer of an insured. And Emhart has to proceed against New England Container first. They're just proceeding against the Providence-Washington or Travelers when we know that New England Container is trying to figure out if they've got coverage there.



So now Emhart is just doing exactly what New England Container is doing in the state court. So you're, essentially, litigating the exact same circumstance in two different forums, and I'm not sure that there is anything that's gained by that.

THE COURT: You may not think there's anything gained by that, but Emhart's rights are different than New England Container's rights, and Emhart has a right to try to protect or get a declaration with respect to its rights, doesn't it?

MR. WHITE: Absolutely. But I think the Court would agree that Emhart has not been able to establish for its part that it is an intended beneficiary and case law seems to show just the opposite, that because, you know, you may have an action as an injured party against a third party and you're not sure their insurer is going to cover that, you can supplant the insured and say I'm going to step up, because I don't think you

can litigate this properly. In a circumstance like this, I don't think that they have any rights that inure to themselves individually until NECC establishes its rights against its insurers. I think they're jumping the gun. They're putting the cart before the horse, and I don't think that that makes any sense.

THE COURT: Well, don't get me wrong. I don't



have a great deal of sympathy -- any more sympathy for Emhart than for any other litigant in this Court, but, you know, there's so much litigation involving this site that you get to see a lot of things play out. And so I've seen them try a case against a set of insurers, and I also watched them try to undo a settlement that was reached between Centredale Manor and the other housing entity with the EPA until I had to recuse myself on that matter and it went to Judge Lisi, but I was involved with it for a bit. And it's a pretty hard thing to intervene in a matter and try to stop a settlement.

So for example, if New England Container does reach a settlement with its insurers, Emhart really doesn't have much chance of intervening in that action, I suppose, in state court. It's certainly hard for them to do it and to try to stop that settlement.

So I imagine what they want to do is come into Federal Court and get some declarations as to their rights so that they have something to say, look, we've got a huge liability here. New England Container caused a lot of this pollution, we think, and we ought

to be able to get access to those insurance proceeds. And maybe it will assist them in state court in intervening, maybe persuading the judge not to approve

24

the settlement. I mean, there's all sorts of good reasons why they would want to do this. And you seem to be saying that they're totally precluded from doing any of that, which puts all the advantage in favor of New England Container and the insurers.

MR. WHITE: Well, I would say, your Honor, that there's a presupposition that you've used in that scenario, which is that Emhart has established its cause of action against New England Container first. They haven't. They're going against New England Container's insurers first before they've established that New England Container owes them as a potentially responsible party.

THE COURT: Isn't this action really both? I mean, they're against New England Container in this action, right?

MR. WHITE: No question. And they go against New England Container. If they establish that liability, then New England Container in a front in the state court is trying to establish its insurance coverage at that point in time, and if that's established, then Emhart will be able to tap into that or whatever assets New England Container has. I don't know what assets New England Container has.

But the problem is we do have a statute in this

25

jurisdiction. Apparently, in some of the states in the Third Circuit and the Seventh Circuit they don't. We do. I didn't draft it. None of us here were alive when it was drafted. But it does exist, and that's the law that we have at this particular point in time.

And to expand that and say this is a little bit more complicated would be fine if there was an exception in the statute, but there is no exception in the statute. And I think that, actually, Judge Gibney in the Baxendale versus Martin case, her rationale, and clearly it's not binding on this Court, but her rationale was very good. Her rationale was, yes, in a situation between two parties to the insurance contract, DJ action may be appropriate. There isn't two parties to the insurance contract. NECC is the only party to our insurance contract. So we're still stepping ahead in still what is a hypothetical circumstance, and we're still asking this Court to make a decision in this hypothetical circumstance and that is universally frowned upon.

THE COURT: Does everyone agree that Rhode Island law applies? Does Emhart agree with that? I'm asking you whether you think they do. They'll get to it.

MR. WHITE: I haven't heard anything to the

26

contrary.

THE COURT: Mr. Pirozzolo.

MR. PIROZZOLO: I think so, your Honor.

THE COURT: Okay. What about the application of the Federal Declaratory Judgment Act, does that have any impact on the applicability of 27-7-2?

MR. PIROZZOLO: You're asking me, your Honor.

THE COURT Okay. I'll ask you.

MR. PIROZZOLO: Yeah. I think that federal law would apply to that.

THE COURT: As to just the standing or as to the --

MR. PIROZZOLO: Yes.

THE COURT: What about as to the substance? Are you still applying the Rhode Island statute?

MR. PIROZZOLO: I think the Rhode Island statute would apply to the substance but not to the discretion of the Court -- no, not to declaratory judgment.

THE COURT: You're saying it only applies to Count VIII, and Count -- I forget the Travelers count, which one that is.

MR. PIROZZOLO: That's right. It does not apply to their request for an injunction.

THE COURT: So that's the point I want to get to you. So respond to that.

27

When we're in under the Federal Declaratory Judgment Act, and that's the source of this Court's jurisdiction, why do I have to then apply 27-7-2 to the substantive question of the declaration of rights that Emhart seeks and the injunction?

MR. WHITE: I believe that the Federal Declaratory Judgment Act applies to the standing issue.

I don't believe it applies to any of the substantive issues that will be before the Court when we get to that particular point in time. But the Wilton court talks about the fact that under the Federal Declaratory Judgment action, the Court has discretion in circumstances that are just like these circumstances to dismiss this action because there is a parallel state court action.

So I think that is the template that the Court needs to use. Wilton went through a circumstance not identical but very similar to these circumstances and said this is what the Federal Court can do. Now, I will acknowledge it is discretionary, but I think given the circumstances of NECC filing this action against Prov-Wash and Travelers three weeks beforehand, and then Emhart three weeks later coming to this Federal Court, Emhart is aware that that is really the way that this case should play out.

28

THE COURT: What factors should play into my exercise of discretion here?

MR. WHITE: The existence of a parallel state action that's not a tort action. The existence of a coverage, a DJ and bad faith action that's right there in Superior Court that was filed before your action.

THE COURT: I understand that, but if issues of judicial economy are to play into it, then isn't the fact that I've just completed this six-week trial, I know a lot about this, more than I would ever hope to know about this case, and we move more quickly than the

state courts typically, don't all of the judicial economy considerations argue in favor of keeping this case here and moving it along?

MR. WHITE: An interesting analysis of judicial economy. I hadn't thought about the Court's knowledge base as something that would be part of judicial economy. My perception of judicial economy is having two judges in different forums litigating -- having to preside over the litigation of the exact same issue seems to be redundant to me.

THE COURT: Would this be the case for the exercise of some kind of a joint effort like I did in another case, the Blue Cross class action case?

MR. WHITE: It's certainly something the Court

D

29

has to consider, and I had not given any consideration of that. My thought is that when a complaint is filed in state court under state law with the statute that exists in an insurance issue, a coverage issue, that is clearly within the parameter of state law, and it's filed three weeks before the action is filed in this Federal Court, then judicial economy would say, you know, NECC, you fight against your insurers over there, then I'll decide what to do with Emhart versus NECC or Emhart, if there's any need be thereafter, versus Providence-Washington or Travelers.

THE COURT: All right. Thank you very much, Mr. White. Who will argue for --

MR. RYAN: Could Mr. Peloso address the Court on behalf of New England Container?

THE COURT: Okay. That's fine.

MR. PELOSO: Good morning, your Honor.

THE COURT: Good morning.

MR. PELOSO: John Peloso on behalf of New England Container. This is our motion to dismiss all of the causes of actions asserted against New England Container in the Complaint filed by Emhart.

As your Honor is aware, there's a 12-cause-of-action Complaint that has been filed by Emhart. As I see it, the causes of action break down

30

into three distinct groups. The first and second causes of action are causes of action under CERCLA; the first is a 107 cost recovery action; the second cause of action is a 113 contribution action. Causes of action 3 through 6 are the state statutory and common law causes of action that are asserted against New England Container. And causes of action 7 through 12 are what I call the insurance related claims. And to break those down, causes of action 7 through 10 are declaratory judgment actions and causes of action 11 and 12 are injunction actions asserted against all defendants.

I'd like, for purposes of this morning's argument, your Honor, to address the issues that I'd like to raise in the order of causes of action as they are alleged by Emhart in its Complaint.

The first cause of action, your Honor, is the 107 cause of action for cost recovery. And I think no one will disagree with the standard here, which is set

forth by United Technologies in the First Circuit decision, which is that only an innocent party can be bring cost recovery action under Section 107. And Emhart is asserting in its brief that it is not a liable party and that it has not made any allegations in its Complaint that it is, in fact, a liable party.



I would state that that is not the case, your Honor. And I would like to refer to specific paragraphs in the Complaint to that effect.

Paragraph 65 of the Complaint Emhart states the following: "EPA issued orders concluding that Emhart is a liable party within the meaning of Section 9607."

Paragraph 30 of the Complaint, your Honor, quote, "EPA has alleged that the liability of Emhart is based upon the activities of Metro-Atlantic."

Those two paragraphs in and of themselves are direct statements by Emhart in its Complaint that it is a liable party.

There are further statements by Emhart in its Complaint, which are not as directly focused and do not as expressly state that they are a liable party, but certainly strongly suggests and can be inferred that they are a liable party.

These are the following excerpts. In paragraphs 22 and 23 of the Complaint, Emhart states that the EPA is conducting a remedial investigation and that Emhart believes that when it is completed, Emhart will be required to undertake remedial work.

What Emhart is saying, your Honor, is that

Emhart believes it's going to be found liable to complete this remedial work.



Paragraph 45 of the Complaint, Emhart states that NECC is liable for its proportionate share of response costs. They're not saying that NECC is liable for everything. They're saying NECC is liable for its proportionate share.

Now, there's only one defendant that has been sued in this case to have been claimed to be a liable party. That's NECC. So if there's any other proportionate share, one has to assume that the other proportionate share is Emhart's.

THE COURT: Sure. But, you know, maybe this is a distinction without a difference, but Emhart is not the polluter. They came into this case many years after the pollution. They inherited a liability. Does that make any difference on your 107 analysis?

MR. PELOSO: No, it does not, your Honor. Emhart is formerly Metro-Atlantic. And under the CERCLA laws, they are -- because they came into the shoes of Metro-Atlantic, they are still liable if they are found to have been a polluter, and if Metro-Atlantic was found to have been a polluter.

So what I'm asserting here, your Honor, is the first cause of action is that Emhart, contrary to what it states in its brief, has expressly stated in its Complaint that it is a liable party.

Emhart time and again in its brief in opposition to our motion says that, well, down the road we'll be proven to be an innocent party. That might be the case. My opinion is, of course, that that will not be the case, but that might be the case. But for purposes of today's motion, the allegations of the Complaint are as stated in the Complaint and they state that Emhart is a liable party, so therefore, we would conclude, your Honor, that a 107 action is not a viable cause of action on the part --

THE COURT: Maybe this is a bit of semantics, but you're using the term "liable" to mean they have been found to be a potentially responsible party by EPA. And under the statute, and the way the CERCLA statute operates, that means they have to pay and then seek other contribution. But their position is that they really are not liable in, I think, in a more common sense of how that term is used. That is, that Metro-Atlantic actually did not do the pollution. They did not pollute the site, that New England Container polluted the site. That's what I think they mean by that. They're saying we are not liable, and it's New England Container that polluted the site.

Now, we may have liability or responsibility under CERCLA right now, but we're not liable. At the



end of the day when everything is litigated, we're going to be able to show that New England Container is the one that actually polluted the site.

MR. PELOSO: I understand that, your Honor. And Emhart has, in fact, made that argument. What they're saying is we are liable today, but we're not going to be liable tomorrow if it's going to prove our innocence.

THE COURT: But the point is you're moving to dismiss. And so isn't this -- don't I have to take the complaint in the light most favorable to the plaintiff and understand what they're saying? I think I do understand what they're saying, rather than throw it out at this very early stage. Now, maybe it will turn out that their theory isn't correct.

MR. PELOSO: I agree, your Honor, that your Honor has to look at the Complaint in the light most favorable to Emhart, but Emhart has stated in its Complaint twice that it is a liable party. Not that it's a potentially liable party, but that it is a liable party. It's right there on the face of the allegations.

So I think that it's -- they argue in their brief that they will not be down the road a liable party, but in their Complaint they state flat out they



are a liable party. So I think that under the 107 cause of action they can't maintain that cause of action.

THE COURT: What if they amended the Complaint?

MR. PELOSO: If they were to amend the Complaint to state that they are not a liable party, I would probably make a motion, add affidavits and substantial

evidence to find that they have been found to be a liable party by EPA. To answer your Honor's question, if they were to amend the Complaint to contain not a single allegation that they were a liable party, they might be able to succeed.

THE COURT: So you're getting to sort of my ultimate question, which is if they were to do that, and you were to try to show that they were a liable party, isn't that really a question of fact that has to be resolved in maybe a trial of the case of who's ultimately fully responsible for this pollution?

MR. PELOSO: Not necessarily. I believe, and I might be mistaken, but I think on a motion to dismiss the Court can also take into consideration matters of known fact, of public record. And I think what I would do in the case of an amendment of the Complaint would be to bring in matters of public record that Emhart has been found to be a liable party.



Moving on, if you will, your Honor, to the 113 contribution claim. I think neither party would take issue with the Aviall position that only a party that has been subject to a prior or a pending civil action can bring a Section 113 claim. And Emhart itself admits on page nine of its brief that it's entitlement to bring a contribution action in this case rests upon whether or not this Court finds that a unilateral administrative order, or I'll refer to it as a UAO, or administrative order on consent, which I'll refer to as an AOC, are found to be civil actions in this context.

We submit, your Honor, that they are not civil actions within this context. And in support of that, I'd like to first start off with simply quoting the language of Justice Thomas in the Aviall decision.

In the very beginning, I believe it's even the first paragraph, Justice Thomas says the following. He says, (Reading:) The issue we must decide is whether a private party who has not been sued under Section 108, 106 or 107, may nevertheless obtain contribution under 113 from other liable parties. We hold it may not. Justice Thomas says "who has not been sued."

Now, an AOC and UAO, when one is confronted with an AOC or a UAO, they are not being sued. They might have to undertake remedies. They might suffer



consequences, which are akin to a judgment being rendered against it in a civil lawsuit, but that does equate -- do not mean that an AOC or a UAO is a civil action. Emhart relies upon the Carrier decision, your Honor, in support of its argument that a UAO or an AOC is akin to a civil action.

And as I read that case, the Carrier court concluded because the results of an AOC or the results of the UAO, that because those results can be as onerous as a civil action, therefore, an AOC or a UAO are, in fact, a civil action. I would submit to your Honor that just because the result is the same doesn't mean that the proceeding in and of itself is the same. Just because the result of an AOC is the same as a civil lawsuit, just because you're paying $5,000,000 as

a result of an AOC and you might pay $5,000,000 as a result of a civil action doesn't mean that they're one and the same.

I would urge your Honor to look at the language that we have cited in our brief. And in particular, I want to read the language from the Pharmacia case, that's a District of Illinois case. And it says the following. And this is a case where the Court held that an AOC -- two AOCs were not considered to be civil actions within the meaning of the Aviall decision.



And the court said the following. (Reading:) In interpreting a statute, courts must presume that the legislature says in the statute what it means, and means in the statute what it says there.

If a court finds the words of a statute unambiguous, judicial inquiry is complete. This court finds the natural meaning of "civil action" is clearly a non-criminal judicial proceeding. Federal Rule of Civil Procedure 2 states that there shall be one form of action to be known as a civil action.

I'd also like to point out to your Honor another case, which was, in fact, cited by Emhart in its brief. Now, I will inform your Honor first off as a preface that Emhart cited this case in support of the implied right of action under 107, which is going to be the next part of my oral argument. But there's interesting language in this case which shows that there is a difference between an AOC and a civil action.

In that case, the Court said the following.

(Reading:) For these reasons, we hold that Section 107A permits a party that has not been sued or made to participate in an administrative proceeding. Okay? So the Court there, and that's the Second Circuit, is separating out --

THE COURT: Which case is that?



MR. PELOSO: It's Consolidated Edison versus UGI Utilities, U.S. Court of Appeals, Second Circuit, 2005.

THE COURT: The first case was District of Illinois case, what was the name of that?

MR. PELOSO: Pharmacia versus Clayton Chemical.

THE COURT: Pharmacia?

MR. PELOSO: Pharmacia. Would you like the cite, your Honor?

THE COURT: Sure.

MR. PELOSO: It's 382 F.Supp 2nd, 1079. And the citation for Con-Ed is 423 F.3d 90.

So the Con Edison case, the Court expressly says you have a civil action or administrative proceeding. And I think that if your Honor just looks at the Federal Rules and looks at the definition of a civil action -- and we've gone into it in our brief, I don't think I need go into it here, but we talk about Black's Law Dictionary. We talk about various dictionaries and authorities. We talk about what a civil action is. It is -- and an administrative order on consent or a UAO are not civil actions.

THE COURT: So what is the remedy for Emhart to seek contribution from someone like New England

Container?

MR. PELOSO: Well, I don't know whether they



have a remedy at this point.

THE COURT: Does that makes sense?

MR. PELOSO: I think under the law it may very well make sense.

THE COURT: Why?

MR. PELOSO: Well, because, I mean, there are certain parameters under the law by which they can seek a remedy and certain parameters under the law which they cannot.

THE COURT: Well, you know the facts of this case, I assume. You know kind of how Metro-Atlantic operated and where New England Container came from and what it did, and you've seen all the data about the pollution, where it's found, where the hot spots are, all that stuff, right?

MR. PELOSO: Yes, your Honor.

THE COURT: So Emhart has a reasonably good argument here that New England Container is at least responsible for some of this pollution. And you're saying they don't have any recourse?

MR. PELOSO: Well, I'm saying they might not have any recourse strictly against NECC, but certainly the EPA has been involved with NECC, and there have been discussions within EPA and NECC. These are not, I think, stated in the Complaint, but it's certainly

something that all parties are very much aware that NECC is very much involved in this site.

THE COURT: But doesn't it seem either at worst unfair and at best ironic that Emhart would have to rely on the EPA to seek remedy from New England Container?

MR. PELOSO: I would submit no, your Honor. I would submit that the EPA has pursued NECC in a vigorous manner and that if NECC, to the extent they're found liable for this site, will certainly have to pay its fair share.

And under the statutes, as your Honor knows, the way the statutes are designed is that any party that's found liable is found to be responsible for its proportionate share of costs.

The final argument that Emhart makes at length, and I would submit much of the argument, if your Honor has looked at the brief, is more of a policy argument, is that Emhart claims that it has an implied right of contribution under Section 107.

And I would point to your Honor, I think the genesis of this whole concept of an implied right, and, in particular, in the First Circuit is from the UTC case, which was a 1994 decision. And the UTC case stated the following. It said (Reading:) It is

D



possible that although falling outside the statutory parameters established for a express cause of action for contribution, and then there's an ellipses, this is from my brief, a PRP who spontaneously initiates a

cleanup without Governmental prodding might be able to pursue an implied right of action for contribution under 107.

I'd like to emphasize to your Honor the point "a PRP who spontaneously initiates a cleanup." Okay? Emhart did not spontaneously initiate a cleanup. In support of its argument, your Honor, Emhart cites to the following case s, the Bangor case, the Atlantic case, the Con Edison case, the Metropolitan case and the Viacom case.

In each one of those cases, your Honor, the Court did, in fact, find an implied right of contribution for that party, but in each one of those cases, your Honor, that party voluntarily cleaned up the site. That's not the case here. There's no allegation in the Complaint that Emhart voluntarily cleaned up the site.

So I think Emhart's reliance on those cases is not well-founded, and I think that its argument is not well-founded.

Now, Emhart seeks to claim that whether or not a



party voluntarily cleaned up a site or did not voluntarily clean up a site is of no import in a judge making a determination of whether or not an implied right under 107 exists. I would beg to differ. And I would like to indulge, your Honor, by reading an excerpt from two cases that are cited, in fact, by Emhart in support of its arguments.

And the first case is the Bangor case, which is

cited extensively by Emhart. That's a District Court of Maine case and that was, again, a voluntary remediation by the party, and the Court says the following. (Reading:) Ultimately, interpreting Section 107 to forbid current owners and other responsible parties for seeking reimbursement for voluntary cleanups would encourage these parties to wait for a Governmental entity or an innocent party to take decisive action before initiating any investigation or remediation. Many courts that have addressed the issue of Section 107 actions by responsible parties after Aviall have noted this effect is contrary to CERCLA's clear goals of encouraging voluntary remediation.

Okay? So they're emphasizing, in my opinion, that if the First Circuit is going to extend this 107 implied right of action, it's going to be to any party,



it's going to be a party that voluntarily cleans up a site.

And the second case I would like to refer to again, is the Con Edison case, which is, again, is a case that is referred to by Emhart. And this is the Second Circuit case, and the Second Circuit says something very similar to what is said in the Bangor case. And the Second Circuit says the following. (Reading:) We believe that it would be impermissibly discouraging voluntary cleanup were we to read Section 107 to preclude parties that have sued would be held liable from Section 107 from recovering necessary --

THE COURT: You have to slow down.

MR. PELOSO: Sorry.

THE COURT: You have to slow way down.

MR. PELOSO: (Reading:) Were this economic disincentive in place, such parties would likely wait until they are sued to commence cleaning up any site for which they are not exclusively responsible because of their inability to be inured for cleanup expenditures in the absence of suit.

What I'm trying to make, your Honor, in terms of my point is that it is very clear from the first case by the First Circuit that if there's going to be any extension of this implied right under 107, it's only

D

45

going to be the parties who have voluntarily cleaned up the site, and there's no allegation in the complaint that Emhart ever did this.

Moving on to the other causes of action, this is the second set I discussed, which is causes of action 3 through 6, which are the state statutory and common law claims. I don't think either parties disputes the fact that these claims are very much dependent upon the existence or the survival of the CERCLA claims in this case.

We, of course, your Honor, submit that the CERCLA claims should be dismissed; and therefore, we submit that the state causes of action, statutory and common law, should also be dismissed. These claim arise from the same set of facts as the CERCLA claims. It is within the Court's discretion to dismiss these

claims. It is not legally in the interest of judicial economy for the Court to entertain these claims.

I, obviously, heard your Honor's discussion of the fact that your Honor has a great deal of knowledge about Emhart having heard the trial for numerous weeks, but I would also agree with counsel for the insurance companies that you have a prior state court proceeding in which these matters have been litigated.

And in terms of a waste of judicial resources, I



mean, many cases talk about how if, for example, your Honor had been on this case for two years and there had been discovery and he's suddenly dismissing these causes of action, isn't that a waste. Well, of course, this Complaint is brand new. We are here on motions to dismiss. This is a young case. I don't believe there's any waste of judicial resources.

The final set of claims, of course, are the claims which I call the insurance claims. And I can go over the same things that the insurer's counsel have --

THE COURT: You don't need to -- unless you have something new to add to what they've talked about.

MR. PELOSO: The only thing I have, your Honor, is that Emhart makes the argument that this case is different from the insurance case in state court because you have two additional actions, and those are the injunctive actions against all of the insurers as well as my client. Okay? And that that is what makes this case different from the state court cases. That's correct. But an injunctive action requires irreparable

harm. The only thing that Emhart is looking for here is money. I don't know of any situation where you can get an injunction where all you're looking for is money damages. So I would submit that the injunctive claims do not survive; and therefore, all you're left with are



the declaratory judgment causes of action and the insurance counsel, of course, have addressed those at length and we would agree with the position that those also --

THE COURT: I would agree with you, generally, that money damages usually do not constitute irreparable harm. But isn't -- doesn't that proposition require that there be some source of recovery of whatever the money damages may be? And I think the fear here is -- this is what I went over with the insurers' counsel. The fear is there'll be some sort of settlement that will establish the liability of New England Container and that amount will be far short of the legitimate contribution that New England Container should be bringing to the table, and they fear that there's no other way to recover that.

Now, I don't know what the circumstances are of New England Container, but I think their point is that this ought to get past the motion to dismiss stage so there can be a determination of whether there's an ability to recover whatever that contribution amount would eventually be.

Let's just say, hypothetically, that New England Container didn't have any other assets that would allow

Emhart to recover against it so the limitation of the



recovery would be determined by the settlement between New England Container and the insurers. Then it really would be, I guess, irreparable, because there's no other source of money, wouldn't it?

MR. PELOSO: It would be irreparable -- I understand the point your Honor is making, and it would be irreparable in let's assume, as insurance counsel said hypothetically, it's 50 cents on the dollar. It's irreparable in that they lose that extra 50 cents. But under the law, irreparable harm in every case that I know of has to do with something other than money damages.

The second thing is that I understand Emhart's concern about trying to go after as much money as it can in its effort to try to ensure that none of the money is dissipated, but the fact of the matter is, as explained, I think, at length by insurance counsel is that the law does not provide the mechanism that they're trying to exercise in this lawsuit to do that.

So that common sense is that when you sue someone for any kind of a case, personal injury or otherwise , you want to go after the carrier also, because you want to make sure none of the money goes anywhere. But the law doesn't permit that.

So I think that from a common sense point of

view, Emhart is doing what anyone with common sense would try to do. But common sense in this case is contrary to what the law allows. So I would say that while Emhart is covering itself, what it's trying to do it cannot do under the law.

THE COURT: Thank you.

MR. PIROZZOLO: Good morning, your Honor.

THE COURT: Good morning, Mr. Pirozzolo.

MR. PIROZZOLO: Your Honor, I think I'll address first the insurers' arguments and emphasize that the claim against, as the Court has already in its questions recognized, the claim against the insurers is for a declaratory judgment, and the declaratory judgment claim is not within the purview of the direct action statute. And this is made very clear by the Rhode Island Supreme Court in the Morrow case.

As the Court knows, the issue in the Morrow case was whether or not the case should be dismissed because the claimant was not the insured. In that case, the claimant was the son of the insured who lived in the insured's household, or allegedly lived in the insured's household.

The Court made findings that he maintained a separate household, and because he maintained that separate household, he did not fall within the

50

exclusion that there was no coverage for a party that was in the same household.

So therefore, the claimant, Robert, as opposed to John, John is the father and he owned the house and

owned the -- was the insured, Robert had standing to sue the insurance carrier. And the Court says, (Reading:) Although the statute cited by Norfolk, which is the statute we're dealing with here, prohibits naming an insurance company as a direct defendant in a tort liability action, there is nothing in the statute that precludes a declaration of rights between parties to an insurance contract. Consequently, we are of the opinion that the trial justice was correct when she determined that Robert possessed standing to bring this declaratory judgment action.

Emhart is in the exact same position in this case as Robert was in the Morrow case. All of these facts support the trial justice's conclusion that Robert was not a member of John's household; therefore he's a third party, and, therefore, allowed the action to proceed.

The Baxendale case, the Superior Court case misreads and, indeed, is not binding at all, but passing that, it misreads the Morrow case. And in that case, it recites the facts of the Morrow case by



saying, (Reading:) The insurance company denied the claim on the ground that the plaintiff was not a third party but an actual insured who thus was precluded from recovery. The insurance company was a party to the contract, I'm reading from the case, was a party to the contract under which an actual claim had been made by plaintiff whom the company alleged was an actual insured party.

Accordingly, the insurance company was a proper party defendant in the declaratory judgment action and plaintiff possessed the requisite standing to bring that action.

So far that correctly states what the Morrow case says. It then makes this distinction, which is not a valid distinction. (Reading:) In the instant case, the plaintiff is not an alleged party to the insurance, and thus the principle of Morrow does not apply. That's where the court misreads Morrow.

And that Rhode Island would recognize the distinction between a declaratory judgment action and a direct action is outlined without decision in Footnote 2 in the Mendez v. Brites case, and also in the Robinson v. Mayo case; and I would say that the analysis, though not binding, the analysis by Judge Posner in the Bankers Trust case explains very clearly

52

why in circumstances such as this, the injured party should be able to give a declaration that a policy covering the insured will provide coverage to the injured party in the event the injured party is successful in its claim.

I would cite two further cases, they're in our brief, the Salab case from the District of Columbia, and the Community Action case from Indiana are cases in which direct action statutes are held not to apply to declaratory judgment actions.

Indeed, the Court has in its questions come to directly what is involved here. NECC has ceased doing

business. NECC is alleged to be unable to satisfy a potential judgment. We know there is litigation between NECC and its insurers, and there is the very real risk that NECC and its insurers will settle that litigation for a buyout of the policies, which would result in vitiating up to $20 million of insurance coverage that otherwise would be available to a legitimate claimant.

Your Honor, in candor, I'm not free to report all of the details, but we have been in negotiation regarding NECC, and there is, you know, the real possibility of a bankruptcy, although there is a possibility of striking some kind of a deal with Emhart



short of the bankruptcy. But the concern and the thing that motivated this case was the concern that NECC would enter into a deal with the insurers that would result in a buyout eliminating a substantial amount of that insurance coverage.

THE COURT: In the Complaint -- I guess the first question I have is, in the Complaint, what is there to sort of explain the situation with respect to NECC which would lead the Court to be able to conclude that there's a need for an injunction or declaration or the likelihood of this settlement that you talked about? It seems like a lot of that is outside of the Complaint.

MR. PIROZZOLO: It is. It is. Your Honor, the Complaint is at paragraph 87 and 88. I'm sorry. In paragraph 87, it alleges that NECC ceased business

operations and that it lacks assets to satisfy a judgment. For the purpose of stating a cause of action, it is sufficient. It would be our intention that, if a deal is not struck, to be back here with a full fact record seeking injunctive relief. But I think for the purpose of pleading, the purpose of stating a cause of action, we have stated a cause of action that would support a declaratory judgment and injunctive relief.

54

I agree that the Court requires a fact record in order to actually enter that relief, and the reason we have not yet presented that fact record is it may turn out not to be necessary.

Now, the other argument -- does your Honor wish me to go on?

THE COURT: I'm sorry?

MR. PIROZZOLO: Should I go on to another subject?

THE COURT: Yes. I think so.

MR. PIROZZOLO: The other argument of the insurers is that Emhart is not a third-party beneficiary. Again, the cases that we have cited make it absolutely clear that Emhart, as a claimant, as an injured party under an insurance policy is an intended beneficiary. Rhode Island is likely to follow the Restatement. And the Restatement provides that an intended beneficiary may bring suit.

I would quote the Flattery v. Gregory case, a Massachusetts case, and in the absence of authority,

Rhode Island authority, Rhode Island often follows Massachusetts. It says, (Reading:) A beneficiary of a promise is an intended beneficiary. If recognition of a right to performance and the beneficiary is appropriate to effectuate the intention of the parties



and either, A, the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary, the performance of the insurance promise would satisfy the obligation of NECC to pay money to Emhart. So it meets Part A of the Restatement. And the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. Why else do you carry third-party liability insurance? Third-party liability insurance is by its very nature intended to benefit a third party injured by the insured.

There are other cases that we cite that say, and I'll quote the Wierman case, which states that a member of the general public was deemed an intended beneficiary under a contract between an insured and his insurance agent in part because the public expects that a source of payment will be provided by mandatory automobile insurance.

It seems almost without possibility of dispute that the intended beneficiary of liability insurance are potentially injured parties, and, therefore, those potentially injured parties would have third-party beneficiary claim against the insurer.

As to Emhart's interest, I would emphasize the

Bankers Trust case, which is a very, very thorough,



very thorough exposition of the policy involved and the rationale why Emhart should be able to maintain a declaratory judgment claim and seek injunctive relief against the insurers.

Unless the Court has questions about the insurance portion of the claim, I would go on to the other --

THE COURT: I understand your arguments so why don't you go ahead and -- I guess the only thing, before you get to that, that I would like you to comment on is what impact does the state court suit have on this proceeding and why shouldn't this be in state court? To the extent it's anywhere, why shouldn't it be in state court? That's where the action was brought between New England Container and the insurers. Why shouldn't you be in there?

MR. PIROZZOLO: Well, I think, in a way, the Court -- we start out with the Court has discretion to allow the case to go forward here under the Federal Declaratory Judgment Act. It is coupled with the CERCLA claim as to which there is jurisdiction in this Court, and it would be most appropriate that the action proceed both as to the CERCLA claim and as to state law claims in this Court at one time.

Passing that, and I do think it is a practical



consideration, is this Court's familiarity, not only

with the complex law in this area but the law as it pertains to this very claim and the background of this claim will make it possible, I think, for this Court to move very quickly to adjudicate the issues in this case.

And so time is a major factor here, and it would be most advantageous if this Court held jurisdiction and decided this case as quickly as it appears the Court is willing and able to do.

THE COURT: What if I agreed with New England Container on the CERCLA claims? Would there be jurisdiction?

MR. PIROZZOLO: I think that it becomes a question of whether once jurisdiction attaches for any claim, even if it's dismissed, the remaining claims -- the remaining claims may continue under supplemental jurisdiction in this Court, but there wouldn't be original jurisdiction.

THE COURT: The practice I have followed consistently has been if, as a result of a motion to dismiss, the federal causes of action are dismissed early in the case, then I will not proceed. I won't hang onto the case just because these other claims were filed, supplemental claims. But if it's late in the



case where discovery has already been completed, we're approaching trial, that sort of thing, then I'll exercise my discretion to hang on to the case.

This case is a little bit unique because of the existence of the other case, which has maybe given me a

lot more knowledge about the case than I would have otherwise at this stage of the proceedings. But that's not really a question. I'm just telling you that's how I operated in the past.

MR. PIROZZOLO: It would not surprise me, your Honor, but I do think this case is different from the ordinary case. And, indeed, even though it's a motion to dismiss early in the case, it is a little late. We are down the road here. And if the Court were to hold onto the case in the absence of the CERCLA claims, I would expect dispositive motions to be coming in virtually immediately absent a settlement. If there is a settlement, that may change things. But I can't at this stage know whether there will be or not.

THE COURT: Okay. Why don't you move on then to the CERCLA arguments.

MR. PIROZZOLO: Okay. As to NECC, we start out with the NECC argument presumed Emhart is a liable party, and that presumption is just wrong. Emhart is a potentially liable party.

59

THE COURT: Wait. Wait. Wait. That's not what they said. What they said is that you drafted the Complaint to say that you are a liable party.

MR. PIROZZOLO: Potentially liable party.

THE COURT: Well, I don't know what the paragraph number in the Complaint is, but they say that you explicitly said that you're going to be held liable for damages.

MR. PIROZZOLO: Well, if it says that, it was

erroneous. It is that we have the risk of being held liable. We are potentially liable, but I don't believe we conceded that we are liable. And if we inadvertently did that, I would hope that the Court will allow us leave to amend to clarify that we are alleging we are potentially liable or risk liability, but categorically deny that we are, in fact, liable.

THE COURT: Well, do you have authority that you can point to under 107 that distinguishes liable party from a potentially responsible party that draws this kind of fine distinction between -- that I was trying to get at with Mr. Peloso that between being legally liable in the sense of actually responsible for the pollution versus potentially responsible for the cost of cleanup.

MR. PIROZZOLO: I think it's in the statute

60

itself and that is -- and you see it in the cases. You have a distinction between a cost recovery action and a contribution action. A liable party or a potentially -- a liable party, I think, after potential liability is established, is entitled to contribution and that's where the Aviall case comes in as to what the procedural vehicle is. A party who is entirely innocent is entitled to cost recovery. And I have the section in front of me. It's Part B of 107.

(Reading:) There shall be no liability under Section A of this section for a person otherwise liable who can establish that the hazardous condition was caused by an act of omission of a third party other

than his own agent.

So that I think that the statute itself and the cases that are in our brief really deal with two circumstances, one where a party alleged to be potentially liable can establish his innocence of any liability, and that is Emhart's position here; and one where he is liable for some, maybe a disputed amount of the problem, in which case he's entitled to contribution in excess of the pro rata share.

I believe that's very evident from both the statute and the discussion in the cases.

So the first arrow to our bow is that Emhart is



not ultimately liable, and therefore, has a right to proceed under 107 as a cost recovery action, and that that proceeding is unaffected by Aviall.

The second arrow is -- I'll come to the 113 section, but under 107 is that given the Aviall decision that there remains a right of contribution under 107, which is, as the courts have said, an implied right of contribution. And that implied right of contribution, again, is evident under the statute. Because the statute says under 107, (Reading:) Notwithstanding any other provision or rule or law.

Any other provision or rule of law would include the provisions of 113. And 113 mirrors that statement in 107 which says, in Section F1, contribution, where the section that deals with the need for a civil action says, (Reading:) Nothing in this subsection shall diminish the right of any person to bring an action for

contribution in the absence of a civil action under 9606 of this title or 9607 of this title.

So, clearly, the statute contemplates that there may be a right of contribution other than 613; that right of contribution exists under 9607, and the Courts have construed that as an implied right of contribution. And the major cases are, that we cite is the District of Maine case, which, again, is within



this circuit, not binding but very, very persuasive, that case finds that there is a right of action for contribution under 9607.

The Second Circuit case, Consolidated Edison to the same effect. The Eighth Circuit case, Atlantic Research, to the same effect. The Third Circuit is the only circuit that has gone the other way. And the rationale, a careful reading of the Third Circuit case is that it felt bound by its pre-Aviall decision, and, of course, the body of law pre-Aviall was since there is a right of contribution under 9613, there is no right of contribution under 9607.

So both the Second Circuit, the Eighth Circuit and Maine say now that you've been determined that for certain kind of cleanups there may not be a right of contribution under 9613, then we default to 9607 and the right of contribution exists under 9607.

I would invite the Court's attention to the Raytheon case, which is a District of Kansas case, which deals explicitly with the argument made that there is no right of contribution under 107 where there

is a UAO. The argument made by the insurers is, well, if there's no civil action under 113, and there's a right of contribution under 107, that's for a voluntary action. And the underlying facts of those cases there



was totally voluntary action, under state supervision. Here, we have an anomaly. Emhart was under an order from the EPA. And the argument, which would be entirely -- and it would make no policy sense whatsoever. The argument is the UAO from the EPA to Emhart is not a civil action, therefore, no right of contribution under 113. And it's not a voluntary order so, therefore, no right of contribution under 107. Therefore, if a party such as Emhart gets a UAO, it can't get contribution under either route, that would seem to be so wholly anomalous that it cannot be a reasonable reading of the statue.

The UAO either is a civil action giving right to contribution under 113, and there's no authority that says it's not, and I would urge that the Court hold in this case that the UAO for reasons in cases that we've cited is a civil action, is meant to be a civil action under 113. But if it's not, what it is is Emhart acting voluntarily under the UAO. It could have not cleaned up. It could have risked the penalties and the fines and other disadvantages of not cooperating with the EPA, and then it would have a right of contribution under 107.

Well, if you look at the whole purpose of CERCLA, that kind of conduct would be absolutely

contrary to the congressional intent. The congressional intent is to encourage responsible parties or potentially responsible parties to act responsibly and get sites cleaned up as quickly as possible.

In this case, Emhart has acted responsibly. It got an order. It complied with the order. And now, the issue is the money, where does the money come from. It should have a right to get the money it spent and will spend in the future from New England Container, the party that really caused the damage on this site, and from New England Container's insurers where New England Container is with funds to be responsible for the damage that was caused.

I think, your Honor, we have covered the law very carefully in our briefs. So if the case is the Court has no other questions, I've got nothing further to add.

THE COURT: No. I think I've got a good sense of both of your arguments.

All right. Is there a pressing need to address anything Mr. Pirozzolo's had to say? I don't want you to add anything -- I don't want you to repeat anything you've already said.

MR. WHITE: There's one case that I wanted to



address that Mr. Pirozzolo addressed, if that's

acceptable with the Court.

THE COURT: Can you tell me just what case it is? I'll make sure I look at.

MR. WHITE: Sure. It's been referenced at least four times, the Robert Morrow versus Norfolk and Dedham case. The reason I want to address it is that Norfolk and Dedham said Robert Morrow wasn't insured; i.e., a party to the contract, which is why Judge Gibney distinguished it. They made the claim and now Judge Gibney made a distinction about that afterwards, and that's the salient part of the case.

THE COURT: Your point has been made.

MR. WHITE: Okay. Thank you, your Honor.

MR. PELOSO: Your Honor, I have one point, if I may.

THE COURT: Let me hear from Travelers first. Do you have anything else you need to say?

MR. HERMANSON: Yes, your Honor. I'll do the same as my co-counsel. I'll bring the Court's attention to one additional case as well. The Doire case, your Honor, is a Rhode Island Supreme Court case that addresses the distinction between the declaratory judgment aspect of 27-7-2, a direct action.

THE COURT: What's the name of the case?

66

MR. HERMANSON: It's D-O-I-R-E.

THE COURT: D-O-I-R-E.

MR. HERMANSON: Correct. I can get you a cite if you would like.

THE COURT: That's all right. As long as I have

the name of it. Okay. Great.

MR. PELOSO: Your Honor will notice that we did not submit a surreply brief in support of our motion, and the reason for that is, I just want to make clear to the Court, is we granted an extension of time for Emhart to respond to our brief, and it ran up against today's hearing date. And I think in talking to local counsel and so forth, we didn't want to have to push off our motion and disrupt all the motions here today, but I believe that I've covered, hopefully to your Honor's satisfaction, all the points that I would have made in writing to the Court.

THE COURT: Yeah. I think you have covered it. All right. Well, there's a lot of interesting questions in this case. The one thing I would like to know about is the timing on any potential settlement here. I don't want to invest a lot of time -- there's some complicated material here, and if I'm going to write an opinion, that's a significant investment of time.

67

MR. PIROZZOLO: I have looked for an authority, by that I mean the right to, on the part of the other parties to report to the Court where we are, and I've been unable to get that authority. I will endeavor to do that, and perhaps report to the Court by letter.

THE COURT: I don't want to know anything about the substance of any settlement. I'm more concerned about the timing. I don't want to invest a lot of time in working out an opinion in a number of complicated

issues here and then only to find out that you've settled it.

MR. PIROZZOLO: I appreciate that, and I am sensitive to that. Let me make some phone calls over the next 24 hours, and I will write to the Court either that I have a projected time or that I can't project.

THE COURT: Or even if you need to tell me, you know, if it's going to settle, it would settle probably within 30 days so maybe hold off 30 days, and that kind of thing could be very helpful. I can tell you it's a very frustrating thing to have -- it's happened to me a couple of times where I've virtually got an opinion all written and ready to go that took a lot of work and then, boom, the case settles. And you just feel like you've wasted and taken that time away from other things.



MR. PIROZZOLO: I totally appreciate that, your Honor.

THE COURT: So just try to give me some guidance, and if it's give us two weeks, give us a week, give us 30 days, whatever, try to give me some idea.

MR. PIROZZOLO: I wanted to do that responsibly, so if I may get back to the Court on it. I appreciate it.

MR. PELOSO: Your Honor, I'll do the same thing.

THE COURT: All right. Very well. Thank you very much.

(Court concluded 11:20 a.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton, RPR

EMHART V NEW ENGLAND

Date

DUFFY SWEENEY & SCOTT, LTD
BUSINESS LAW & LITIGATION

*Rachelle R. Green*
*rgreen@duffysweeney.com*

February 6, 2007

***Via Hand Delivery***
The Honorable Patricia A. Hurst
Providence County Superior Court
250 Benefit Street
Providence RI 02903

Re: *Emhart Industries, Inc. vs. New England Container Co., Inc. et al.*
C.A. No. 06-6095

Dear Judge Hurst:

I enclose a bench copy of Plaintiff's Objection to Defendant Travelers Casualty & Surety Company's Motion to Dismiss Plaintiff's Complaint, Plaintiff's Memorandum of Law in support thereof, and copies of the cases principally relied on by Plaintiff in opposition to Defendant Travelers Casualty & Surety Company's Motion to Dismiss. This matter has been set for hearing on February 20, 2007.

Sincerely,

Rachelle R. Green

RRG/emh
Enclosures
cc: Jack R. Pirozzolo, Esq. (*w/o enclosures*)
James W. Ryan, Esq. (*w/o enclosures*)
John F.X. Peloso, Jr., Esq. (*w/o enclosures*)
Todd D. White, Esq. (*w/o enclosures*)
Eric B. Hermanson, Esq. (*w/o enclosures*)
R. Kelly Sheridan, Esq. (*w/o enclosures*)

*Emhart Industries, Inc\New England Container Corp. (NECC) (06-6095) PCSC\Letters\Hurst 02-06-07 RRG.doc*