UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                )
EMHART INDUSTRIES, INC.,        )
                                )
        Plaintiff and Counterclaim )
        Defendant,              )
                                )
        v.                      )   C.A. No. 06-218 WES
                                )
NEW ENGLAND CONTAINER COMPANY,  )
INC., et al.,                   )
                                )
        Defendants and Counterclaim )
        Plaintiffs.             )
_____)
                                )
EMHART INDUSTRIES, INC.,        )
                                )
        Plaintiff and Counterclaim )
        Defendant,              )
                                )
        v.                      )   C.A. No. 11-023 WES
                                )
UNITED STATES DEPARTMENT OF THE )   CONSOLIDATED
AIR FORCE, et al.,              )
                                )
        Defendants, Counterclaim )
        Plaintiffs, and Third-Party )
        Plaintiffs,             )
                                )
        v.                      )
                                )
BLACK & DECKER, INC., et al.,   )
                                )
        Third-Party Defendants. )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge.

I.   Introduction

Having trudged through several phases of litigation and been found liable for contamination at the Centredale Manor Restoration Project Superfund Site, Emhart now hopes to recover some response costs as contribution from those it argues are also responsible.  To do so, it leans on Section 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), see United States v. Atl. Rsch. Corp., 551 U.S. 128, 131, 139 (2007), under which Emhart must prove as follows: (1) the party falls within one of the four categories of covered persons; (2) there was a release or threatened release of a hazardous substance from a facility; (3) the release or threatened release caused the incurrence of response costs; and (4) the response costs track the national contingency plan, Dedham Water Co. v. Cumberland Farms Dairy, 889 F.2d 1146, 1150 (1st Cir. 1989) (citing 42 U.S.C. § 9607(a)).

Emhart's targets - the Third-Party Defendants and Cross Defendants[1] – resist this result, taking aim at Emhart's claim that they are covered persons.  The Court allowed these Defendants to move early,[2] before the

_____

[1] The Court uses "Defendants" to include their predecessors, some of which are merely alleged.

[2] The movants are BASF Corporation, BNS LLC, CNA Holdings LLC, Cranston Print Works Company, Eastern Color & Chemical Co., Exxon Mobil Corporation, Henkel Corporation, Hexagon Metrology, Inc., Ivax LLC,

2

bulk of expert discovery, on the limited question[3] of whether there is a triable issue as to arranger liability.  From this came thirteen Motions for Summary Judgment from fourteen Defendants, ECF Nos. 890, 893, 894, 896, 898, 900, 902, 904, 905, 908, 910, 912, 914.  As stated in the Court's September 22, 2022, Text Order, the Court DENIES all, with two caveats: both Henkel Corporation and BASF Corporation (only as it relates to Paragon) may refile their Motions, ECF Nos. 905, 914, following expert discovery.  The reasons for the Court's rulings follow.

## II.  Analysis

These Defendants are tied to this saga because they sent used 55-gallon steel drums to New England Container Company ("NECC") for drum reconditioning between about 1948 and 1972.  Emhart Statement Additional Facts ("Emhart Stat.") ¶¶ 134-135, ECF No. 944; Emhart Resp. Defs.' Common Facts ("Emhart Resp. Stat.") ¶ 4-5, ECF No. 945.  To attach liability, Emhart argues these customers were arrangers because they intended to dispose of residual hazardous substances at the Site. Because Emhart did not move for summary judgment, it need not prove

_____

Organic Dyestuffs Corporation, The Original Bradford Soap Works, Inc., Sequa Corporation, Teknor Apex Company, and Union Oil Company of California.  They move together.  See Defs.' Mot. Summ. J. 2 n.1, ECF No. 890.

[3] The parties quibble with the scope of the limited issue.  Emhart understood it to be this: "Assuming (without deciding) that Defendants supplied drums to NECC containing residual hazardous substances, is there a genuine dispute of material fact about whether Defendants intended to dispose of those hazardous substances in the process?" Emhart Statement Additional Facts ("Emhart Stat.") 1-2, ECF No. 944. Most Defendants refuse certain of these assumptions.

this now; instead, the familiar summary judgment standard applies, testing for triable issues and requiring the Court to draw all reasonable inferences in Emhart's favor.  See Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 175 (1st Cir. 2021).

These Motions concern whether Defendants were "arrangers," meaning they "entered into [a sale] with the intention that at least a portion of the product be disposed of during the transfer process."  Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 612 (2009).  An arranger "arranges for disposal or treatment . . . of hazardous substances."  42 U.S.C. § 9607(a)(3) (cleaned up).  "Disposal" is "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  Id. § 6903(3).

Burlington Northern is the seminal case on arranger liability. There, the Supreme Court confirmed that liability attaches where entities "enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance" but does not attach "merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination."  556 U.S. at 610.

The trickier cases are those landing along this spectrum of liability – these were the subject of Burlington Northern.  "[C]ases in

which the seller has some knowledge of the buyers' planned disposal or whose motives for the 'sale' of a hazardous substance are less than clear" require a fact-intensive, case-specific analysis. Id.; see also Consolidation Coal Co. v. Ga. Power Co., 781 F.3d 129, 147 (4th Cir. 2015) ("What qualifies as arranging for disposal under CERCLA is clear at the margins but murky in the middle.") (internal quotation marks omitted).

In Burlington Northern, the Court held that Shell, which shipped pesticides and other chemicals before switching to bulk sales and requiring its purchasers to maintain bulk storage facilities, was not an arranger. 556 U.S. at 612. It reasoned that Shell did not "enter into the sale with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in the statute." Id. (cleaned up). Evidence supported that Shell was aware of "minor, accidental spills" but did not "intend such spills to occur." Id. at 612-13 (cleaned up). And "[w]hile it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." Id. at 612 (emphasis added). To be an arranger, Shell must have sold the chemicals "with the intention that at least a portion of the product be disposed of

during the transfer process by one or more of the methods" defined as disposal.[4]  Id. (emphasis added).  Shell, however, "took numerous steps to encourage its distributors to reduce the likelihood of such spills."  Id. at 613.  Thus, "Shell's mere knowledge that spills and leaks continued to occur" provided "insufficient grounds" for arranger liability to attach.  Id.  And so, the Court held that it did not.

In Burlington Northern's wake, courts have tried to gauge where offending parties land on the spectrum of liability.  The analyses vary depending on the facts, but always focus on whether the offenders took intentional steps toward disposal.[5]  See id. at 611.  From those courts' analyses, we can glean the following:

First, a party may be liable as an arranger even absent an agreement expressly contracting for disposal if it understood disposal "would be the result of its actions and took the conscious and intentional step of leaving [the disposer] to dispose of the materials."  United States v. Gen. Elec. Co., 670 F.3d 377, 391 (1st Cir. 2012) (citing Burlington N., 556 U.S. at 610, which held that courts must "look[] beyond the parties' characterization of the transaction as a

---

[4] In adopting this test, the Court rejected the Ninth Circuit's more relaxed definition of arranger: those who are parties to transactions where hazardous waste disposal is a "foreseeable byproduct."  Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 606 (2009).  Across the board, Defendants argue that Emhart inaptly applies the "foreseeable byproduct" standard to avoid summary judgment.

[5] Defendants give only cursory treatment to the relevant circuit and district court cases (and none to cases involving drums).

'disposal' or a 'sale' and seek to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict liability provisions"). Thus, Defendants' plaint that "Emhart has not produced a single contract or agreement for the disposal of hazardous substances at the Site" is not dispositive. Mem. L. Supp. Defs.' Mot. Summ. J. 9, ECF No. 890-1.

Second, actual (not constructive) intent is required, see Gen. Elec., 670 F.3d at 390, and courts rely on circumstantial evidence of the totality of the circumstances to find arranger liability when direct evidence is lacking, see, e.g., id. at 394 (relying on circumstantial evidence); United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1233 (6th Cir. 1996) (same); see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 120 (2d Cir. 2010) (quoting Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc., 240 F.3d 534, 547 (6th Cir. 2001)) ("When determining CERCLA liability, there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain.") (internal quotation marks omitted). For this reason, Defendants' insinuation that circumstantial evidence is somehow second-class to direct evidence and cannot raise a triable issue is off the mark.

Third, control over the method of contamination is unnecessary. Distilled to its essence, arranger liability wants "to deter and, if necessary, to sanction parties seeking to evade liability by

'contracting away' responsibility." Gen. Elec., 670 F.3d at 382.  This purpose would be defeated if Defendants' exposure ended once the drums left their control, as they suggest.  See Cello-Foil, 100 F.3d at 1232 ("[A] party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of substances.").

Fourth - and most consequential to these Motions - disposal need not be the only purpose of the transaction; instead, it may be one among several.  Emhart emphasizes that "[a]ll that is required for arranger liability to attach is that disposal be an intended purpose of a transaction; it need not be the sole or even primary purpose of the transaction."  Emhart's Opp'n Defs.' Mot. Summ. J. ("Opp'n") 9, ECF No. 943.  Defendants, as they must, conceded as much at oral argument.[6]  See Cello-Foil, 100 F.3d at 1233-34 ("The primary purpose of the drum return arrangement was to regain the deposit; however, we conclude that the district court erred when it concluded the Government offered absolutely no proof that Defendant's further purpose was to dispose of the residual wastes returned with the drums.") (emphasis added); see also Consolidation Coal, 781 F.3d at 149 (recognizing that Burlington Northern does not "foreclose arranger liability as a matter of law based

---

[6] Saying there can be two purposes is different from saying that "disposal of hazardous wastes [wa]s a foreseeable byproduct of, but not the purpose of, the transaction giving rise to arranger liability." Burlington N., 556 U.S. at 606-07.  Defendants' criticism of Emhart's employ of Vincent Buonanno's milkman analogy does not alter this conclusion.

on a secondary intent, at least when there is a sufficient factual basis for such a finding from the necessary 'fact intensive and case specific' inquiry" (quoting Burlington N., 556 U.S. at 610)).

With those boundaries sketched out, Emhart and Defendants both argue that their case is one of the "easy" ones falling on opposite ends of Burlington Northern's spectrum.  Neither is correct, but Emhart is closer.

Emhart first tries a sweeping argument, claiming that "drum reconditioning cases firmly fall near, if not directly on," the end of the Burlington Northern scale where the "sole purpose is discarding a used and no longer useful hazardous substance."  Opp'n 2, 20 ("intent is virtually self-evident in the drum reconditioning context"), 22. With this, Emhart would have the Court find that these Defendants were the classic arrangers – generating waste and having it hauled away. That theory has some facial appeal, but the law does not support liability simply because Defendants were drum reconditioning customers. See Cello-Foil, 100 F.3d at 1234 n.6 (declining to issue holding that would lead to "every drum return agreement or arrangement" being "considered an arrangement for disposal").

Rather, the analysis is fact intensive.  Intent to dispose focuses foremost on intentional steps Defendants took toward the goal of disposal, but also asks whether the product was useful, if Defendants

knew of the hazardousness,[7] and the state of the hazardous substances at the time of the transaction.[8]  These together can paint a picture of intent to dispose.   It's worth repeating that, while there is a distinction between desire to dispose and knowledge of disposal, intent must be to dispose.  See Am. Premier Underwriters, Inc. v. Gen. Elec. Co., 14 F.4th 560, 572 (6th Cir. 2021) ("Disposal was not the goal."). Thus, while knowledge alone might not suffice, willful blindness – a concept borrowed from criminal law – could suggest such an intent because it implies active steps to ignore.  See Gen. Elec., 670 F.3d at 387 (discussing calculated inactions in the arranger liability equation).   Intent is a fact that may be inferred from the "natural consequences of [one's] deeds," Cello-Foil, 100 F.3d at 1233, and it is

---

[7] "[K]nowledge that a material was hazardous is a requirement for arranger liability under CERCLA."  Cooper Crouse-Hinds, LLC v. City of Syracuse, N.Y., 568 F. Supp. 3d 205, 235 (N.D.N.Y. 2021), reconsideration denied, No. 516CV1201MADATB, 2022 WL 344053 (N.D.N.Y. Feb. 4, 2022).   Most Defendants no doubt knew their material was hazardous.  See Emhart Stat. ¶¶ 96-133; Appleton Papers Inc. v. George A. Whiting Paper Co., No. 08-C-16, 2012 WL 2704920, at *10 (E.D. Wis. 2012) ("[L]arge drums of old chemicals pose an obvious environmental risk (even if the specific risk due to PCBs was not so obvious).")). Still, some argue the proof fails as to them.

[8] No Defendant meaningfully analyzes another factor courts sometimes consider: whether the hazardous material was contained or leaking at the time of the transaction.  See Consolidation Coal, 781 F.3d at 154 (material hazardous in use but contained when sold).  Emhart suggests the drums leaked when stored in NECC's operational areas.  But intent is measured at the time of transaction, see Burlington N., 556 U.S. at 610, so Emhart's point adds little.  In any event, the lack of discussion suggests it is a non-issue, so the Court treats it as such.

a necessary precursor to the imposition of CERCLA's strict liability, id. at 1231.

The facts and supporting evidence in this case go back decades, differ by Defendant, and lend themselves to arguments that vary from Defendant to Defendant.  But despite their distinctiveness, variations on two common themes emerge.  The first – and the most controverted - concerns the amount of residue left in the drums sent to NECC, and the second considers the economic arrangements between Defendants and NECC.  Both are relevant to Defendants' intent to dispose and, where there are disputed issues of fact, preclude summary judgment.[9]  The Court briefly addresses them in turn.

A.   Amount of Residue in Drums

An inference about intent may be drawn from evidence of the drums' emptiness.  In Cello-Foil,[10] the Sixth Circuit said as much, recognizing

---

[9] Emhart makes a cryptic and undeveloped argument that "direct evidence of one NECC supplier's intent is valid circumstantial evidence of other suppliers' intent, especially considering that all of this evidence is consistent."  Emhart's Opp'n Defs.' Mot. Summ. J. 17 n.5, ECF No. 943.  Emhart cites nothing to support this blanket statement, and neither has the Court uncovered anything suggesting what Emhart says is true.  The case law gives no indication that Defendants rise or fall together.  And if this argument flows from Emhart's claim that all drum reconditioning customers are presumed to be arrangers, it is downstream from a faulty premise and fails for the same reason.

[10] This case is pre-Burlington Northern.  Not only was it cited in Burlington Northern, see Burlington N., 556 U.S. at 611, but the Sixth Circuit panel at oral argument in American Premier acknowledged Cello-Foil as pre-Burlington Northern, see Oral Argument, C.A. No. 20-4010, Am. Premier Underwriters v. Gen. Elec, and cited it approvingly anyway, see Am. Premier Underwriters, Inc. v. Gen. Elec. Co., 14 F.4th 560, 570

that leftover residues reflect on intent to dispose.  100 F.3d at 1234 n.6.[11]  That case centered on a drum deposit arrangement through which parties returned drums to the disposer and received credit for doing so.  Id. at 1233.  As with these Defendants, those in Cello-Foil swore their drums were clean.  Deciding that genuine issues of fact precluded summary judgment anyway, the court imagined how a factfinder might digest the record evidence; those conclusions, it wrote, could range

_____

(6th Cir. 2021).  And for good reason: Cello-Foil foretold much of Burlington Northern and aligns with it and the cases that followed.

[11] In full, it said:

> One of the difficult issues this case presents is how much must be left in a returned drum before CERCLA liability attaches.  As the evidence in this case indicates, typical commercially employed methods for emptying solvent barrels leaves some residue, approximately a tea cup's worth, in the barrel.  If every party who left this amount of residue in a drum were liable, every drum return agreement or arrangement would be considered an arrangement for disposal.  In light of the demonstrated physical problems in completely emptying these drums, we are not convinced that CERCLA is intended to reach all such transactions.  Rather, whether a drum return arrangement is an arrangement for disposal should be determined on a case-by-case basis. Furthermore, there appear to be benefits of these agreements, such as the reuse and recycling of drums, which we do not wish our interpretation of the statute to discourage.  Thus, at this point it is important to reiterate that whether an arrangement has been made is an issue to be determined viewing the totality of the circumstances.

United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1234 n.6 (6th Cir. 1996).

from the defendants did not leave solvents in the drums, to the drums contained other debris, to the acts of leaving residue did not support an inference of disposal.  Id. at 1233-34.

Just as in Cello-Foil, Emhart need not prove at this point that the drums for sure contained residues; rather, its lift is much lighter, requiring it only to develop a record on which a reasonable factfinder could find in its favor.  And the evidence that the Sixth Circuit relied on is markedly similar to the evidence here.  Id. at 1234-35.  Emhart summarizes that the residues ranged from a coating to a quarter full, Emhart Stat. ¶ 73, and from this a reasonable factfinder could infer that Defendants took affirmative steps to dispose, see Cello-Foil, 100 F.3d at 1234 n.6.  Emhart also cites to accounts from former NECC employees expanding on NECC's relationships with these customers.  For example, Vincent Buonanno, NECC's former V.P. and C.E.O., testified that the drum conditioning business is like the "milkman" picking "up the dirty milk bottles," describing it as like a "dirty laundry" service.  He testified that suppliers would use the drums to move products, "[a]nd then they took the dirty container, like dirty laundry, and sent it to the laundry.  And we would clean them and give them back a sterilized, re-coated container, which they would use again internally."  Emhart Stat. ¶ 36-38.  Buonanno was not alone in this view.  See, e.g., id. ¶ 40 (Lester Olson testifying that the purpose is to "clean out" used drums); id. ¶¶ 41-42 (Joseph Nadeau testifying that NECC removes "stuff" from drums); id. ¶¶ 43-44 (Robert Baker testifying

that the purpose is to detoxify drums).  The court in Cello-Foil cited to similar testimony from that disposer's employees, who also remarked on the impossibility of draining a drum completely.  100 F.3d at 1233 n.2.

Defendants would rather focus on their mitigation efforts, which are detailed in the record.  They say, for example, that not only were NECC's drivers strictly instructed to pick up only empty drums (i.e., ones with less than two inches of material), but leaving product was against their financial interests.  Emhart Resp. Stat. ¶¶ 15-16, 18. Because NECC required their drums to be empty, most took pains to do so.  But such efforts, while certainly relevant, do not entitle Defendants to judgment as a matter of law.  Evidence of attempts to reduce the likelihood of "spills" may cast doubt on intent to dispose. See Burlington N., 556 U.S. at 612-13 ("[T]he evidence does not support an inference that Shell intended such spills to occur.  To the contrary, the evidence revealed that Shell took numerous steps . . . to reduce the likelihood of such spills").  And Defendants are correct that imperfect practices themselves cannot support a finding of intent to dispose.  See Burlington N., 556 U.S. at 613.

Emhart not only denies the effectiveness of Defendants' mitigation efforts, but also disputes whether Defendants even made such efforts. And on this record a reasonable factfinder could conclude, as Emhart hopes, that Defendants' "practical efforts to" limit the residues "shows that these Defendants knew that their used drums contained residues and

that any such residues that could not be disposed at their facility would need to be disposed by NECC." Opp'n 19; see Gen. Elec., 670 F.3d at 389-90 (General Electric's "well-documented history of purposeful inaction" shows its intent necessary to support liability as an arranger where General Electric sought to "wash [its] hands of the issue" of disposal). Or that same factfinder could instead tend in Defendants' favor, viewing Defendants' actions as only efforts to preserve product, with no intent to dispose. See Am. Premier, 14 F.4th at 573 (distinguishing Gen. Elec., and holding that "[i]f anything, [General Electric] took steps to preserve, not lose the essential coolant") (internal quotation marks omitted). It is too soon to say and favoring one reasonable inference over another would betray the summary judgment standard.

This result should not surprise: these cases are at least as often resolved at trial (and more so in cases involving drums), which makes sense based on the fact-intensive nature of the intent issue. See Gen. Elec. Co., 670 F.3d at 394 (in scrap chemical case, affirming district court's bench decision after four-day bench trial holding that General Electric was liable as an arranger where it trucked scrap Pyranol because General Electric viewed scrap Pyranol as a waste product and intended to offload the disposal responsibilities onto Fletcher); Cello-Foil, 100 F.3d at 1233 (in drum deposit case, reversing district court's grant of summary judgment for the defendants because "[b]y leaving amounts of solvents in drums ranging from one-half to ten

gallons, which [the d]efendants knew Thomas Solvent would carry away, a trier of fact could infer that [the d]efendants were taking affirmative acts to dispose"); Appleton Papers Inc. v. George A. Whiting Paper Co., No. 08-C-16, 2012 WL 2704920, at *11 (E.D. Wis. 2012) (in paper waste case, holding that, post bench trial, Appleton did not arrange the disposal of hazardous waste where the waste was a secondary market for Appleton and financial considerations were the impetus).[12]

In sum, factual disputes prevent summary judgment for most Defendants. Viewing the evidence in the light most favorable to Emhart, the Court holds that material factual disputes exist for Defendants CNA Holdings, LLC (American Hoechst), Union Oil Company of California (AMSCO), BASF Corporation (Ciba-Geigy Corporation), BNS, LLC, Hexagon Metrology, Inc., Cranston Print Works Company, Eastern Color & Chemical Co., Exxon Mobil Corporation (Esso), Ivax LLC (U.S. Oil), The Original Bradford Soap Works, Inc., Organic Dyestuffs Corporation, Teknor Apex

---

[12] Some cases, particularly those involving transformers, have come out the other way. See Am. Premier, 14 F.4th at 573 (in transformer case, affirming district court's decision on cross-motions for summary judgment that arranger liability was inappropriate where General Electric's purpose was to enable transformers to function safely in exerting Pyranol, not to facilitate discharge of waste into the environment); Consolidation Coal, 781 F.3d at 144, 150 (in transformer case, affirming grant of summary judgment for the defendants because no genuine issue of material fact existed where the disposer purchased used transformers and reconditioned them for sale); Schiavone v. Ne. Utils. Servs. Co., No. 3:08CV429 (AWT), 2011 WL 1106228, at *6 (D. Conn. Mar. 22, 2011) (in transformer case, granting the defendants' summary judgment motion, holding that their sales of used transformers as scrap metal did not show an intent to dispose of transformer oil because the purpose of the sale was to sell the transformers as scrap metal). But transformers are inherently different from drums.

Company, and Sequa Corporation (Warwick).  The extent of the evidence varies among these Defendants, but there are clearly enough disputed fact issues for each to proceed to trial.[13]  Whether Defendants' "acts in leaving residual amounts of solvents in the drums," if proven, supports "an inference of purposeful or intentional disposal" is a question for trial.[14]  Cello-Foil, 100 F.3d at 1233-34.

---

[13] Though for some less than others.  For those Defendants facing thinner evidence – for example, BNS and Hexagon – the Court finds that there is still enough for a reasonable factfinder to infer intent to dispose, with the caveat that the records as to these Defendants are less convincing than the same of their co-Defendants.

[14] A few specific arguments should be addressed, even though they do not affect the outcome.  Ivax, for example, challenges Peter Hauser, who intends to testify about the materials in U.S. Oil's drums.  It says Emhart has no evidence establishing the contents of the drums, so the testimony is speculative at best.  Third-Party Def. Ivax LLC's Reply Mem. Supp. Mot. Summ. J. ("Ivax Reply") 6-7, ECF No. 1163.  Ivax argues that nothing confirms the contents of U.S. Oil's drums, and the closest Emhart gets is showing the drums had oily and lubricating residues.  Id. at 8-9.
     From that, Ivax submits that CERCLA's petroleum exclusion, which carves out petroleum from liability, is implicated.  Id. at 2; 42 U.S.C. § 9601(14) (excluding petroleum products from the definition of hazardous).  It also argues that, even if the exclusion does not clearly apply, this does not prove that the material was hazardous because non-hazardous material can leave such residue, too.  Ivax Reply 4.  Ivax says that without sufficient identification of the materials, experts cannot offer credible opinions as to hazardousness.  Id. at 6.  Through its expert Peter Hauser, Emhart offers that U.S. Oil manufactured textile chemicals.  But Ivax says Hauser never contended that U.S. Oil shipped hazardous substances to NECC.  Id. at 7.
     These issues are better left for after expert discovery.  First, waste oil is exempted from the petroleum exclusion.  See City of N.Y. v. Exxon Corp., 766 F. Supp. 177, 187 (S.D.N.Y. 1991) ("[S]everal courts have determined that wastes at issue in the actions before them are not subject to the petroleum exclusion because contaminants present in the wastes are not indigenous to petroleum or refined petroleum products, or are present at elevated levels.").  Whether the residues were waste may be informed by expert discovery.  And second, based on this

That evidence is nearly non-existent, however, as to Paragon (through BASF Corporation) and Tanner (through Henkel Corporation). For Paragon, Emhart simply claims that those drums contained paints, but cites no evidence to support that conclusion. <u>See</u> Emhart Stat. ¶ 91. And as to Tanner, Emhart hypothesizes about the types of materials the drums – had they been sent (also speculative) – could have contained. <u>See</u> <u>id.</u> ¶ 92. Emhart pleads that, without the benefit of expert discovery, summary judgment would be premature. The Court will for now give the benefit of the doubt to Emhart, but, as noted in this Court's September 22, 2022, Text Order, BASF's Motion (as to Paragon only) and Henkel's Motion are denied, but they may refile after expert discovery if they see fit.

B.   Economic Arrangements

The Court could stop there. But the parties also expend considerable energy debating Defendants' economic arrangements with NECC, which arrangements Emhart says signal that disposal was a

_____

testimony, a reasonable factfinder could infer what Ivax argues is the missing link here: that U.S. Oil shipped drums with hazardous remnants to NECC.

Separately but relatedly, Teknor Apex Company makes an argument implicating the petroleum exclusion. <u>See</u> Reply Mem. of Teknor Apex Company Supp. its Mot. Summ. J. 3 n.2, ECF No. 968. But, as with Ivax's argument, factual disputes remain.

And finally, certain Defendants – including The Original Bradford Soap Works, Inc. ("OBS") – argue that no evidence supports that their drums contained hazardous materials. <u>See</u> Emhart's Statement Disputed Facts Resp. The Original Bradford Soap Works, Inc.'s Statement Undisputed Material Fact ¶ 10, ECF No. 954. This too is better reserved for a factfinder after expert discovery.

principal purpose of the transactions.  To that end, Emhart submits evidence showing that almost all Defendants were dual customers and suppliers of NECC, meaning they sent drums to be reconditioned and received drums in return (though the specifics varied).  Emhart Stat. ¶¶ 58-59.

Defendants claim Emhart's arguments about the economic arrangements are red herrings because no matter their form, they are all sales in that "NECC applied a monetary value to each drum that it accepted from Defendants."  Defs.' Reply Emhart's Opp'n Defs. Mot. Summ. J. ("Defs.' Reply") 3 n.1, ECF No. 966.  Defendants miss the point. Economic arrangements between an accused arranger and a disposer are relevant evidence from which a reasonable factfinder can infer intent; courts regularly consider the "dealings" between an accused arranger and a disposer, and there is no reason not to include the economics of those dealings in that inquiry.  See Burlington N., 556 U.S. at 609 ("The more difficult question is whether Shell also qualifies as a PRP under § 9607(a)(3) by virtue of the circumstances surrounding its sales to B & B."); see also Gen. Elec. Co., 670 F.3d at 387 (considering General Electric's "dealings with" the purchaser in evaluating intent finding post bench trial).  A factfinder could reasonably infer, Emhart argues, that even if Defendants technically "sold" the drums to NECC, they effectively paid for a cleaning service because they sometimes bought the drums back at a markup.  Emhart Stat. ¶ 66.

Emhart further points to those it submits paid NECC a "servicing" or a "laundering" fee.  Id. ¶¶ 62-63.  If that evidence is believed, it is another avenue for a factfinder to conclude that NECC effectively charged for cleaning.  Id. ¶ 63.  Those customers include American Hoechst, AMSCO, Ciba-Geigy Corporation, Esso, Original Bradford Soap Works, Inc. ("OBS"), Teknor Apex Company, U.S. Oil, and Warwick. American Hoechst, AMSCO, Ciba-Geigy Corporation, Eastern Color & Chemical Co., and OBS, evidentially operated on a credit basis, where suppliers received a credit against their purchase of reconditioned drums.[15]  Emhart Stat. ¶¶ 65, 70.  If true, then those Defendants effectively paid NECC to dispose of the residuals in their drums.[16]

This evidence reinforces the Court's decision to deny summary judgment as to most Defendants.

---

[15] It is unpersuasive to say that an arrangement cannot be a laundering one if the same drums are not returned.  See, e.g., Reply Further Supp. BNS LLC and Hexagon Metrology, Inc.'s Mot. Summ. J. 5, ECF No. 980; The Original Bradford Soap Works, Inc.'s Reply Mem. Further Supp. Mot. Summ. J. ("Bradford Soap Reply") 3-4, ECF No. 978; Reply Mem. Law Further Supp. BASF Corporation's Mot. Summ. J. 2, ECF No. 973.

[16] Certain Defendants argue that it was unnecessary to use drum reconditioning as a pretext for disposal because, at the time, they could lawfully and easily dispose of chemicals without threat of violating the strict environmental regulations now in place.  See Bradford Soap Reply 12; Cranston Print Works Company's Reply Mem. Further Supp. Mot. Summ. J. 11, ECF No. 970.  This same argument was made in General Electric before the First Circuit.  See Oral Argument, Case No. 11-1034; General Electric Reply 11-13, Case No. 11-1034.  It did not sway the panel then, as it does not sway this Court now.

C.   Useful Product Doctrine

The Court finally considers the so-called useful product doctrine, a sort of mirror to the above analysis and the main focus of Defendants' Motions.  It is considered a "convenient proxy for the intent element," Gen. Elec., 670 F.3d at 385; Am. Premier, 14 F.4th at 573, but is not dispositive, United States v. Dico, Inc., 808 F.3d 342, 349 (8th Cir. 2015).  Recall that arranger liability does not attach "'[i]f a party merely sells a product, without additional evidence that the transaction includes an "arrangement" for the ultimate disposal of a hazardous substance.'"  Gen. Elec., 670 F.3d at 385 (quoting Freeman v. Glaxo Wellcome, Inc., 189 F.3d 160, 164 (2d Cir. 1999)).  This is so even if the seller "know[s] its product will [ultimately] be leaked, spilled, dumped, or otherwise discarded."  Am. Premier, 14 F.4th at 572.  The useful product doctrine attempts to distinguish between useful products and waste, saving from liability those who sold a useful product for a useful purpose and condemning those whose motives were less benign.[17] Id.  The former avoid arranger liability as a matter of law, and Defendants wield this theory to argue that they are entitled to summary judgment.

---

[17] At oral argument in Burlington Northern, Chief Justice Roberts identified the rub in using this doctrine as a surrogate for intent: It "assumes a sharp distinction between useful product and waste.  Yet it's quite common to talk about there being waste associated with a useful product."  See Burlington N. Tr. 12:19-22.  As the cases reveal, the contrast between the two is not always so stark.

Several cases illustrate the point.  In Team Enters., LLC v. W. Inv. Real Est. Tr., 647 F.3d 901 (9th Cir. 2011), the Ninth Circuit recognized that "[i]t would be odd . . . to say that an auto parts store sells motor oil to car owners for the purpose of disposing of hazardous waste."  Id. at 908 (affirming grant of summary judgment).  And in Vine St. LLC v. Borg Warner Corp., 776 F.3d 312 (5th Cir. 2015), the Fifth Circuit held that a seller involved in designing a dry-cleaning facility and draining system was not an arranger despite that it knew that separators led to chemical releases; there, the transaction did not center on disposal of waste and instead the driver was the "successful operation of a dry[-]cleaning business."  Id. at 319 (affirming grant of summary judgment).  Showing the distinction further, in Appleton Papers the district court concluded after a bench trial that a party did not arrange for disposal of hazardous waste, 2012 WL 2704920, at *1, where the party sold the paper waste for profit and the court found its "efforts to round up the broke and arrange for its sale (rather than disposal) [] far more telling than whether the parties subjectively viewed the product as 'waste' or 'useful,'" id. at *9.  "[F]inancial considerations were the driving force[, and] [the party] treated the product as something of value and took care to maximize the value it would receive upon sale."  Id.  And in General Electric, the First Circuit evaluated the totality of the circumstances before concluding that General Electric viewed the scrap Pyranol - an unusable PCB - as waste, making liability appropriate.  Gen. Elec., 670 F.3d at 385.

The first obvious question is: what are the products?   In
Consolidation Coal, the Fourth Circuit explained that the focus should
be on the material within the product if the hazardous materials are
easily separable from the overall product (e.g., a battery in a toy).
781 F.3d at 151.   But if "separation is impractical, like a coat of
paint on the toy," the focus should instead be on the overall product.
Id.   Thus, used drums - with residues - are the products here because
the hazardous material cannot be easily severed from the sale (hence
the reconditioning).   See Cello-Foil, 100 F.3d at 1232 n.1 (not mincing
words in stating that "[a]s much as the [d]efendants would like, we
will not view these transactions as matters involving only the drums
with no regard to the contents . . . [f]or this case is not about the
disposal of the drums, it is about the disposal of their contents at
[the facility]").   Cf. United States v. Mallinckrodt, Inc., 343 F. Supp.
2d 809, 816-17 (E.D. Mo. 2004) (in drum reconditioning case, holding
that drums painted with lead-based paint were not useful products and
denying summary judgment motion).

So, did Defendants view their used drums with residues as useful?
Arguing that they did, Defendants emphasize the competitiveness of the
used steel drum market.   See Emhart Resp. Stat. ¶¶ 10-11, 13.   Defendants
sold the drums as a commodity and received value in return - the hallmark
of a market for exchange of useful products, they say.

The First Circuit in General Electric considered this same
question.   There, the court held that the trial record had "ample

23

evidence [to support the finding] that [General Electric] viewed scrap Pyranol as waste material and that any profit it derived from selling scrap Pyranol to [the disposer] was subordinate and incidental to the immediate benefit of being rid of an overstock of unusable chemicals." Gen. Elec., 670 F.3d at 385.  That record included evidence that General Electric sought to lessen its scrap Pyranol stockpile (kept in scrap and salvage yards) and the scrap Pyranol was contaminated with impurities; this, the Court found, put the lie to General Electric's argument that it viewed scrap Pyranol as a useful substance for a useful purpose.  Id. at 386, 386 n.9.  The First Circuit also relied on General Electric's lack of effort to "market scrap Pyranol as a viable product to any entity or person other than [the disposer]," which evinced no general demand for scrap Pyranol.  Id. at 386.

The Sixth Circuit took a different approach in American Premier. There, General Electric designed transformers for a railroad system in a way that caused the transformers to periodically emit Pyranol.  14 F.4th at 573.  Despite its intentional design, the Sixth Circuit, reviewing cross-motions for summary judgment, held that General Electric did not emit Pyranol "with disposal in mind," making arranger liability inappropriate.  Id. at 572-73.  The court, as some do,[18]

_____

[18] Just how the useful product doctrine fits in the analysis remains unclear today; some courts blend the inquiries together and others cleanly divide them.  This Court views it – whatever its present viability – as confirmation that this case is not one of the "easy" ones deserving of early judgment.

blended <u>Burlington Northern</u>'s intentional steps focus with the useful product doctrine, noting "nothing suggest[ed] that a desire to get rid of Pyranol motivated" General Electric where "Pyranol was a 'useful, albeit dangerous product' with an 'intended purpose.'" <u>Id.</u> at 573 (quoting <u>AM Int'l, Inc. v. Int'l Forging Equip. Corp.</u>, 982 F.2d 989, 999 (6th Cir. 1993)). Rather, "[t]he specific purpose of selling transformers with release valves wasn't to get rid of an undesirable waste product — it was to release pressure and avoid tank rupture." <u>Id.</u> at 571 (internal citation and quotation marks omitted). And General Electric "tried to minimize undesirable loss of Pyranol into the environment." <u>Id.</u> Disposal, although foreseeable, was not the goal: the goal was successful operation of the trains and for that "[t]he useful Pyranol product was essential." <u>Id.</u> at 572-73.

Whether this case is more like <u>General Electric</u> or <u>American Premier</u> will depend on the record. As in <u>General Electric</u>, Defendants seemingly "understood that not all of" the used drums would be useful to NECC. <u>Gen. Elec.</u>, 670 F.3d at 390 ("GE understood that not all of its scrap Pyranol would be of use to Fletcher."). And contra Defendants' assertions otherwise, receiving compensation is not necessarily the end of the inquiry. "If one knows that a given chemical is hazardous, and if that chemical is of no use to him, it would be far easier to conclude that he was 'disposing' of that chemical, even if he did receive some compensation for it. The substance being disposed of is not only useless, but potentially harmful, and thus it is likely that the

overriding motivation is to dispose of the substance." Appleton Papers, 2012 WL 2704920, at *11 (internal citation omitted and emphasis removed). In that event, a reasonable factfinder could conclude that any economic advantage was subordinate and incidental to the immediate benefit of being rid of unusable drums with residual chemicals.

Even with a competitive market for used drums, one could agree that that market "didn't exist because the drums are useful products — it existed precisely because the drums were unusable to companies in their existing state." Opp'n 31. Emhart intends to use expert testimony, industry and regulatory evidence, and witness testimony to give color to the used drum market. It cites putative drum reconditioning expert Lawrence Bierlein,[19] who will testify that "raw, used drums cannot practically be reused without reconditioning and, accordingly, have no commercial value as a container." Emhart Stat. ¶¶ 24, 71. Disposal of residue is a component of the economic arrangement between reconditioners and suppliers, he'll say. Id. ¶¶ 26(a)-(c); see also id. ¶ 27 (contending that "drum suppliers [like Defendants] are commonly referred to as 'emptiers,' not as 'suppliers'"). To similar effect, a book from the National Barrel & Drum Association explains that, before RCRA regulations emerged in the 1980s, drum reconditioners

_____

[19] At an earlier chambers conference, Emhart's counsel said any Daubert and admissibility issues are beyond the scope of these Motions. Most Defendants agree, so the Court does not address arguments challenging the qualifications of Bierlein, or any other admissibility issues.

were effectively in the "waste disposal business."  Id. ¶¶ 28, 30.
Bierlein will speak to the "one-inch rule," an RCRA exemption lobbied
for to avoid burdensome requirements; the rule allows suppliers such
exemptions if their drum-residues are less than one-inch.[20]  Id. ¶¶ 32,
33e.

Defendants generally refute that evidence's relevance, arguing it
does not speak to their specific intent.  Defs.' Reply 6-7 (specific to
the regulatory evidence, arguing that the regulations, having been
enacted in the 1980s, did not influence Defendants' conduct and are not
otherwise indicative of intent).  True, this evidence is not specific
to Defendants.  But it gives context to the historical treatment of
residual chemicals, responds to the dispute about the nature of NECC's
business, and conveys how these companies may have viewed the products.
See Emhart Resp. Stat. ¶¶ 6-7.

In all, nothing demands an early judgment that the used drums with
residues were useful products for a useful purpose; in fact, the exact
opposite conclusion is at least equally plausible.  That is, a
reasonable factfinder could conclude that the drums contained residues

---

[20] CNA Holdings specifically attacks this evidence, see Reply CNA
Holdings LLC Supp. Mot. Summ. J., Ex. A, Decl. of J. Michael Murphy ¶¶
4-9, ECF No. 969-1, but the Court is neither weighing the credibility
of evidence, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255
(1986) ("Credibility determinations, the weighing of the evidence, and
the drawing of legitimate inferences from the facts are jury functions,
not those of a judge, whether [s]he is ruling on a motion
for summary judgment or for a directed verdict."), nor considering
admissibility arguments now.

– leftover nuisances diminishing the overall value – which served no discernable purpose to Defendants.  By the time of the transactions with NECC, Defendants had exhausted all utility.[21]  See Gen. Elec., 670 F.3d at 385; see also Cello-Foil, 100 F.3d at 1233.  This doctrine, therefore, does not save Defendants' Motions.

III. Conclusion

For the reasons stated above, and as held in the Court's September 22, 2022, Text Order, the Court denies ECF Nos. 890, 893, 894, 896, 898, 900, 902, 904, 908, 910, 912.  It also denies Henkel Corporation's Motion for Summary Judgment, ECF No. 914, and BASF Corporation's Motion for Summary Judgment, ECF No. 905, as it relates to Paragon.  Both Henkel Corporation's and BASF Corporation's Motions may be refiled following expert discovery.


IT IS SO ORDERED.

_William E. Smith_
William E. Smith
District Judge
Date: October 27, 2022

---

[21] In fact, Defendants' reminder that they could just as easily (and lawfully) toss the chemicals in their environs cuts against their argument that these drums with residues were useful products.  See Gen. Elec., 670 F.3d at 385 (noting that General Electric sought to deplete its Pyranol stockpile by, in part, chucking it into the Hudson River).