UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., | ) | |
| | ) | |
|     Plaintiff, Cross-Plaintiff, Third-Party Plaintiff, and Counter-Defendant, | ) ) ) | |
| | ) | C.A. No. 06-218 WES |
|     v. | ) | |
| | ) | |
| NEW ENGLAND CONTAINER COMPANY, INC., ET AL., | ) ) | |
| | ) | |
|     Defendants, Counter-Plaintiffs, and Third-Party Plaintiffs. | ) ) ) | |

| | | |
|---|---|---|
| | ) | |
| EMHART INDUSTRIES, INC., | ) | |
| | ) | |
|     Plaintiff, Cross-Plaintiff, Third-Party Plaintiff, and Counter-Defendant, | ) ) ) | |
| | ) | C.A. No. 11-023 WES |
|     v. | ) | |
| | ) | CONSOLIDATED |
| UNITED STATES DEPARTMENT OF THE AIR FORCE, ET AL., | ) ) | |
| | ) | |
|     Defendants, Counter-Plaintiffs, Cross-Plaintiffs, and Third-Party Plaintiffs, | ) ) ) ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| BLACK & DECKER INC., | ) | |
| | ) | |
|     Counter-Plaintiff, Cross-Plaintiff, Third-Party Plaintiff, and Third-Party Defendant, | ) ) ) ) | |
| | ) | |
|     v. | ) | |
| | ) | |

```
A. HARRISON & CO., INC.; EASTERN    )
COLOR & CHEMICAL CO.; EASTERN       )
RESINS CORP.; EVANS PLATING         )
CORP.; GREYSTONE INC.; HENKEL       )
CORP.; HEXAGON METROLOGY, INC.;     )
INDUPLATE INC.; INDUPLATE           )
OPERATIONS, LLC; IVAX LLC,          )
                                    )
       Third-Party Defendants,      )
                                    )
       v.                           )
                                    )
BNS LLC; CNA HOLDINGS LLC;          )
CRANSTON PRINT WORKS CO.; DURO      )
TEXTILES LLC; ELI LILLY & CO.;      )
EXXON MOBIL CORP.; ORGANIC          )
DYESTUFFS CORP.; SEQUA CORP.;       )
TEKNOR APEX CO.; THE ORIGINAL       )
BRADFORD SOAP WORKS, INC.; UNION    )
OIL COMPANY OF CALIFORNIA,          )
                                    )
       Cross-Defendants,            )
                                    )
       v.                           )
                                    )
BASF CORP.,                         )
                                    )
       Cross-Defendant and Fourth-  )
       Party Plaintiff,             )
                                    )
       v.                           )
                                    )
ROHM AND HAAS COMPANY,              )
                                    )
       Fourth-Party Defendant.      )
                                    )
```

**PHASE IIIA FINDINGS OF FACT AND CONCLUSIONS OF LAW**

2

**Table of Contents**

Table of Contents............................................... 3

I. INTRODUCTION .................................................. 6

II.BACKGROUND .................................................. 10

A.  The Pollution Problem and the CERCLA Solution........... 10

B.  Factual History........................................ 10

   1.  The Site, Contaminants, and Former Occupants.......... 10

   2.  Metro Atlantic's Generated Wastes .................... 13

   3.  NECC's Reconditioning Process and Generated Wastes..... 17

   4.  Fate and Transport of Generated Wastes ............... 19

   5.  Cleanup Costs ........................................ 20

C.  Phase I Conclusions of Law............................. 21

D.  Phase II............................................... 23

III.  LEGAL STANDARD.......................................... 23

A.  The Broad Structure of CERCLA Contribution Claims........ 23

B.  Release of a Hazardous Substance at a Facility; Response Costs
    ...................................................... 27

C.  Covered Persons: Operators and Arrangers................. 28

D.  Causation.............................................. 31

E.  Summary of Disputed Legal Issues........................ 36

IV.  PHASE IIIA FINDINGS OF FACT............................. 37

A.  NECC Timeline.......................................... 37

B.  NECC's Purpose: To Recondition Drums for Reuse........... 38

C.  NECC Operations and Pathways of Contamination........... 43

   1.  Locations of NECC Operations.......................... 44

   2.  Drum Staging and Storage ............................. 44

   3.  Open-Head Drum Incineration .......................... 45

   4.  Closed-Head Drum Caustic Wash ........................ 48

   5.  Drum Conversion ("Can-Opener") ....................... 50

D.  Centredale Contamination Broadly....................... 51

   1.  Dioxins/Furans ....................................... 52

   2.  PAHs ................................................. 53

   3.  PCBs ................................................. 53

4.  VOCs ............................................................. 55

5.  SVOCs ............................................................ 55

6.  Pesticides ...................................................... 55

7.  Metals .......................................................... 56

E.  Centredale Contamination Attributable to NECC............ 57

1.  Dioxins/Furans .................................................. 58

2.  PAHs ............................................................ 67

3.  PCBs ............................................................ 69

4.  Remaining COCs .................................................. 71

a.  VOCs ........................................................ 72

b.  SVOCs ....................................................... 72

c.  Pesticides .................................................. 73

d.  Metals ...................................................... 74

5.  Other Non-COC Substances ...................................... 74

F.  Batch  Chemical  Manufacturing  and  Metalworking  Industries Broadly ............................................................. 75

G.  BASF (formerly Ciba-Geigy)................................... 77

1.  Relevant Entities, Time Period, Location, and End Products Generated ............................................... 77

2.  Materials Spent and Containers Used .................... 79

a.  PCBs ........................................................ 80

b.  VOCs ........................................................ 91

c.  SVOCs ....................................................... 94

d.  Pesticides .................................................. 95

e.  Metals ...................................................... 95

f.  Other Materials ............................................. 97

3.  The Ciba-Geigy-NECC Relationship ....................... 99

4.  Ciba-Geigy's  Use  of  Plastic  Liners,  Drum-Emptying Practices, and Presence of Residuals .................... 102

5.  Summary of Residuals in Ciba-Geigy's Drums to NECC .... 105

H.  BNS (formerly Brown & Sharpe)............................. 106

1.  Precision Park (Drums) ............................... 107

a.  Relevant Entities, Time Period, Location, and End Products Generated............................................ 107

    b. Materials Spent and Containers Used .................. 109

    c. The B&S-NECC Relationship ........................... 114

  2. Greystone (Upstream) .................................. 121

    a. Relevant Entities, Time Period, Location, and End Products Generated.............................................. 122

    b. Evidence of Contamination and Materials Spent ....... 124

    c. Release of Hazardous Substances ..................... 133

    d. Downstream Migration to Centredale ................. 134

I. Sequa (formerly Warwick Chemical)....................... 145

  1. Relevant Entities, Time Period, Location, and End Products Generated ............................................... 145

  2. Materials Spent and Containers Used.................... 147

    a. PCBs ................................................ 148

    b. VOCs ................................................ 149

    c. SVOCs ............................................... 151

    d. Metals .............................................. 152

    e. Other Materials ..................................... 155

    f. Finished Products and Intermediates ................. 156

  3. The Warwick Chemical-NECC Relationship................ 158

  4. Warwick Chemical's Drum-Emptying Practices and Presence of Residuals ........................................... 160

  5. Summary of Residuals in Warwick Chemical's Drums to NECC ................................................... 162

J. Teknor................................................... 163

  1. Relevant Entities, Time Period, Locations, and End Products Generated ............................................... 163

  2. Materials Spent and Containers Used.................... 166

    a. PCBs ................................................ 167

    b. VOCs ................................................ 171

    c. SVOCs ............................................... 174

    d. Metals .............................................. 175

    e. Other Materials ..................................... 176

  3. The Teknor-NECC Relationship.......................... 177

  4. Teknor's Drum-Emptying Practices and Presence of Residuals ................................................... 181

    5. Summary of Residuals in Teknor's Drums to NECC ........ 184

V. PHASE IIIA CONCLUSIONS OF LAW .......................... 184

  A. Drum Reconditioning Arranger Claims.................... 185

    1. Release of Hazardous Substance at Facility and Response Costs ................................................... 185

    2. Was BASF's Predecessor Ciba-Geigy an Arranger?........ 186

      a. Disposal of Hazardous Substances at the Site ........ 186

      b. Intent to Dispose ................................... 187

      c. Section 9607(b) Defenses ........................... 191

    3. Was BNS's Predecessor Brown & Sharpe an Arranger?..... 192

      a. Disposal of Hazardous Substances at the Site ........ 192

    4. Was Sequa's Predecessor Warwick Chemical an Arranger?. 192

      a. Disposal of Hazardous Substances at the Site ........ 192

      b. Intent to Dispose ................................... 193

      c. Section 9607(b) Defenses ........................... 194

    5. Was Teknor an Arranger? .............................. 195

      a. Disposal of Hazardous Substances at the Site ........ 195

      b. Intent to Dispose ................................... 196

      c. Section 9607(b) Defenses ........................... 197

  B. Upstream Operator Claim................................ 198

    1. Release of Hazardous Substances at Facility and Response Costs ................................................... 198

    2. Was BNS's Predecessor Brown & Sharpe an Operator?..... 199

    3. Section 9607(b) Defenses ............................. 200

VI. CONCLUSION.......................................... 200

# I.    INTRODUCTION

This is the third installment in this case about industrial pollution at the Centredale Manor Restoration Project Superfund Site (the "Site" or "Centredale") in North Providence, Rhode Island. The ultra-curious reader could consult this Court's

opinion in the Phase I trial for a more fulsome recounting of the saga.  Emhart Indus., Inc. v. New Eng. Container Co., 130 F. Supp. 3d 534 (D.R.I. 2015) (Dkt. No. 405).[1]  But for present purposes, a brief synopsis will do.

In the late 1990s, the Environmental Protection Agency ("EPA") investigated the subject Site in North Providence, now the location of Centredale Manor, a high-rise housing complex, and identified "two primary culprits" responsible for the pollution found there: chemical manufacturer Metro Atlantic, Inc. ("Metro Atlantic") and drum reconditioner New England Container Co. ("NECC").  Id. at 542; see id. at 538, 540, 542.  The EPA notified Plaintiff Emhart Industries, Inc. ("Emhart"), Metro Atlantic's corporate successor, that it was potentially liable for pollution at the Site, which in time led to Emhart's intervention in the EPA's cost recovery lawsuit.  See Compl. ¶¶ 11-30, Dkt. No. 1, C.A. No. 06-218; see generally Order, Dkt. No. 34, C.A. No. 05-195.

The Court structured the case into three phases.  Emhart, 130 F. Supp. 3d at 539.  After extensive discovery over the course of many years, Phase I concluded in 2015 when, following a twenty-day bench trial, the Court found Emhart to be a responsible party for pollution at the Site.  Id. at 540, 603, 611-12.  Phase II

---

[1] Unless otherwise indicated, all docket numbers provided herein correspond to C.A. No. 11-023.

discovery ensued and was similarly tried to the Court.  The Court's decision was withdrawn in favor of a Consent Decree in which Emhart agreed, inter alia, to perform the Site cleanup and compensate the United States and State of Rhode Island for their unrecovered past and future costs incurred due to the pollution.  Emhart Indus., Inc. v. New Eng. Container Co., C.A. No. 06-218, 2019 WL 7631111, at *1-2 (D.R.I. Apr. 8, 2019) (Dkt. No. 714), aff'd sub nom. Emhart Indus., Inc. v. U.S. Dep't of the Air Force, 988 F.3d 511 (1st Cir. 2021).  Once Emhart agreed to perform the cleanup, it turned its attention to identifying third parties who could help pay for the work.  Many were identified through discovery.  Most settled; some were dropped for various reasons; and four proceeded to a six-week trial before the Court in October and November 2024.[2]  The

---

[2] See Notice of Dismissal, Dkt. No. 598 & Text Order (Mar. 8, 2018) (dismissing Akzo Nobel N.V., Ingredion Inc., and Unilever United States, Inc.); Notice of Dismissal, Dkt. No. 556 & Text Order (Oct. 6, 2017) (dismissing Bayer Corp. and Lanxess Sybron Chemicals, Inc.); Order, Dkt. No. 1102 (approving CNA Holdings LLC settlement); Order, Dkt. No. 1053 (approving Cranston Print Works, Inc. settlement); Motion to Withdraw as Counsel of Record, Dkt. No. 544 & Text Order (Sep. 18, 2017) (regarding Duro Textiles LLC); Stipulation of Liability, Dkt. No. 1083 & Text Order (Sep. 20, 2024) (regarding Eastern Color & Chemical Co.); Notice, Dkt. No. 1099 in C.A. No. 06-218 (regarding Eastern Resins Corp.); Memorandum & Order, Dkt. No. 1015 (approving Eli Lilly & Co. settlement); Order, Dkt. No. 1018 (approving Exxon Mobil Corp. settlement); Order, Dkt. No. 963 (approving Greystone Inc., Induplate Inc., and Induplate Operations, LLC settlement); Order, Dkt. No. 1074 (approving Henkel Corp. settlement); Stipulation of Dismissal with Prejudice, Dkt. No. 1066 & Text Order (Aug. 29, 2024) (regarding Rohm and Haas); Order, Dkt. No. 1069 (approving Hexagon Metrology, Inc. settlement); Judgment, Dkt. No. 864 (regarding Indusol, Inc.); Order, Dkt. No. 1028 (approving IVAX

instant Opinion addresses those claims and mercifully concludes the first part of the final phase ("Phase IIIA").

At issue here in Phase IIIA is the liability of potentially responsible parties BASF Corporation ("BASF"), BNS LLC ("BNS"), Sequa Corporation ("Sequa"), and Teknor Apex Company ("Teknor") (collectively, "Third-Party Defendants" or "TPDs") — for pollution of the Site, as distinguished from Emhart's pollution. 8th Revised Case Mgmt. Order 2, Dkt. No. 295; Third Am. Third-Party Compl. & Cross-Claim 1, Dkt. No. 873. Specifically at issue is whether the TPDs arranged for disposal of hazardous substances at the Site by sending residue-containing drums to NECC for reconditioning. Additionally, there is a question of whether BNS contaminated the Site from its operations at a facility upstream. For the following reasons, the Court finds that BASF, Sequa, and Teknor are all liable as arrangers; BNS is not liable as an arranger but is liable as an operator. Future proceedings will address each party's relative share of responsibility.

_____

LLC settlement); Text Order (May 19, 2021) (regarding Olin Corp. and Phibro Animal Health Corp.); Consent Judgment, Dkt. No. 1057 (regarding Organic Dyestuffs Corp.); Order, Dkt. No. 1105 (approving The Original Bradford Soap Works, Inc. settlement); Joint Motion to Dismiss Defendant, Univar USA Inc., Dkt. No. 627 & Text Order (Mar. 20, 2018) (dismissing Univar USA Inc.); Order, Dkt. No. 1103 (approving Union Oil Co. of California settlement); Text Order (Jan. 2, 2013) (dismissing UNOCAL Corp.); Some Third-Party Defendants — A. Harrison & Co., Inc., and Evans Plating Corp. — never appeared.

## II.   BACKGROUND

### A. The Pollution Problem and the CERCLA Solution

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675, governs this case.   Congress enacted CERCLA to address "the serious environmental and health risks posed by industrial pollution." Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 602 (2009).  CERCLA promotes the prompt cleanup of toxic waste and "ensure[s] that the costs of such cleanup efforts [are] borne by those responsible for the contamination."  Id.  Relevant to this case are CERCLA §§ 107(a) and 113(f), 42 U.S.C. §§ 9607(a) and 9613(f), which "allow private parties to recover expenses associated with cleaning up contaminated sites."  United States v. Atl. Rsch. Corp., 551 U.S. 128, 131 (2007).

### B. Factual History[3]

#### 1. The Site, Contaminants, and Former Occupants

The Site is a three-mile expanse along the Woonasquatucket River in North Providence and Providence, consisting of a wetland area ("Oxbow Area" or "forested wetland"), four ponds (from north to south: Allendale Pond, Lyman Mill Pond, Manton Pond, and Dyerville Pond), and a nine-acre peninsula ("peninsula") deemed by

---

[3] These facts are synthesized from the Phase I Opinion, and, as "law of the case," are part of the Court's "Findings of Fact" for purposes of Phase IIIA, unless otherwise stated.  Stipulation, Dkt. No. 1100; Text Order (Oct. 4, 2024) (entering stipulation).

the EPA to be the source of contaminants on the Site.  Emhart, 130 F. Supp. 3d at 541 & n.13.  There are currently two elderly housing facilities on the peninsula: Brook Village and Centredale Manor. Id. at 541.  "The peninsula is bounded to the north by Smith Street, to the south by Allendale Pond, to the west by the Woonasquatucket River, and to the east by the 'tailrace,' a remnant of a narrow body of water used for water power by the mills that used to occupy the peninsula."  Id.  A map of the Site, provided in Appendix A to the Phase I Opinion, is reproduced here in Appendix 1 infra.

After dioxins were found in fish collected from the Woonasquatucket River in the late 1990s, the EPA determined that the Site was polluted with dioxins, polychlorinated biphenyls ("PCBs"), volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), polycyclic aromatic hydrocarbons ("PAHs"), pesticides, and metals.  Id. at 541, 607.  Dioxins are a primary contaminant, particularly 2,3,7,8-tetrachlorodibenzo-p-dioxin ("2,3,7,8-TCDD"), the most toxic dioxin.  Id. at 540-41 & n.11.  The EPA pointed to Metro Atlantic and NECC as the dominant polluters.  Id. at 541-42.

In approximately 1943, Metro Atlantic (then known as Atlantic Chemical Company) began operating on the peninsula.[4]  _Id._ at 542 & n.18.  In the northeast corner of the peninsula, Metro Atlantic's "Main Building" consisted of a manufacturing building, offices, a laboratory, a maintenance building, a dryer room, and a boiler room.  _Id._ at 542 & n.19.  There, "Metro Atlantic manufactured several textile chemicals, including water repellants, resins, cotton softeners, powdered soaps, reserve salt (an anti-bleeding agent for textile dyes or a metal stripper), and sulfonated tallow for wool."  _Id._ at 543.  Metro Atlantic also received and relabeled packages of dye.  _Id._

Southwest of the Main Building, Metro Atlantic manufactured a pesticide, trifluralin, in a building known as the "Texas Tower," for about a year around 1962 or 1963.  _Id._ at 542.  In the mid-1960s, Metro Atlantic manufactured hexachlorophene ("HCP") in that same area, but in a different building (the "HCP Building"), likely for at least a year.  _Id._ at 540, 542, 556.

Between 1948 and 1952, NECC began its drum reconditioning operations on the eastern side of the peninsula, south of Metro Atlantic's Main Building and east of Metro Atlantic's Texas Tower and HCP Building.  _Id._ at 542-43; _see_ _infra_ Part IV.A.    NECC

_____

[4] Entities that occupied the peninsula before this time are not directly implicated in this case.  _See_ _Emhart_, 130 F. Supp. 3d at 542 n.17.

received drums for reconditioning from entities including Metro Atlantic.[5] Emhart, 130 F. Supp. 3d at 547. In fact, "[w]hen NECC began operations, Metro Atlantic was its half parent and primary customer." Id. at 547 n.27.

The southern portion of the peninsula contained a waste disposal area ("WDA"), which expanded during Metro Atlantic's and NECC's tenures. Id. at 543. An access road ran from the WDA to Smith Street. Id. In 1972, a fire damaged Metro Atlantic's and NECC's buildings on the peninsula, and those buildings were demolished as of March 1974. Id.

### 2. Metro Atlantic's Generated Wastes

In its Main Building operations, Metro Atlantic used raw materials including "alcohols, formaldehyde, urea, sulfur trioxide, metal salts, fixatives, melamine, detergents, silicone, nitrobenzene, boric acid, sulfuric acid, citric acid, hydrochloric acid, tallow, methanol, and isopropyl." Id. Those operations generated solid and liquid waste. Id. Some of the solid waste was sent to the WDA and some to a roll-away dumpster next to the Main Building. Id. at 543-45. As for the liquid waste, some was discharged into North Providence's municipal sewer system and some into the tailrace. Id. at 545-47. Wastes generated by Metro

---

[5] TPDs also provided drums to NECC for reconditioning, which was not addressed in Phase I but is important in this Phase and is discussed infra.

Atlantic's trifluralin production were washed onto the ground and discharged into the Woonasquatucket River. Id. at 547. However, the Court's CERCLA liability analysis in Phase I did not concern wastes from the Main Building or trifluralin. Id. at 543, 547 n.26. Rather, the Court focused on Metro Atlantic's HCP production and one specific resulting dioxin: 2,3,7,8-TCDD. Id. at 540, 543.

Metro Atlantic's HCP production process began with 2,4,5-trichlorophenol ("2,4,5-TCP") in its crude sodium form ("crude Na 2,4,5-TCP"), purchased from Diamond Alkali Company. Id. at 551. Metro Atlantic stored the crude Na 2,4,5-TCP in tanks outside the HCP Building. Id. at 552-54. To produce HCP, Metro Atlantic first converted the crude Na 2,4,5-TCP "into purified 2,4,5-TCP," a process involving the use of Nuchar, an activated carbon product. Id. at 557-58, 569-73. Then, the 2,4,5-TCP "was extracted into [perchloroethylene ("PCE")]" and heated. Id. at 557-58. Paraformaldehyde and sulfuric acid were added to form an intermediate, and then additional sulfuric acid was added to form HCP in the PCE. Id. at 558. Next, Nuchar and calcium carbonate were added to decolorize the HCP in the PCE. Id. The Nuchar, calcium carbonate, and colored impurities were then filtered out, HCP was crystallized and separated from the PCE, and finally, the HCP crystals were dried, ground, and packaged. Id.

The crude Na 2,4,5-TCP contained 2,3,7,8-TCDD. Id. at 551-52. The Court determined that "there is simply too much

14

uncertainty" as to "the duration of Metro Atlantic's manufacture of HCP, the frequency with which a batch of HCP was manufactured, and the total quantity of [crude] Na 2,4,5-TCP used by Metro Atlantic over the life of the process," id. at 556, but found it likely that Metro Atlantic brought at least 0.455 kilograms of 2,3,7,8-TCDD to the peninsula over the course of at least a year, id. at 556-57.

Some of that 2,3,7,8-TCDD made its way into the environment through the liquid and solid wastes from Metro Atlantic's HCP operations. Id. at 558, 565, 582. Releases of 2,3,7,8-TCDD in liquid waste resulted from leaks and spills during transfer of the crude Na 2,4,5-TCP from Diamond Alkali tanker trucks into Metro Atlantic's storage tanks, as well as from flushing out the storage tanks.[6] Id. at 554-55, 558. Liquid waste also resulted from crude Na 2,4,5-TCP purification, HCP synthesis, "a still bottom of recycled PCE,"[7] the washing of equipment and floors, and accidental leaks and spills during manufacturing. Id. at 558. Though some

---

[6] "[T]he total concentration of 2,3,7,8-TCDD spilled during all of the transfers from the tanker truck to the storage tanks was between approximately 0.00009 to 0.00039 kilograms . . . ." Emhart, 130 F. Supp. 3d at 555. In contrast, the flushing out of the tanks would have resulted in "significant" releases of 2,3,7,8-TCDD because an estimated twenty percent of the 2,3,7,8-TCDD in the crude Na 2,4,5-TCP "would have settled at the bottom of the tanks." Id.

[7] A "still bottom" consists of the impurities or byproducts resulting after a liquid is heated. See Nov. 5 Trial Tr. 24:10-22, Dkt. No. 1143.

15

of these liquid waste streams only contained small traces of 2,3,7,8-TCDD, "significant concentrations" of 2,3,7,8-TCDD were likely produced from the flushing of the crude Na 2,4,5-TCP storage tanks onto the ground or into a drain, and from the washing of filter waste containing Nuchar into the trench drain along the floor of the HCP building.  Id. at 558-59.  These liquid wastes ultimately drained into the Woonasquatucket River.  Id. at 560-63.

Solid wastes from Metro Atlantic's HCP production included filter waste containing Nuchar ("filter cake").  Id. at 563.  The Nuchar used during crude Na 2,4,5-TCP purification absorbed the "vast majority" of the 2,3,7,8-TCDD.  Id.; see id. at 573-74.  In contrast, the Nuchar used during decolorization contained "significant concentrations of [hexachloroxanthene ("HCX")] but little, if any, 2,3,7,8-TCDD."  Id. at 574; see id. at 551, 565-66, 573.  Some of the Nuchar filter cake, and correspondingly the 2,3,7,8-TCDD and HCX, ended up in a dumpster, and some in the WDA.  Id. at 563-82.  In reaching this conclusion, the Court also found that Emhart "identified a potential link between NECC and HCX, but nothing more."  Id. at 568.

Elevated levels of 2,3,7,8-TCDD were also detected in the soil within and around the footprint of the HCP Building.  Id. at 582.  This likely resulted in part from NECC's storage of drums along the western side of the peninsula, but more likely and to a

16

greater extent from Metro Atlantic's leaky HCP pipes. Id. at 582-95. Similarly, 2,3,7,8-TCDD found in Allendale Pond is attributable both to NECC and to Metro Atlantic's HCP operations. Id. at 595-97.

### 3. NECC's Reconditioning Process and Generated Wastes

From the late 1940s or early 1950s until the early 1970s, NECC reconditioned 55-gallon open-head and closed-head drums on the peninsula. Id. at 547, 549. "Many of the drums that NECC received contained residues of the substances that were once contained in the drums." Id. at 547. "Some of this residual material would leak onto the beds of the NECC trucks, and the drivers would hose these materials onto the ground . . . ." Id. at 547-48. NECC stored drums in various locations on the peninsula. Id. at 548-49. Residuals sometimes leaked from the stored drums onto the ground, contributing to some of the Site's 2,3,7,8-TCDD contamination. Id. at 548-49, 584.

NECC's reconditioning of open-head drums involved incineration, sandblasting, and painting. Id. at 549-50. Some drums could not be reconditioned and were left to "deteriorate" because their condition or contents were not suitable for burning. Id. at 549. NECC employees prepared drums for incineration "by burning off any flammable liquids with a match and removing any plastic liners that the drums contained." Id. Then, the drums were placed upside-down on a conveyor belt to go through the

17

incinerator. Id. Ash not released into the air fell with other drum residuals into a concrete pit, the contents of which were periodically emptied but sometimes seeped into the ground. Id. Incineration creates dioxins, including 2,3,7,8-TCDD and particularly octochlorodibenzo-p-dioxin ("OCDD"). Id. at 549-50.

NECC reconditioned closed-head drums by submerging them in a tank of caustic soda and rinsing them with water in a second tank. Id. at 550. The caustic soda was reused for a certain period and then drained into the floor of the building. Id. Because there appeared to be a drainage feature from the closed-head reconditioning building to the tailrace, "NECC likely discharged its spent caustic soda into the tailrace up until the early 1960s." Id. In 1962 or 1963, NECC moved its closed-head reconditioning operations to a different building, from which liquids were discharged to an area of ponding liquid known as the "impoundment." Id. at 550-51. "Storm water runoff in an area where NECC stored drums also drained into the impoundment." Id. at 550. The impoundment expanded from 1970 to 1972 and a berm of soil was constructed to contain it, though the Rhode Island Department of Health ("RIDOH") expressed concerns that materials in the impoundment could end up in the Woonasquatucket River or the tailrace. Id. at 550-51. Elevated levels of contaminants were found in areas adjacent to the impoundment, including 2,3,7,8-TCDD, OCDD, PCBs, PCE, toluene, 1,4-dichlorobenzene, and HCX. Id.

18

at 551.   However, it is unclear what contaminants were in the impoundment itself because soil from that area was removed in the early 1980s to allow for construction of Centredale Manor.   Id.

NECC deposited some of the waste resulting from its operations into the WDA.   Id.   Additionally, as mentioned, some of the 2,3,7,8-TCDD detected in the vicinity of the HCP Building and in Allendale Pond is likely attributable to NECC's practices.   Id. at 595-97.

### 4. Fate and Transport of Generated Wastes

"Fate and transport" refers to the movement of contaminants after their initial discharge into the environment.   Id. at 597. The 2,3,7,8-TCDD in the liquid wastes from Metro Atlantic's HCP production, which were released into the Woonasquatucket River, migrated downstream.   Id. at 598.   The 2,3,7,8-TCDD from Nuchar filter cake disposed of in the WDA also migrated downstream, as well as to the Oxbow Area, due to flooding of the Woonasquatucket River and surface-water runoff.   Id.   Flooding, surface-water runoff, and erosion during high river flow carried 2,3,7,8-TCDD in soil around the HCP Building footprint into the river and downstream.   Id. at 598-99.   And 2,3,7,8-TCDD in soil underneath the HCP Building footprint seeped into the river and downstream through colloidal transport.[8]   Id. at 599-600.   "The upshot of this

---

[8]  "[C]olloidal transport occurs when a low-solubility contaminant, such as 2,3,7,8-TCDD, forms colloidal particles or

downstream transport is that elevated concentrations of 2,3,7,8-TCDD are found throughout the Site, including in downstream areas, and the 2,3,7,8-TCDD found throughout the Site is mixed with a host of other contaminants." Id. at 600.

### 5. Cleanup Costs

The EPA's response to the Site's contamination — ranging from soil and sediment sampling to short-term "removal actions" — has resulted in substantial costs. Id. The EPA's removal actions include construction of interim protective caps where the WDA and HCP Building were located and along the tailrace; "reconstruction of the Allendale Dam and restoration of Allendale Pond to prevent further downstream migration of contaminants; excavation and removal of one hundred cubic yards of soil . . . along Allendale and Lyman Mill Ponds;" and the building of fences around residential properties near the Site to prevent access. Id. at 601. In 2009, under an Administrative Order on Consent, Emhart financed and executed the removal of contaminated soil from the HCP Building footprint and the installation of a Resource Conservation and Recovery Act ("RCRA") cap. Id. "The EPA has accepted this RCRA cap as the final remedy for the area in the

---

absorbs to other particles to form colloidal particles, which are extremely small particles that move through the groundwater within the pore spaces between grains of sand and gravel." Emhart, 130 F. Supp. 3d at 599. "It can also occur when a low-solubility contaminant migrates in the groundwater with dissolved organic compounds, such as fluvic and humic acids." Id.

vicinity of the HCP [B]uilding footprint[.]"  <u>Id.</u>  But there is more work to be done, as was established in Phase II of the case, discussed <u>infra</u>.

**C. Phase I Conclusions of Law**

The Phase I trial was originally slated to address Emhart's and NECC's liability for pollution at the Site.  <u>Id.</u> at 539. However, shortly before the trial, NECC settled with the Federal Government and Emhart for $8,750,000 and the parties stipulated to the dismissal, with prejudice, of Emhart's claims against NECC and its insurers, as well as NECC's claims against Emhart.  <u>Id.</u> at 539 & n.6.

To prevail on its CERCLA cost recovery counterclaim against Emhart, the EPA had to prove by a preponderance of the evidence that: "(1) a release or threatened release of a hazardous substance occurred (2) at a facility; (3) the release caused the EPA to incur response costs; and (4) Emhart qualifies as one of the four types of responsible parties identified in § 9607(a)."  <u>Id.</u> at 602 (footnotes omitted) (citing 42 U.S.C. § 9607(a); <u>United States v. Domenic Lombardi Realty, Inc.</u>, 204 F. Supp. 2d 318, 329 (D.R.I. 2002); <u>Dedham Water Co. v. Cumberland Farms Dairy, Inc.</u>, 889 F.2d 1146, 1150 (1st Cir. 1989), <u>decision clarified sub nom. In re Dedham Water Co.</u>, 901 F.2d 3 (1st Cir. 1990)).

Based on the foregoing Phase I Findings of Fact, the Court found Emhart liable for pollution of the Site as a "past operator"

21

under § 107(a) of CERCLA, 42 U.S.C. § 9607(a). Id. Under CERCLA, an operator "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Id. at 603 (quoting United States v. Bestfoods, 524 U.S. 51, 66-67 (1998)). Emhart meets these criteria because "Metro Atlantic — and, by extension, Emhart — discharged a hazardous substance, 2,3,7,8-TCDD, see 40 C.F.R. § 302.4, to the Site," and thus, "conduct[ed] operations . . . having to do with the leakage or disposal of hazardous waste." Id. Metro Atlantic's release of 2,3,7,8-TCDD happened at a facility and caused the EPA to incur response costs. Id. at 603 & n.115. Accordingly, the EPA prevailed on its CERCLA cost recovery claim against Emhart. Id. at 603.

Further, the Court found Emhart jointly and severally liable because Emhart failed to show by a preponderance of the evidence that the harm at the Site is divisible — i.e., Emhart failed to show a reasonable basis for apportionment of the harm "by geography, volume, type of contaminant, or time." Id. at 608; see id. at 604-07, 609.

Finally, the Court rejected Emhart's claim that the DOD was liable under CERCLA as an arranger of hazardous waste disposal because Emhart did not advance a preponderance of evidence to show

that the DOD's drums sent to NECC at the Site contained a hazardous substance.  <u>Id.</u> at 540-41, 589-94, 609-11.

**D. Phase II**

In Phase II, the Court held a trial and issued an opinion addressing, <u>inter alia</u>, whether the EPA's remedy-selection process for the Site was arbitrary, capricious, or otherwise not in accordance with law.  <u>Emhart Indus., Inc. v. New Eng. Container Co.</u>, 274 F. Supp. 3d 30, 37-38 (D.R.I. 2017) (Dkt. No. 548). However, the Court vacated that opinion after Emhart, the Federal Government, and the State of Rhode Island entered into a Consent Decree.  <u>Emhart</u>, 2019 WL 7631111, at *2; <u>see generally</u> Remedial Design/Remedial Action Consent Decree ("Consent Decree"), Dkt. No. 715.  Under that Consent Decree, Emhart agreed to perform the Site cleanup and compensate the Federal Government and State of Rhode Island for their unrecovered past costs estimated at $42,014,895.20 and future costs estimated at $96,900,000.  <u>Emhart</u>, 2019 WL 7631111, at *1; Consent Decree 13, 18.  The Consent Decree also resolved the remaining Site-related CERCLA claims between Emhart, the Federal Government, and the State of Rhode Island. <u>Emhart</u>, 2019 WL 7631111, at *1.

### III. LEGAL STANDARD

**A. The Broad Structure of CERCLA Contribution Claims**

Once Emhart was held liable for contaminating the Site, and the scope of the cleanup was determined, Emhart turned its

attention to seeking compensation for the cleanup costs from other parties that it alleged contributed to the Site contamination.

The elements that Emhart must meet to succeed on its contribution claims are nearly identical to the elements the EPA had to meet in its cost recovery claim against Emhart in Phase I. See United States v. Davis, 261 F.3d 1, 29 (1st Cir. 2001). That is, a CERCLA contribution claimant must establish the following: (1) there has been a "release"[9] or "threatened release" of a "hazardous substance"[10] at a "facility,"[11] 42 U.S.C. § 9607(a)(4); (2) the release or threatened release caused the claimant to incur response costs, id.; (3) those incurred costs were necessary and "consistent with the national contingency plan," id. § 9607(a)(4)(B); see id. § 9601(23)-(25); and (4) the defendant

---

[9] A "release" under CERCLA "means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)," with some exceptions not relevant here. 42 U.S.C. § 9601(22).

[10] Substances are considered hazardous under CERCLA if they are designated as such under several other statutes or by the EPA, with some exceptions not relevant here. 42 U.S.C. § 9601(14); see 40 C.F.R. § 302.4 (listing CERCLA hazardous substances).

[11] A "facility" includes "any building, structure, installation, equipment, pipe or pipeline . . ., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft," or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).

falls within one of four classes of "covered persons," id. § 9607(a), also known as "potentially responsible parties" ("PRPs"), Burlington, 556 U.S. at 605, 608-10.

Once the claimant establishes these four elements, the defendant is presumed liable, and the burden shifts to the defendant to prove that "the harm was solely caused by someone (or something) else." Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 75 (1st Cir. 1999) (emphasis added); see 42 U.S.C. § 9607(b).

The level of proof necessary for either a plaintiff to make its liability claim or for a defendant to advance a Section 9607(b) defense is a preponderance of the evidence.[12] Kalamazoo River Study Grp. v. Rockwell Int'l Corp., 355 F.3d 574, 589-90 (6th Cir. 2004); 42 U.S.C. § 9607(b). Circumstantial evidence, in lieu of

---

[12] To support a proposition by a preponderance of the evidence is to show that the proposition is more likely true than false. Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 137 n.9 (1997); see Preponderance of the Evidence, Black's Law Dictionary (12th ed. 2024) (defining "preponderance of the evidence" as "[t]he greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other").

"Unlike other standards of proof such as reasonable doubt or clear and convincing evidence, the preponderance standard 'allows both parties to share the risk of error in roughly equal fashion,' except that 'when the evidence is evenly balanced, the [party with the burden of persuasion] must lose.'" Metro. Stevedore, 521 U.S. at 137 n.9 (citations omitted) (first quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983); and then quoting Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 281 (1994)).

direct evidence, is permissible and often necessary in CERCLA cases, given the passage of time between the original course of events and the ensuing litigation. Chevron Mining Inc. v. United States, 863 F.3d 1261, 1271 (10th Cir. 2017); United States v. Davis, 20 F. Supp. 2d 326, 336 (D.R.I. 1998) (holding that reliance on circumstantial evidence "is not unusual in CERCLA cases . . . where the dumping occurred many years ago, detailed records are unavailable, memories have dimmed, and witnesses having first-hand knowledge may either be difficult to locate or are reluctant to testify"), aff'd in part, remanded in part, 261 F.3d 1 (1st Cir. 2001).

If the Court finds a party liable under 42 U.S.C. § 9607(a), the Court then must decide under 42 U.S.C. § 9613(f) how much contamination that party is liable for, i.e., how much that party must contribute to cleanup costs. Kalamazoo River Study Grp. v. Menasha Corp., 228 F.3d 648, 656–57 (6th Cir. 2000) ("Menasha") ("Recovery of response costs by a private party under CERCLA is a two-step process. Initially, a plaintiff must prove that a defendant is liable under CERCLA. Once that is accomplished, the defendant's share of liability is apportioned in an equitable manner." (quoting Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 934 (8th Cir. 1995))). This Opinion focuses on the § 9607(a) liability question, the elements of which are further explored

below.   The § 9613(f) allocation question will be decided at a later time.   17th Revised Case Mgmt. Order 5, Dkt. No. 1012.

**B. Release of a Hazardous Substance at a Facility; Response Costs**

As established in Phase I, a release of a hazardous substance occurred at a facility, and per the Consent Decree, Emhart has incurred response costs for that release.   The Phase I findings focused on one hazardous substance — 2,3,7,8-TCDD — and the facility from which that release occurred was not precisely defined.   See Emhart, 130 F. Supp. 3d at 603 & n.115.   Below, the Court considers whether the release of 2,3,7,8-TCDD and other hazardous substances at the Site is also attributable to NECC and, if so, to any of the TPDs.   Further, the Court will address whether hazardous substances were released from BNS's facilities located upstream of Centredale.

The parties do not address (and it appears undisputed) that Emhart's incurred response costs are necessary and consistent with the national contingency plan, and the Court has previously held that Emhart meets this element.   See Emhart, 2019 WL 7631111, at *2 ("[T]he Court concludes that the remedial action described in the [EPA's Record of Decision] . . . is not inconsistent with CERCLA and the National Contingency Plan.").

The Court next considers the more contested legal issues: PRP status and causation.

27

## C. Covered Persons: Operators and Arrangers

Two categories of PRPs are relevant in this case. A question for each of the TPDs, relevant to their engagements with NECC, is whether they were "arrangers." See 42 U.S.C. § 9607(a)(3). Another question for BNS alone is whether it was an "operator"[13] upstream of Centredale. See id. § 9607(a)(1).

"[A]n operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Bestfoods, 524 U.S. at 66-67; see also 42 U.S.C. § 9601(20)(A) (defining an operator as including "any person owning or operating" a facility). As here, sometimes operator allegations involve more than one facility, e.g., allegations that hazardous substances migrated from one facility to another. Asarco LLC v. Cemex, Inc., 21 F. Supp. 3d 784, 803 (W.D. Tex. 2014) ("In a two-site case, the release or threatened release of a hazardous substance occurs at one site, and the [claimant] incurs response costs at another."); Dedham, 889 F.2d at 1154 (holding that CERCLA applies equally to "one-site" and "two-site" cases).

---

[13] 42 U.S.C. § 9607(a)(1) states "owner and operator," but 42 U.S.C. § 9607(a)(2) and the relevant definitions in 42 U.S.C. § 9601 refer to "owner or operator." For purposes of this Opinion, the Court simply uses the term "operator."

An "arranger" is, in relevant part, "any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person," to be disposed[14] or treated[15] "at any facility or incineration vessel owned or operated by another party and containing such hazardous substances." 42 U.S.C. § 9607(a)(3). Arranger liability turns on whether the entity "takes intentional steps to dispose of a hazardous substance." Burlington, 556 U.S.

---

[14] "Disposal" has a narrower definition than "release" and means

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3); see id. § 9601(29); Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 878 (9th Cir. 2001).

[15] "Treatment" means:

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous.

42 U.S.C. § 6903(34); see id. § 9601(29). For ease of reference, the Court refers to treatment and disposal collectively as disposal.

at 611 (citing United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1231 (6th Cir. 1996)). In other words, even though CERCLA is a strict liability statute, an entity is liable as an arranger only if it intended to dispose of hazardous substances;[16] only after an entity is deemed an arranger does strict liability attach. Cello-Foil, 100 F.3d at 1231-32.

Courts evaluate evidence of intent to dispose on a spectrum. Burlington, 556 U.S. at 609-10. On one end, an entity is liable as an arranger if its "sole purpose" was to "discard[] a used and no longer useful hazardous substance." Id. at 610. On the other end of the spectrum, an entity is not liable "merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." Id. This case lands in the middle of that spectrum, requiring a "fact-intensive inquiry" into the question of intent to dispose. Id.; see Emhart Indus., Inc. v. New Eng. Container Co., 638 F. Supp. 3d 117, 124 (D.R.I. 2022). Intent to dispose can be inferred from the totality of the

---

[16] Whether the entity needs to have known that the substance was hazardous is a question that has only been answered by one circuit thus far. See 68th St. Site Work Grp. v. Alban Tractor Co., 105 F.4th 222, 230-31 (4th Cir. 2024) (holding that a party can be liable as an arranger even if it did not know that the substance it intended to dispose was hazardous). The parties do not dispute this issue here.

circumstances.  <u>Cello-Foil</u>, 100 F.3d at 1231.[17]  Further, a party can be deemed an arranger "even when it has no control over the process leading to the release of substances."  Id. at 1232.

### D. Causation

Given CERCLA's legislative history, its remedial purpose, and the often-circumstantial nature of evidence in CERCLA litigation, there need only be a "minimal causal nexus" between the defendant's hazardous waste and the release that led to claimant's incurred response costs.  <u>Violet v. Picillo</u>, 648 F. Supp. 1283, 1292 (D.R.I. 1986); <u>see</u> <u>id.</u> at 1290-93 (assessing CERCLA's legislative history and drafting with respect to causation).  To summarize that causal

---

[17] The <u>Burlington</u> intent inquiry supersedes certain standards previously articulated by courts.  For example, the Second Circuit previously held that an entity could be deemed an arranger if the plaintiff established either the defendant's "obligation to exercise control over hazardous waste disposal" or the defendant's "actual involvement in the decision to dispose of waste."  <u>Gen. Elec. Co. v. AAMCO Transmissions, Inc.</u>, 962 F.2d 281, 286 (2d Cir. 1992) ("<u>AAMCO</u>").  Now, such factors might be relevant but are not necessarily dispositive of the intent inquiry.  <u>Burlington</u>, 556 U.S. at 610.  As another example, the Third Circuit has stated that for arranger liability to attach, "[a] plaintiff must . . . demonstrate either control over the process that results in a release of hazardous waste or knowledge that such a release will occur during the process."  <u>Morton Int'l, Inc. v. A.E. Staley Mfg. Co.</u>, 343 F.3d 669, 677 (3d Cir. 2003).  But now, because an arranger must have intended "that at least a portion of the product be disposed of," knowledge that a release would occur is not sufficient on its own to warrant liability.  <u>Burlington</u>, 556 U.S. at 612 ("While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity 'planned for' the disposal . . . .").

nexus: a plaintiff need only show that a defendant's hazardous waste reached the facility[18] and "hazardous substances alike, similar, or of a like kind" to those in the defendant's waste "or that could have been produced by the mixture of the defendant's waste with other waste" were present at the facility at the time that a release of any kind of hazardous substance — not necessarily the same kind as the defendant's — occurred at the facility. United States v. Monsanto Co., 858 F.2d 160, 169 (4th Cir. 1988); see also id. at 169 n.15 ("[CERCLA plaintiffs] must . . . present evidence that a generator defendant's waste was shipped to a site and that hazardous substances similar to those contained in the defendant's waste remained present at the time of release."); Asarco, 21 F. Supp. 3d at 807 (citing Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n, 66 F.3d 669, 681 (4th Cir. 1995)) (holding that, in a two-site operator case, the claimant must "demonstrate that the same or a similar contaminant is

---

[18] Some courts suggest that a plaintiff need not show that a defendant's waste actually reached the facility. See Dedham, 889 F.2d at 1154 ("There is nothing in the statute, its legislative history, or the case law, which requires proof that the defendant's hazardous waste actually have migrated to plaintiff's property, causing contamination of plaintiff's property, before CERCLA liability is triggered."); Picillo, 648 F. Supp. at 1288 ("[T]he literal terms of the statute could be interpreted to impose liability on a waste generator who arranges for waste disposal by contract or agreement, but who never actually delivers the waste to a disposal facility." (citing United States v. Wade, 577 F. Supp. 1326, 1332 (E.D. Pa. 1983))). Emhart does not advocate the use of this standard, so the Court follows other case law requiring proof that a defendant's hazardous waste reached the facility.

present" at both sites and "must also demonstrate the existence of a 'plausible migration pathway'" between the sites); see also United States v. Alcan Aluminum Corp., 964 F.2d 252, 266 (3d Cir. 1992) (holding that the plaintiff need only show "that the defendant's hazardous substances were deposited at the site from which there was a release and that the release caused the incurrence of response costs").

In other words, CERCLA "does not require the [claimant] to match the waste found to each defendant as if it were matching fingerprints," for "[t]o do so would be to defeat the purpose of the statute." United States v. Ottati & Goss, Inc., 630 F. Supp. 1361, 1402 (D.N.H. 1985) (citations omitted); O'Neil v. Picillo, 883 F.2d 176, 179 n.4 (1st Cir. 1989) (noting that courts "recogniz[e] Congress' concern that cleanup efforts not be held hostage to the time-consuming and almost impossible task of tracing all of the waste found at a dump site"); Menasha, 228 F.3d at 655-56 (collecting cases holding that a claimant need not show that any particular defendant caused the release).

TPDs point to excerpts of two First Circuit cases to argue that "Emhart must prove that a release of hazardous substances by the TPDs caused Emhart to incur response costs." Joint Defs.' Post-Trial Br. 46, Dkt. No. 1120 (emphasis added) (citing Dedham, 889 F.2d at 1150); see also id. (citing Acushnet, 191 F.3d at 77 n.7, to argue that "[a] potentially responsible party does not

33

cause a plaintiff to incur response costs when that person did not actually cause any alleged contamination or where cleanup efforts were directed at cleaning up toxins other than those attributed to the defendant"). But neither case supports TPDs' contention that it is Emhart's burden to trace a release and resulting cleanup costs to a specific TPD. First, in Dedham, the First Circuit acknowledged that CERCLA "impose[s] liability . . . without reference to whether [the defendant] caused or contributed to the release or threat of release." 889 F.2d at 1153; see also St. Paul Fire & Marine Ins. v. Warwick Dyeing Corp., 26 F.3d 1195, 1197-98 (1st Cir. 1994) (citing Dedham, 889 F.2d at 1150-56) ("Under CERCLA, a person that generates hazardous substances and arranges for their disposal is strictly liable, regardless of whether the person was at fault or whether the substance actually caused or contributed to any damage, for all costs of remediating environmental damages at the site where the substances ultimately are disposed."). Second, contrary to TPDs' reading of Acushnet, "once the plaintiff has established that a defendant disposed of hazardous waste, Acushnet put the burden of proof on the defendant to show that this waste did not contribute to cleanup costs." Davis, 261 F.3d at 44. Said another way, once a plaintiff makes the requisite showing described above, it is the defendant's burden to disprove its own connection to the release and response costs. 42 U.S.C. § 9607(b); see Monsanto, 858 F.2d at 170 & n.17.

34

Generally, the migration or disposal of any amount of a hazardous substance, however small, may trigger liability.[19] Acushnet, 191 F.3d at 76 (collecting cases and finding "the courts of appeals are in unison" on this point); see also, e.g., Menasha, 228 F.3d at 658; Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 131-32 (2d Cir. 2010).  Arguments about relative contributions to a release go to either the affirmative defense that someone or something else solely caused the release and response costs or to the allocation of costs for the Court's later consideration.  See Acushnet, 191 F.3d at 77-78 ("[A] defendant may avoid joint and several liability for response costs in a contribution action under § 9613(f) if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts. This rule is not based on CERCLA's causation requirement, but is logically derived from § 9613(f)'s express authorization that a court take equity into account when fixing each defendant's fair share of response costs."); Davis, 261 F.3d at 43-44 (interpreting

---

[19] However, CERCLA contains a "de micromis" exception under which certain entities are not liable if the materials containing hazardous substances for which they arranged for treatment or disposal amount to "less than 110 gallons of liquid materials or less than 200 pounds of solid materials." 42 U.S.C. § 9607(o)(1)(A).  The parties here did not discuss this exception, so the Court does not consider it.

Acushnet as speaking to a defendant's burden to raise an affirmative defense after a plaintiff meets the liability elements).[20]

### E. Summary of Disputed Legal Issues

Getting to the heart of this dispute, Emhart must establish by a preponderance of the evidence that TPDs were either operators that generated hazardous substances which migrated to the Site, or arrangers that intended to dispose of hazardous substances at the Site and in fact did so. Emhart need not precisely trace the operator's generated waste or the arranger's deposited waste to the waste ultimately released and cleaned up at the Site. Once Emhart meets its burden, the TPDs may escape liability if they present a preponderance of evidence showing that someone or something else was the sole cause of the release at the Site, i.e., that they did not contribute to the release at all. If any TPDs are deemed liable, their relative amounts of contribution will be determined in the next stage of this litigation.

---

[20] After all, response costs triggering liability do not solely consist of cleanup costs, but also include, e.g., costs for "actions as may be necessary to monitor, assess, and evaluate the release or threat of release . . . ." 42 U.S.C. § 9601(23); see also id. §§ 9601(24)-(25), 9607(a)(4)(B).

## IV.   PHASE IIIA FINDINGS OF FACT[21]

### A. NECC Timeline[22]

NECC's exact operational timeline on the Site is unclear. NECC could have begun operating on the Site as early as 1948 and as late as 1952, at which time NECC was an affiliate of Metro Atlantic. Oct. 8 Trial Tr. 87:13-14, Dkt. No. 1131; TPD124.0001; TPD284.0003 ("During the 1949-52 period, . . . [a] new plant was established, also at Centredale, for the reconditioning of barrels and steel drums, and New England Container Corporation was formed as a Metro[ ]Atlantic affiliate to operate it."); Buonanno Dep. 16:16-19, Mar. 25, 2003; EMH1004-0004-0005.   NECC began reconditioning drums from other entities, including "drum peddlers," by the early 1960s, though Metro Atlantic continued to constitute the bulk of NECC's business.  Buonanno Dep. 67:20-68:9, Oct. 22, 2008; Buonanno Dep. 16:24-17:10, Mar. 25, 2003; Oct. 9 Trial Tr. 126:21-128:6, Dkt. No. 1123; see Zeoli Dep. 12:1-5,

---

[21] Some of these Phase IIIA Findings of Fact expand upon or clarify certain findings from Phase I, based on the evidence presented in Phase IIIA.

[22] Evidence pertaining to NECC includes depositions of several former NECC employees, whose names and dates of employment are as follows: Robert Baker (began in 1990s), Baker Dep. 8:17-9:14, May 23, 2013; Vincent Buonanno (began in 1959), Buonanno Dep. 19:3-21:16, 26:6-17, Oct. 20, 2020; Joseph Cifelli (1954-1970), Cifelli Dep. 5:24-6:13, Feb. 13, 2003; Thomas Lussier (began in 1971), Lussier Dep. 7:12-8:4, June 18, 2014; Raymond Nadeau (1956-1969), Nadeau Dep. 18:21-19:10, June 12, 2013; Lester Olson (1970s-1980s), Olson Dep. 23:4-13; John Turcone (1963-1965), Turcone Dep. 26:1-19; Gennaro Zeoli (1953-1956), Zeoli Dep. 12:1-5.

31:19-20, (testifying that he picked up drums for NECC from other entities in mid-1950s).

NECC began constructing a new drum reconditioning facility in Smithfield, Rhode Island, in 1968. TPD179.0001. NECC's transition from Centredale to Smithfield was gradual. Buonanno Dep. 49:6-51:3, Nov. 17, 2020. NECC stopped reconditioning open-head and closed-head drums at Centredale in approximately February 1971 and the summer of 1971, respectively. Lussier Dep. 11:6-12:13, 47:18-24, Apr. 30, 2009; EMH1004-0004-0005. As further discussed in Part IV.G.1 below, based on evidence related to Ciba-Geigy's operations, the Court finds that NECC stopped closed-head drum reconditioning at Centredale in August 1971.

As found in Phase I, the buildings at Centredale were damaged by a fire in 1972, leading to their demolition in 1974. Emhart, 130 F. Supp. 3d at 543. The soil on the Site was then regraded and, in 1982, Centredale Manor was built. Oct. 8 Trial Tr. 101:18-103:9; EMH7041-0031-0032.

**B. NECC's Purpose: To Recondition Drums for Reuse**

The weight of the evidence demonstrates that NECC served to recondition drums to make them safe for reuse and, in the process, to dispose of residuals left in used drums.

Emhart's expert Mr. Lawrence Bierlein spoke about the drum reconditioning industry generally. From 1980 to 2015, Bierlein was General Counsel for the National Barrel and Drum Association

38

("NABADA"), a drum reconditioner trade association.  Oct. 7 Trial
Tr. 125:7-9, Dkt. No. 1130; Oct. 8 Trial Tr. 28:24-25; EMH1144-
009-010.  NECC was a member of NABADA.  Oct. 8 Trial Tr. 30:5-10.
Bierlein described residuals in drums as a "constant struggle" for
the industry during "most of the 20th Century."  Oct. 7 Trial Tr.
139:5-10.  Laws and regulations regarding drum residuals appear to
have been minimal, if existent at all, until CERCLA, RCRA, and
their state law counterparts went into effect beginning in the
late 1970s.  EMH1144-015, 031.  In 1980, Bierlein helped establish
the "One-Inch Rule," also known as the "Empty Container Rule,"
codified at 40 C.F.R. § 261.7.  Oct. 8 Trial Tr. 11:13-14:3.  Under
that rule, drums could be considered "empty" and thus exempt from
certain RCRA requirements if "[n]o more than 2.5 centimeters (one
inch) of residue remain on the bottom of the container. . . ."  40
C.F.R. § 261.7(a) & (b).  This rule was intended to encourage
improvement in drum suppliers' drum emptying practices, to reduce
the residues that drum reconditioners had to deal with.  Oct. 7
Trial Tr. 141:1-142:24.

Other sources echo that drum residuals were a problem in the
drum reconditioning industry broadly.  Pamela Terry's book,
"Fifty-Five Gallons: The History of Steel Drum Reconditioning,"
documents the role of drum reconditioners in the disposal of
residual wastes in used drums.  EMH1144-007-008, 013-017, 027-028,
030, 032.  A 1981 report conducted for the EPA (the "Touhill

Report") noted that "[t]he biggest problem facing reconditioners is the need to provide safe, economical, and environmentally acceptable means for residuals management." EMH1110-0026. A recent EPA report indicates continuing issues with residual wastes at drum reconditioning facilities. EMH1119-0001, 0005-0006.

More specific to NECC, former employees testified to their role in cleaning out residuals so that used drums could be reconditioned for reuse. See, e.g., Baker Dep. 50:11-14, 58:7-19, Apr. 22, 2009 (describing NECC's open-head and closed-head drum processing to "detoxify" the drums); Buonanno Dep. 92:6-7, Mar. 25, 2003 ("[A]ll empty [used] drums have some traces of prior residues."); Buonanno Dep. 175:12-176:8, May 15, 2013 (describing empty drums as "raw" drums received from customers that NECC needed to clean out and finish for resale); Cifelli Dep. 25:21-26:13, May 21, 2013 (describing "[a]ll kinds of chemicals, residues" in drums NECC received, noting "sometimes there would be quite a bit" and "[t]hey would be difficult to deal with"); Nadeau Dep. 12:14-16, Oct. 1, 2002 (regarding drums picked up by NECC: "Every drum had residue, from a coating to a couple of inches, because they were used drums, so there was something in them."); Olson Dep. 57:2-58:24 (describing how NECC cleaned used drums so they could be reused). Vincent Buonanno compared NECC's reconditioning process to that of a laundry service or a milkman delivering milk in clean bottles and picking up dirty bottles. Buonanno Dep. 19:25-21:9,

40

89:11-90:18, Nov. 17, 2020. NECC had different payment arrangements, all of which could reasonably be interpreted as NECC charging entities for its cleaning services: "sometimes we had a laundering arrangement where we would charge a service charge," Buonanno Dep. 87:9-11, Nov. 17, 2020; sometimes arrangements were on a credit basis, Olson Dep. 56:7-57:1; and sometimes NECC would buy used drums from companies and then sell reconditioned drums back to those companies at a higher price, Buonanno Dep. 20:18-21:9, Nov. 17, 2020 (estimating that, in the 1960s, NECC bought used drums for $2 and sold reconditioned drums for $6).

TPDs argue that NECC's mission was not residue disposal. Joint Defs.' Post-Trial Br. 13 ("NECC was not a waste disposal operation."). Rather, they claim, NECC ran a competitive business in which it "cleaned, sandblasted, de-dented, put into round (when needed), and painted" drums for resale, while rejecting drums that were "heavy" with residuals. Id. at 12. TPDs also challenge Bierlein's testimony because his own experience began in 1980, so any knowledge about drum reconditioning during the relevant time period is based "solely on hearsay." Id. at 14. They also note Bierlein's acknowledgement that, contrary to his opinion that "empty drums were never really empty," the EPA notified him in 1980 that "empty drums could in fact be considered empty if certain steps were taken," at least for RCRA purposes. Id. at 14-15 (first quoting Oct. 8 Trial Tr. 39:13-17; then citing Oct. 8 Trial Tr.

41

39:19-45:20; and then citing EMH1112).  Further, they noted that "[a]ccording to the Touhill Report, almost all reconditioners performed some kind of screening process with drums received at their facilities, and more than ninety percent (90%) of those reconditioners would return drums that were damaged, that were not empty, or that contained unacceptable materials," id. at 15 (citing Oct. 8 Trial Tr. 47:8-48:12; TPD287.0051), and "Bierlein agreed that Buonanno followed such practices at NECC," id. (citing Oct. 8 Trial Tr. 45:21-46:7; TPD250.0043).

Emhart seems to acknowledge that NECC had a policy for rejecting drums that contained certain levels of residuals, but argues that the policy was not "comprehensive," "uniform," or "stringent," pointing to testimony of former NECC employees. Emhart Post-Trial Br. 29-30, Dkt. No. 1122.  Vincent Buonanno testified that NECC drivers "were instructed to take only empty drums" and "a drum that is not empty is heavy," but beyond that, "there wasn't a process of incoming inspection of every container." Buonanno Dep. 214:17-215:21, May 15, 2013.  He also testified that the NECC employees collecting drums to be reconditioned, or "unloaders," made their own individual judgments regarding emptiness.  Buonanno Dep. 118:12-19, Nov. 17, 2020; see also Olson Dep. 130:23-133:4 (explaining rejection of drums containing three or four inches of material or weighing ten or twenty-five pounds

heavier than the weight of the drum as "a matter of judgment and feel").

It is evident that NECC was a profit-making enterprise that rejected some drums containing too much residual waste, but even so, one of its roles was to clean out and dispose of some residuals, such that used drums could be safely reused after reconditioning. Bierlein's testimony speaks to the drum reconditioning industry's response to environmental regulations and the problem of residuals, which provides context as to what the industry was like during the relevant time period. Evidence in this Phase corroborates the Phase I finding that there were residuals in drums reconditioned by NECC, ranging from traces to several gallons. See, e.g., Buonanno Dep. 92:3-7, Mar. 25, 2003; Buonanno Dep. 90:17-24, Oct. 22, 2008; Cifelli Dep. 41:23-42:11, Feb. 13, 2003 (regarding open-head drums); Cifelli Dep. 36:15-23, May 21, 2013 (regarding closed-head drums); Nadeau Dep. 12:11-16, Oct. 1, 2002; Nadeau Dep. 11:4-7, Dec. 17, 2002. Whether each TPD's drums contained residuals will be discussed in the TPD-specific sections below.

## C. NECC Operations and Pathways of Contamination

Evidence presented in this Phase corroborates and expands upon the basic findings in Phase I about NECC's operations and the resulting pathways of contamination on the Site.

### 1. Locations of NECC Operations

Emhart's expert Mr. William Locke and TPDs' expert Dr. Jeffrey Rominger generally agree as to the layout of NECC's Centredale operational area.  Compare EMH7041-0025, with TPD824.007.  These images are reproduced at Appendix 2 infra.

As these images show, NECC had one area where it reconditioned drums, immediately west of the tailrace and south of Metro Atlantic's primary operational area.  Oct. 8 Trial Tr. 91:25-92:7; EMH7041-0018.  To the west of that operational area was an area for drum storage, equipment staging, and parking, bordering the Woonasquatucket River, where Metro Atlantic also manufactured trifluralin and HCP for a brief time.  Oct. 8 Trial Tr. 92:8-21; EMH7041-0019.  South of that area was another region for drum and equipment staging, and further south was the WDA, where both Metro Atlantic and NECC disposed of wastes.  Oct. 8 Trial Tr. 92:23-93:8; EMH7041-0020-0021.  There was also the impoundment area used "in the later years . . . by NECC for the discharge of some aqueous wastewaters."  Oct. 8 Trial Tr. 93:24-94:9; EMH7041-0023.

### 2. Drum Staging and Storage

NECC's handling of drums before the reconditioning process led to contamination on the Site.  As found in Phase I, some drums leaked onto NECC's truck beds when they were initially picked up and those residuals were rinsed onto the ground when they arrived at Centredale.  Oct. 8 Trial Tr. 107:16-25.  Some drums likely

44

leaked while staged for reconditioning.  Id. at 112:9-16.  The same can be said for drums that NECC deemed unfit for reconditioning, which were set aside on-site or disposed of in the WDA, if not sent back to the supplier.  Id. at 114:23-116:12.

Based on aerial photographs analyzed by Emhart's expert Mr. Randall Grip, it is likely that NECC stacked open-head drums two-high vertically and closed-head drums five-high horizontally in pyramids.  Oct. 15 Trial Tr. 83:3-12, Dkt. No. 1134.  Grip estimated that, at one moment in time in 1970, NECC was storing about 8,800 drums at Centredale, excluding the drums disposed of in the WDA.  Id. at 82:21-23, 84:22-85:2; EMH7043-0114-0115.

### 3. Open-Head Drum Incineration

Testimony in this Phase aligns with the Court's Phase I findings regarding NECC's open-head incineration process.  Open-head drums have removable lids, Oct. 7 Trial Tr. 148:12-14, and are generally used for more viscous, thick, or solid materials, Buonanno Dep. 31:16-32:2, Oct. 20, 2020.  Initially, NECC workers would drop matches into open-head drums to burn off residuals; then, the open-head drums passed through the incinerator upside-down; this process released toxins on the Site both through emissions and ash.  Oct. 8 Trial Tr. 108:7-110:24; EMH7041-0035-0036.  Ash was deposited in the WDA but would also contaminate the drum reconditioning area.  Oct. 10 Trial Tr. 78:5-22, Dkt. No. 1132.

NECC installed its first drum incineration furnace in 1954. Oct. 9 Trial Tr. 119:4-16. That furnace was later replaced; the replacement furnace became operational in 1963. Id. at 120:2-121:9. Whether either incinerator had an afterburner is disputed. An afterburner is a "secondary combustion chamber" that reduces airborne emissions. Id. at 122:3-4; see EMH1131-0440 (noting that an afterburner can reduce dioxin and furan emissions by 95 percent). Emhart points out that Locke found it "unlikely that either NECC incinerator was equipped with an afterburner," and "[n]one of Defendants' witnesses opined that NECC incinerators were equipped with afterburners." Emhart Post-Trial Br. 42 n.15. The TPDs acknowledge that it is not known whether either furnace had an afterburner, but they present evidence suggesting that "afterburners were common beginning as early as 1959," seeming to suggest that the replacement furnace likely had one. Joint Defs.' Post-Trial Br. 9 (citing TPD243.0023; TPD250.0027); see id. at 7.

Locke assumed that the original furnace lacked an afterburner because "concerns about air pollution controls were not well developed . . . at that time in our industrial history." Oct. 9 Trial Tr. 121:16-18. Locke did not believe the replacement furnace had an afterburner because "[t]here's no reference [to an afterburner] by any of the NECC workers who spoke, and actually in some detail, about the furnace line and how things worked." Id. at 121:20-122:4. However, he also conceded that he did not know

46

if any of those employees were asked about an afterburner.  Id. at 122:6-8.  When asked about whether either furnace had an afterburner, TPDs' expert Dr. Robert Parette stated he had "never seen that addressed."  Oct. 29 Trial Tr. 42:17-21, Dkt. No. 1141.

The afterburner evidence presented by TPDs consists of a March 1960 magazine article about the "Model 40 Burnerator," TPD243.0023, and a July 1959 advertisement for automatic smokeless drum furnaces, TPD250.0027.  The Model 40 Burnerator, which had an afterburner, was the "most popular" of the custom-made drum incinerators produced by a company called National Furnace. TPD243.0022-0023.  The article notes that Farrell & Sons, Inc., a company in Providence, Rhode Island, used the Model 40 Burnerator. Id. at 0023.  The 1959 advertisement, from the company R.G. White Manufacturing Corporation, notes that "over 100" of its smokeless drum furnaces had been installed in the United States and Canada. TPD250.0027.

Based on Locke's testimony and the absence of any other evidence saying otherwise, the Court is convinced that the first furnace likely had no afterburner.  But Locke's testimony as to the replacement furnace is less compelling because it is not clear whether the NECC employees were asked about an afterburner.  The Court cannot locate any designated testimony from NECC employees explicitly discussing an afterburner, secondary combustion chamber, or smokeless furnace.  However, Joseph Cifelli said during

47

one of his depositions that "inspectors would come occasionally to look at our smokestack because once in a while we got complaints," presumably about smoke. Cifelli Dep. 37:14-16, May 21, 2013. Cifelli worked in various roles at NECC from 1954 to 1970, so it is unclear what time frame applies to this observation. Cifelli Dep. 8:20-10:15, Sep. 30, 2002. From Cifelli's statement, it might be inferred that NECC's furnaces never had an afterburner, but it could also be inferred that NECC would have recognized a need for an afterburner to reduce smoke complaints.

As it currently stands, the evidence on the afterburner issue (post-1963) does not support either Emhart's or TPDs' position. TPDs do not argue that the presence of an afterburner would completely absolve them of liability, i.e., that it would completely reduce contaminants to below the cleanup levels. Rather, the afterburner issue could affect allocation because it potentially impacts the amount of contamination attributable to NECC's incineration of drums. Thus, the Court declines to resolve the question at this time; and given the current state of the record, this question may benefit from further factfinding in the allocation phase.

### 4. Closed-Head Drum Caustic Wash

Testimony in this Phase aligns with the Court's Phase I findings regarding NECC's closed-head caustic wash process. Closed-head drums have nonremovable lids with small holes enclosed

48

by bungs, Oct. 7 Trial Tr. 148:14-16, and are generally used to hold thinner, more liquid-like materials, including oils, Buonanno Dep. 31:9-31:15, Oct. 20, 2020.   In NECC's process, first, residuals were dumped from the closed-head drums into open-head drums, which ultimately went through the incineration process; next, a low-temperature, high-pH caustic solution was applied to the closed-head drums either through drum submersion or with nozzles and sprays; then the drums were rinsed with water.   Oct. 8 Trial Tr. 111:17-113:20; EMH7041-0037-0038.   In "earlier years," the spent caustic solution and water were released into the tailrace; then, "once the impoundment was online, those direct discharges . . . would go into the impoundment."   Oct. 8 Trial Tr. 113:13-20; see Oct. 9 Trial Tr. 143:17-23 (noting that the impoundment was built in the early 1960s).

A point of contention is whether Emhart incurred response costs for contamination of the impoundment.   As mentioned, soil was excavated from the impoundment in the early 1980s for the construction of Centredale Manor.   TPDs contend that "Emhart did not incur any costs in connection with the removal of the material from the surface impoundment area."   Joint Defs.' Post-Trial Br. 8 (citing Oct. 9 Trial Tr. 148:8-17 for same proposition with respect to the EPA).   In closing arguments, Emhart clarified that it had to clean up the area immediately adjacent to Centredale Manor, including putting in a RCRA cap, because the impoundment

was larger than the area excavated to build Centredale Manor, as
also reflected by data showing contamination around Centredale
Manor.  Jan. 30 Trial Tr. 53:15-24, 56:6-57:24, 61:15-62:3, Dkt.
No. 1149.  The Court finds that some of the Site remediation paid
for by Emhart was done in response to NECC's use of the
impoundment, even after some of the impoundment soil was removed.

### 5. Drum Conversion ("Can-Opener")

The evidence shows that NECC sometimes converted closed-head
drums to open-head drums by removing the top of the drum with a
tool known as the "can-opener."  Emhart argues that NECC's use of
the can-opener was a "routine practice" due to "[the] need for
more open-head drums, dried or hard to remove viscous residual
content, or rust."  Emhart Post-Trial Br. 39.

There is ample testimony from former NECC employees regarding
the use of the can-opener.  Buonanno Dep. 137:9-16, May 15, 2013;
Buonanno Dep. 55:12-56:6, Nov. 17, 2020; Cifelli Dep. 14:2-12,
Feb. 13, 2003; Cifelli Dep. 34:20-36:14, May 21, 2013 (noting can-
opener was sometimes used after closed-head drum washing due to
rusting); Lussier Dep. 24:24-25:5, Apr. 30, 2009 (noting that if
the closed-head drums contained resin, they had to be converted
for incineration); Nadeau Dep. 77:8-21, Oct. 1, 2002 (noting use
of can-opener for rusty drums); Olson Dep. 86:19-88:15, 92:16-21,
98:24-99:15; Turcone Dep. 28:7-13.  Emhart also presented an EPA
report which suggested that conversion of closed-head drums to

open-head drums was done in the drum reconditioning industry broadly. EMH1127-0025.

The Court is not convinced that NECC would convert closed-head drums to open-head out of a need for more open-head drums, given that most of its drum supply was open-head. See Buonanno Dep. 136:8-20, May 15, 2013 (estimating "80 or 90 percent" of NECC's business involved open-head drums). However, the Court finds that NECC used the can-opener on closed-head drums containing rust, oily or viscous materials, or resin, and for inventory purposes, from time to time.

## D. Centredale Contamination Broadly

The EPA's 2012 Record of Decision ("ROD") and 2019 Explanation of Significant Differences ("ESD") outline the agglomerate of chemicals found at Centredale. Oct. 8 Trial Tr. 69:23-70:3, 129:8-131:6. The chemicals that must be cleaned up due to their potential threat to human health or the environment are known as "contaminants of concern" ("COCs"). Id. at 119:2-14; EMH7041-0043. The EPA set a cleanup level ("CUL") for each COC so that the Site can be made safe for people and the environment. Oct. 8 Trial Tr. 119:15-120:19; EMH7041-0043. "Background" levels of a chemical "do[] not reflect anything that happened at the site but . . . reflect[] the larger ambient conditions within which the site exists," such that they "essentially define a limit to what the cleanup may be capable of achieving." Oct. 8 Trial Tr. 120:20-

51

121:9; see id. at 121:10-122:7; EMH7041-0043.  The categories of Centredale's COCs are dioxins and furans, PAHs, PCBs, VOCs, SVOCs, pesticides, and metals.  EMH7041-0044; see Oct. 8 Trial Tr. 125:3-9 (discussing PAHs as part of the SVOC category).

### 1. Dioxins/Furans

Dioxins and furans, known as chlorinated dibenzo-p-dioxins or "PCDDs" and chlorinated dibenzofurans or "PCDFs," are byproducts of industrial incineration, combustion, and the manufacture of chlorine-containing chemicals.  EMH7041-0044; EMH7048-0010. Dioxins and furans can be grouped into homologues, based on the number of chlorine atoms they contain, and congeners, based on the location of those chlorine atoms on the molecule.  EMH7048-0010. Seventeen dioxins and furans are known to be toxic, all of which have chlorine atoms in the 2,3,7,8 positions, with 2,3,7,8-TCDD being the most toxic.  Oct. 23 Trial Tr. 21:23-24:18, Dkt. No. 1125.  Toxic equivalency ("TEQ") is a measurement of the toxicity of a mix of the seventeen toxic dioxins and furans.  Oct. 8 Trial Tr. 131:19-133:4.  The primary driver of remediation efforts at Centredale is 2,3,7,8-TCDD, Emhart, 130 F. Supp. 3d at 541, though the other 2,3,7,8-substituted congeners require cleanup at the Site as well, see EMH1003-0255 (discussing formulation of dioxin cleanup levels); id. at 0199 ("Dioxin TEQ cleanup level for sediment is background level of 34 ng/kg.").

### 2. PAHs

Polycyclic aromatic hydrocarbons ("PAHs") can be petrogenic, meaning they stem from petroleum-based products, or pyrogenic, meaning they form when carbon-containing molecules are incinerated. Oct. 9 Trial Tr. 19:13-20:8, 167:19-168:20; Oct. 22 Trial Tr. 113:1-3, Dkt. No. 1138. PAHs can also be precursors to dioxins and furans "in the presence of chlorine sources and in oxidizing conditions." Oct. 22 Trial Tr. 114:1-5. PAHs that are COCs at Centredale include benzo(a)pyrene, dibenz(a,h)anthracene, and chrysene. EMH1003-0037, 0039.

### 3. PCBs

Polychlorinated biphenyls ("PCBs") were manufactured by Monsanto Chemical Company ("Monsanto") from about 1929 to 1978 under the "Aroclor" trademark, though PCBs can also be generated as byproducts in some processes. Oct. 10 Trial Tr. 102:16-103:3; Oct. 23 Trial Tr. 34:3-12; EMH7049-0017. There were several different formulations of Aroclors, distinguished by the amount of chlorine they contained. Oct. 10 Trial Tr. 103:3-6 (explaining that Aroclor 1242 has 42 percent chlorine and Aroclor 1260 has 60 percent chlorine); EMH7042-0009 (listing Aroclors 1242, 1248, 1254, 1260, and 1268 as examples and noting that "[g]enerally, the last two digits of the Aroclor series numbers correspond[] with the percentage of chlorine present in the PCB mixture"). Higher chlorine content means higher density. Oct. 10 Trial Tr. 107:11-

108:9.  At room temperature, Aroclors with less chlorine — e.g., Aroclors 1242 and 1248 — have the consistency of kitchen oil, whereas Aroclor 1254 is a viscous liquid, like honey, that "barely pours," Aroclor 1260 is a sticky resin that "[does] not pour," and Aroclor 1268 is an off-white powder.  Id. at 105:21-106:18; EMH7042-0013.  The higher Aroclors had to either be spooned out or heated up to make them pourable.  Oct. 10 Trial Tr. 106:17-18, 107:3-7.

In their various applications, PCBs provide stability, durability, flexibility, fire retardancy, electrical insulation, and water insolubility.  Id. at 101:1-102:6.  During the relevant time period, PCBs were used in: dielectric fluids for transformers and capacitors, see id. at 110:14-111:6, 112:2-114:1; heat transfer fluids for heat transfer systems, id. at 116:18-119:21; hydraulic fluids, id. at 119:22-120:22; vacuum fluids for vacuum pumps, id. at 120:23-121:20; cutting oils, id. at 129:19-130:19; plasticizers, id. at 126:5-129:18; and building materials, id. at 29:3-25; see also EMH7042-0019 (identifying the specific Aroclors used in each application).  PCBs could be purchased from Monsanto, other distributors, or companies that incorporated Aroclors into their products.  Oct. 10 Trial Tr. 133:10-138:4; EMH1106-0001.

The EPA set CULs at the Site for both "total PCBs" as well as individual Aroclors 1254 and 1268.  Oct. 8 Trial Tr. 144:3-145:11; EMH1003-0194, 0199-0202.

54

### 4. VOCs

Volatile organic compounds ("VOCs") "evaporate into air at room temperature." Oct. 8 Trial Tr. 125:14-15. They are used in "industrial solvents, petroleum fuels, hydraulic fluids, paint thinners, dry cleaning agents, [and] glues." EMH7041-0044. VOCs can end up in the environment from a direct release or the degradation of another substance. Oct. 8 Trial Tr. 138:24-140:24. VOCs that are COCs at Centredale include benzene, PCE, toluene, 1,2,4-trichlorobenzene, trichloroethene ("TCE"), vinyl chloride, and xylene.[23] EMH7041-0046; EMH1003-0195, 0197.

### 5. SVOCs

Semi-volatile organic compounds ("SVOCs") partially vaporize when heated. Oct. 8 Trial Tr. 125:2-5. "They are manmade or also generated in certain cases by combustion activities . . . ." Id. at 125:5-7. They are used in "oil-based products, fire retardants, cleaning agents, vinyl flooring, [and] electronics." EMH7041-0044. SVOCs that are COCs at Centredale include naphthalene and pentachlorophenol. Id. at 0046, 0048; EMH1003-0194.

### 6. Pesticides

Pesticides are chemicals used to kill pests or plants. Oct. 21 Trial Tr. 125:21-126:19, Dkt. No. 1137. Pesticides requiring

---

[23] Some references to VOCs in the record use synonyms, e.g., perchloroethylene ("PCE") is also known as tetrachloroethene and tetrachloroethylene, and trichloroethene ("TCE") is also known as trichloroethylene.

cleanup at the Site include aldrin, dieldrin, heptachlor, 4,4-DDE, and technical chlordane.  EMH7041-0046, 0048; EMH1003-0194, 0202.

### 7. Metals

Metals are naturally occurring but can become toxic at certain concentrations or accumulations.  Oct. 8 Trial Tr. 125:16-126:6. Metals identified as COCs at Centredale include antimony, arsenic, beryllium, cadmium, copper, lead, manganese, and thallium. EMH7041-0046; EMH1003-0212.

There is some dispute as to whether certain other metals are COCs requiring cleanup at the Site.  See Nov. 1 Trial Tr. 68:4-69:22, Dkt. No. 1142.  Locke acknowledged that aluminum, barium, selenium, vanadium, and zinc "were not listed as COCs, but are listed in [the] ROD as having CULs."  EMH7041-0048; see also Oct. 8 Trial Tr. 137:11-22 (noting those metals "did not come through the risk assessments as COCs" but "came in for a different category of exposure that EPA identified after the fact as something they wanted to bring into the cleanup decision," related to "direct exposure to . . . floodplain soil sediment in Lyman Mill Pond"); EMH1003-0202 (providing CULs for those metals).  The Court finds that the cost of cleaning up those metals was incorporated into the total cleanup costs.  EMH1003-0202, 0213; TPD085.0021.  And forms of those metals are "hazardous substances" falling within CERCLA's ambit.  See 40 C.F.R. § 302.4.  Thus, the Court considers them relevant.

**E. Centredale Contamination Attributable to NECC**

The Court next considers NECC's contributions to the release of COCs at Centredale. Although, in Phase I, the Court already found that a release of hazardous substances from a facility occurred, that finding was focused on 2,3,7,8-TCDD from Metro Atlantic. Emhart's arranger claims against TPDs hinge on whether they arranged for disposal of hazardous substances at NECC. Accordingly, it is important to determine whether there was a release of hazardous substances from NECC. If NECC did not contribute to the release of a COC at the Site, it follows that the TPDs cannot be found liable for the release of that COC, at least under the arranger theory.

According to Emhart, detections of COCs in NECC's operational areas and downstream of the peninsula are attributable to NECC. Emhart Post-Trial Br. 57. Further, Emhart argues that the evidence shows some dioxins, furans, and PAHs at the Site were created by combustion — specifically, NECC's open-head drum incineration. Id. at 58-63. TPDs counter that Site development and soil regrading muddies the connection of COCs to NECC. Joint Defs.' Post-Trial Br. 11. Further, TPDs challenge the dioxin and furan fingerprinting evidence presented by Emhart. Id. at 27-30. They argue it is more likely that the COCs came from Metro Atlantic, other parties, or events such as the fires that occurred on the Site. Id. at 9-11, 21.

### 1. Dioxins/Furans

TPDs point out that "[t]here is no evidence that NECC handled any drums at the Centredale Site that contained 2,3,7,8-TCDD." Joint Defs.' Post-Trial Br. 5; see also id. at 47. Emhart does not disagree. It argues that dioxins and furans were not directly handled by the TPDs; rather, dioxins and furans were produced by NECC's incineration of open-head drums. Emhart Post-Trial Br. 42, 46.

The evidence shows that drum incineration creates dioxins and furans. In 1987, the EPA issued a "National Dioxin Study" in which it reported that dioxins and furans were generated during drum incineration. EMH1127-0015, 0023-0025, 0055; see Oct. 29 Trial Tr. 25:19-27:23; TPD534.024, 026 (citing a 2006 EPA report which "re-affirmed" the 1987 findings). In 1992, John Hosenfeld issued a report for the California Air Resources Board (the "Hosenfeld Study"), which reported detections of dioxins and furans at the outlet of the incinerator stacks at two drum reconditioning facilities, based on three runs of open-head drum incineration at each facility. EMH1126-0063, 0068-0069, 0072, 0076, 0080-0081, 0084. TPDs argue that these studies show that 2,3,7,8-TCDD contamination from drum incineration is "miniscule" and not "meaningful," but do not otherwise dispute the results. Joint Defs.' Post-Trial Br. 20-21.

One point of contention is whether the temperature maintained during NECC's drum incineration process would have resulted in the generation of dioxins and furans. Emhart's expert Dr. Pasquale Forgione opined that NECC's furnace operated between 300 and 400 degrees Celsius, which was hot enough to create dioxins and furans but not so hot that it would destroy them. Oct. 22 Trial Tr. 117:6-118:15 (explaining formation and destruction of dioxins and furans and noting that "above about 530 degrees or so, . . . the drums would warp and be unusable"), 126:22-127:22 (explaining that Buonanno testified to a temperature range of 300-400 degrees without specifying the unit and concluding the unit was Celsius because 300-400 degrees Fahrenheit "would be way too low for a drum reconditioning facility"). Parette believes Forgione is incorrect because he doubts that Buonanno's "default temperature unit would be Celsius." Oct. 29 Trial Tr. 18:21-22:24 (also explaining that Nadeau and Buonanno each stated the same temperature range, without specifying units, for the incinerator and bake oven, but that those two apparatuses would not have operated at the same temperature). The Court finds it more likely that NECC incinerated drums at a temperature range of 300-400 degrees Celsius, permitting the formation of dioxins and furans.

Locke looked at the locations of Site samples containing detections of dioxins and furans. He found exceedances of 2,3,7,8-TCDD in soil "in all areas of the peninsula," Oct. 9 Trial Tr.

13:12-16; see EMH7041-0063, and found "the highest concentrations" of the other sixteen 2,3,7,8-substituted congeners in soil "in and around the former NECC drum reconditioning operating area and then along the tailrace and forested wetland area and into the [WDA]," Oct. 9 Trial Tr. 15:14-22; see EMH7041-0065. For Site sediments, Locke found "significant exceedances [of 2,3,7,8-TCDD] . . . in both pond and reach samples associated with Allendale Pond and with the tailrace and with Woonasquatucket [R]iver." Oct. 9 Trial Tr. 32:1-8; see EMH7041-0078. Locke also found "numerous" exceedances "throughout the area" for the other 2,3,7,8-substituted congeners. Oct. 9 Trial Tr. 33:1-9; see EMH7041-0079. Based on the locations of the samples, Locke concluded that NECC was a "strong (secondary)" contributor to 2,3,7,8-TCDD and a "strong (major)" contributor to other 2,3,7,8-substituted dioxins and furans. EMH7041-0091. Locke acknowledged that contamination could be spread "from where it was originally released to where it would be detected today" due to soil regrading at the Site, Oct. 9 Trial Tr. 98:15-20, but he only found the regrading to be "[c]onfounding to a degree" such that it would not "[o]bliterat[e] the signal," id. at 156:7-12.

Emhart's expert Dr. Court Sandau and TPDs' expert Dr. Rominger used receptor modeling to assign "fingerprints" or "end-members" to Centredale samples of dioxins and furans — in other words, they named categories of possible sources of those contaminants. Oct.

28 Trial Tr. 34:3-5, Dkt. No. 1140 (noting that "end-member" and "fingerprint" are synonymous); EMH7049-0004 (defining end-members as "sources"); see also Oct. 23 Trial Tr. 81:22-82:7 (Sandau clarifying that the end-members are more like "averages" for sources, rather than pointing to one specific source); Oct. 28 Trial Tr. 24:9-25:19 (Rominger analogizing fingerprints to shoeprints because "[y]ou can have many different sources . . . in the site data that produce the same fingerprint and so they might not be associated with a unique source" and, additionally, "an individual source itself can have multiple fingerprints"). The goals of receptor modeling, according to Rominger, are to (1) identify the number of fingerprints present in the data, (2) determine the chemical composition of those fingerprints, (3) assign those fingerprints to the data samples, and (4) locate the chemical fingerprints on the Site. TPD824.009.

Sandau and Rominger agreed on the four identified end-members, despite some differences in their methodologies. Oct. 23 Trial Tr. 9:19-10:2; Oct. 28 Trial Tr. 32:20-33:4, 40:14-41:7. One of those end-members, which is 2,3,7,8-TCDD dominant, is associated with Metro Atlantic's 2,4,5-TCP handling for its HCP manufacturing. Oct. 23 Trial Tr. 10:3-7, 125:1-25, 141:14-23; Oct. 28 Trial Tr. 33:5-8. There is also an OCDD-dominant fingerprint that Sandau associates with "general combustion." Oct. 23 Trial Tr. 10:23-11:2; EMH7049-0004; Oct. 28 Trial Tr. 34:7-

11 (referencing TPD824.014). Additionally, there is a fingerprint consisting of a "high furan homologue pattern" that Sandau associates with "waste incineration." Oct. 23 Trial Tr. 11:13-16; see EMH7049-0004; Oct. 28 Trial Tr. 35:9-12 (referencing TPD824.015). Finally, Sandau associates the fourth fingerprint, which has "high amounts of two furan congeners" — specifically, octachlorodibenzofuran ("OCDF") and heptachlorodibenzofuran ("HpCDF") — with "chlorinated waste." Oct. 23 Trial Tr. 11:3-12; see EMH7049-0004; Oct. 28 Trial Tr. 35:13-16 (referencing TPD824.015).

The latter three fingerprints are all based on samples containing 2,3,7,8-substituted congeners. Oct. 23 Trial Tr. 11:19-12:9. Sandau and Rominger agree that those fingerprints also include detections of 2,3,7,8-TCDD, but Rominger emphasizes that the degree of those detections is "basically rounded to zero." Oct. 28 Trial Tr. 35:20-37:8. On the other hand, Sandau opines that the mathematical modeling underpredicts the amount of 2,3,7,8-TCDD in those end-members, as evidenced by detections of the HCP end-member north of Route 44, which Sandau says make no sense from a fate and transport standpoint; thus, Sandau contends, the model overpredicts the locations of the HCP end-member. Oct. 23 Trial Tr. 85:12-86:6, 91:12-92:20; EMH7049-0064. Rominger counters that the samples north of Route 44 are consistent with the HCP fingerprint because he does not know of any other source

that could form those high levels of 2,3,7,8-TCDD.  Oct. 28 Trial Tr. 32:20-33:14, 46:20-48:7.  Rominger also challenges Sandau's decision to remove 133 samples associated with the HCP end-member to better measure the 2,3,7,8-TCDD levels in the other three end-members, but acknowledges that that decision still resulted in "negligible" detections of 2,3,7,8-TCDD in the non-HCP end-members.  Id. at 41:16-42:19.  He also acknowledges the existence of literature discussing the "phenomenon" that "if you have a pure 2,3,7,8-TCDD source like we have here, the model might not see other 2,3,7,8-TCDD sources." Id. at 161:8-23.  The Court finds it likely that the 2,3,7,8-TCDD levels in the three non-HCP end-members are underpredicted, though it is unclear to what degree.  TPDs do not explain how the 2,3,7,8-TCDD levels in the non-HCP fingerprints are so negligible as to not require remediation.  Tellingly, based on Rominger's calculations, between four and seven percent of Site samples contain 2,3,7,8-TCDD compositions that could be explained by some source other than TCP handling.  Id. at 61:9-62:12.  In all, the Court finds it likely that the 2,3,7,8-TCDD detections at the Site are not all solely attributable to Metro Atlantic's TCP handling and HCP production, which aligns with the Court's Phase I findings.  See Emhart, 130 F. Supp. 3d at 595-97 (finding NECC likely responsible for some 2,3,7,8-TCDD

deposited in Allendale Pond sediments based on radiometric dating evidence).[24]

Sandau and Rominger agree that the non-HCP fingerprints may all stem from incineration or combustion, Oct. 23 Trial Tr. 10:12-17; Oct. 28 Trial Tr. 91:21-92:1, 128:19-129:7, 133:14-21, though they engage in a "scientific bun fight" as to the possible source matches, Oct. 23 Trial Tr. 75:20.  Sandau contends that "these [fingerprints] were generally located around the NECC's drum reconditioning facility and result[ed] from their reconditioning processes."  Id. at 10:17-19; see id. at 83:24-86:20, 103:22-104:21; EMH7049-0058-0061, 0070.  In contrast, Rominger posits the fingerprints are "generic, . . . not source-specific" and could align with "many different types of sources."  Oct. 28 Trial Tr. 91:11-92:5.  For example, he found wastewater treatment plant sludge to be an "excellent match" to the general combustion footprint, and also pointed to wood treatment and stormwater as potential matches.  Id. at 92:21-93:19.  For the chlorinated waste fingerprint, Rominger indicated that the source could range from

---

[24] Rominger also noted the co-location of the HCP fingerprint and the non-HCP fingerprints, indicating a "common disposal pathway" from Metro Atlantic.  Oct. 28 Trial Tr. 100:25-102:14, Dkt. No. 1140; TPD824.072.  But this does not eliminate NECC as a contributor, given the overlap of this disposal pathway with NECC's operational areas.  See Oct. 28 Trial Tr. 123:8-130:15, 133:14-139:1; TPD824.072.  Indeed, Rominger clarified his conclusion that "[i]t's very possible" that Metro Atlantic was "one of the common sources," "in the mix just like NECC."  Oct. 28 Trial Tr. 102:15-25.

"PVC combustion" to "metal productions." Id. at 93:20-94:9. And for the waste incineration fingerprint, Rominger highlighted several potential sources including "[v]arious . . . types of combustion and incineration" and "vehicle emissions." Id. at 94:10-24. Sandau acknowledged that drum incineration is not the closest match to the fingerprints, but he emphasized the "ebb and flow" and "fuzzy" nature of drum incineration and dioxin and furan contamination, highlighting the difficulty in aligning exact matches to the fingerprints. Oct. 24 Trial Tr. 85:14-88:10, 101:13-103:25, Dkt. No. 1139. Based on the totality of the evidence, the Court finds that NECC's drum incineration is a probable source of dioxins and furans for some (but not all) of the samples affiliated with the non-HCP combustion-related fingerprints.

Assuming NECC was a source of dioxin and furan contamination at the Site, TPDs again emphasize the miniscule nature of that contamination. They argue that certain samples associated with the three non-HCP fingerprints are below the CUL for dioxins and furans, and "[t]o the extent samples . . . are above the cleanup level, it is because they have some 2,3,7,8-TCDD mixed in with them. This is consistent with Metro[ ]Atlantic's TCP handling as the source." Joint Defs.' Post-Trial Br. 30 (citing Oct. 24 Trial Tr. 59:13-60:5; Oct. 28 Trial Tr. 75:19-76:1, 77:1-16; TPD819; TPD824.052). Although, as cited by TPDs, Rominger testified that

some samples fell below the CUL, he also testified that there were samples for the three non-HCP fingerprints that lacked 2,3,7,8-TCDD and exceeded the relevant CUL. See Oct. 28 Trial Tr. 139:9-146:8. Sandau also found that, when 2,3,7,8-TCDD was excluded from the end-members, there were still samples that required remediation. Oct. 23 Trial Tr. 104:22-105:14; EMH7049-0071. TPDs argue that "[t]he EPA's own research indicates that, given the scale of NECC's operations, NECC's emissions of 2,3,7,8-TCDD, if any, would have been, in total, between 0.002 and 0.2 grams over the entire duration of NECC's operations." Joint Defs.' Post-Trial Br. 21 (citing Oct. 29 Trial Tr. 28:23-30:11). But they do not translate these 2,3,7,8-TCDD estimates in terms of required remediation at the Site. Accordingly, these quantity arguments go to allocation rather than liability.

TPDs do their best to sow doubt as to NECC's role in the dioxin and furan contamination at Centredale, particularly by highlighting the role of other sources, namely, Metro Atlantic and fires on the Site. Defs.' Joint Post-Trial Br. 10-11, 19, 22, 24. But they fail to eliminate NECC as a contributor to the dioxins and furans requiring cleanup. Accordingly, based on the scientific literature and expert testimony, the Court concludes that NECC's drum incineration process likely contributed to the release of 2,3,7,8-TCDD and other 2,3,7,8-substituted dioxins and furans at the Site that caused Emhart to incur response costs.

66

## 2. PAHs

As with dioxins and furans, NECC could only be a source of Centredale PAH contamination through drum incineration. Emhart Post-Trial Br. 62-63; Defs.' Joint Post-Trial Br. 47. The evidence supports that it was.

The Hosenfeld Study indicates that drum incineration creates PAHs. EMH1126-0074, 0086 (detecting PAH in every run at both drum reconditioning sites). The experts agree that PAHs are generated by incineration but disagree as to whether NECC was a source of that incineration. See Emhart Post-Trial Br. 55 ("Given the temperatures and chemicals involved, it was almost a forgone conclusion of any of the experts addressing this topic that NECC's drum incineration processes would generate PAHs."). Locke noted exceedances of benzo(a)pyrene and chrysene scattered about the peninsula. Oct. 9 Trial Tr. 18:16-22:5; see EMH7041-0071-0074. Locke found "high concentrations right at the north end of the peninsula just south of Smith Street," which "very likely . . . reflects the presence of the road and . . . all the vehicle traffic coming in and out of the [S]ite." Oct. 9 Trial Tr. 21:12-17. "We also see elevated concentrations immediately in the [vicinity] of the NECC drum reconditioning buildings and yard . . . ." Id. at 21:20-22. In sediment, Locke found exceedances of dibenz(a,h)anthracene in Allendale Pond sediments, in the reach, and in the tailrace. Id. at 33:19-34:9; see EMH7041-0081. Sandau,

who relied on "diagnostic ratios" instead of receptor modeling for PAHs, Oct. 23 Trial Tr. 35:21-36:3, found that "almost all the [PAH] samples on the [S]ite were found to be pyrogenic or coming from combustion incineration, which could be . . . in very high concentrations associated with the drum incineration processes in and around that area," id. at 14:18-15:7; see also id. at 120:1-9 (noting that "highest concentrations [of PAHs] are located in and around NECC's operations, as well as down in the [WDA]"); EMH7049-0084. Rominger acknowledged "a couple of high concentrations [of PAHs] also near the former NECC building," Oct. 28 Trial Tr. 103:18-22, but otherwise opined that the patterns point to "regional or combustion sources related to the roadway," id. at 104:7-11; see also TPD824.079.

TPDs try to deflect blame for the PAH contamination away from NECC by noting that "[t]he highest concentrations of PAHs are across the tailrace adjacent to Metro[ ]Atlantic's smokestack and north of Route 44." Joint Defs.' Post-Trial Br. 30-31 (citing Oct. 23 Trial Tr. 148:1-24, 149:10-13, 150:2-14; Oct. 28 Trial Tr. 103:13-19, 104:8-11). They further argue that PAH concentrations in the WDA "are relatively low compared to other areas of the peninsula." Joint Defs.' Post-Trial Br. 21 (citing EMH7041-0071-0074). But this does not change the fact that, based on the scientific literature and expert testimony, NECC was a likely source of PAH contamination through its drum incineration.

68

### 3. PCBs

The evidence shows that PCB contamination at Centredale is attributable, at least in part, to NECC's drum reconditioning operations.

Locke detected total PCBs exceeding the soil CUL "primarily in the southern two-thirds of the peninsula with some scattered exceedances [of] somewhat lower concentrations in the northern one-third of the peninsula," which he tied to "operations at NECC, disposal of waste in the [WDA], and . . . either runoff transporting PCBs into [the forested wetland area] or discharge of waste waters into the tailrace and/or the impoundment and then migration of those into the forested wetland area." Oct. 9 Trial Tr. 16:11-17:4; see EMH7041-0067-0068. For sediment, Locke found background exceedances for total PCBs "along the tailrace, . . . at multiple locations at Allendale Pond[,] and at a couple of locations along the Woonasquatucket River reach." Oct. 9 Trial Tr. 36:12-20; see EMH7041-0083-0084. For some exceedances north of the Metro Atlantic mill building and Route 44, Locke was not aware of operations from Metro Atlantic or NECC affecting that area. Oct. 9 Trial Tr. 36:21-37:9. For Aroclor 1254 specifically, exceedances were generally detected in the same areas as for total PCBs. Id. at 37:15-38:1; see EMH7041-0085-0086. Ultimately, Locke opined that NECC's handling of drum residuals was a "strong (major)" source of PCB contamination, upstream sources and urban

background were a "strong (minor)" source,[25] and Metro Atlantic's textile and HCP operations were each limited or incidental sources. EMH7041-0091.

Sandau "found four predominant end-members or sources of PCBs at the [S]ite": Aroclor 1242/1248,[26] Aroclor 1254, Aroclor 1260, and a by-product PCB that the EPA mischaracterized as Aroclor 1268. Oct. 23 Trial Tr. 12:10-13:22; EMH7049-0005. He opined that the first three PCB end-members are attributable to NECC's drum handling, while the fourth is not. Oct. 23 Trial Tr. 12:10-13:22; EMH7049-0005. Sandau found the highest concentrations of total PCBs to be located near NECC's operational area, the tailrace, and the WDA. Oct. 23 Trial Tr. 114:18-116:13; EMH7049-0072, 0081-0083.

TPDs generally argue that the spatial distribution of PCB exceedances could be impacted by the fires on the Site and subsequent soil regrading. Joint Defs.' Post-Trial Br. 11. They also point to the presence of PCBs in Metro Atlantic's buildings that burned down and Metro Atlantic's possible use of PCBs. Id. at 4, 11. But they do not show how this eliminates NECC's

---

[25] Locke's opinion that upstream sources contributed to PCB contamination at the Site is relevant to Emhart's upstream operator claim against BNS discussed infra Part IV.H.2.

[26] It is difficult to distinguish between Aroclors 1242 and 1248, so Sandau grouped them together. Oct. 23 Trial Tr. 13:23-14:17, Dkt. No. 1125.

connection to the PCB contamination.  In fact, Rominger agreed that "the data show NECC as a differentiable source of PCBs at the [S]ite."  Oct. 28 Trial Tr. 108:13-22.  In comparing the dioxin and PCB detections at the Site, Rominger opined that PCBs were primarily disposed of on land, while 2,3,7,8-TCDD was disposed of on land and in waterways.  Id. at 96:17-97:18; TPD824.067.

There were no detections of PCBs in the former impoundment area because (1) some of the soil in that area was excavated in the early 1980s and (2) new samples could not be taken from that area because it is where Centredale Manor stands.  Emhart, 130 F. Supp. 3d at 551 ("[A] data gap exists with respect to [the impoundment].");  Oct. 9 Trial Tr. 17:5-11.  However, "[s]ampling from areas immediately adjacent to the impoundment revealed elevated concentrations of . . . PCBs," among other contaminants. Emhart, 130 F. Supp. 3d at 551.

Accordingly, the Court finds that some PCB contamination at the Site is attributable to NECC's operations.

### 4. Remaining COCs

Locke is the only expert who considered NECC's broad connection to the remaining COC categories — VOCs, SVOCs, pesticides, and metals.  Emhart Post-Trial Br. 63.  The parties advanced their arguments as to these COCs in their TPD-specific discussions rather than the broader NECC discussion.  See generally Joint Defs.' Post-Trial Br. (providing minimal discussion of the

71

attribution of VOCs, SVOCs, pesticides, and metals to NECC). Locke did not look at every substance falling under each COC category, Oct. 9 Trial Tr. 165:9-17, but ultimately, the Court finds that Emhart has advanced enough evidence to demonstrate a contamination pathway from NECC for these COCs.

### a. VOCs

For VOCs, Locke looked at detections of PCE, vinyl chloride, benzene, toluene, chlorobenzene, and xylene. Id. at 22:6-27:25; EMH7041-0075, 0100-0110. For PCE, three exceedance samples appear close to Metro Atlantic's HCP production area, while the other three are closer to NECC's operational area. Oct. 9 Trial Tr. 22:24-23:8. Exceedances of vinyl chloride, which as detected in the soil was likely a degradant of PCE or TCE, showed a "similar pattern" as PCE. Id. at 23:25-25:1. The benzene exceedances are all in the WDA, about which Locke did not have an opinion. Id. at 25:25-26:5. For toluene, two exceedances were detected in NECC's operational area and two in the WDA. Id. at 26:13-21. For xylene, three exceedances were detected in NECC's operational area and one in the WDA. Id. at 27:5-7. And for chlorobenzene, exceedances were detected in NECC's operational area and along the impoundment. Id. at 27:14-20.

### b. SVOCs

Locke's categorization of PAHs, VOCs, and SVOCs did not specifically address NECC's connection to any SVOCs that are not

also PAHs.  See Emhart Post-Trial Br. 63 ("For VOCs/SVOCs, Mr. Locke examined the site contamination for PCE, vinyl chloride, benzene, toluene, xylene, and chlorobenzene . . . ."); EMH7041-0045 (characterizing such substances as VOCs); id. (listing benzo(a)pyrene, chrysene, and dibenz(a,h)anthracene as SVOCs); Oct. 9 Trial Tr. 10:19-20, 20:21-22, 33:19-22 (defining such substances as PAHs).  Nonetheless, the Court finds that Locke's description of pathways of contamination from NECC to the Site are equally applicable to SVOCs as to the other COCs, see EMH7041-0090, and TPDs have provided no countervailing evidence.

### c. Pesticides

For pesticides, Locke looked at concentrations of dieldrin in soil and determined that "the predominance" of exceedances above the CUL were in "the footprint of NECC's former drum reconditioning operating area and yard with some locations in the former forested wetland area and [in] the [WDA]," leading Locke to conclude "that the operations of the drum reconditioning facility were responsible for the highest concentrations that we observed." Oct. 9 Trial Tr. 17:12-17, 18:1-15; see EMH7041-0069-0070.  Locke also looked at gamma chlordane in sediment, noting exceedances "across the footprint of Allendale Pond, some higher exceedances in a couple of cluster locations toward the center of the pond, and then some exceedances as you go up the tailrace." Oct. 9 Trial Tr. 38:2-23; EMH7041-0087-0088.

73

#### d. Metals

For metals, Locke looked at antimony and lead exceedances at the Site.  Oct. 9 Trial Tr. 28:1-30:12; EMH7041-0111-0114.  Locke read the antimony exceedances, located in the drum reconditioning area and the WDA, as indicative of contamination from NECC.  Oct. 9 Trial Tr. 29:4-10.  The lead exceedances are more widespread, which "may indeed reflect the urbanized sources and vehicle use sources . . . and the usage of lead and fuels," but there are also clusters in NECC's operational footprint and the WDA.  Id. at 29:21-30:12.

### 5. Other Non-COC Substances

For each TPD, but not for NECC broadly, Emhart discusses substances that it does not clearly categorize as COCs.  See Emhart Post-Trial Br. 57-64 (focusing on COCs for NECC broadly), 104-08 (for Sequa, discussing materials without clarifying whether they are COCs), 122-25 (same for Ciba-Geigy), 167-68 (same for Teknor), 189-91 (same for BNS).  The Court finds that these substances are relevant to the extent they are considered hazardous under CERCLA, see supra Part III.C, and were in drums incinerated at NECC, thus contributing to the dioxin, furan, and PAH contamination at the Site.

**F. Batch Chemical Manufacturing and Metalworking Industries Broadly**

Three of the TPDs or their predecessors were batch chemical manufacturers: BASF, successor to Ciba-Geigy; Sequa, successor to Warwick Chemical; and Teknor. Emhart Post-Trial Br. 86, 121, 156; Oct. 17 Trial Tr. 113:7-11, 143:3-11, Dkt No. 1135; Oct. 21 Trial Tr. 10:18-12:2. The fourth is BNS, successor to Brown & Sharpe. Brown & Sharpe was not a chemical manufacturer like the other TPDs, but rather produced precision equipment, ranging from small handheld devices like calipers and micrometers to large machine tools used for the same metalworking processes that it conducted at its own facilities. EMH2000-0005; Andrade Dep. 47:6-19, 49:8-19.

In batch chemical manufacturing, "all the ingredients that are going to be put into a product are added in one batch," analogous to a car manufacturer making cars one by one. Oct. 17 Trial Tr. 95:23-96:3. "In a batch facility, . . . you can make smaller lots and . . . you can switch over from product A to product B fairly easily provided you do all the necessary cleanup work in between." Oct. 21 Trial Tr. 17:2-6. In contrast, continuous chemical manufacturing is analogous to an assembly line, Oct. 17 Trial Tr. 96:4-11, and involves "long production runs of the same thing over and over . . . again, essentially

75

inputting materials at one end and collecting your finished product at the output end of the equipment," Oct. 21 Trial Tr. 16:18-17:1.

In both the batch chemical manufacturing and metalworking industries, a variety of containers were available for use, including steel drums, stainless steel drums, plastic drums, fiber drums, 5-gallon pails, bags, tote boxes, and bulk tanks.  Oct. 18 Trial Tr. 20:8-21:4, 26:17-27:1, 40:1-11, 101:17-21, 103:1-5, 117:4-15; EMH7044-0008-0010.  The parties do not suggest that NECC reconditioned containers other than 55-gallon steel drums.  See Emhart Post-Trial Br. 71; Joint Defs.' Post-Trial Br. 5.  Emhart's experts emphasized the importance of 55-gallon steel drums in batch chemical manufacturing processes for receipt of raw materials, movement and storage of intermediates, and shipment of final products.  Oct. 21 Trial Tr. 41:12-24 (Emhart expert Dr. Charles Daniels characterizing 55-gallon steel drums as playing a "key role" in batch manufacturing for receipt and transport of materials); id. at 92:7-14 (Emhart expert Dr. Wayne Genck noting that a batch manufacturer "by definition uses a lot of drums because these are multi-steps that are . . . going on where you're moving material from one part of the plant to the other, from one reactor to the other, so the vehicle that [his workplace] used for them primarily is 55-gallon drums"); Oct. 17 Trial Tr. 100:25-103:16 (Emhart expert Dr. Peter Hauser explaining range of uses for drums and observing that steel drums were commonly used in the

76

early 1970s but fiber drums became more prominent later, except for flammable, volatile, or corrosive materials for which steel drums were safest). Emhart's expert Dr. Robert Iezzi also testified to the predominance of steel drums in metalworking. Oct. 17 Trial Tr. 24:3-14.

### G. BASF (formerly Ciba-Geigy)

#### 1. Relevant Entities, Time Period, Location, and End Products Generated

BASF is successor to Ciba Specialty Chemicals, Inc. ("CSC"), which is successor to Geigy Chemical Company and Ciba-Geigy Corporation (hereinafter collectively referred to as "Ciba-Geigy"). Emhart Post-Trial Br. 121; BASF Post-Trial Br. 1-2, Dkt. No. 1121.[27]

The parties agree that Ciba-Geigy and NECC maintained a business relationship while NECC operated at Centredale, but they disagree on the relevant time period during which that relationship existed. They agree that Ciba-Geigy's engagement with NECC began "when NECC acquired the customers of a competitor called Accorn

---

[27] Evidence pertaining to BASF includes depositions of several former Ciba-Geigy employees, whose names and dates of employment are as follows: Roger Ambuter (1968-1974), Ambuter Dep. 22:16-21; Ernest Briggs (began working for Ciba-Geigy in either the 1960s or 1970s), Briggs Dep. 18:23-25, 99:17-25; Everett Cote (began working for Ciba-Geigy in 1970), Cote Dep. 19:9-19; Vito D'Ambra (1961-1984), D'Ambra Dep. 21:3-6, 24:13-21; Ronald Mikucki (began in 1974), Mikucki Dep. 20:21-21:16; Harold Slade (1966-1986), Slade Dep. 17:3-18:11; John Walsh (1958-1976), Walsh Dep. 23:4-25:23.

Cooperage" ("Accorn"),[28] Ciba-Geigy being one of those customers, and continued through NECC's transition from Centredale to Smithfield.  Emhart Post-Trial Br. 152; see BASF Post-Trial Br. 5-6.  Emhart posits that the dates are fuzzy, placing the start date in the "late 1960s" and emphasizing that NECC's transition from Centredale to Smithfield was "gradual."  Emhart Post-Trial Br. 151-52; see id. at 152 (citing testimony as to the uncertainty of when NECC acquired Accorn's customers).  BASF defines the relevant time period as June 1969 to August 1971, based on an accounting document known as the "Isserlis Ledger."  BASF Post-Trial Br. 5-6; see TPD388.0018, 0033 (explaining that after NECC's acquisition of Accorn's customers, NECC agreed to pay Mr. Isserlis, the owner of Accorn, $0.25 per drum picked up from Ciba-Geigy); EMH7047-0022 (Emhart expert Dr. Wayne Genck opining that "Ciba-Geigy's Cranston Plant sent tens of thousands of 55-gallon steel drums to NECC for reconditioning between June 1969 and August 1971"); see generally TPD117 (Isserlis Ledger).

The Court agrees with BASF that the evidence establishes the relevant time period as June 1969 to August 1971.  While it is possible, based on the testimony Emhart cites, that Ciba-Geigy

---

[28] Emhart refers to this entity as "Accorn Cooperage" while BASF refers to it as "Acorn Cooperage."  Compare Emhart Post-Trial Br. 152, with BASF Post-Trial Br. 5.  Based on relevant exhibits, the Court refers to it as "Accorn."  See, e.g., Lussier Statement, Aug. 20, 2003.

could have sent drums to NECC at Centredale earlier than June 1969, the Court finds the Isserlis Ledger to be the most reliable indicator that June 1969 was the start date.

During its relevant time period, Ciba-Geigy operated a chemical manufacturing facility in Cranston, Rhode Island (the "Cranston Plant"), which consisted of seven manufacturing buildings. Emhart Post-Trial Br. 121; BASF Post-Trial Br. 2-3. The Cranston Plant was a batch manufacturing facility in which Ciba-Geigy "produce[d] nearly 150 finished products and numerous intermediate products." EMH3002-0004. Ciba-Geigy's end products included "pharmaceuticals, agricultural products, leather and textile auxiliaries, plastics additives, optical brighteners, bacteriostats, and other specialty organic chemicals." TPD388.0015 (citing TPD066.0026).

### 2. Materials Spent and Containers Used

The Court next considers the raw, intermediate, and maintenance materials that Ciba-Geigy used in its operations during the relevant time period, as well as the containers in which those materials were held. Based on the record, the Court cannot delineate the "approximately 500 raw materials" that Ciba-Geigy used in its operations but will consider the most pertinent ones, as identified by Emhart. EMH3002-0004.

To connect BASF to NECC and Centredale, the Court must determine to what extent Ciba-Geigy used 55-gallon steel drums in

79

its operations and for which materials.  The parties agree that
BASF used both open- and closed-head 55-gallon steel drums, though
there is conflicting evidence as to the specific materials that
were handled in drums versus other containers.  BASF Post-Trial
Br. 3 (noting that raw materials were handled in steel drums as
well as fiber drums, bags, and large bulk storage tanks).  Emhart
contends that Ciba-Geigy used steel drums extensively.  Emhart
Post-Trial Br. 135-37.  BASF does not really disagree, but argues
that "the use of a chemical at the Cranston Plant does not mean
that that chemical ever came into contact with a 55-gallon steel
drum."  BASF Post-Trial Br. 12 (citing Oct. 18 Trial Tr. 76:2-11;
Oct. 22 Trial Tr. 7:18-24).

As explained below, Emhart has made a sufficient showing that
Ciba-Geigy used PCBs, VOCs, SVOCs, pesticides, metals, and other
materials not categorized as a COC, and that many of these
substances came into contact with drums.[29]

### a. PCBs

Ciba-Geigy used PCB-containing fluids in plant equipment —
namely, in transformers (Inerteen PPO, consisting of Aroclor
1260), capacitors (Aroclors 1242 and 1254), vacuum pumps (Santovac

---

[29] Emhart does not allege that Ciba-Geigy used or generated
dioxins, furans, or PAHs in its manufacturing processes.  See
Emhart Post-Trial Br. 154-56.  Rather, any connection to the
Centredale dioxin, furan, or PAH contamination hinges on whether
any of Ciba-Geigy's drums contained residues of hazardous
materials and were subject to incineration.  See id.

2, consisting of Aroclor 1254), its hot oil heat transfer system (Therminol FR-1, consisting of Aroclor 1242, and Therminol FR-2, consisting of Aroclor 1248), and possibly in hydraulic systems (hydraulic fluids, consisting of Aroclors 1232, 1242, 1248, 1254, and/or 1260).  Emhart Post-Trial Br. 125-26; BASF Post-Trial Br. 22, 31, 34-35; see Nov. 13 Trial Tr. 132:18-134:25, Dkt. No. 1127; Nov. 14 Trial Tr. 29:25-30:12, Dkt. No. 1146; EMH7042-0060 (summarizing relevant parts of EMH3006).  Ciba-Geigy also used Aroclor 1221 as a dye carrier in manufacturing, though Aroclor 1221 is not a COC at Centredale.  Nov. 13 Trial Tr. 123:21-124:3. The most significant issues to be resolved are how much and which PCB-containing fluids Ciba-Geigy used during the relevant time period; the direct evidence is slim, and Emhart's contentions rely on a series of inferences derived from various data and expert opinions.

### i. The Monsanto Sales Records

The Monsanto sales records indicate that Ciba-Geigy received PCBs in drums as well as other containers.  During its relevant time period, Ciba-Geigy purchased 1,800 pounds of Therminol FR-1 (Aroclor 1242), which were packaged in three 55-gallon steel drums. EMH3006-0007 (showing that Ciba-Geigy purchased 600 pounds of Therminol FR-1 in 1970 and 1,200 pounds in 1971); Oct. 11 Trial Tr. 45:25-47:19, Dkt. No. 1133 (explaining that such purchases were probably received in drums, with 600 pounds per drum, because

81

5-gallon pails would be too small and bulk containers would be too large). Those drums were closed-head. Nov. 13 Trial Tr. 127:24-128:1; see TPD134.0004 (comparing Aroclor 1242 to "vegetable oil"). Ciba-Geigy purchased sixty pounds of Santovac 2 (Aroclor 1254) in 1971, packaged in 5-gallon pails. EMH7042-0060 (citing EMH3006); Oct. 11 Trial Tr. 47:22-48:12. Finally, hundreds of thousands of pounds of Aroclor 1221 were purchased and packaged in bulk. EMH7042-0060 (citing EMH3006); TPD162.001.

The Monsanto sales records also reflect PCB purchases by Ciba-Geigy, likely in drums, before Ciba-Geigy's relevant time period. EMH7042-0060 (citing EMH3006) (indicating that Ciba-Geigy purchased 1,000 pounds of Aroclor 1248 in 1960, 674 pounds of Inerteen PPO in 1966, and 1,200 pounds of Therminol FR-2 in 1968). BASF argues that purchases made before the relevant time period are irrelevant, and thus, for our purposes, Ciba-Geigy only purchased three 55-gallon steel drums of PCBs — specifically, Therminol FR-1. BASF Post-Trial Br. 22, 28-30. During trial, Emhart suggested that drums purchased before the relevant time period could have been sent to NECC during the relevant time period, but it does not give the Court a concrete reason to consider that speculative argument further. Nov. 14 Trial Tr. 29:8-15.

Emhart argues that Ciba-Geigy likely used more drums of PCBs than is reflected in the Monsanto sales records and that those

records are incomplete or Ciba-Geigy purchased PCBs from other distributors. Emhart Post-Trial Br. 125, 128.[30] Emhart points to the PCB-contaminated soil at the Cranston Plant as evidence of more extensive use of PCBs. Id. at 129-31. Emhart claims that Ciba-Geigy would have needed PCBs to "top off" transformers and hydraulic and vacuum equipment, id. at 134-35, and that Ciba-Geigy had more than one hot oil heat transfer system and thus Ciba-Geigy would have needed more than three drums of Therminol FR-1. Id. at 131-33.

BASF argues that the Monsanto sales records are complete, and that Ciba-Geigy did not purchase PCBs from other distributors. BASF Post-Trial Br. 22, 32. It posits that the records and the PCB contamination at the Cranston Plant coincide with its conceded use of PCBs, and any contamination indicative of excess PCB use is attributable to PCBs contained in Cranston Plant building materials, which were transmitted to the soil from the demolition that occurred in 1986. Id. at 34-41. Regarding transformers, BASF contends that Ciba-Geigy would only need to occasionally top them off due to incidental leaks, while any other maintenance would

---

[30] As previously mentioned, the Court only considers quantities at this stage as they relate to liability, i.e., the likelihood that a party sent drums containing certain residuals to Centredale. Any quantity determinations made herein are not determinative on the question of cost allocation. (Of course, such findings may be helpful to the parties in their effort to resolve allocation by agreement.)

have been completed by an outside contractor.  Id. at 28-31.  As to Emhart's contention that there was more than one hot oil system at the Cranston Plant, BASF highlights both the absence of evidence supporting Emhart's argument and the presence of evidence indicating there was only one such system.  Id. at 24-27.

To determine whether the Monsanto sales records reflect all the PCBs used by Ciba-Geigy during the relevant time period, the Court looks at evidence of PCB contamination at the Cranston Plant and evidence concerning the number of hot oil heat transfer systems.

### ii.   The Cranston Plant PCB Contamination

Prior to the 1986 demolition, the Cranston Plant buildings tested positive for Aroclor 1254, averaging less than 25 ppm.  TPD056.002; see also Emhart Post-Trial Br. 98 (citing TPD052.0003-0008) (reporting average of 11.3 ppm).  PCBs were used in building materials when the Cranston Plant was constructed, especially Aroclor 1254.  Oct. 11 Trial Tr. 89:12-90:1; EMH1088-0003 ("Surface coatings are the largest single outlet for the Aroclor compounds."); EMH7042-0019 (noting Aroclor 1254 use in caulk and other building materials); TPD062.0013 (indicating Cranston Plant building construction dates); TPD289.0011 ("[M]any buildings across the country which were constructed or renovated from 1950-1978 may have high levels of PCBs in the caulk around windows and

door frames, between masonry columns, and in other masonry building
materials.").

Sandau evaluated the Cranston Plant PCB contamination,
relying on samples taken for a 1996 remediation report and a 2016
supplemental remediation report.  EMH7050-0005 (citing EMH3123).
Aroclors 1242, 1248, 1254, and 1260 were detected in Cranston Plant
soils.  Id. at 0012.  He found that "600 percent of the Aroclor
1254 sales records are present in [Cranston Plant] soil."  Oct. 24
Trial Tr. 117:10-11.[31]  Based on this excess, Sandau concluded that
the PCB sales records must be incomplete.  Id. at 117:11-16.  To
support his contention, Sandau identified "[h]otspots" of Aroclor
detections, EMH7050-0010, and concluded that, if the detected
Aroclor 1254 was from building materials as BASF argues, "it would
be spread evenly across [the] site, not concentrated in Ciba-Geigy
operational hotspots," id. at 0020, and would be "diluted," Oct.
24 Trial Tr. 175:5-18.  Sandau also opined that Aroclor 1254 from
building material would not explain the detections found deeper in
the soil, id. at 127:3-16, though he acknowledged that the Cranston
Plant soil had been regraded after demolition, which could impact
the ability to determine the source of those detections, id. at
159:23-160:22.  Regarding Aroclors 1242, 1248, and 1260, Sandau
opined that Ciba-Geigy used them in more ways than is reflected in

---

[31] Six hundred percent amounts to about half a drum of Aroclor
1254.  Oct. 24 Trial Tr. 141:19-142:16, Dkt. No. 1139.

the sales records, based on the locations of the detections and their co-location with one another. Id. at 123:17-125:12, 129:10-131:3. And, although the releases of Aroclors in the Cranston Plant soil were fractions of the amounts reflected in the sales records, he opined that those releases were still significant enough to suggest that more would have been purchased than is reflected in the records. Id. at 164:22-165:9.

BASF's expert Mr. Eric Litman challenged Sandau's opinions on several grounds. Litman noted that Sandau did not account for all the transformers and capacitors on the Cranston Plant site, which were co-located with the identified hotspots, and thus, "[t]he PCBs detected in these locations are not from unknown sources, but from documented equipment that utilized PCB Aroclor containing fluids." TPD388.0105; see Nov. 13 Trial Tr. 158:17-160:10. Litman could not comment on Sandau's Aroclor 1242 analysis, Nov. 13 Trial Tr. 160:16-23, but regarding Aroclor 1254, he opined that the diffuse concentrations are explained by the 1986 demolition, while hotspots could be due to soil regrading or "could very well be from . . . releases of [A]roclor fluids. We're not certain what they are, but they could have been from the Santovac vacuum pump system, for instance." Id. at 162:11-20; see id. at 163:10-164:7. He also commented that "there's no technically defensible way to age date the release of PCBs" detected in the Cranston Plant soil, such that the PCBs could have been released before Ciba-Geigy's

86

relevant time period, id. at 167:14-20, an issue that Sandau also acknowledged, Oct. 24 Trial Tr. 169:2-24.

The evidence of PCB contamination at the Cranston Plant is insufficient to support a finding that Ciba-Geigy purchased more drums of Aroclors during its relevant time period than is reflected in the Monsanto sales records. Aroclor 1254 detections are almost certainly explained by the building demolition. For Aroclors 1242, 1248, and 1260, Sandau acknowledges that only fractions of the known purchased amounts were detected in the soil and does not explain how such detections are nonetheless so "significant" as to conclude that Ciba-Geigy purchased excess drums. Moreover, he acknowledges that he did not account for amounts of Aroclors that would have already been inside equipment when Ciba-Geigy received the equipment. Id. at 155:20-156:17. Some detections of those Aroclors at the Cranston Plant align with Ciba-Geigy's conceded use of those Aroclors. For example, high detections of Aroclor 1242 were found outside Building 11, near capacitors (for which Aroclor 1242 was used). EMH7050-0018; TPD388.0105. But see Nov. 14 Trial Tr. 52:12-15 (Litman acknowledging that Cranston Plant PCB contamination "doesn't appear to be" from capacitors). And high detections of Aroclor 1248, used in Therminol FR-2, were found near the pilot plant, where the parties agree a hot oil system was located. EMH7050-0017; Emhart Post-Trial Br. 127; BASF Post-Trial Br. 24. Alas, some Aroclor detections at the Cranston Plant make

less intuitive sense.   For Aroclor 1260, used in transformers,
clusters were found near the pilot plant and Building 11, which do
not appear to be near transformer substations.   EMH7050-0013;
TPD388.0104.  And for all of these Aroclors, there are other lower
detections throughout the Cranston Plant.   Such detections are
likely best explained, at least in part, by soil regrading.

The only other potentially viable explanation offered by
Emhart, aside from the hot oil heat transfer system issue discussed
in the next section, is that Ciba-Geigy used hydraulic fluids
containing PCBs.  Emhart Post-Trial Br. 126.  But the Court is not
convinced.   During the relevant time period, some but not all
hydraulic fluids contained Aroclors 1232, 1242, 1248, 1254, or
1260.   EMH7042-0028; Oct. 10 Trial Tr. 121:22-24, 124:6-17.   A
1995 remediation report regarding the Cranston Plant indicated
that, in the "[p]roduction area," "[o]ur current understanding" is
that "PCBs were derived from two sources; 1) de minimis releases
of Dowtherm A, . . . and, 2) de minimis releases of PCB containing
hydraulic fluid within process buildings during production."
EMH3120-0032.  But this document is not persuasive because of its
framing as a "current understanding" without more context, the
absence of discussion of building materials, and the fact that the
Dowtherm A observation was made in error — as the parties
acknowledge, Dowtherm A does not contain PCBs.  See EMH3120-0032;
Nov. 14 Trial Tr. 31:24-32:6.   Further, a document describing

Cranston Plant cleanup prior to demolition indicates the existence of hydraulic systems in the Cranston Plant but does not include such systems in a list of "equipment containing PCB." TPD062.0002, 0006, 0027. Granted, that list may not be exhaustive because it does not mention vacuum pumps or hot oil heat transfer systems.

In sum, Emhart has not shown that Ciba-Geigy's PCB use during its relevant time period exceeded what is reflected by the Monsanto sales records.

### iii. Number of Hot Oil Systems

One factual issue remains with respect to PCBs. Emhart contends that the Cranston Plant had two hot oil heat transfer systems, not one. Emhart's position hinges on two documents. The first is a 1971 memorandum memorializing a conversation between a Monsanto representative and Ciba-Geigy representative James Genser, in which the Monsanto representative referred to Ciba-Geigy's "three or four systems that they have in the plants" in the context of "chang[ing] over their systems from FR to Therminol 55." EMH1090-0537. The other document Emhart relies on is an "On-Site Remedial Measures Work Plan" that was previously referenced regarding hydraulic fluids, which refers to "heat transfer fluid, within process buildings." EMH3120-0032.

Notwithstanding these two documents, the collective evidence shows that the Cranston Plant had only one hot oil heat transfer system. First, the phone call memorandum refers to "plants"

89

plural, signaling that perhaps they were discussing three or four systems across more than just the Cranston Plant. See Oct. 10 Trial Tr. 143:5-9. Second, other documents suggest there was only one system. One is another phone call memorandum from several days prior to the memorandum just referenced, in which Genser and the Monsanto salesperson discussed "what to switch FR system in pilot plant to." TPD189.0002. It further states that "[p]lant down for vacation until 8/17 and then pilot plant system not scheduled to operate for ten days." Id. Another document is a 1971 letter from Monsanto's James Roder to Genser regarding "the conversion of your heat transfer unit from Therminol FR to Therminol 55," indicating that Monsanto was providing six drums of Therminol 55 to use for completely replacing the Therminol FR. TPD148.0001; see Nov. 13 Trial Tr. 142:4-10. As interpreted by Litman,[32] the document references a singular "system" and indicates the system likely had a maximum volume of about 300 gallons. Nov. 13 Trial Tr. 146:21-147:7. Litman also referenced a Monsanto document that showed Ciba-Geigy's return of about 150 gallons of spent Therminol FR, presumably from the switch to Therminol 55. Id. at 147:8-22; TPD176.0001; see BASF Post-Trial Br. 27 (noting that 1,794 pounds equals about 155 gallons). These quantities

---

[32] Litman based his opinion on the hot oil heat transfer system in part on deposition testimony that the Court will not consider because the testimony is not evidence in this matter. See TPD388.0095; Emhart Post-Trial Br. 127 n.50.

suggest the existence of just one system. Nov. 13 Trial Tr. 147:23-148:1; see TPD129 (omitting Ciba-Geigy from a list of "key" Monsanto heat transfer accounts).

Accordingly, the Court finds that the Cranston Plant likely had only one hot oil heat transfer system.

### iv. PCB Conclusions

To summarize the Court's conclusions regarding Ciba-Geigy's use of PCBs and their containers: during its relevant time period, Ciba-Geigy purchased three drums of Aroclor 1242; Emhart has not shown that Ciba-Geigy used more drums of PCBs during the relevant time period.

### b. VOCs

Ciba-Geigy used VOCs in its manufacturing operations and plant maintenance. Nov. 13 Trial Tr. 168:18-22; BASF Post-Trial Br. 47-48. These VOCs "would have largely been components in solvents." TPD388.0114. According to BASF, these VOCs included "[s]ulfuric acid, hydrochloric acid, nitric acid, methanol, isopropanol, heptane, acetone, toluene, and xylenes," which "were all stored in bulk storage tanks." BASF Post-Trial Br. 47. BASF notes that materials stored in bulk tanks were "piped directly to the reactors in the production buildings," id. at 61, and "[s]pent solvents were recovered and reclaimed for reuse" without the use of drums, id. at 47; TPD388.0115; see also BASF Post-Trial Br. 11-12 (citing Mikucki Dep. 38:4-16; Walsh Dep. 95:10-19). Emhart

91

adds benzene, chlorobenzene, dichlorobenzene, PCE, and TCE to the list of VOCs used by Ciba-Geigy, Emhart Post-Trial Br. 122-25, and argues that VOCs would have been handled in drums "as raw materials, in intermediates, and/or as maintenance materials," id. at 155.

Regarding Ciba-Geigy's use of PCE, TCE, and dichlorobenzene, Emhart relies on a PowerPoint slide from Genck, though Genck did not provide a source for that information or testify to Ciba-Geigy's use of those substances.    See EMH7047-0040.    For dichlorobenzene, Emhart also cites "hazardous waste manifests," though from what the Court can tell, dichlorobenzene is only listed once on a 1984 manifest.    Emhart Post-Trial Br. 123 (citing, inter alia, EMH3002A-0003-0052; EMH3002-0003-0007, 0018, 0040, 0050-0052).    Emhart also notes that dichlorobenzene, PCE, TCE, and vinyl chloride — a degradant of PCE and TCE — were all detected at the Cranston Plant, implying that Ciba-Geigy used those substances. Id. at 122 (citing EMH3123-0009, 0023, 0028); see Oct. 9 Trial Tr. 23:13-24:19.    While the presence of those substances at the Cranston Plant likely means they were used at some point, this is not enough, on its own, to indicate that Ciba-Geigy used those substances during the relevant time period.[33]    For benzene, for

_____

[33] This is one of several occasions where the Court does not view evidence of detections at the TPD's predecessor's site as demonstrative of that predecessor's use of the detected substance during the relevant time period.    This is distinguishable from

example, Emhart only cites a statement from former Ciba-Geigy employee John Walsh, which is ambiguous at best.  Emhart Post-Trial Br. 123; see Walsh Dep. 93:1-5 ("I know we used benzene. Very limited, though.  There wasn't much that we had to do that involved benzene.  And that was probably just one period of time, a brief period of time . . . .").  Accordingly, Emhart has not shown that Ciba-Geigy used PCE, TCE, dichlorobenzene, or benzene during the relevant time period.  However, there is sufficient evidence that Ciba-Geigy likely used chlorobenzene during that time period.  Nov. 13 Trial Tr. 168:20-22; EMH3012-0002; EMH3014-0001, 0003.

The evidence further confirms that Ciba-Geigy typically received and stored much if not all of the VOCs in bulk containers, and the VOCs were then directly piped into reactors.  TPD062.0002; EMH3012-0002; Briggs Dep. 70:19-71:6; Mikucki Dep. 38:9-16; Walsh Dep. 94:11-95:19.  However, two former Ciba-Geigy employees testified that solvents were sometimes handled in drums.  Cote Dep. 144:17-21, 145:20-24; D'Ambra Dep. 58:10-21, 81:5-11.  There are also two Cranston Plant "Operator Training Program" manuals, one revised in 1968 and the other from 1970, which both discuss scenarios in which "toluene would probably be drummed" if there

---

other instances in which the Court finds the opposite because in those instances, there is additional corroborating evidence.  See, e.g., supra Part IV.G.2.a; infra Part IV.J.2.a & IV.I.2.b.

was rust in it.  EMH3004-0015; EMH3005-0016.  Expert testimony also supports Emhart's argument that some VOCs came into contact with drums during Ciba-Geigy's batch chemical manufacturing process.  Oct. 22 Trial Tr. 7:25-8:20 (Genck noting batch chemical manufacturers often used drums to temporarily hold materials including solvents); Nov. 13 Trial Tr. 168:16-169:1 (Litman acknowledging that "[s]olvents that were received in smaller quantities may have been in closed-head drums").

In all, the evidence shows that the VOCs used by Ciba-Geigy — chlorobenzene, sulfuric acid, hydrochloric acid, nitric acid, methanol, isopropanol, heptane, acetone, toluene, and xylene — were typically handled in bulk containers and directly piped into reactors but were also sometimes handled in drums.

### c. SVOCs

Ciba-Geigy used naphthalene in its manufacturing processes. See, e.g., EMH3012-0001-0002; EMH3020-0004.  Naphthalene was likely handled in bulk.  See EMH3012-0002; Mikucki Dep. 38:4-16. Emhart's evidence regarding Ciba-Geigy's drum use does not address naphthalene specifically.  However, it is reasonable to conclude drums were occasionally used for naphthalene just as they were for solvents.  See EMH3004-0014-0015; Oct. 21 Trial Tr. 127:1-24. Accordingly, the evidence shows that Ciba-Geigy used naphthalene, which was sometimes handled in drums, even if primarily handled in bulk.

94

#### d. Pesticides

Ciba-Geigy produced certain agricultural chemicals that are not COCs at Centredale.  TPD388.0117; EMH3004-0008.  According to both Genck and Litman, Ciba-Geigy likely used herbicides and pesticides to maintain the Cranston Plant grounds.  Oct. 21 Trial Tr. 125:21-126:25; Nov. 13 Trial Tr. 171:11-17.  But the only evidence identifying specific kinds of pesticides and herbicides is a 2016 remedial investigation report indicating one detection of chlordane and one detection of dieldrin at the Cranston Plant site.  EMH3123-0027-0028.  This alone is not enough to find that Ciba-Geigy used those chemicals during the relevant time period.

Genck testified that, in his experience, pesticides and herbicides were purchased in drum quantities.  Oct. 21 Trial Tr. 126:20-25; see id. at 88:12-89:9.

The Court finds it likely that Ciba-Geigy used pesticides or herbicides during the relevant time period, which it obtained in drums, but there is insufficient evidence to identify the specific pesticides or herbicides, and thus, the Court cannot determine whether they constitute hazardous substances under CERCLA.

#### e. Metals

Ciba-Geigy used zinc and copper compounds in manufacturing. Emhart Post-Trial Br. 122; BASF Post-Trial Br. 49; Nov. 13 Trial Tr. 172:4-15.  The parties provide no details regarding Ciba-Geigy's use of copper.  As for zinc, BASF argues that "[g]iven the

95

quantity of zinc used at the Cranston Plant, it is likely that it was delivered to the plant in bulk by rail car." BASF Post-Trial Br. 49. The source that BASF cites for this proposition is a 1995 RCRA Facility Investigation Report for the Cranston Plant, which describes a zinc oxide spill from a "broken rail car that was on the railroad siding near Buildings 32 and 33 in the Warwick Area." EMH3116-0124. It does not specify whether that delivery was being made to Ciba-Geigy. See id. One former Ciba-Geigy employee testified that "[s]ome of the zinc came in small containers, metal," though it is not clear whether he was referring to 55-gallon steel drums. D'Ambra Dep. 80:20-21. Even if zinc was delivered in bulk, it seems unlikely that it would have been transported to reactors through piping. See Cote Dep. 187:15 (referring to a "powdered zinc"); Briggs Dep. 70:19-71:6 (discussing piping system for liquids). It is more likely that metals would have been transported in open-head steel drums, fiber drums, or bags. Oct. 17 Trial Tr. 99:20-100:1 (Hauser noting that solid materials typically were held in open-head drums or bags); Nov. 13 Trial Tr. 97:1-5 (Litman describing a fiber drum as a "cardboard drum" that is "less durable but . . . lighter weight" and "well suited for . . . dry solid materials"), 97:19-98:22, 173:25-174:2 (noting that zinc would not be packaged in a closed-head drum); TPD388.0050 (citing TPD237.0010-0011; TPD183.0003); EMH3005-0011 ("Dry powders received by us in containers or bags

are spot checked . . . .”).  But see Oct. 17 Trial Tr. 102:2-14 (Hauser noting that fiber drums became more common after the relevant time period); EMH3014-0030 (noting that zinc dust is a “moderate fire hazard” and that “‘[s]pent’ material is pyrophoric and should not contact combustible material”); EMH3011-0090.

Additionally, to the extent zinc was mixed with other materials during the manufacturing process, it is unclear whether this would have brought zinc into contact with 55-gallon steel drums.  Former Ciba-Geigy employee Everett Cote described the use of zinc in various processes, noting that zinc would either be used to reduce a substance to a final product or would be added into a vessel or reactor that is not clearly a drum.  Cote Dep. 50:7-9, 52:5-23, 54:5-55:14, 73:17-22, 187:11-188:1.

There is too much uncertainty as to whether the metals that Ciba-Geigy used were handled in 55-gallon steel drums or other containers.  Therefore, Emhart has not shown it more likely than not that Ciba-Geigy’s use of zinc and copper involved the use of 55-gallon steel drums.

### f. Other Materials

Ciba-Geigy used other raw materials and produced intermediates that were not discussed in the context of the COC categories.  These materials are relevant to liability for dioxin, furan, and PAH contamination to the extent they consist of hazardous substances, were sent to Centredale as residuals in

drums, and were incinerated.  The parties do not identify all of these materials.  See Emhart Post-Trial Br. 124; BASF Post-Trial Br. 10.  A more extensive evaluation may be warranted later for allocation purposes.

There are several documents in the record that discuss these materials.  In NECC's Supplemental 104(e) Response, NECC provided a list of "the type of chemicals handled and produced by [Ciba-Geigy] during the Relevant Time Period," which it defined as from 1952 to the summer of 1971.  EMH3020-0002; see id. at 0001 n.1. That list includes several substances already discussed above. See id. at 0003-0004.  Without exhausting the entire list, the Court notes that several of the listed substances are hazardous under CERCLA.  See id. (listing, e.g., methylene chloride, bis(2-Chloroethyl) ether, silver nitrate, and hydroquinone); 40 C.F.R. § 302.4 (identifying such substances as hazardous under CERCLA). Additionally, historical Ciba-Geigy bulk chemical lists, "Hazards and Precautions" documents, and training materials indicate use of other substances that are hazardous under CERCLA.  See, e.g., EMH3012-0002 (listing, e.g., formaldehyde); EMH3014-0002 (acetic acid, ammonium chloride, and aniline); EMH3005-0011 (phenol); 40 C.F.R. § 302.4.

Based on these documents, expert and employee testimony about the use of steel drums for transporting raw and intermediate materials, and the sheer volume of drums that Ciba-Geigy used

98

during its relevant time period, the Court finds that Ciba-Geigy likely handled hazardous raw and intermediate materials not categorized as COCs in open-head and closed-head drums. See EMH3005-0014, 0016 (discussing use of drums); BASF Post-Trial Br. 11 (citing Nov. 13 Trial Tr. 99:20-22; TPD388.0049) ("Certain intermediates at the Cranston Plant were temporarily stored in open-head 55-gallon steel drums to move them through the manufacturing process, but many intermediates were stored in fiber drums."); D'Ambra Dep. 63:18-25 (discussing intermediate solids placed in open-head drums); Mikucki Dep. 41:21-25 (discussing use of both open-head and closed-head drums for raw materials and intermediates); Walsh Dep. 51:20-54:4 (discussing open-head drums as containing primarily intermediate products).

### 3. The Ciba-Geigy-NECC Relationship

Ciba-Geigy sent both open- and closed-head drums to NECC for reconditioning and received both kinds of reconditioned drums from NECC, though the reconditioned drums received were not necessarily the same drums that Ciba-Geigy sent to NECC. Emhart Post-Trial Br. 154; BASF Post-Trial Br. 6, 8. Ciba-Geigy sent closed-head drums to NECC at Centredale from June 1969 to August 1971, but only sent open-head drums there until January 1971, after which NECC moved its open-head reconditioning operations to Smithfield, Rhode Island. TPD388.0043-0044 (citing Olson Dep. 41:23-42:5). According to the Isserlis Ledger, Ciba-Geigy sold a total of 80,928

99

drums to NECC at Centredale and Smithfield during its relevant time period. TPD388.0033-0035 (citing TPD116.0007-0009). BASF estimates, based on an NECC order record from a week in July 1971, that about eighty percent of its drums sold to NECC were open-head and twenty percent closed-head, and that 21,289 of the total drums sold would have been handled in Smithfield. TPD388.0037-0038, 0044 (citing TPD171.0002-0004). Buonanno testified that Ciba-Geigy was "very much [a] one to one generator[], where [it] took out as many [drums from NECC] as [it] put in [to NECC for reconditioning]." Buonanno Dep. 248:20-23, Mar. 28, 2003.[34]

BASF suggests that Ciba-Geigy enlisted the services of other drum reconditioners during the relevant time period, based on accounting ledgers from 1972, "which is the earliest year for which such ledgers are available." BASF Post-Trial Br. 63; see TPD076.0042, 0060. According to BASF, "[a]ssuming each of the drum reconditioners paid Ciba-Geigy an equal amount for its used drums, NECC would have purchased approximately 31% of the Cranston Plant's used drums in January 1972." BASF Post-Trial Br. 63. Setting aside the fact that these ledgers fall outside the relevant time period, such arrangements may have been the case, but the Court sees no evidence indicating that Ciba-Geigy sent drums to

---

[34] Emhart posits that the exact number of drums is an allocation question. Emhart Post-Trial Br. 153. The Court agrees and only considers quantities in this Opinion to the extent they relate to liability.

different reconditioners based on the drums' contents. Therefore, for purposes of a liability finding, the Court finds that the drums sent to NECC by Ciba-Geigy could have contained any of the materials it used that came into contact with drums. Any proportionality argument may be raised during the allocation phase.

Ciba-Geigy engaged with NECC, at least in part, because it could not reuse its used drums due to risks of cross-contamination but could use reconditioned drums as if they were new. See BASF Post-Trial Br. 12 (discussing concerns about cross-contamination), 66-67 ("[NECC] was able to sell a reconditioned drum that was comparable in quality to a brand-new drum at a significantly lower price."); Briggs Dep. 44:13-45:15, 46:9-21, 66:25-67:15; D'Ambra Dep. 60:25-62:4; Mikucki Dep. 45:12-47:8, 82:5-15; Walsh Dep. 105:1-8, 107:15-108:7.

One area of dispute is whether NECC converted any of Ciba-Geigy's closed-head drums to open-head drums with its "can-opener" device and thereafter incinerated those drums. BASF argues there is no evidence as to the frequency of can-opener use or that the can-opener was specifically used on Ciba-Geigy's drums. BASF Post-Trial Br. 9, 24. The Court finds the can-opener was likely used

on some of Ciba-Geigy's closed-head drums.  See supra Part IV.C.5.

The extent of that use is a matter for allocation.[35]

### 4. Ciba-Geigy's Use of Plastic Liners, Drum-Emptying Practices, and Presence of Residuals

BASF used plastic liners in some of its open-head 55-gallon

steel drums "to ensure that raw materials, intermediates, and final

products were not exposed to the interior surfaces of the drums."

BASF Post-Trial Br. 13; see also Emhart Post-Trial Br. 137

(acknowledging that Ciba-Geigy used plastic liners in "certain"

drums "[i]n some operations").  Ciba-Geigy did not use liners in

closed-head drums.  Oct. 17 Trial Tr. 106:15-18; Nov. 13 Trial Tr.

103:4-5.

There was testimony that Ciba-Geigy used liners in most, but

not all, of its open-head drums.  See, e.g., Mikucki Dep. 48:2-

15; Cote Dep. 62:2-11; Walsh Dep. 52:12-53:9.  BASF argues that no

residuals would have remained in drums with plastic liners.  BASF

Post-Trial Br. 13-15.  This position is supported by various

witnesses' testimony.  TPD388.0057 (Litman); Oct. 8 Trial Tr. 42:6-

18 (Bierlein); Cote Dep. 67:22-68:22, 151:19-152:8; Mikucki Dep.

47:5-24; Walsh Dep. 52:24-53:2.  Other evidence to this effect

includes a letter from the EPA to Emhart's expert Bierlein, stating

"[a]n unrinsed 'empty' container which previously held an acutely

---

[35] The Court more thoroughly considers the can-opener question
for Teknor infra because there is a closer question as to whether
Teknor sent open-head drums to NECC at all.

hazardous material . . . is a hazardous waste unless the container had an inner liner which has been removed." EMH1112-0005.

Other testimony expressed skepticism as to the effectiveness of liners, which could either fall into the drum or tear. Oct. 17 Trial Tr. 148:5-149:11); Oct. 18 Trial Tr. 64:23-69:23; cf. Briggs Dep. 42:25-43:13 (noting that bags were "closed on the top" after being filled with material, which suggests that the bags were not attached to the edges of the drums).

As to whether liners remained in Ciba-Geigy's drums when they were sent to NECC, there is also conflicting evidence. One former Ciba-Geigy employee stated that "if there was a residue, it was in the poly liner," and liners were removed before the drums were taken out of the building. D'Ambra Dep. 65:9-66:2. On the other hand, former NECC employees testified to receiving liners in drums, although they did not specifically identify those liners as Ciba-Geigy's. Buonanno Dep. 37:21-38:14, Oct. 20, 2020; Cifelli Dep. 75:22-76:5, Sep. 30, 2002; Nadeau Dep. 12:20-22, Oct. 1, 2002. Some testimony indicates that NECC would dispose of the liners "off-site." Buonanno Dep. 38:11-14, Oct. 20, 2020; see Cifelli Dep. 76:4-8, Sep. 30, 2002. Other testimony indicates that the liners would get disposed of at Centredale. Nadeau Dep. 67:20-69:16, Oct. 1, 2002; Buonanno Dep. 36:8-16, Oct. 22, 2008.

The Court also heard testimony describing the way Ciba-Geigy emptied the contents of drums lacking liners before sending the

drums offsite.  To get materials out of a drum into a reactor, "the drum would be put on a drum lift and tilted over the manhole and dumped into the reactor via the manhole."  Ambuter Dep. 48:11-49:6; see also Walsh Dep. 101:11-102:21 (explaining that sometimes funnels were used and employees would hit the drum with a shovel to get the material moving).  Sometimes, for closed-head drums containing liquid, employees used a vacuum and pump system instead of the tilting method.  Slade Dep. 49:5-11; Walsh Dep. 105:13-106:13; Mikucki Dep. 45:5-11.

The weight of the evidence shows that, while Ciba-Geigy's use of liners and drum emptying methods likely minimized residuals, they did not completely eliminate them.  Ciba-Geigy's former employees acknowledged that there were residuals in Ciba-Geigy's drums sent to NECC, however small the amount.  Briggs Dep. 44:13-45:15 (noting "there'd still be traces" of residuals left in emptied drums); D'Ambra Dep. 61:22-62:4 (stating there were "apparently" residues of raw materials in drums because "[y]ou couldn't mix different products"); Mikucki Dep. 82:5-15 (explaining that Ciba-Geigy did not keep emptied drums "[b]ecause [the drums] had whatever was in them from the last time.  You don't want to take a chance of cross-contaminating"); Walsh Dep. 104:18-105:8 (discussing the need for drums to be cleaned out after use because "you can't take a drum of X, empty it, and then . . . put Y in it or Z in it. . . . [T]here's going to be some residual X in

104

it that's going to screw up Y or Z"). NECC's former employees also acknowledged the presence of residuals in drums generally, which supports the conclusion that Ciba-Geigy's drums had residuals. See Buonanno Dep. 59:13-25, Mar. 28, 2003 (describing drums as having "[v]ery little or nothing" left in them when received by NECC, the very little being "[v]isible residues, powders, sticky materials that adhere to the interiors"); Olson Dep. 127:3-130:7 (describing the "paste" inside Ciba-Geigy's drums, though observed in drums sent to Smithfield). The 104(e) responses from NECC and BASF's predecessor CSC also indicate that there were residuals in Ciba-Geigy's drums. EMH1005-0025 (reporting that residual content in drums included "[o]il and solvents" in closed-head drums and "[p]aste[-]like material" in open-head drums); EMH3001-0001, 0005 (reporting that drums sent to NECC contained residue of intermediates).

In sum, Emhart has shown that residuals (however small in amount) remained in most of the drums Ciba-Geigy sent to NECC, and sometimes liners would have remained in the drums as well.

### 5. Summary of Residuals in Ciba-Geigy's Drums to NECC

Because the Court has determined that some residuals would have remained in drums sent from Ciba-Geigy to NECC at Centredale, the Court must consider the makeup of those residuals. Based on the foregoing assessment of hazardous substances that contacted drums during Ciba-Geigy's operations, the Court finds the

following hazardous substances would have remained as residuals to some degree when the drums were sent to NECC: PCBs (specifically, Aroclor 1242); VOCs (chlorobenzene, sulfuric acid, hydrochloric acid, nitric acid, methanol, isopropanol, heptane, acetone, toluene, and xylene); SVOCs (naphthalene); and some other hazardous substances not categorized as COCs. Most of Ciba-Geigy's drums sent to NECC were open-head but some were closed-head. Dioxins, furans, and PAHs likely resulted from the incineration of residuals in some of Ciba-Geigy's drums.[36]

### H. BNS (formerly Brown & Sharpe)

Emhart asserts two theories of CERCLA liability against BNS for the actions of its corporate predecessors, to which the Court refers collectively as Brown & Sharpe ("B&S").[37] Emhart Post-Trial Br. 181. First, Emhart contends that BNS is liable as an arranger

---

[36] TPDs broadly argue that Emhart's arranger claims against them fail for the same reasons that arranger claims against other parties failed in Phase I, i.e., that Emhart's evidence is too speculative and inferential. See Joint Defs.' Post-Trial Br. 34-35. But the evidence regarding each party across all phases is unique, warranting distinct rulings from the Court. Compare, e.g., Emhart, 130 F. Supp. 3d at 568 n.57 (finding no evidence that HCP was stored in steel drums as opposed to other types of containers), with supra Part IV.G.2 (finding that Ciba-Geigy handled various hazardous materials in steel drums). And, as discussed, circumstantial evidence is perfectly acceptable in CERCLA cases. Chevron Mining, 863 F.3d at 1271.

[37] The relevant corporate predecessors to BNS are Brown & Sharpe Mfg. Co. (incorporated in Rhode Island in 1868; Delaware in 1968), and Brown & Sharpe Manufacturing Company (1969-2001). EMH2000-0004.

based on allegations that B&S sent used drums to NECC containing hazardous substances from its Precision Park location in North Kingstown, Rhode Island.  Id. at 181-82, 195.  Second, Emhart alleges that BNS is liable as an operator because B&S released hazardous substances from another location — the Greystone Mill Complex in North Providence, Rhode Island ("Greystone") — into the Woonasquatucket River, which carried the substances downstream to the Centredale site.  Id. at 198.  BNS argues that B&S did not send drums to NECC during the relevant time period and that Emhart cannot prove that hazardous substances were released from Greystone, let alone that the substances migrated downstream to Centredale and contributed to the contamination there.  BNS Post-Trial Br. 3, Dkt. No. 1117.

### 1. Precision Park (Drums)

The Court finds that Emhart has not proven by a preponderance of the evidence that B&S sent drums from Precision Park to NECC containing hazardous substances detected at Centredale.

### a. Relevant Entities, Time Period, Location, and End Products Generated

B&S owned and operated facilities at three locations: on Promenade Street in Providence (1872-1964); at Greystone in North Providence (1950-1983); and at Precision Park in North Kingstown (1964-2001).  EMH2000-0003; see also Sumner Dep. 27:16-19.  Because Emhart's arranger claim against B&S only concerns activities at

107

Precision Park, the window of potential liability for B&S on this ground is 1964-1971.

What we know about Precision Park comes from the deposition testimony of former employees and documents that BNS submitted to the EPA.[38]  The Court also relies on the deposition testimony of a machinist who worked at Greystone during the relevant period, see Carruolo Dep. 11:24-12:5, 13:9-12, and a 1954 article in a trade magazine about the Promenade Street plant, see EMH2087-0005.  These latter two sources only tell us so much about Precision Park, but the record suggests all three facilities used similar equipment and likely generated the same kinds of waste.  See Andrade Dep. 43:8-12, 98:2-6.

The evidence directly concerning Precision Park is limited. Following a request from the EPA, BNS was unable to "locate[] any archived documents with respect to the transportation, storage, purchase and/or disposal of chemicals and/or wastes during the period of time from 1952 to 1972."  EMH2000-0007.  The Court is

_____

[38] The former Precision Park employees are James Andrade, who joined in 1972 or 1973, Andrade Dep. 167:20-23; Thomas D'Amato (1965-1974), D'Amato Dep. 19:17-20:7; Benjamin Leander (unclear), Leander Dep. 10:24-11:2; Raymond Massie (1951-1992) (first at Promenade Street), Massie Dep. 11:20-25, 54:10-18, 63:16-20; Sandra Kearney (1998-2004), Kearney Dep. 7:15-23; Daniel Shea (1964-1971), Shea Dep. 14:9-14; and Richard Sumner (1962-2000s) (first at Promenade Street), Sumner Dep. 19:22-25, 37:5-10.  The documents that BNS submitted to the EPA are a 1988 response to an information request concerning a landfill in North Smithfield, Rhode Island, EMH2045, and a 2003 response to the EPA concerning NECC, EMH2000.

thus left to fill in the gaps with testimony of former Precision Park employees and the parties' respective experts.

### b. Materials Spent and Containers Used

One of the materials that B&S used in its operations — cutting fluid — contained PCBs; B&S received cutting fluid and other materials in 55-gallon steel drums; and B&S used drums to handle some, but not all, of its PCB-containing wastes.

The manufacturing floor at Precision Park was divided into multiple departments. According to Daniel Shea, who started in 1964 as a machine mill operator, Shea Dep. 14:9-11, 15:20-16:5, there were about twenty-five milling machines on the floor, along with about fifteen lathes and about six drilling machines, id. at 29:14-31:3, and screw machines as well, id. at 38:14-39:1. Precision Park also had tooling machines and grinding machines. Id. at 30:7-23, 31:9-32:5; see also Andrade Dep. 134:7-15; Carruolo Dep. 25:7-22.

B&S used lubricating oil and cutting fluid while operating its machines. Lubricating oil was "pump[ed] into the machine" so that "all the gears and parts of the machine" ran smoothly. Andrade Dep. 27:9-12; see also Leander Dep. 14:7-18. Cutting fluid, on the other hand, was applied directly to the workpiece to reduce friction and heat as it was cut by the machine tool. See Andrade Dep. 146:14-24 (describing difference between "lubricating and cutting oils"); Shea Dep. 18:19-19:6 (explaining purpose of

109

cutting oil); see also id. at 19:21-20:9.  After it was applied to the workpiece, the cutting fluid gathered in the "sump of the machine," and from there it was pumped "back to the cutting tool" in a "circular operation."  Andrade Dep. 28:7-10; see also Carruolo Dep. 24:19-25:4; Shea Dep. 25:16-24.

B&S periodically replaced the lubricating oil and cutting fluid in its machines.  Andrade Dep. 28:11-13.  "Thousands of gallons of lubricating and cutting oils" were used each year at Promenade Street, EMH2087-0005, and the demand for these materials at Precision Park was likely just as high.  B&S received new lubricating oil and cutting fluid in closed-head drums, Andrade Dep. 114:9-11; Shea Dep. 42:21-24; see also Carruolo Dep. 23:18-22, and pumped spent lubricating oil and cutting fluid into open-head drums, Shea Dep. 42:17-20; see also Andrade Dep. 28:11-24.

In addition to spent lubricating oil and cutting fluid, B&S generated two kinds of wastes: chips and sludge.  EMH2087-0004-0005.  These wastes are similar in that both were a mixture of cutting fluid and metal fragments that the machine tool had removed from the workpiece, but they are not identical.  Contra. Emhart Post-Trial Br. 186.  Chips and sludge had different consistencies, were possibly generated by different machines, and were disposed of in different ways.

Chips accumulated on the surface of the machines and, although coated in cutting fluid, were light enough to be removed using an

"air hose" or "brush."   See Leander Dep. 22:20-24:3; Shea Dep.

26:4-15, 55:21-56:5.   In contrast, sludge was thick, almost "like

a mud," Carruolo Dep. 25:7-22, and formed when "little pieces of

metal [were] washed away by the [cutting fluid] . . . into a tank,"

Andrade Dep. 134:12-14.   Although each machine generated metal

fragments, the evidence suggests that only certain machines,

grinding machines in particular, created fragments that were fine

enough to create this kind of waste.   See id. at 134:7-15; see

also Carruolo 24:13-25:22.

    B&S had separate methods of disposing of chips and sludge.

According to the 1954 article about Promenade Street, chips were

collected in square metal bins known as "tote boxes," which were

"carried to a central collecting point" and later emptied into a

railcar for offsite disposal.   EMH2087-0004.   Sludge, in contrast,

was "picked up in barrels" — which appear in a photograph to be

open-head drums — that were "carried outside" and emptied into

containers that were later shipped offsite.   Id. at 0005.   Sludge

was therefore handled in drums at Promenade Street, but chips were

not.   This was likely the case at Precision Park as well.   See

Leander Dep. 25:8-16 (testifying that chips were collected in a

"square thing"); Andrade Dep. 159:23-160:5 (testifying that

grinding sludge was put in drums).   But see Carruolo Dep. 22:4-10

(testifying that sludge was never picked up in drums at Greystone).

Emhart alleges that the cutting fluid B&S used at Precision Park contained PCBs.[39]  Emhart Post-Trial Br. 184-86.  This claim relies primarily on evidence that PCB-contaminated soil was detected at and later removed from a section of Precision Park known as the Metal Chip Recycling Area ("MCRA").  EMH2063-0007. Almost 700 tons of soil with PCB concentrations greater than 1 ppm were removed from the MCRA in 2003, along with over 1,000 tons of soil with PCB concentrations less than 1 ppm.  Id. at 0007-0008. Emhart attributes these detections to cutting fluid that leaked from open storage containers and caused considerable surface staining in and around the MCRA.  Emhart Post-Trial Br. 186-87; see also EMH7001-0094-0095; EMH2063-0005.  Aside from this evidence, Emhart relies on Iezzi's testimony that most cutting fluids in circulation during the relevant period contained PCBs. Oct. 17 Trial Tr. 27:13-17.  Lastly, Emhart cites a pair of undated pamphlets from Monsanto, which state that "Aroclor 1254 is used in the finest quality 'straight' and 'soluble' or emulsifiable-type cutting oils."  EMH1105-0015; EMH1100-0023.

BNS responds that if PCBs were in the cutting fluid used at Precision Park, then the concentration of PCBs detected in the MCRA would have been much higher.  BNS Post-Trial Br. 20; see Nov.

---

[39] Emhart also contends that "B&S may have also handled PCB-contained transformer fluid in drums."  Emhart Post-Trial Br. 189. But that argument is too speculative for Emhart to meet its burden.

5 Trial Tr. 92:24-93:12, Dkt. No. 1143. BNS's expert Mark
Elmendorf also claimed that PCB detections at "old facilities"
like Precision Park "could come from a huge range of uses," given
their presence in various products during the relevant period.
Id. at 49:1-12.

BNS fails to disprove Emhart's claim that the cutting fluid
B&S used at Precision Park contained PCBs. First, the suggestion
that PCBs were in a "huge range" of products during the relevant
period undermines the simultaneous contention that PCBs were not
in cutting fluids. Second, BNS has offered no evidence that the
PCBs detected in the MCRA came from a different source. And third,
the argument that PCBs would have been detected at higher
concentrations is too vague to be of use. PCBs may have been a
minor ingredient in cutting fluid, or B&S may have used cutting
fluid that contained PCBs only for a short period. The Court finds
there is sufficient evidence that B&S used PCB-containing cutting
fluid at Precision Park, received the cutting fluid in closed-head
drums, pumped its spent cutting fluid into open-head drums, and
likely handled sludge in open-head drums.[40] These findings are
limited to cutting fluid, as there is insufficient evidence that
B&S used lubricating oil that contained PCBs.

---

[40] If sludge was handled in open-head drums, then those drums
would have contained metals in addition to PCBs. Emhart does not
identify which metals B&S used in its operations. See Emhart Post-
Trial Br. 197-98.

### c. The B&S-NECC Relationship

Notwithstanding the above, the Court finds that Emhart has not met its burden to show that B&S sent drums from Precision Park to NECC during the relevant period.  Emhart's argument relies in large part on two documents in the administrative record for the EPA's investigation of Centredale.  See Mem. & Order 3, Dkt. No. 1098.  The first document is an unsigned, undated memorandum that describes a December 11, 2001 interview with Raymond Nadeau, who drove a truck for NECC from about 1962 to 1969.  EMH2173-0002.  The memorandum states that "Nadeau recalled delivering and/or picking up barrels at [several] companies," including B&S, "while he was employed as a driver for NECC."  EMH2173-003.  The entry for B&S reads:

> Located at 200 Frenchtown Road, North Kingstown, RI, this company manufactures precision equipment.  Nadeau stated that he would pick up 40-50 used drums about every six months.  He did not deliver to this location.  [Th]e drums that he picked up appeared to have had metal shavings in them and were fairly clean.  He did not recall the used barrels having any signs of chemicals in them.

EMH2173-0005.

The second document is NECC's 104(e) Response, which provides a table titled "NECC Customers and Drum/Residual Information." EMH1005-0023.  The table is based on discussions with Nadeau and another former NECC employee, Thomas Lussier, who joined NECC in 1971 and never worked at Centredale, as well as an affidavit from

Nadeau dated October 27, 2000.  EMH1005-0005-0006; see generally
TPD754.  The entry for B&S states that (1) drums were picked up
from Waterman Avenue in North Providence, which is the location of
Greystone, not Precision Park; (2) B&S sent only closed-head drums;
and   (3)   the   drums   contained   "[m]etal   shavings"   and
"[l]ubricating/cutting oils."  EMH1005-0024.  The 104(e) Response
provides no information regarding the volume or frequency of B&S's
drum shipments to NECC.  Id.

The Court must assess these documents in the broader context
of the record, which includes deposition testimony, including from
Nadeau,[41] and other evidence bearing on Emhart's claim that B&S
sent drums to NECC from Precision Park.  But first, the Court
considers the relationship between the interview memorandum and
the 104(e) Response, which in turn requires a close look at the
2000 affidavit upon which the latter relies in part.  The affidavit
identifies more than twenty companies that delivered drums to NECC.
See generally TPD754.  Although it does not mention B&S, the

_____

[41] A pre-trial order found Nadeau's deposition testimony with
respect to "Defendant-specific" evidence generally inadmissible,
but the Court reserved on whether such evidence could be admitted
under Federal Rule of Evidence 106 if circumstances so required.
Order (Oct. 4, 2024), Dkt. No. 1099.  Both at trial and in its
Post-Trial Brief, BNS observed that Nadeau was deposed several
times and "never testified under oath that he picked up drums from
BNS."  Oct. 17 Trial Tr. 51:22-23, Dkt. No. 1135; BNS Post-Trial
Br. 6.  As Emhart notes, however, Nadeau was never asked about B&S
during his depositions.  Emhart Post Trial Br. 193.  Pursuant to
Rule 106, the Court admits Nadeau's deposition testimony to put
this matter in context.

affidavit states "[t]here were additional companies," whose names Nadeau could not recall, from which he obtained used drums.  TPD754 ¶ 11.   The 2000 affidavit is handwritten (Nadeau signed a typewritten version of the affidavit on August 14, 2002).  Id.; see TPD756.[42]

All the companies identified in the 2000 affidavit also appear in the 104(e) Response, but the latter names dozens of additional companies that sent drums to NECC, including B&S.  Compare TPD754, with EMH1005-0023-0035.  As mentioned, the table identifying drum suppliers in the 104(e) Response is based on three sources: the 2000 affidavit, discussions with Nadeau, and discussions with Lussier.  EMH1005-0005-0006.  Information about the additional companies therefore must have come from discussions with either Nadeau or Lussier, but Lussier did not start working at NECC until 1971, and only then at its Smithfield location.  EMH1005-0005. The Court is unable to determine precisely which companies NECC added to the table based on discussions with Nadeau or discussions with Lussier, but the interview memorandum suggests it was Nadeau.

There are discrepancies between the interview memorandum and the 104(e) Response, along with other concerns, that undermine the

---

[42] The Court granted Third-Party Defendants' motion to exclude the typewritten version of the affidavit, TPD756, but they did not move to exclude the earlier handwritten version, TPD754.  See Order 3 (Oct. 4, 2024), Dkt. No. 1099; TPDs' Mot. in Limine 8, Dkt. No. 1081.

reliability of each document as to B&S.  The interview memorandum's
entry for B&S begins: "Located at 200 Frenchtown Road, North
Kingstown, RI, this company manufactures precision equipment."
EMH2173-0005.  Emhart argues that Nadeau's ability to recall such
specific details about Precision Park lends to the document's
credibility, Emhart Post-Trial Br. 192, but the Court is not
convinced.  Unlike most other drum suppliers described in the
interview memorandum, Precision Park is described in the present
tense.  See EMH2173-0003-0007.  Precision Park was still in
business in 2001, EMH2000-0003, so this makes sense.  But there is
no reason for Nadeau to have known that, given that he stopped
working for B&S in 1969.  EMH2173-0009.  Another company described
in the present tense is Eastern Color and Chemical Company, and
the entry for that company provides not only the address but also
the telephone number.  EMH2173-0006.  It is hard to believe Nadeau
recalled such specific information more than three decades after
the fact, especially regarding B&S, where he picked up only a small
number of drums (from Precision Park) and about only twice per
year.  EMH2173-0005.  Furthermore, if Nadeau could recall such
specific details about Precision Park in December 2001, when he
was interviewed, then one would expect those details to be in the
104(e) Response, which was partly based on discussions with Nadeau
and submitted nine months later.  But the 104(e) Response does not
merely fail to provide an address for Precision Park; it misstates

the location altogether, and instead provides information for
Greystone. See EMH1005-0024. And it is the same with respect to
drum volume. During his December 2001 interview, Nadeau said "he
would pick up 40-50 used drums about every six months" from
Precision Park, but the August 2002 104(e) Response states that
"[n]o information [was] currently available" regarding the number
of drums B&S sent to NECC. Compare EMH2173-0005, with EMH1005-
0024. And then there is the minor discrepancy regarding the drums'
residual content: the interview memorandum reports metal shavings,
EMH2173-0005, but the 104(e) Response reports both metal shavings
and lubricating or cutting oils, EMH1005-0024. In any event, the
Court has good reason to doubt the reliability of information about
B&S in both documents.[43]

As for lubricating/cutting oils, it makes sense that closed-
head drums from B&S would have contained residuals of these
products at some point, in part because two employees testified
that B&S received them in closed-head drums. See Andrade Dep.

---

[43] There are other issues as well. Both documents state that
drums from B&S contained metal shavings. EMH2173-0005; EMH1005-
0024; see also Leander Dep. 26:21-27:9. But while sludge may have
been handled in drums, chips or shavings were handled in square
tote boxes. See EMH2087-0004; Leander Dep. 24:9-26:10. Moreover,
according to the 104(e) Response, B&S sent only closed-head drums
to NECC. EMH1005-0024. But even if chips or shavings were handled
in drums — and the evidence suggests they were not — those drums
would have been open-head. See Emhart Post-Trial Br. 196
(conceding this point). Emhart's explanation is that the 104(e)
Response is "almost certainly underinclusive," id., which may be
another way of saying it is simply unreliable on this point.

118

114:9-11; Shea Dep. 42:21-24. But it is not plausible that Nadeau, after forgetting B&S entirely in 2000 and mentioning only metal shavings in 2001, suddenly remembered in 2002 the specific types of oils or fluids that were in B&S's drums. Someone other than Nadeau likely provided information about B&S in the 104(e) Response. For this reason and all those above, the 104(e) Response is unreliable when it comes to B&S's relationship with NECC.

Emhart's effort to connect B&S to NECC as a supplier hits other obstacles as well. For one, Vincent Buonanno's testimony regarding B&S is inconsistent, to say the least. Buonanno testified in 2003 that, from what he could remember, B&S was a "small" customer in the "[l]ate sixties" for which NECC provided "containers for scrap metals." Buonanno Dep. 118:23-119:10, Mar. 28, 2003. When asked which companies were customers, which were suppliers, and which were both, Buonanno stated that B&S was solely a customer, i.e., that it purchased drums from NECC but did not also send drums to NECC. Id. 123:23-25, 124:21-22. Five years later, in 2008, Buonanno was asked again whether B&S was a customer in the 1960s. Buonanno Dep. 74:6-7, Oct. 22, 2008. He responded that he could not remember, but that B&S was a "good example of a company which made machine tools and might have called us for 50 scrap containers in a year." Id. at 74:8-11. Although Buonanno acknowledged that he identified B&S as a customer during his 2003 deposition, he confusingly went on to say that he was "not sure if

119

when we spoke of customers, we were mixing people who sold us drums with those to whom we sold drums." Id. at 74:16-20.  Finally, in 2013, Buonanno was shown the 104(e) Response and said that he would agree with the residual contents listed for B&S "just through logic," because B&S was "a big tool shop."  Buonanno Dep. 161:6-14, 174:2-8, May 15, 2013.  Moments later, Buonanno stated that B&S had "all kinds of oils and lubricants coming in.  They never buy a drum from us.  We go and pick up Brown & Sharpe's raw drums." Id. at 176:2-5.

These inconsistencies undermine the reliability of Buonanno's testimony regarding B&S.  If B&S was either a customer or supplier, but not both, then it was more likely a customer for two reasons. First, Andrade suggested that (1) open-head drums of sludge, spent lubricating oil, and spent cutting fluid were sent offsite for disposal, Andrade Dep. 134:7-135:14, 141:3-10, and (2) closed-head drums in which B&S received lubricating oil and cutting fluid were sent back to the vendor or for offsite disposal.  Id. at 61:16-23, 62:10-63:10.  Second, the record indicates that B&S handled sludge in open-head drums, but it is unclear where else the drums would have come from other than from NECC.  Drums leaving Precision Park are thus accounted for, but drums coming to Precision Park are not, which suggests that if B&S indeed had a relationship with NECC, it was a customer, not a supplier.

120

A final piece of evidence bearing on whether B&S sent drums to Centredale is a document showing that, in 1993, B&S sent forty-four empty drums from Precision Park to NECC.  EMH2020-0002.  When asked about this transaction, Andrade said it was likely a one-off shipment following B&S's acquisition of a two-thousand-gallon tank used for storing spent synthetic coolant.  Andrade Dep. 123:1-125:2.  Before that, Andrade explained that B&S stored the spent material in "55-gallon drums," which it "stack[ed] up until [there were] enough for the vendor to come and take them away."  Id. at 124:6-17.  When weighed against the rest of the evidence, the Court finds that a single transaction that occurred twenty years after the relevant period and involved drums that were not sent to Centredale, which had long since closed, does not demonstrate that B&S sent drums to NECC during the relevant period.

In sum, the Court finds that Emhart has not met its burden of showing that B&S sent drums from Precision Park to NECC during the relevant period.

### 2. Greystone (Upstream)

The Court finds that Emhart has, however, met its burden of showing that B&S contributed to the environmental contamination at Centredale through its operations at Greystone.  This finding can be broken into three parts.  First, the Court finds that B&S, through its operations at Greystone, generated wastes of several hazardous substances with cleanup levels at Centredale: PAHs

121

(benzo(a)pyrene, dibenz(a,h)anthracene), PCBs (Aroclor 1254), and metals (barium).  See EMH1003-0111, 0200-0202, 0205, 0210-0211. Second, the Court finds that B&S released large amounts of these hazardous substances into the Woonasquatucket River, via multiple pathways.  Third, the Court finds that some of these hazardous substances migrated downstream to portions of the Centredale Site, including Allendale Pond and Lyman Mill Pond.

To be sure, the overwhelming share of the contamination in the ponds likely came from Metro Atlantic or NECC.  But not all. The extent of B&S's contribution to the contamination at Centredale is a question for the allocation phase.  Here, in the liability phase, the key factual issue is whether B&S contributed to any contamination for which Emhart has incurred response costs.  The answer is yes.

### a. Relevant Entities, Time Period, Location, and End Products Generated

Greystone occupies the eastern bank of the Woonasquatucket River about a half mile upstream of Centredale.  See EMH1003-0072. It once consisted of several interconnected structures — two five-story mill buildings, the smaller of which spanned the river; a spread of one- and two-story factory buildings, and a powerplant — as well as two small, unconnected structures used for maintenance and storage.  EMH2050-0005; see EMH7043-0033-0038.  Greystone also contained a railroad spur, which passed through the western end of

122

the smaller mill building and crossed a bridge over the river to its eastern bank.  See EMH7043-0033.

B&S gradually reduced its footprint at Greystone after buying the entire complex in 1950.  That year, B&S sold the northern end of the larger mill building to another company, Worcester Textile, and leased a portion of the southern end to the same.  EMH7043-0061; see also EMH2003-0002, 0005-0006; Oct. 15 Trial Tr. 62:16-63:7.  As part of an arrangement with Worcester Textile, B&S kept control of the powerplant, which was connected to the southern end of the larger mill building.  EMH2003-0005-0006; see EMH7043-0005.  By 1966, however, the powerplant had been demolished, and B&S had sold the rest of the larger mill building, along with two factory buildings and the maintenance building, to Worcester Textile.  EMH7043-0062-0063; see id. at 0029, 0027, 0033.  Then, in 1973, B&S sold the smaller mill building and a connected structure to a third company, Industrial Plating, later Induplate.  Id. at 0062-0064.  In the meantime, B&S had removed the railroad bridge, leaving only the pylons rising from the river, and had paved over a section of the eastern riverbank, just south of the building complex, that had been expanded using artificial fill.  See id. at 0068-0074; compare id. at 0072, with id. at 0073.  B&S ceased operations at Greystone in 1983, when it sold its three remaining factory buildings and the storage building to Worcester Textile.  Id. at 0064-0065.

In addition to the buildings, railroad bridge, and riverbank fill, Greystone contained other relevant structural features. These included several drainage pipes, or "outfalls," which originated in different areas of the site and discharged into the river.  See EMH2059-006-0007.  Among them was an eighteen-inch clay pipe that ran from an underground cistern, or "sump," which was fed in turn by at least two drain lines that originated in a factory building that B&S used for the entire 1950-1983 period. EMH2142-0024, 0050.  Greystone also featured multiple outdoor transformers, most of which were installed in the mid-1960s and contained PCBs.  EMH2058-0015; EMH2142-0040.

### b. Evidence of Contamination and Materials Spent

There is considerable evidence of contamination from PAHs, PCBs, and metals at Greystone, and Emhart has shown that B&S contributed to such contamination.[44]

### i. PAHs

Benzo(a)pyrene and dibenz(a,h)anthracene were found in the sump, outfalls, monitoring wells, and riverbank soil at Greystone. For reference, the CULs for these substances at Centredale are 0.4 ppm in the source area soil and 1.4 ppm, for benzo(a)pyrene, and 0.97 ppm, for dibenz(a,h)anthracene, in the sediment of Allendale

---

[44] BNS has put forward no evidence that a different operator was responsible for the contamination from PAHs, PCBs, and metals at Greystone.  See BNS Post-Trial Br. 48-49.

and Lyman Mill Ponds. EMH1003-0194, 0199, 201. At Greystone, these substances were detected in the sump at 42 ppm and 11 ppm, respectively. EMH2051-0169. Detections of both substances were recorded above 1 ppm in multiple outfalls, EMH2050-0015; EMH2059-008, including a detection of benzo(a)pyrene at 12.6 ppm in the outfall across from the large mill building, EMH2059-008; see id. 0011.

Both substances were also found in monitoring wells between the storage and maintenance buildings at concentrations of up to 2.3 ppm and 0.47 ppm, respectively, EMH2050-0015, but not at significant levels in the one monitoring well south of the building complex, EMH2060-0016. Soil samples from this area, though, suggested that both substances were present there. See id. at 0012-0014. Finally, a sample from the riverbank showed a concentration of both substances exceeding 0.8 ppm. Id. at 0023.

B&S used at least two kinds of heat treatment processes to strengthen its finished metal products. One process, known as case hardening, involved heating the metal product in the absence of oxygen but in the presence of organic material, such that carbon was absorbed into the product's outer layers. See EMH2011-0173-0177; Oct. 31 Trial Tr. 41:11-18, Dkt. No. 1126. BNS has failed to rebut Emhart's evidence that case hardening generated PAHs like benzo(a)pyrene and dibenz(a,h)anthracene. See Oct. 31 Trial Tr. 41:11-42:8; see generally BNS Post-Trial Br. Accordingly, the

125

Court finds that the detections of these PAHs at Greystone are attributable, at least in part, to B&S's case hardening efforts.

### ii.  PCBs

Aroclor 1254 was detected at 0.44 ppm in the sump, EMH2051-0169, at 3.12 ppm in the riverbank soil, EMH2060-0022-0023, and at 7.8 ppm in the river sediment, EMH2133-0016, 0036.  The soil and sediment samples were taken immediately downstream of the building complex.  EMH2060-0022, 0038; EMH2133-0016, 0036.  These were the only significant detections of Aroclor 1254 at Greystone.  It is unclear whether samples were taken from the outfall connected to the sump, but samples from three outfalls slightly upriver of that location showed only trace amounts of Aroclor 1242 and no other PCBs.  See EMH2050-0015; compare id. at 0174, with EMH2051-0194. Other outfalls at the site were not tested for PCBs.[45]  See EMH2059-0008.

Investigators also took samples from several monitoring wells and soil borings on the site, see EMH2050-0174; EMH2060-0038, but

---

[45] Two organizations conducted outfall sampling at Greystone. The first, SAGE Environmental, Inc., tested three outfalls between the maintenance and storage buildings for multiple contaminants, including PCBs.  EMH2050-0015, 0174.  The second, EA Engineering, Science, and Technology, Inc., located ten outfalls, five of which were tested for multiple contaminants, excluding PCBs.  EMH2059-0008, 0011.  The southernmost outfall tested in the second set was near the storage building, whereas the northernmost was across from the large mill building.  EMH2059-0008, 0011.  It appears from the maps that one outfall was tested both times.  Compare EMH2050-0174, with EMH2059-0011.

most of the samples were not tested for PCBs, see EMH2050-0025-
0027; EMH2060-0014, 0016, 0017, 0021. Samples from five monitoring
wells near the storage and maintenance buildings showed no signs
of Aroclor 1254. EMH2050-0015, 0174. Among the samples from
monitoring wells south of the building complex, only one was tested
for PCBs, and that sample was also a non-detect for Aroclor 1254.
EMH2060-0021, 0038. That said, a sample from the surface soil of
the southernmost monitoring well detected trace amounts of Aroclor
1254, as well as an Aroclor 1242 concentration of 4.98 ppm. Id.
at 0023. The few other samples tested for PCBs, including from
soil near the sump and storage building, did not yield significant
detections of Aroclor 1254. See, e.g., EMH2142-0019, 0025, 0028,
0038. At Centredale, Aroclor 1254 has a CUL of 0.031 ppm in the
sediment of Allendale and Lyman Mill Ponds. EMH1003-0199.

Aside from the limited testing for PCBs at Greystone discussed
above, the Court notes two additional PCB-related issues. The
first pertains to the outdoor transformers discovered there, which
contained Pyranol, a "PCB dielectric fluid." EMH2050-0095. Site
investigators found that the "transformers appeared to be in good
condition and were not observed to be leaking dielectric fluid at
the time of the site walkthrough," which took place some three
decades post-installation. Id. at 0095-0096. Furthermore,
investigators "observed no visual evidence of past spills or leaks
on or adjacent to the transformers." Id. at 0096. Pyranol is a

127

mixture of Aroclors 1254 and 1260.  See Nov. 5 Trial Tr. 99:18-
20.

The second issue pertains to the artificial riverbank fill.
According to site investigators, the fill material was an apparent
"mixture of soil, urban fill, coal ash and what might be considered
by today's regulatory standards, solid waste." EMH2060-0033. As
mentioned above, Aroclor 1254 was detected at 3.12 ppm in the same
section of riverbank where the filling occurred. See id. at 0022-
0023. Additional samples from the riverbank were taken during
subsequent remediation efforts, but the samples apparently were
not analyzed for PCBs. See id. at 0118. Instead, remediators
seem to have requested analysis only for total chromium and total
petroleum hydrocarbons ("TPH"), the two contaminants for which
site-specific remedial objectives were set. See EMH2061-0007-
0012. In any event, remediators ultimately removed "573 tons . . .
of impacted soil and sediment" that, according to associated waste
manifests, were "PCB-[c]ontaminated." Id. at 0013-0014; e.g. id.
at 253. The waste manifests also include a notation for "PCB's
<50," which likely signifies a PCB concentration of less than 50
ppm. See, e.g., id. at 253.

BNS's efforts to discredit them notwithstanding, the waste
manifests lend support to the Court's conclusion that the riverbank
fill contained significant concentrations of PCBs. See Nov. 12
Trial Tr. 62:1-66:6. Because the one known sample from that area

of the riverbank shows a detection for Aroclor 1254, the Court finds it reasonable to assume that Aroclor 1254 accounted for at least part of the overall PCB contamination in the riverbank fill.

Emhart attributes the detections of Aroclor 1254 at Greystone to (1) cutting fluid, (2) dielectric fluid, (3) oil transported on the railroad spur and kept in the storage building, and (4) the contaminated riverbank fill. Emhart Post-Trial Br. 246-47. The Court finds that the cutting fluid B&S used for metalworking likely contributed to the Aroclor 1254 contamination at the site. B&S is also responsible for any releases of Aroclor 1254 from the fill material because it conducted the filling efforts. But the record does not support the other mechanisms of Aroclor 1254 release that Emhart attributes to B&S.

Just like those at Precision Park, the metalworking machines at Greystone required cutting fluids. Carruolo Dep. 20:14-21:1; see also Andrade Dep. 43:8-10, 98:2-6; EMH2045-0012. The Court has already found that B&S used cutting fluids that contained PCBs, specifically Aroclor 1254, at Precision Park, see supra Part IV.H.1.b, and this conclusion applies to Greystone as well. Accordingly, the Court finds that sometime between 1950, when B&S purchased Greystone, and the mid-1970s, when the use of PCBs in open applications had largely ceased, B&S used cutting fluids at Greystone that contained Aroclor 1254. See Nov. 5 Trial Tr. 62:5-15. The Court further finds that these cutting fluids likely

accounted for some of the Aroclor 1254 contamination at Greystone, whether in the sump, outfalls, or riverbank fill.

As for the riverbank fill, all or most of the filling occurred between 1950 and 1970, and the area was not paved over until sometime after 1963 but before 1970. See EMH7043-0067-0073. According to site investigators, the filling efforts expanded the riverbank twenty to thirty feet. EMH2060-0033. This timeline suggests that B&S was responsible for the filling efforts. And the findings of site investigators, not to mention the annotated aerial photographs that Emhart has placed into the record, suggest that the amount of fill material was considerable.

In short, the record shows that B&S contributed to the release of Aroclor 1254 at Greystone through its use of cutting fluids and its efforts to expand the riverbank using artificial fill. As for Emhart's argument about the release of Aroclor 1254 from outdoor transformers and oils transported along the railroad spur and kept in the storage building, the evidence is lacking.

### iii. Metals

Barium was detected in the sump, outfalls, subsurface soil, and riverbank surface soil. Monitoring-well samples were not tested for barium. See EMH2050-0014-0015; EMH2060-0016, 0020-0021. In the sump, barium was detected at 32 ppm. EMH2051-0169. It was also detected in multiple outfalls, including at 97.3 ppm in an outfall between the storage and maintenance buildings that

130

was sampled because of its "proximity to the main portion of the mill complex." EMH2059-007-008. As for subsurface soils in areas south of the building complex, detections of barium ranged from 69 ppm to 880 ppm. EMH2060-0014. Lastly, a surface soil sample from the riverbank, different from the one discussed above but on the same section of river, was found to contain 152 ppm of leachable barium, as distinct from total barium. EMH2137-0008. Timothy Regan, an environmental engineer who signed off on the report that documented these samples and was deposed in this case, testified that this was the highest reading of leachable barium he had seen. Regan Dep. 17:2-18:19, 28:14-29:4. To put this reading into perspective, Okun estimated that, had the sample been tested for total barium instead of leachable barium, the recorded concentration would have been upwards of 3,000 ppm.[46] Oct. 31 Trial Tr. 79:24-80:10. Therefore, barium was detected in one area of the riverbank at a concentration that could be several orders

---

[46] BNS argues that "Okun employed an incorrect and misleading calculation methodology that produced an artificially high barium level at Greystone locations." BNS Post-Trial Br. 38. Based on a careful review of Okun's interpretation of the leachable barium reading, the Court finds that his was more likely a conservative estimate of the probable total barium concentration in that sample. Indeed, BNS's expert Dr. Amy Jones conceded at trial that, for a related sample in which both the leachable chromium concentration and the total chromium concentration were known, applying Okun's methodology to estimate the probable total chromium concentration based on the leachable chromium concentration would have resulted in a "gross understatement" of the actual total chromium concentration. Nov. 12 Trial Tr. 138:5-8, Dkt. No. 1145.

of magnitude above the cleanup level at Centredale, which is 134 ppm in Lyman Mill Pond.  See EMH1003-0202.

In addition to case hardening, a second type of heat treatment process that B&S utilized at Greystone involved the application of molten barium chloride to the metal product, which was then cooled in quenching oil.  Fernald Dep. 26:6-23; Oct. 31 Trial Tr. 42:13-21; see also Lippy Dep. 39:9-16.  Contemporaneous hazardous waste manifests point to B&S generating large amounts of barium chloride through this process.  See EMH7051-0042-0043, 0046-0047.  As with respect to PAHs, BNS makes no effort to rebut Emhart's argument that B&S was responsible for the generation of barium detected at Greystone.  The Court thus finds that the barium contamination at the site is attributable, at least in part, to B&S.

### iv.  Other Materials

Benzo(a)pyrene, dibenz(a,h)anthracene, Aroclor 1254, and barium were not the only hazardous substances detected at both Greystone and Centredale.  Arsenic, for example, was detected in multiple areas of Greystone and has a cleanup level in the sediment of Lyman Mill Pond.  See EMH2050-0015; EMH2051-0169; EMH2060-0014. But Emhart does not make affirmative arguments of downstream migration for this and other substances.  See Emhart Post-Trial Br. 265-68.  The Court therefore does not consider contamination at Greystone from hazardous substances aside from those discussed

132

above (although it has noted detections of other PCBs in addition
to Aroclor 1254).

### c. Release of Hazardous Substances

Emhart has met its burden of showing that the benzo(a)pyrene,
dibenz(a,h)anthracene, Aroclor 1254, and barium that B&S used or
generated at Greystone entered the river through at least three
pathways: (1) the outfalls; (2) stormwater discharge; and (3)
riverbank erosion. Emhart has not, however, met its burden with
respect to other alleged pathways, including the emission of fly
and bottom ash from the powerplant, the demolition of the
powerplant, and the use of the railroad spur sources. See Emhart
Post-Trial Br. 246-47.

The outfalls are an obvious release pathway into the river.
So too is stormwater discharge, which likely carried any hazardous
substances in the soil or on building exteriors into the outfalls
or directly into the river. Because the riverbank fill area was
not paved over until sometime between 1963 and 1970, the Court
finds that significant amounts of fill material were likely carried
by stormwater into the river as well. See EMH7043-0072-0073. As
for riverbank erosion, more than a dozen flooding events occurred
between 1950 and 2005, when the riverbank was finally remediated.
See EMH2064-0053-0054; EMH2061-0010. Each flooding event likely
washed away sections of riverbank and carried sediment downstream.

133

The effects of stormwater discharge and elevated river flow on the composition of the riverbank are documented in the record. Two fifty-year storm events occurred after remediators excavated the riverbank fill material and installed an engineered cap in its place. EMH2061-0013. According to a report on the remediation effort, "[t]he volume of stormwater crossing the [s]ite and the elevated flow of the Woonasquatucket River necessitated the reconstruction of portions of the previously engineered cap." Id. In other words, parts of the riverbank were washed away in back-to-back storms. Other flood events occurring in the 1950-2005 period would have also caused some degree of erosion. See EMH2066-EMH2081 (compiling contemporaneous news articles about storms and flood events in the area).

### d. Downstream Migration to Centredale

Some of the benzo(a)pyrene, dibenz(a,h)anthracene, Aroclor 1254, and barium that B&S released into the river from Greystone not only migrated downstream but also settled in the sediment of Allendale and Lyman Mill Ponds. Therefore, B&S contributed to contamination at Centredale for which Emhart has incurred response costs. To begin, the Court provides an overview of the Woonasquatucket River from Greystone to Lyman Mill Pond. The discussion then turns to the parties' respective theories of downstream migration.

### i. Woonasquatucket River Overview

The Greystone Mill Complex sits downstream of the Greystone Dam.  See EMH7043-0085.  From the southern end of the building complex, the river flows less than a half mile before it reaches the former Centredale Dam, just north of the peninsula.  EMH2164-0038; EMH2132-0039.  As evidenced by aerial photographs, the river narrows to about thirty-six feet at this location, causing the water to back up behind the former dam.  See EMH7043-0090. According to a report by Tetra Tech NUS, Inc. ("Tetra Tech"), which led an investigation of the river sediment for the EPA, the river "has a low current velocity and the bottom substrate is composed predominantly of sand" between Greystone and the Centredale Dam. EMH2132-0039.  But once past the former dam, the "current velocity increases" and, for about 150 to 200 feet, "the substrate . . . is comprised mostly of cobbles, boulders, and gravel."  Id.

The river then flows beneath Route 44 and along the peninsula before reaching the mouth of Allendale Pond.  Certain remedial activities had already taken place at Centredale by the time Tetra Tech conducted its investigation of the river sediment, including the installation of riprap on the "eastern bank side portion of the site."  Id.; see also EMH1003-0015.  These activities may have affected some features of the river in this area.  At least at the time of Tetra Tech's investigation, however, this section of river

135

was characterized by "[i]ncreased current velocity and a gravel, cobble, and sand substrate."  EMH2132-0039.

From there, the river flows into Allendale Pond, where the substrate consists of sand in higher flow areas and sand, silt, and organic material in lower flow areas.  Id.  The river picks up speed again as it leaves Allendale Pond before slowly meandering through vegetated wetland (the Oxbow Area) to Lyman Mill Pond, the bottom of which is a mixture of sand, silt, and organic material. Id. at 0040; see also Emhart, 130 F. Supp. 3d at 541 n.13.  When Tetra Tech conducted its investigation, the Allendale Dam, which separates Allendale Pond from the river's lower sections, had been breached for nearly a decade, but it was later restored.  See EMH1003-0026.

When it comes to the distance between these different sections of river, the record is scant.  According to a report prepared for the U.S. Army Corps of Engineers, the distance along the river between Greystone and the "Centredale Manor Site," which is downstream of the former Centredale Dam and thus further away from Greystone, is 1,970 feet.  EMH2164-0038.  The distance between the Centredale Site and the Allendale Dam, at the southern end of Allendale Pond, is 0.7 miles, or 3,670 feet, id. at 0042, see also id. at 0020-0022; and the distance between the Allendale Dam and the mouth of Lyman Mill Pond is 1,150 feet, id. at 43.  As noted above, the distance between the former Centredale Dam and Route

136

44, which marks the northern end of the Centredale Site, is 150 to
200 feet.  EMH2132-0039.  Therefore, while a rough estimate of the
distance between the Centredale Site and Lyman Mill Pond is 4,820
feet (3,670' + 1,150'), an admittedly rougher estimate of the
distance between Greystone and the former Centredale Dam is 1,820
feet (1,970' – 150').  Again, these are rough estimates, but this
means the river travels less than half as far between the southern
end of Greystone and the former Centredale Dam as it does between
the northern end of the Centredale Site and Lyman Mill Pond.  Cf.
EMH1003-0012 (providing map of river).

### ii.  Theories of Downstream Migration

Emhart's argument relies on calculations of river slope and
general principles of hydrology, as well as observations about
different features of the river that can be found in the record.
Its basic contention is that between Greystone and the former
Centredale Dam, the river is net erosional as opposed to
depositional, such that significant amounts of the contaminants
B&S released from Greystone bonded to sediment that traveled
downstream and reached the former dam.  See Emhart Post-Trial Br.
252.  Emhart further contends that most of the contaminated
sediment made it past the former dam and flowed downstream of the
peninsula into Allendale and Lyman Mill Ponds.  See id. at 254.

Whether a section of river is net erosional or depositional
depends in part on river velocity, which in turn depends in part

137

on the gradient, or slope, of the river in that stretch. Okun
calculated the slope of three sections of river: (1) from the
Greystone Dam to the southern end of the Greystone Mill Complex;
(2) from the southern end of the complex to the former Centredale
Dam; and (3) from the former dam to the mouth of Allendale Pond.
Emhart Post-Trial Br. 250. But see EMH2120; EMH2129 (suggesting
second stretch may have been calculated to — and the third stretch,
from — the Route 44 bridge). He provided two sets of calculations,
one based on elevation data from the Federal Emergency Management
Agency ("FEMA"), and the other based on elevation estimates that
Grip produced using aerial photographs. Id.; see Oct. 15 Trial
Tr. 14:9-17. Okun's slope calculations were 18 feet per mile (for
both sets) in the first section of river, 7 or 9 feet per mile for
the second, and 9.5 or 10 feet per mile for the third. Emhart
Post-Trial Br. 250-51. These calculations suggest that absent
consideration of other factors like drag or vegetation, any
differences in average river velocity between the second and third
sections of river are minimal, which in turn suggests that if one
section is net erosional, the other likely is as well. But see
BNS Post-Trial Br. 50 (discussing the potential effect of drag,
vegetation, and the like).

    Emhart cites other evidence in support of its contention that
this second stretch of river — between Greystone and the former
Centredale Dam — is net erosional. For one, it notes that people

138

who worked at Greystone and who were deposed in this case did not
remember seeing the river freeze over.  Emhart Post-Trial Br. 252;
see Fernald Dep. 94:21-95:9; Simmons Dep. 71:13-19.  All agree a
river is less likely to freeze the more swiftly it moves.  Emhart
Post-Trial Br. 252; Nov. 12 Trial Tr. 98:15-16.  Emhart also notes
that according to the Tetra Tech report, the "bottom substrate is
composed predominantly of sand" between Greystone and the former
Centredale Dam.  Emhart Post-Trial Br. 253 (quoting EMH2132-0039).
It also claims that according to a report on riverbank sampling
conducted in 2004, "the river bottom adjacent to the Greystone
Mill Complex is sandy, and the sediment is not cohesive and so is
easily eroded."  Emhart Post-Trial Br. 252 (citing Oct. 31 Trial
Tr. 92:15-21; EMH2138-0008).

From Emhart's perspective, it matters that the river bottom
between Greystone and the former Centredale Dam is sandy, because
whether sediment is transported, deposited, or eroded depends not
only on river velocity but also on particle size.  See Emhart Post-
Trial Br. 262.  To illustrate, Okun used a conceptual model called
the Hjulström Curve, which uses two variables — river velocity and
particle size — to predict the behavior of sediment.  See EMH7051-
0151-0154; Oct. 31 Trial Tr. 123:24-124:5.  According to this
model, finer particles like clay or silt are suspended in the water
column and transported downstream at lower velocities, while
larger particles like pebbles or cobbles are transported only at

higher velocities.  EMH7051-0153.  Medium-sized particles — like sand or gravel — fall somewhere in between.  Id.  The relationship between particle size and river velocity is basically linear with respect to deposition as well.  Even at very low velocities, clay or silt remains suspended in the water column and will not be deposited, while pebbles or cobbles will be deposited even at very high velocities, and sand or gravel will be deposited at medium velocities.  Id.  In essence, when it comes to the transportation and deposition of sediment, the Hjulström Curve shows that as particle size increases, the likelihood of suspension and transportation decreases, while the likelihood of deposition increases.

When it comes to the erosion of sediment, however, the picture is more complicated, as the relationship between particle size and river velocity is nonlinear.  It is not so that as particle size increases, the likelihood of erosion decreases.  Rather, the Hjulström Curve shows that finer particles are more resistant to erosion than certain medium-sized particles, sand in particular.  That is because finer particles like clay or silt are more cohesive than sand.  See Oct. 31 Trial Tr. 91:19-92:11.  And although larger particles like gravel, pebbles, or cobbles are less cohesive than sand, their size makes them more likely to remain in place.

There seem to be at least two intended takeaways from Emhart's invocation of the Hjulström Curve.  First, because the river bottom

140

between Greystone and the former Centredale Dam consists mostly of sand, the river velocity in that stretch is high, or at least high enough that finer particles entering the river are not deposited but rather remain suspended in the water column.  Therefore, any contaminants released from Greystone that bonded to finer sediment like clay or silt were transported downstream.  See Emhart Post-Trial Br. 247-48.  Second, and relatedly, because the river bottom between Greystone and the former Centredale Dam consists mostly of sand, the sediment in that stretch of river is relatively more susceptible to erosion.  Therefore, any contaminants released from Greystone that bonded with medium-sized sediment like sand may have settled at the river bottom, only for the sediment to be eroded and carried downstream during floods and other high-flow events, of which the record shows there were many during the 1950-2005 period.  See id. at 213, 251-52.

BNS faults Emhart for using the Hjulström Curve in lieu of a "hydrodynamic fate and transport model" to determine patterns of sediment migration between Greystone and the former Centredale Dam.  See BNS Post-Trial Br. 31-34.  BNS also contends that Emhart minimizes the effects of the former dam, which causes the river to slow down significantly and create what it calls a "floodplain." Id. at 30.  According to BNS, the slowdown at the former dam "would cause deposition of any migrating sediment . . . well before the Centredale peninsula, and that no more than an 'immaterial' amount

141

would . . . have migrated further downstream." Id. at 24 (quoting
Nov. 12 Trial Tr. 72:2-10). Furthermore, BNS argues that PCBs
were detected at much higher levels on the peninsula than at
Greystone, which suggests that PCB contamination in Allendale and
Lyman Mill Ponds was not caused by releases from Greystone. See
id. at 34-40.

The Court agrees with BNS that the Hjulström Curve has limited
utility as a predictive model. It also agrees that Emhart likely
downplays the sedimentation rate behind the former Centredale Dam.
And it recognizes that the PCB contamination on the peninsula was
likely more severe than it was at Greystone. But none of this
overcomes the Court's finding that B&S released benzo(a)pyrene,
dibenz(a,h)anthracene, Aroclor 1254, and barium from Greystone,
and that such releases contributed to contamination at Centredale.

In the Court's view, Okun used the Hjulström Curve less as a
predictive model and more to illustrate general principles of
hydrology that are relevant to this case. Emhart argues that Okun
was unable to perform hydrodynamic modeling of the river between
Greystone and the former Centredale Dam because he lacked the
requisite data, and that acquiring such data was "infeasible."
Emhart Post-Trial Br. 263-64. In any event, BNS's expert Dr. Amy
Jones did not run a model, either. Nov. 12 Trial Tr. 89:9-25.
And despite the limitations of the Hjulström Curve, it nonetheless
provides useful context.

142

BNS also argues that Emhart minimizes the amount of deposition that occurs behind the former Centredale Dam. As BNS points out, aerial photographs depict considerable ponding in this area, which in turn suggests a decrease in river velocity and corresponding increase in deposition. BNS Post-Trial Br. 30; see, e.g., EMH7043-0090. It is probably true that when conditions like those depicted in the aerial photograph just cited occurred, some contaminated sediments carried downstream from Greystone were removed from the water via deposition before it passed the former dam and continued to Centredale. But other contaminated sediments, including fine particles that remain suspended at lower velocities, likely were not deposited and continued downstream. And one snapshot in time cannot account for the varied conditions that occur on a river in a single year, let alone sixty-five years or more, especially on a river that often floods.

These flooding events caused significant erosion, see, e.g., EMH2061-0013, and the floodwaters likely carried large amounts of contaminated sediment down from Greystone to the former Centredale Dam. The Court finds it implausible that from 1950 to 2005, the former Centredale Dam stopped all but negligible amounts of contaminated Greystone sediment from traveling further downstream. This finding is bolstered by two additional points. First, based on sedimentation rates recorded in the report prepared for the U.S. Army Corps of Engineers, Okun estimated that Allendale Pond

143

receives hundreds of tons of sediment each year. Emhart Post-Trial Br. 257 (citing Nov. 1 Trial Tr. 61:23-62:7); <u>see also</u> <u>Emhart</u>, 130 F. Supp. 3d at 596 (discussing rate of sedimentation in Allendale Pond). Second, the Court already knows from Phase I of this case that contaminated sediment migrated from the Centredale peninsula to Allendale Pond, down the heavily vegetated Oxbow Area, and into Lyman Mill Pond. As noted above, that is a journey of some 4,820 feet. The distance between Greystone and the former Centredale Dam, in contrast, is about 1,820 feet. No two stretches of river are the same. But it strains credulity to suggest that only negligible amounts of contaminated sediment would have made the shorter journey from Greystone to beyond the former Centredale Dam.

Lastly, regarding Aroclor 1254, even if the PCB contamination was more severe on the peninsula than at Greystone, that does not foreclose Emhart's downstream migration argument. The relevant issue is whether B&S's operations at Greystone contributed to the contamination in Allendale and Lyman Mill Ponds, not whether those operations are primarily responsible for that contamination. For the reasons above, the Court finds that it did.

I. **Sequa (formerly Warwick Chemical)**

    1. **Relevant Entities, Time Period, Location, and End Products Generated**

Whether Sequa is responsible for the release of hazardous substances at Centredale depends on the conduct of its predecessor, Sun Chemical Corporation, which operated a textile chemical plant in Wood River Junction, Rhode Island, from about 1945 to 1971. EMH5001-0003. Because the parties use the name of an earlier predecessor, Warwick Chemical, when referring to this company, the Court does the same. See id.

Aside from the plant at Wood River Junction, Warwick Chemical operated at least one other plant, in Chester, South Carolina. Id. According to documents that Sequa submitted to the EPA and contemporaneous news articles, Warwick Chemical opened the Chester plant in 1963 and gradually phased out its operations at Wood River Junction until that plant finally closed in early 1971. Id.; see EMH5039; EMH5041. Carroll Products, Inc., which manufactured industrial soaps, detergents, and other products, began operations at Wood River Junction following Warwick Chemical's departure. EMH5132-0001, 0003.

The parties agree that Warwick Chemical and NECC had a business relationship while the former was at Wood River Junction and the latter was at Centredale, but they disagree as to when the relationship began. Emhart argues that Warwick Chemical sent drums

to NECC beginning in "the mid-1950s." Emhart Post-Trial Br. 114.
As support, it cites the deposition testimony of Gennaro Zeoli,
who drove a truck for NECC from about 1953 to 1956 and recalled
making pickups and deliveries at "Sun Chemical in Carolina." Zeoli
Dep. 60:3-10. (Carolina and Wood River Junction are neighboring
villages.) Emhart also claims that "Vincent Buonanno specifically
remembered that 'Sun Chemical' was a customer 'during the '50s,
'60s, and '70s.'" Emhart Post-Trial Br. 114 (quoting Buonanno
Dep. 141:2-4, May 15, 2013). But Zeoli's testimony is inadmissible
as defendant-specific evidence. See Order 3 (Oct. 2, 2024), Dkt.
No. 1099. And Emhart misconstrues Buonanno's testimony.[47]

At an earlier deposition, Buonanno was asked about companies
that had a relationship with NECC during "the pre-1967 time frame."
Buonanno Dep. 47:5-10, Mar. 28, 2003. He did not name either "Sun
Chemical" or Warwick Chemical. See id. 47:11-53:25. But later,
during the same deposition, he was asked specifically about Warwick
Chemical, and he said that "the time period [NECC] dealt with them"
was the "late sixties." Id. at 133:9-20; see also id. 135:4-9
(naming Warwick Chemical as one of NECC's "significant customer[s]

---

[47] Buonanno was asked to recall "customers" of NECC "during
the '50s, '60s, and '70s," and he named "Sun Chemical." Buonanno
Dep. 141:2-6, May 15, 2013. That does not mean Warwick Chemical
was an NECC customer throughout that entire three-decade period.
Rather, it means that it was a customer during at least part of
that period. Even then, that Warwick Chemical was a customer does
not mean it was also a supplier. See Buonanno Dep. 88:13-14, Oct.
22, 2008 (distinguishing between customers and suppliers).

. . . in the '67-'69 time frame").  Based on this evidence, the Court finds that Warwick Chemical sent drums to Centredale from 1967 until the closure of its Wood River Junction plant in early 1971.

Warwick Chemical manufactured textile chemicals at Wood River Junction, including permanent press finishes and water repellants. See Sequa Post-Trial Br. 2, Dkt. No. 1119 (citing Sanocki Dep. 81:7-20); Emhart Post-Trial Br. 87 (citing, inter alia, Oct. 17 Trial Tr. 121:13-122:6).

### 2. Materials Spent and Containers Used

The Court next considers the materials that Warwick Chemical used in its operations at Wood River Junction and the containers in which those materials were held.  This section of the discussion relies on three sources: evidence of contamination at Wood River Junction; contemporaneous business records, including more than a thousand pages of raw material lists and product specifications for Warwick Chemical that were stored in binders and which Hauser summarized in a demonstrative; and the testimony of former Warwick Chemical and Sequa employees.[48]

---

[48] It is unclear whether or for how long Warwick Chemical used certain raw materials or manufactured certain products according to a particular specification at Wood River Junction.  But the binders nevertheless shed light on the composition of Warwick Chemical's products during the relevant period.

Emhart has shown that Warwick Chemical used VOCs, metals, and other materials that are hazardous substances but not categorized as COCs, and that many of these substances were held in drums. But Emhart has not shown that Warwick Chemical handled PCBs, a VOC called 1,2,4-trichlorobenzene, or SVOCs in drums. Finally, while Emhart has shown that Warwick Chemical received raw materials and packaged its finished products in drums, the evidence does not suggest that Warwick Chemical stored intermediates in drums.

### a. PCBs

The only reported detection of PCBs at Wood River Junction was of Aroclor 1254 in a small patch of soil next to a building on the site. See EMH5140-0001-0002; EMH5147-0003. Based on Hauser's demonstrative, it appears that the binders contain no references to PCBs or Aroclors. See generally EMH7044-0013-0059; see also Oct. 18 Trial Tr. 43:8-10. Nor did Peter Brindamour, who started working for Warwick Chemical at Wood River Junction in 1966 and followed the company down to Chester, recognize the word "Aroclor." Brindamour Dep. 9:22-10:2; 31:12-17. And although Joseph Sanocki, who started in 1959 and moved to Chester as well, "vaguely" recalled the word, he did not believe Warwick Chemical used PCBs. Sanocki Dep. 20:17-19, 32:18-21, 149:10-18.

To be sure, the record suggests that PCBs were commonly used during this period. But when weighed against the lack of reported PCBs elsewhere at the site, the testimony of former employees, the

148

absence of any references to PCBs in the binders, and uncertainty about how this area of the site would have been used by Warwick Chemical or Carroll Products, a single detection of Aroclor 1254 is not enough to show that Warwick Chemical used PCBs in its operations at Wood River Junction, much less that Warwick Chemical handled PCBs in drums.

### b. VOCs

VOCs used by Warwick Chemical at Wood River Junction during the 1967-1971 period likely include benzene, PCE, toluene, and xylene. All four substances were detected at Wood River Junction, see EMH5132-0005-0008, and are listed in the binders as ingredients for certain products, EMH7044-0039, 0045-0046. Sanocki recalled PCE and toluene, Sanocki Dep. 132:19-21, and Brindamour recalled xylene, Brindamour Dep. 48:12-16. Neither Sanocki nor Brindamour was asked specifically about benzene, but each recalled a product known as Warco, which contained benzene, and both said that Warco was made at Wood River Junction. Sanocki Dep. 90:7-14; Brindamour Dep. 14:4-17. Brindamour testified that one difference between Wood River Junction and Chester was that Warwick Chemical did not make Warco at Chester. Brindamour 14:4-17. It is possible that Warwick Chemical had slowed down or ceased production of Warco by the time it closed its doors at Wood River Junction. But the evidence suggests that, for at least part of the 1967-1971 period,

Warwick Chemical was producing Warco at Wood River Junction and, therefore, would have been using benzene in its operations.

Regarding the containers in which these four VOCs were held, the evidence suggests that all were received in closed-head drums. Sanocki Dep. 131:2-5, 12-13 (placing PCE and toluene in "drums"); Brindamour Dep. 48:12-16 (placing xylene in closed-head drums); TPD429-12 (conceding that all four substances would have been in closed-head drums or smaller containers).

Emhart also contends that Warwick Chemical used a fifth VOC (1,2,4-trichlorobenzene) at Wood River Junction. Emhart Post-Trial Br. 120. But the evidence does not support this contention. For one, there were no detections of 1,2,4-trichlorobenzene at Wood River Junction. See generally EMH5132; EMH5134; EMH5147. Nor did Sanocki, Brindamour, or Robert Iuliucci, who joined Warwick Chemical in 1979, recognize this substance when asked. Brindamour Dep. 29:12-17; Sanocki Dep. 148:23-24; Iuliucci Dep. 22:4-7, 100:25-101:3. On the other hand, Hauser acknowledged that 1,2,4-trichlorobenzene was listed as a raw material in one of the binders he reviewed, but never as an ingredient in a specific formula. See Oct. 18 Trial Tr. 45:1-46:12; EMH7044-0057; see also Iuliucci Dep. 107:7-14 (reviewing raw material lists and agreeing 1,2,4-trichlorobenzene is shown). While it is possible that Warwick Chemical or Sequa used 1,2,4-trichlorobenzene at one of its locations, there is insufficient evidence that Warwick Chemical

150

used this substance at Wood River Junction during the 1967-1971 period.

### c. SVOCs

Letters from Warwick Chemical and Carroll Products to the EPA identified naphthalene as one of the raw materials Warwick Chemical used at Wood River Junction. EMH5127-0004; EMH5128-0003. Also in evidence is a 1991 letter from Sequa to South Carolina authorities that identifies naphthalene as a material handled at the Chester plant. EMH5152-0001, 0005. But Sanocki testified that naphthalene was not an ingredient in Warwick Chemical's products. Sanocki Dep. 149:2-6. Nor do the binders appear to mention naphthalene. See EMH7044-0040, 0055. And although naphthalene was detected at Wood River Junction, it was not co-located with other materials used in Warwick Chemical's manufacturing process, such as in the lagoons, but rather was detected "in just one of three sediment samples" collected in a riverbed "adjacent to the site." EMH5147-0007-0008.

Despite this conflicting evidence, Warwick Chemical likely used naphthalene at one point during its tenure at Wood River Junction. But the purpose and duration of that use are unclear, and so is whether Warwick Chemical received naphthalene in drums. See EMH7044-0055 (providing list of Warwick Chemical's "Example Raw Materials" that would have been in drums but failing to mention naphthalene). In short, Emhart is unable to prove that Warwick

151

Chemical used naphthalene at Wood River Junction during the 1967-1971 period.[49]

### d. Metals

Warwick Chemical used aluminum and zinc compounds in products manufactured at Wood River Junction during the 1967-1971 period. One of these products was Impregnole, which Sanocki and Brindamour both recalled, and which contained aluminum acetate and aluminum formate. See Sanocki Dep. 98:16-99:1; Brindamour Dep. 25:13-16; EMH7044-0043; see also EMH5127-0002; Lamendola Dep. 44:1-2 (noting Warwick Chemical "bought a lot of aluminum acetate"). Another product was Norane, a water repellant, which Sanocki and Brindamour both recalled and which, according to one product specification, contained "zinc chloride anhydrous." Sanocki Dep. 87:19-88:3; Brindamour Dep. 24:15-18; EMH7044-0039. Other aluminum and zinc compounds noted in the record include aluminum sulfate, which Sanocki said went in water repellants, Sanocki Dep. 151:9-17; aluminum chloride, zinc acetate, zinc nitrate, zinc stearate, and zinc sulfate, which were ingredients in catalysts for permanent

---

[49] The relationship between naphthalene and "amyl naphthalene" is unclear in the record, but the latter is listed as an ingredient in Warco. See EMH7044-0040. Because Warwick Chemical produced Warco at Wood River Junction for at least part of the 1967-1971 period, see supra Part IV.I.2.b, it likely received amyl naphthalene during this time. Hauser stated that amyl naphthalene would have been handled in drums. EMH7044-0055.

press finishes, EMH7044-0045; and aluminum stearate, the use of which is not explained, id.

Despite Warwick Chemical's extensive use of aluminum, there were no reported detections of aluminum at Wood River Junction. This suggests that samples were not tested for aluminum, perhaps because only certain aluminum compounds are designated hazardous substances. See 40 C.F.R. § 302.4(a). One of those compounds is aluminum sulfate, which Sanocki said was used in water repellants. Id.; Sanocki Dep. 151:9-17. Hauser's summary of the binders does not mention aluminum sulfate. See EMH7044-0039-0046, 0055. But because Sequa concedes that Warwick Chemical used aluminum sulfate at Wood River Junction, the Court finds the same. See Sequa Post-Trial Br. 23; see also EMH5152-0004. Zinc, on the other hand, was detected in multiple locations at Wood River Junction, EMH5132-0006-0007; EMH5147-0006-0009, and is a hazardous substance per se, 40 C.F.R. § 302.4(a).

Although Warwick Chemical used hazardous aluminum and zinc compounds as raw materials at Wood River Junction during the 1967-1971 period, the evidence does not suggest that it received those raw materials in drums. Sanocki testified that aluminum sulfate probably would have come in bags. Sanocki Dep. 151:14-22. And Brindamour testified that zinc chloride anhydrous would have come in bags as well. Brindamour Dep. 57:4-7. These two are the only aluminum and zinc compounds, what the parties call "metal salts,"

153

that Sanocki and Brindamour were asked to place in either bags or
drums.  See Emhart Post-Trial Br. 105; Sequa Post-Trial Br. 23.
The only other evidence on this question comes from the parties'
experts and a 1991 letter from Sequa about its operations at the
Chester plant.  EMH5152.  Because Hauser and Sequa's expert Dr.
William Hanley agreed that metal salts could have been packaged in
either bags or drums, their opinions do not move the needle.  See
Oct. 18 Trial Tr. 44:14-17; Nov. 8 Trial Tr. 61:14-18, 62:10-11,
63:3-5, Dkt. No. 1144.  Nor does the 1991 letter, which provides
a complete list of "hazardous materials handled at [Chester]," all
of which, according to the letter, were "purchased in drum
quantities (approximately 500 pounds), not bulk quantities."
EMH5152-0001, 0005.  Unless Sequa received hazardous raw materials
exclusively in drums at Chester, the term "drum quantities" is
more likely a unit of measurement than a reference to a specific
container type.  The Court's view on this matter is based in part
on testimony from Chester employees who said that raw materials
came in various containers, including drums, bags, and fiber drums.
Iuliucci Dep. 36:2-4.  In any event, what happened at Chester does
not reveal what happened at Wood River Junction.  The most
probative evidence as to whether Warwick Chemical received
aluminum and zinc compounds in bags or drums at Wood River Junction
is the testimony of people who worked there, and both Sanocki and
Brindamour said the answer was bags.

154

Although the evidence suggests that Warwick Chemical received aluminum and zinc compounds in bags, these compounds would have ended up in open-head drums of finished product.

### e. Other Materials

The evidence suggests Warwick Chemical used other materials at Wood River Junction that are hazardous substances but not COCs, including formaldehyde, methanol, n-butanol, and phenol. See EMH5132-0005, 0007; Brindamour Dep. 47:11-16; EMH7044-0056; EMH5127-0004; 40 C.F.R. § 302.4(a). These and other non-COC hazardous raw materials are relevant to Sequa's liability for dioxin, furan, and PAH contamination to the extent they consist of hazardous substances, were sent to Centredale as residuals in drums, and were incinerated.

Warwick Chemical received many of its raw materials in drums. See Brindamour Dep. 60:16-18. ("You know, we used a lot of drums. I would say 90 percent of the stuff we used came in either drums or a bag."). Some of these raw materials, like the VOCs discussed above, came in closed-head drums, see supra Part IV.I.2.b, but others came in open-head drums, see Brindamour Dep. 42:18-25; see also Sanocki Dep. 57:13-21 (noting Warwick Chemical received raw materials in both open- and closed-head drums). Of the four non-COC hazardous raw materials mentioned in the preceding paragraph, the evidence suggests Warwick Chemical received all but phenol in either closed-head drums or bulk tankers at Wood River Junction

during the 1967-1971 period.  See Brindamour Dep. 47:11-19, 54:1-
2 (discussing n-butanol); Sanocki Dep. 113:8-18 (noting that, in
the "mid-1960s," Warwick Chemical began receiving methanol and
"formalin," a formaldehyde mixture, in bulk tankers instead of
drums).  Emhart suggests that phenol, a solid, was held in open-
head drums.  See Emhart Post-Trial Br. 104 (citing, inter alia,
EMH7044-0055).

A more extensive evaluation of these issues will be warranted
during the allocation phase.  But even if Warwick Chemical received
none of its raw materials that are non-COC hazardous substances in
open-head drums, these raw materials would have ended up in open-
head drums of finished product.  See Brindamour Dep. 15:22-16:3
(noting Warwick Chemical generally shipped its products in drums);
Sanocki Dep. 93:17-21, 102:24-25 (describing certain products as
a "thick liquid" or "paste," which suggests they were packaged in
open-head drums).

### f. Finished Products and Intermediates

In addition to receiving many of its raw materials in drums,
Warwick Chemical "ship[ped] out [its] final product in drums."
Brindamour Dep. 16:1-3.  Emhart contends that Warwick Chemical
also used drums to store intermediates.  Emhart Post-Trial Br.
100.  But the evidence does not support this contention.

Emhart's argument that Warwick Chemical stored intermediates
in drums is based on Hauser's general observation that "sometimes

drums are used to store the intermediate product," Oct. 17 Trial
Tr. 101:8-9, as well as testimony from Sanocki, which the Court
finds to be ambiguous.  During his deposition, Sanocki was asked
if he knew how "internally manufactured products, . . . [which
were] later integrated into another product, [were] stored for
that interim period before integration[.]"  Sanocki Dep. 125:21-
26.  "I would guess," he said, that "it was shipped in a steel
drum with a plastic liner."  Id. at 126:1-3.  Sanocki likely
misunderstood the question because intermediate products are not
"shipped" offsite.  Whatever the case, Sanocki's testimony is
insufficient to show that intermediates were stored in drums at
Wood River Junction, especially because there is evidence to the
contrary.  Sanocki and Brindamour testified that raw materials
were fed into "reactors."  Sanocki Dep. 58:3-18; Brindamour Dep.
43:21-24; see also Nov. 8 Trial Tr. 59:21-60:3 (Hanley interpreting
testimony to mean that "often the intermediate would be mixed in
a vessel and remain in that vessel until the final product was
manufactured").  Furthermore, Sanocki testified that the only
"source[s] of drums that were sent to a reconditioner" like NECC
were "raw materials" and "customer-returned product," not
intermediates.  Sanocki Dep. 158:13-19; see also Brindamour Dep.
41:6-7 ("Basically, all of our drums went to [NECC], other than

the specialized drums."[50]).  To conclude, the Court finds that Emhart has not shown that Warwick Chemical stored intermediates in drums at Wood River Junction.

### 3. The Warwick Chemical-NECC Relationship

Warwick Chemical sent open- and closed-head drums to NECC for reconditioning and received reconditioned open-head drums from NECC.  This relationship lasted from 1967 to February 1971, when the plant at Wood River Junction closed its doors.[51]  See EMH5039. According to Brindamour, NECC delivered "a full truckload" — or about 150 drums — to Wood River Junction at least once a week, and Warwick Chemical sent just as many back to NECC.  Brindamour Dep. 41:8-42:13, 59:23-60:19; see Nadeau Dep. 48:21-22, Dec. 17, 2002; see also EMH1005-0034.  Sequa highlights testimony from Buonanno that Warwick Chemical bought a lot of drums from NECC but "sent very little back."  Buonanno Dep. 133:9-134:3, 251:17-19, Mar. 28, 2003.  The Court credits Brindamour's testimony over Buonanno's on this issue and thus concludes that Warwick Chemical sent upwards of 150 drums to NECC per week.

---

[50] The term "specialized drums" refers to "very expensive stainless steel drums" that "were sent back to the manufacturer." Brindamour Dep. 38:3-7.

[51] NECC moved its open-head reconditioning operations to Smithfield, Rhode Island, in January 1971.  TPD388.0043-0044.  If Warwick Chemical sent open-head drums for reconditioning during its final month of operation in February 1971, those drums would not have gone to Centredale.  See EMH5039.

The Court further finds that Warwick Chemical sent both open-
and closed-head drums to NECC. According to NECC's 104(e)
Response, NECC received only open-head drums from Warwick
Chemical. EMH1005-0034. But as discussed above, Warwick Chemical
received various raw materials in closed-head drums, including
VOCs, see supra Part IV.I.2.b, and Brindamour testified that
"[b]asically, all of [Warwick Chemical's] drums went to [NECC],"
Brindamour Dep. 41:6-7. The Court therefore concludes that Warwick
Chemical sent both open- and closed-head drums in which it had
received raw materials to NECC, and that the can-opener was likely
used on some of Warwick Chemical's closed-head drums. See supra
Part IV.C.5. The extent of that use is a matter for allocation.

The record also suggests that customers of Warwick Chemical
occasionally sent open-head drums of finished product back to Wood
River Junction. See Sanocki Dep. 154:10-13. When this happened,
Warwick Chemical salvaged the drums' contents and then sent the
drums to NECC. Id. at 154:13-155:10. These customer-returned
drums likely accounted for a small percentage of the drums Warwick
Chemical sent to NECC.

When asked why Warwick Chemical did not simply reuse the drums
in which it had received raw materials, Sanocki responded that "we
were going to put our clean product in a clean drum." Sanocki
Dep. 160:3-9. Warwick Chemical therefore engaged with NECC, at
least in part, because it could not reuse its used drums due to

159

risks of cross-contamination but could use reconditioned drums as
if they were new.  See also id. at 143:4-13.

### 4. Warwick Chemical's Drum-Emptying Practices and Presence of Residuals

Warwick Chemical took steps to use as much of the material in
its drums as it could, whether those drums contained raw materials
or customer-returned product.  See Sanocki Dep. 154:14-155:5,
155:16-156:1.  But Warwick Chemical did not take the further step
of cleaning those drums before sending them to NECC.  Sanocki
testified that drum contents "would be siphoned out — or poured
out, and any residual would be rinsed out and put in the batch."
Id. at 155:16-20.  The drums were most likely rinsed with water,
which — unlike other potential rinsing fluids — would not have
contaminated the batch, because Warwick Chemical's products "were
all water-based."  Id. at 157:22-23.

Aside from rinsing its drums, Warwick Chemical also "tipped
[its drums] almost upside down . . . into the reactor."  Brindamour
Dep. 43:21-23.  Both methods ensured that Warwick Chemical made
good use of the raw materials it purchased.  According to Sanocki,
"most of the raw materials were not left" in drums that had been
rinsed.  Sanocki Dep. 155:20-21.  And Brindamour said that whenever
a drum was tipped over and drained into the reactor, "there was
very little left inside of it."  Brindamour Dep. 43:22-24.  But
neither approach rid the drums entirely of their contents.

The extent to which residuals were left in drums that Warwick Chemical sent to NECC depends on the drums' contents. The contents of closed-head raw-material drums were liquids that would have flowed more easily than the contents of customer-returned drums, which could be thick and paste-like. See Sanocki Dep. 93:17-21, 102:24-25. But even then, many of the raw materials that Warwick Chemical received in closed-head drums, such as VOCs like benzene, PCE, toluene, and xylene, are immiscible in water, and rinsing therefore would have been less effective for drums containing these materials. See Oct. 17 Trial Tr. 139:18-25; see also Nov. 8 Trial Tr. 53:20-54:1. In short, the Court finds that some of the drums that Warwick Chemical sent to NECC likely contained trace amounts of liquids, including hazardous substances like VOCs, while others would have contained small amounts of customer-returned product, including thick, paste-like material that consisted of hazardous substances. The Court reaches these conclusions without relying on NECC's 104(e) Response, EMH1005, or on the affidavit of Raymond Nadeau, who drove a truck for NECC during part of the 1967-1971 period, TPD754 ¶ 10. But the Court notes that its conclusions are consistent with the descriptions of Warwick Chemical's residual drum contents provided in those documents. See EMH1005-0034; TPD754 ¶ 10(3).

161

5. **Summary of Residuals in Warwick Chemical's Drums to NECC**

The Court has determined above that some residuals would have remained in drums Warwick Chemical sent from Wood River Junction to NECC at Centredale. Most of these drums were open- and closed-head drums in which Warwick Chemical received raw materials, and the rest were open-head drums in which Warwick Chemical had shipped finished product to customers and that were later returned to Wood River Junction.

Warwick Chemical likely sent multiple hazardous substances as residuals in drums to NECC. In closed-head raw-material drums, the residuals include VOCS (benzene, PCE, toluene, and xylene) and some other hazardous substances that are not categorized as COCs, such as n-butanol. In open-head raw material drums, the residuals include some other hazardous substances that are not categorized as COCs, such as phenol. In open-head finished-product drums, the residuals include VOCs (benzene, PCE, toluene, and xylene), metals (aluminum and zinc), and some other hazardous substances that are not categorized as COCs, such as formaldehyde, methanol, n-butanol, and phenol.

The incineration of residuals in some of the drums Warwick Chemical sent to NECC likely generated dioxins, furans, and PAHs. Furthermore, the degradation of residual PCE in closed-head drums

Warwick Chemical sent to NECC likely caused the release of TCE and vinyl chloride at Centredale.

**J. Teknor**

### 1. Relevant Entities, Time Period, Locations, and End Products Generated

Teknor was formed in September 1968.  TPD607 at EPA 010347. Teknor and NECC maintained a business relationship while NECC operated at Centredale.[52]  The parties dispute whether the relevant time period begins prior to September 1968, considering Teknor's corporate predecessors who engaged with NECC.

Teknor's predecessors Apex Tire & Rubber Company ("Apex Tire") and Thompson Chemical Company ("Thompson Chemical") operated facilities eventually taken over by Teknor – in Pawtucket, Rhode Island, at 505 Central Avenue and 90 Mendon Avenue (collectively, the "Pawtucket Facility") and at 330 Oakhill Avenue in Attleboro, Massachusetts (the "Attleboro Facility" or "Hebronville Facility").  EMH4002-0004; EMH4231-0003-0004; TPD607 at EPA010350; Murray Dep. 20:21-21:15, 22:2-24:7.  In September 1964, Continental Oil Company ("Continental") purchased all of

---

[52] Evidence pertaining to Teknor includes depositions of several former Teknor employees, whose names and employment dates are as follows: Morris Caruthers (began in 1952), Caruthers Dep. 20:8-15; Robert Duarte (1961-2000), Duarte Dep. 15:22-17:7; Arthur Duprey (1962-1999), Duprey Dep. 19:11-17; Gordon Gould (1960-1998), Gould Dep. 25:14-24; Earl Knight (began in 1972), Knight Dep. 20:5-6; William Murray (began in 1978), Murray Dep. 5:20-7:11; Antonio Patrizio (began in 1969), Patrizio Dep. 22:20-23.

163

Apex Tire's and Thompson Chemical's stock.  Emhart Post-Trial Br.
App. 1 at 1; Teknor Post-Trial Br. 8, Dkt. No. 1118; see generally
EMH4003F.  "In late 1964, just prior to the liquidation and
dissolution of [Apex Tire] and [Thompson Chemical], Continental
incorporated Thompson Apex Company [("Thompson Apex")] as a
wholly-owned subsidiary of Continental."  Emhart Post-Trial Br.
App. 1 at 1 (citing EMH4005V); see also Teknor Post-Trial Br. 8.
In July 1968, Continental transferred certain assets to Thompson
Apex but kept liabilities, and then sold Thompson Apex's stock to
Elmgrove Corporation ("Elmgrove").  Emhart Post-Trial Br. App. 1
at 3; Teknor Post-Trial Br. 8; see generally EMH4003M; EMH4003N.
Thompson Apex then changed its name to Teknor Apex, EMH4003K, and
eventually Teknor and Elmgrove merged, EMH4003L.

Teknor argues it is not liable for the operations of Thompson
Chemical because Continental kept liabilities when it transferred
assets to Thompson Apex.  Teknor Post-Trial Br. 8-10.  Emhart
argues that Teknor is equitably liable "for pre-1964 operations of
its predecessors, including Thompson Chemical," and that this is
an allocation question.  Emhart Post-Trial Br. 156; see id. App.
1 at 4-6.  As for Thompson Apex's operations, Emhart argues that
Teknor is legally liable.  Id. at 156 & App. 1 at 3-4.  Teknor
does not advance a position as to its liability for Thompson Apex's
operations in its Post-Trial Brief.  See Teknor Post-Trial Br. 8-

10 (only discussing liability issues with respect to Thompson Chemical).

Emhart argues that the successor liability question is an allocation issue. Emhart Post-Trial Br. 156. The Court disagrees. Given Emhart's failure to make an adequate successor liability argument, the Court will only consider Teknor's liability during the time period of September 1968 to August 1971. See id. App. 1 at 3-6 & n.1 (Emhart acknowledging that state law governs successor liability issues but neglecting to apply state law, let alone identify which state's law and which theory of successor liability applies).

At the Pawtucket Facility, Teknor engaged in rubber compounding and manufacturing, plastics compounding (polyvinyl chloride or "PVC"), garden hose manufacturing, wire coating manufacturing, and repackaging of oils and antifreeze. Oct. 21 Trial Tr. 10:23-12:2; TPD607 at EPA010350; TPD763.005; Caruthers Dep. 25:18-29:11, 54:4-56:2; EMH4153-0002; EMH7046-0012-0014. At the Attleboro Facility, Teknor manufactured plasticizers and color concentrates. Oct. 21 Trial Tr. 10:23-12:2; TPD607 at EPA010350; TPD763.005; EMH7046-0012-0014. Plasticizers are "softening agent[s]" used to make things bendable. Oct. 21 Trial Tr. 12:6-21; see also Murray Dep. 37:21-25.

### 2. Materials Spent and Containers Used

The Court next considers the raw, intermediate, and maintenance materials that Teknor used in its operations, as well as the containers in which those materials were held. The Court reviews the evidence below, but to summarize, Emhart has shown that Teknor used PCBs, VOCs, SVOCs, and metals.[53]

Regarding containers, Emhart argues that Teknor's use of 55-gallon steel drums was pervasive. Emhart Post-Trial Br. 168-69. In contrast, Teknor claims that its raw materials "were mainly received in bulk (by railcar or tanker truck), bags, and in various types of drums other than those that came in 55-gallon steel drums (i.e., smaller steel drums, fiber/corrugated drums)." Teknor Post-Trial Br. 11. Teknor claims that "[o]nly a limited number of materials were received by Teknor in 55-gallon steel drums." Id.

The evidence indicates that, although Teknor may have received its raw materials in a variety of containers, some of Teknor's raw materials and intermediates came into contact with 55-gallon steel drums during Teknor's manufacturing processes. Teknor's expert Mr. Lawrence McTiernan acknowledged as much at

---

[53] Emhart does not allege that Teknor used or generated dioxins, furans, or PAHs in its manufacturing processes. See Emhart Post-Trial Br. 179-81. Rather, any connection to the Centredale dioxin, furan, and PAH contamination hinges on whether any of Teknor's drums contained residues of hazardous materials and were reconditioned by incineration. See id. Further, Emhart does not contend that Teknor used pesticides or herbicides. See id.

166

trial.   Nov. 15 Trial Tr. 29:13-23, Dkt. No. 1147; <u>see also</u>
TPD763.013.   And Emhart's expert Dr. Charles Daniels was
"absolutely convinced" that Teknor used drums daily, given its
"very flexible batch manufacturing operation." Oct. 21 Trial Tr.
41:12-42:3; <u>see also</u> <u>id.</u> at 12:22-13:3, 57:5-58:6; EMH7046-0028.
The containers used to handle each type of material are discussed
below.

### a. PCBs

The most contentious issue is whether Teknor used PCBs.
Emhart claims that Teknor used PCBs in both its manufacturing
processes and equipment maintenance, while Teknor argues it did
not; rather, Teknor claims, the only PCBs used at its facilities
were in transformers.  Emhart Post-Trial Br. 161-66, 168; Teknor
Post-Trial Br. 35-42.  For the following reasons, the Court finds
that Emhart has presented sufficient evidence to show that Teknor
used PCBs in its manufacturing of plasticizers.

Historically, PCBs were used in the manufacturing of products
like Teknor's because they improved flexibility, durability, and
fire retardancy.   Oct. 10 Trial Tr. 99:7-13, 125:25-129:13;
EMH7042-0008-0009, 0029-0032; Oct. 21 Trial Tr. 54:7-57:1;
EMH7046-0067-0074.

While there is no direct evidence that Teknor used PCBs in
its manufacturing, the circumstantial evidence points that way.
Specifically, Aroclor 1260 was detected in the "still bottoms

disposal area" ("SBDA") at the Attleboro Facility in a 2002 report. EMH4183-0003-0005, 0008-0009, 0009A, 0011-0020; see Emhart Post-Trial Br. 158; Teknor Post-Trial Br. 38. And earlier reports indicated that other materials used in Teknor's manufacturing were detected in the SBDA as well. EMH4178-0024-0026 (indicating detections of VOCs, TPH, and SVOCs); TPD651.0073-0084 (indicating detections of Aroclor 1260 and other substances); TPD635.0019-0022 (indicating detections of VOCs, SVOCs, and metals in the "still bottoms fill area").[54]

Teknor argues that the PCB contamination is attributable to transformer fluids rather than manufacturing. Teknor Post-Trial Br. 35-42. In support of its alternative theory, Teknor first points to the lack of evidence of PCB purchases from Monsanto by Teknor or reference to PCBs in Teknor's formulas. Oct. 11 Trial Tr. 105:8-17; Oct. 21 Trial Tr. 71:7-72:3. But as Emhart notes, essentially, the absence of evidence is not evidence of absence. See Emhart Post-Trial Br. 12 (citing Oct. 11 Trial Tr. 138:12-140:13; EMH1106-0001); Jan. 30 Trial Tr. 47:18-48:6.

Second, Teknor cites to several Teknor employees who testified they believed that Teknor did not use PCBs in manufacturing. Duarte Dep. 127:3-14; Gould Dep. 95:7-11; Patrizio

---

[54] Additionally, Aroclor 1254 was detected in "former sludge drying beds" at Attleboro, though the parties' arguments focus on the Aroclor 1260 detections. EMH4181-0008, 0013.

Dep. 145:12-16.  But this testimony has limited persuasive value;
for example, Gould also testified that "Monsanto was a supplier of
something during [his] time at the Hebronville facility" "[a]t one
time or another."  Gould Dep. 91:7-10.  And, as we know, Monsanto
was the main source of PCBs during this period.

Third, Teknor relies on the testimony of its experts Elmendorf
and McTiernan for its transformer theory.  Elmendorf's testimony
is less than compelling.  He stated: "you would need a substantial
increase in your information base to make any decisions whether
[the PCB contamination] was related to a transformer or not" and
even said that it could have come from a different source like
"plasticizers."  Nov. 5 Trial Tr. 28:13-29:7.  McTiernan similarly
admitted that the transformer theory was "speculative."  Nov. 15
Trial Tr. 130:19-131:4.

McTiernan also suggested that PCBs were not co-located with
other manufacturing wastes at the Attleboro Facility.  He noted
that PCB detections were "limited to [the] uppermost 4 feet of
soil, versus 11 feet for SVOCs . . . in most of [the] SBDA."
TPD763.40.  But as Emhart points out, McTiernan "waffled when
presented with the data clearly showing that PCBs were detected
throughout the area and alongside other substances used in Teknor's
manufacturing operations."  Emhart Post-Trial Br. 165-66 (citing
Nov. 15 Trial Tr. 126:21-130:10).  And the evidence indeed
indicates co-location of Aroclor 1260 with other manufacturing

169

substances. Id. at 166 (citing TPD651.0073-0084, regarding three samples).[55]

Weighing the two competing theories as to the source of PCBs at Attleboro, the Court finds it is more likely that Teknor used PCBs in its plasticizer manufacturing, and this was the source of the contamination in the SBDA. First, Teknor enlisted the help of a third-party to service its transformers. Oct. 21 Trial Tr. 82:3-83:13; Gould Dep. 84:25-85:10; TPD702. When a transformer is decommissioned, that third-party would drain the transformer into a tote and take the fluid away with them. Nov. 5 Trial Tr. 19:19-21:3. So, it is unlikely that the transformer fluid was dumped on-site, except for perhaps some accidental spillage. Second, the record of manufacturing wastes found in the SBDA clearly shows that the SBDA was used for the disposal of manufacturing wastes. The spread of the Aroclor 1260 detections throughout the SBDA is more consistent with the dumping of manufacturing waste than with a transformer leak or decommissioning, particularly because PCBs are "hydrophobic" — that is, they attach to soil particles and generally do not move with water. Oct. 24 Trial Tr. 139:7-24. On

---

[55] Teknor also argues that the PCB contamination had to have occurred after 1992 because the 1992 GZA Report did not detect PCBs. Teknor Post-Trial Br. 39. But that is not necessarily true because Appendix A to the 1992 GZA Report indicates that "[u]nless otherwise specified in the report, GZA GeoEnvironmental did not perform testing or analyses to determine the presence or concentration of asbestos or polychlorinated biphenyls . . . at the site or in the environment at the site." EMH4178-0045.

balance, it does not seem likely that the distribution of Aroclor 1260 detections in the SBDA could have resulted from transformer decommissioning or leaks, given the locations of the transformers relative to the SBDA. See TPD635.0084 (locating former transformer at "HA-25 . . . North [of] Building T-15 near HA-26"), 0232 (map showing that HA-25 is south of the "still bottoms area"); see also EMH4183-0009A (highlighting Aroclor 1260 detections in the SBDA). It appears more likely than not that Teknor used Aroclor 1260 in its plasticizer manufacturing during its relevant time period given the demonstrated benefits to the product and the widespread use in the industry at the time.

Aroclor 1260, a "sticky resin," was either contained in closed-head drums and heated up to be made pourable, or in open-head drums and spooned out. Oct. 10 Trial Tr. 106:12-107:7. No other evidence indicates a different kind of container was used for Aroclor 1260.

### b. VOCs

The weight of the evidence shows that Teknor used VOCs in the form of solvents including benzene, toluene, TCE, and vinyl chloride to produce materials including PVC and plasticizers during its relevant time period. Oct. 21 Trial Tr. 24:21-25:16 (Daniels discussing vinyl chloride); Duarte Dep. 141:17-142:4 (benzene), 143:8-17 (toluene), 145:14-15 (vinyl chloride); Murray Dep. 127:19-24 (solvents), 147:1-10 (benzene); EMH4191-0007

(toluene); see also EMH4193-0003, 0006, 0009, 0012, 0018; TPD607 at EPA010351; EMH1003-0195 (listing these materials as VOCs with CULs).[56]  Teknor also likely used solvents to clean its equipment. See Oct. 21 Trial Tr. 57:5-20; EMH7046-0026.

William Murray, who was the Executive Vice President of Teknor when deposed, testified that VOCs could have "[p]ossibly" been handled in closed-head 55-gallon steel drums.  Murray Dep. 112:20-113:23.  Daniels opined that some solvents like vinyl chloride were used in bulk but others, like various alcohols, were likely handled in drums.  Oct. 21 Trial Tr. 25:2-22, 27:15-28:9; see Oct. 22 Trial Tr. 16:24 (referring to alcohols as solvents).[57]  Daniels also testified that Teknor needed to use drums to temporarily store materials, including solvents, while equipment was cleaned, which aligns with the Court's findings for Ciba-Geigy, though Emhart does not present corroborating evidence on this point with respect to Teknor as it did for Ciba-Geigy.  Oct. 21 Trial Tr. 28:10-20; see supra Part IV.G.2.  McTiernan suggests that Teknor handled

---

[56] Some evidence falls slightly outside of Teknor's relevant time period, but it is proximate enough to be considered relevant, especially considering other evidence of the continuity of operations at the Attleboro and Pawtucket Facilities before and after Teknor's formation in 1968.  See generally EMH4005B; EMH4231.

[57] Alcohols are discussed in further detail as "Other Materials" infra, for the parties do not discuss them with respect to any COCs.

solvents in five-gallon pails. Nov. 15 Trial Tr. 42:20-43:1, 50:8-51:18.[58]

The evidence that Teknor received these VOCs in drums is slim, but there is ample evidence that the substances Teknor produced with the VOCs — e.g., plasticizers — were transported between its facilities in drums for further use in production. Daniels explained that Teknor used its own plasticizers when making other products and stored the plasticizers in drums.[59] Oct. 21 Trial Tr. 12:22-13:3, 33:16-24, 35:20-25, 47:17-25. McTiernan also acknowledged that plasticizers were made at the Hebronville Facility and then sent to the Pawtucket Facility in drums. Nov. 15 Trial Tr. 29:1-12; TPD763.013. Testimony of former Teknor employees generally supports these opinions and further states that the drums were either reused for the same purpose or sent for reconditioning. Duarte Dep. 84:15-85:18; Knight Dep. 63:14-64:3;

--------

[58] The available recipe cards do not help in deciphering what kinds of containers the named VOCs were handled in. Benzene is not listed, see generally EMH4191, EMH4192, EMH4193; the amounts listed for toluene could indicate either drum or bulk storage, see, e.g., EMH4191-0005 (listing 280 gallons for a batch); and the amounts for TCE and vinyl chloride are provided in pounds, not gallons, and the parties gave the Court no guidance on making the conversion for those particular materials, see, e.g., EMH4193-0001 (listing 6,000 pounds for vinyl chloride), 0003 (listing 120 pounds for TCE).

[59] Teknor sometimes received plasticizers for use as a raw material from other entities, instead of using its own. Murray Dep. 47:9-48:25. Teknor acknowledged that plasticizers were received in drums. Teknor Post-Trial Br. 15.

Murray Dep. 36:24-37:20, 38:24-40:7; Patrizio Dep. 71:16-73:5, 96:5-16; see also EMH 4213-0001-0003.  But see Caruthers Dep. 42:16-25 (stating that plasticizer was sent in tank trucks).

In all, the Court finds it likely that benzene, toluene, vinyl chloride, and TCE were handled in drums during Teknor's manufacturing of plasticizers.

### c. SVOCs

For SVOCs, Teknor used bis (2-ethylhexyl) phthalate — or di (2-ethylhexyl) phthalate — as a plasticizer in its PVC compounding. Murray Dep. 100:7-14, 102:2-6; see EMH7041-0045.  It also used naphthalene in its production of phthalic anhydride, but that production ended in about 1968, so the Court finds that such use falls outside Teknor's relevant time period.  EMH4003B-0002; Duarte Dep. 29:19-30:20, 31:20-23, 146:15-18; see EMH7041-0045.

Teknor previously acknowledged that "[d]i (2-ethylhexl) phthalate (DEHP) . . . arrived to Teknor as a liquid in bulk and was stored in a tank" but also that "limited quantities of DEHP . . . may have been received in drums for use in production trials or for small volume production."  EMH4007-0010.  McTiernan testified that some SVOCs could have been in drums, to the extent that plasticizers were in drums.  Nov. 15 Trial Tr. 62:9-17.

Accordingly, the Court finds it likely that Teknor handled di (2-ethylhexyl) phthalate in drums during the production process or the transport of plasticizers between facilities.

174

### d. Metals

Teknor used metals as raw materials, including antimony, arsenic, barium, cadmium, chromium, copper, lead, and zinc. Oct. 21 Trial Tr. 36:20-24, 137:19-20; Nov. 15 Trial Tr. 64:12-65:8; Duarte Dep. 149:23-151:20; Murray Dep. 49:24-50:11, 73:23-74:10, 77:4-12, 94:23-95:5, 102:10-103:12, 114:5-117:12, 155:10-24; TPD607 at EPA010351.

Teknor concedes that barium, cadmium, and zinc came in 55-gallon closed-head steel drums. Teknor Post-Trial Br. 42-44; TPD763.021, 035 (describing the use of those metals in stabilizers and noting that stabilizers are liquid). Teknor argues that other metals were in color concentrate ingredients, "which would have been in powder form and not received or put in a drum." Teknor Post-Trial Br. 44. To support that argument, Teknor cites testimony stating that such powders "would not have been present in closed-head 55-gallon steel drums." Nov. 15 Trial Tr. 42:16-19 (emphasis added). Other testimony states that powders came in open-head drums. Nov. 8 Trial Tr. 62:10-11. But McTiernan claimed that the powders likely came in bags. Nov. 15 Trial Tr. 39:10-12. And Teknor has previously stated that "[l]ead compounds used for heat stabilization and antimony compounds were received in bags." EMH4007-0010; see also Duarte Dep. 111:13-22.

The Court finds that metals incorporated into liquids — barium, cadmium, and zinc — were handled by Teknor in closed-head

175

drums, but Emhart has not presented enough evidence to show that the powders were handled in drums as opposed to bags.  The Court recognizes the possibility that some powdered metals could have been incorporated into material later handled in drums, but Emhart has not presented sufficient evidence showing that to be the case. See Emhart Post-Trial Br. 160-61.

### e. Other Materials

Teknor used a variety of materials that the parties have not identified as COCs.  These are relevant to liability for dioxin, furan, and PAH contamination to the extent they consist of hazardous substances, were sent to Centredale as residuals in drums, and were incinerated.

Teknor used acids and alcohols in manufacturing different products.  EMH4002-0022; EMH4003B-0002.  To clean and maintain equipment, Teknor used lubricating oils, hydraulic fluids, and certain other fluids like kerosene.  Oct. 21 Trial Tr. 58:1-6; EMH7046-0050; TPD761.004; Murray Dep. 112:20-113:23, 126:2-13; see EMH7041-0044 (noting that VOCs were used in hydraulic fluids). Teknor also generated and reused "various recovered product" or "VRP."  Gould Dep. 63:13-19.

Teknor acknowledged that kerosene and lubricating oils were received in drums.  Teknor Post-Trial Br. 15.  Teknor also previously stated that "[a]lcohols were received in bulk . . . and stored in tanks" but also that "limited quantities of . . .

alcohols may have been received in drums for use in production
trials or for small volume production." EMH4007-0010. Expert
testimony supports that some of these materials were received or
handled in drums. See Oct. 21 Trial Tr. 27:15-28:3. Former Teknor
employees also testified to drum use for materials including
alcohols, adipic acid, and VRP. Duarte Dep. 146:20-147:12; Gould
Dep. 61:17-24; Murray Dep. 135:1-7. But see EMH4191-0045 (listing
"bags" of adipic acid as ingredient).

However, without more specific details as to the kinds of
acids, alcohols, and various fluids that Teknor used, as well as
the makeup of the VRP, the Court cannot determine whether those
materials are hazardous under CERCLA. But see 40 C.F.R. § 302.4
(listing adipic acid as a hazardous substance and omitting
kerosene). Without confirmation of their hazardous nature, they
are irrelevant. See supra Part III.C.

### 3. The Teknor-NECC Relationship

Teknor sold used drums to NECC for reconditioning at a rate
of about 300 drums per month during the relevant time period — the
Pawtucket Facility and the Attleboro Facility each sent about 150
drums per month. Emhart Post-Trial Br. 176; TPD763.013; see
EMH1005B-0033-0034. Teknor also bought reconditioned drums from
NECC, though the number of drums it purchased is not well
established. Emhart Post-Trial Br. 174-76; Teknor Post-Trial Br.
13; see Duarte Dep. 85:15-87:9; Gould Dep. 17:17-25.

177

Teknor engaged with NECC, at least in part, because it could not reuse its used drums due to risks of cross-contamination but could use reconditioned drums as if they were new.  See Duprey Dep. 55:14-25; Gould Dep. 66:1-67:2; Patrizio Dep. 76:11-77:21.

The primary dispute regarding the Teknor-NECC relationship is whether Teknor sent both open-head and closed-head drums to NECC for reconditioning.  Emhart argues that Teknor sent both types of drums to NECC for reconditioning, while Teknor argues it only sent closed-head drums.[60]  Emhart Post-Trial Br. 176-78; Teknor Post-Trial Br. 12-13.

Emhart has shown that Teknor more likely than not sent both types of drums to NECC for reconditioning, though it primarily sent closed-head drums.  It is true, as Teknor emphasizes, that

---

[60] Teknor argues that it could not have contributed to dioxin, furan, and PAH contamination at the Site because it sent only closed-head drums, which went through NECC's caustic wash process rather than the incineration process.  See Teknor Post-Trial Br. 31.  But before NECC put its closed-head drums through the caustic wash process, NECC dumped residuals from those drums into open-head drums that later went through the incineration process.  See supra Part IV.C.4.  The residual contents of closed-head drums sent to NECC were therefore subject to incineration, regardless of whether NECC removed their lids using the can-opener device.  The can-opener issue is nevertheless relevant, however, because the residual contents of some closed-head drums sent to NECC would not have been pourable, whether because of their viscosity or because the supplier had already drained all the pourable contents from the drum before sending it to NECC.  In either event, any residual contents would have remained in the drum after the first step of the caustic wash process, and so whether the contents of that drum contributed to dioxin, furan, and PAH contamination at the Site depends on whether its lid was ultimately removed.

NECC attributed only closed-head drums to Teknor in its August 22,
2002 Supplemental 104(e) Response.  EMH1005-0033-0034.  And there
is testimony from former NECC and Teknor employees supporting that
conclusion, though some is equivocal.  Buonanno Dep. 174:20-21,
228:11-12, May 15, 2013 (referring to Teknor's drums as "oil drums"
and noting that "[c]losed-head drums are oil drums"); Olson Dep.
157:23-158:10 (noting he did not see Teknor's drums sent to NECC
and that he was not sure about open-head drums but knew Teknor
sent closed-head drums for reconditioning); Murray Dep. 44:16-22;
Duarte Dep. 53:14-54:2, 95:24-97:4; Gould Dep. 42:15-44:5, 59:22-
25, 64:20-65:1 (discussing special order for open-head drums from
NECC, used to ship product to customers, and that raw materials
were received in closed-head drums).

But, as Emhart argues, the 104(e) Response depends on
recollection and could simply reflect that Teknor primarily sent
closed-head drums.  Emhart Post-Trial Br. 178 n.69.  And that
recollection is from former NECC employees who had to recall
details about drums received from many companies, so it may not be
entirely accurate.  What might be more accurate is company-specific
testimony from the company's employees.  And there is testimony
from Teknor employees — granted, also based on recollection of
events from long ago — indicating that both types of drums were
used and sent out for reconditioning, though like the testimony
backing Teknor's argument, it is not all unequivocal.  Patrizio

179

Dep. 72:3-73:5, 95:1-96:16, 154:14-155:13; EMH4213-0001-0003; Duarte Dep. 123:2-126:14; Duprey Dep. 41:9-17, 51:17-56:25; Gould Dep. 40:3-17; Murray Dep. 42:4-8.

While the majority of Teknor's drums were likely closed-head, Teknor likely handled some materials in open-head drums, particularly plasticizers. Teknor would have eventually needed to recondition those open-head drums, and the evidence establishes a long-standing reconditioning relationship with NECC.

A related question is whether NECC converted any of Teknor's closed-head drums to open-head drums with its "can-opener" device and thereafter incinerated those drums. Emhart argues it did, given NECC's "regular" use of the can-opener, Teknor's need for reconditioned open-head drums, and that the viscous materials in Teknor's drums would need to be incinerated for full cleaning. Emhart Post-Trial Br. 178-79. Teknor says that there is no evidence indicating its closed-head drums were converted to open-head and, further, that Emhart overstates the frequency of the can-opener's use. Teknor Post-Trial Br. 32-33.

As discussed in Part IV.C.5 above, there is much testimony regarding the use of the can-opener. Teknor emphasizes that some of this testimony states that the can-opener was only used "sometimes," rather than "regularly" as testified by Emhart's expert Locke. Teknor Post-Trial Br. 32-33 (citing Oct. 10 Trial

180

Tr. 47:6-9; Cifelli Dep. 37:10-14, May 21, 2013; Turcone Dep. 28:7-
10).

The Court finds that the caustic wash process did not always
sufficiently clean out the oily or viscous material in Teknor's
closed-head drums.  See Oct. 21 Trial Tr. 44:3-5, 44:24-45:10
(describing plasticizers in Teknor's drums as like "salad oil" or
"honey"); Nov. 8 Trial Tr. 25:18-26:2 (Nuckolls testifying that
the caustic wash process "[p]robably [would] not" "completely
decompose and destroy" PCB residuals in drums);  EMH7042-0013
(describing Aroclor 1260 as a "sticky resin"); Duarte Dep. 91:1-
11 (describing some plasticizers in drums as "more like molasses"
than cooking oil).  Accordingly, even if the can-opener was only
"sometimes" used, the Court finds that Emhart has demonstrated a
likelihood that some of Teknor's drums were converted to open-head
and incinerated.

### 4. Teknor's Drum-Emptying Practices and Presence of Residuals

There is no dispute that Teknor drained its drums before
sending them to NECC for reconditioning.  Emhart Post-Trial Br.
174; Teknor Post-Trial Br. 14-19.  The parties quarrel over the
extent to which Teknor drained its drums and whether residuals
remained after the drainage.  Emhart Post-Trial Br. 170-74; Teknor
Post-Trial Br. 14-19.

181

Teknor's former employees described what Teknor's drainage process looked like. "Most drums were pumped first and then manually drained." EMH4213-0001. The drum was placed on a stand, tipped over, and drained into a bucket or another drum with a funnel. Patrizio Dep. 65:11-67:11; Gould Dep. 61:1-8.

Teknor drained its drums so that it could salvage and reuse the materials in the drums and, by doing so, save money. See Oct. 21 Trial Tr. 65:7-10, 67:2-5; Nov. 15 Trial Tr. 64:12-19, 81:24-82:12; Gould Dep. 61:8-16, 64:6-8; Patrizio Dep. 66:17-68:1. Some testimony also indicates that Teknor drained its drums because otherwise, if the drums had too much residual material, NECC would not accept them. Patrizio Dep. 67:19-22.

Some testimony supports Teknor's claim that it drained the drums until they were essentially empty. Gould Dep. 44:13-18 ("[The drums would] drain . . . sometimes for days and days."), 61:6-8 ("It would drain there until we get rid of it[;] . . . until it's empty."); Patrizio Dep. 66:6-16 (noting that no liquid would be left after draining); Olson Dep. 156:19-160:7 (remarking that he "hardly ever felt anything in Teknor Apex barrels" and that Teknor's drums were "probably . . . the cleanest barrels that we ever got from anybody," "clean as a whistle," and "pretty darn clean"). Emhart challenges Olson's testimony because Olson never saw the drums sent from Teknor to NECC and, in any event, a clean appearance did not necessarily mean clean because "Teknor strove

182

'to make a plasticizer that was water clear' or 'crystal clear' in appearance." Emhart Post-Trial Br. 172 (citing Olson Dep. 157:23-158:3; quoting Patrizio Dep. 44:23-45:19).

Other testimony supports Emhart's claim that residuals remained in Teknor's drums after draining, the consensus being that thick and viscous materials like Teknor's were difficult to completely drain, posing the risk of cross-contamination if the drums were reused. Duarte Dep. 97:8-98:9; Oct. 17 Trial Tr. 105:11-20; Oct. 21 Trial Tr. 43:14-45:14. Another practical consideration is that closed-head drums are more difficult to drain than open-head. Oct. 17 Trial Tr. 105:4-10. Daniels also questioned the extent of Teknor's drainage practices because "time is money; you just simply can't wait for it all to drain." Oct. 21 Trial Tr. 45:11-12. Even Teknor's expert McTiernan testified that residuals "may" have remained in Teknor's drums after draining, though he qualified that depending on the substance, the amount of residuals could range from "nothing at all," to "a few drops," to a "very thin film that adhered to the edge of the drum." Nov. 15 Trial Tr. 28:4-13. "But in all aspects," he continued, "we're talking less than a teacup." Id. at 28:12-13. Further, according to NECC's 104(e) Response, residues were observed in drums picked up from both the Attleboro Facility and Pawtucket Facility. EMH1005-0033-0034.

Based on the foregoing evidence, even if Teknor drained its drums extensively, residuals likely remained in those drums when they were sent to NECC.  This does not necessarily conflict with Teknor's supporting testimony.  There might have been very little residuals left such that they were hard to detect and close enough to "clean" to be considered as such.  But if there really were no residuals at all, Teknor would have had no concern about possible cross-contamination upon reuse of drums, and no reason to send drums to NECC for reconditioning.

### 5. Summary of Residuals in Teknor's Drums to NECC

Based on the foregoing assessment of the kinds of materials handled in drums, Teknor likely sent the following hazardous substances as residuals in drums to NECC: PCBs (specifically, Aroclor 1260); VOCs (benzene, toluene, vinyl chloride, and TCE); SVOCs (di (2-ethylhexyl) phthalate); and metals (barium, cadmium, and zinc).  Aroclor 1260 was stored in either open-head or closed-head drums.  Some of these other substances were sent in open-head drums after being processed as components of plasticizers, but they were primarily sent in closed-head drums, some of which were converted to open-head.  Dioxins, furans, and PAHs likely resulted from the incineration of residuals in some of Teknor's drums.

### V.    PHASE IIIA CONCLUSIONS OF LAW

As noted above in Part III, Emhart must establish the following to succeed on its contribution claim: (1) there has been

184

a release or threatened release of a hazardous substance at a
facility, 42 U.S.C. § 9607(a)(4); (2) the release or threatened
release caused Emhart to incur response costs, id.; (3) those
incurred costs are necessary and "consistent with the national
contingency plan," id. §§ 9607(a)(4)(B); see id. § 9601(23)-(25);
and (4) the TPD falls within one of four classes of "covered
persons," id. § 9607(a).   Once Emhart has done so, the TPD is
presumed liable and the burden shifts to it to prove that someone
or something else was the sole cause of the release and resulting
response costs.   Acushnet, 191 F.3d at 75; 42 U.S.C. § 9607(b).

**A. Drum Reconditioning Arranger Claims**

   **1. Release of Hazardous Substance at Facility and
      Response Costs**

   Hazardous substances (dioxins and furans, PAHs, PCBs, VOCs,
SVOCs, pesticides, and metals) were released from a facility (NECC
at Centredale).   42 U.S.C. § 9607(a)(4); see supra Part IV.D-E;
EMH1003-0193-0213 (ROD listing hazardous substances requiring
cleanup at the Site); see generally TPD085 (ESD making some
adjustments to the ROD); 40 C.F.R. § 302.4 (listing CERCLA
hazardous substances).   Per the Consent Decree, Emhart incurred
response costs caused by that release.   See generally Consent
Decree.   The parties do not address (and it appears undisputed)
that Emhart's incurred response costs are necessary and consistent
with the national contingency plan, and the Court has previously

185

held that Emhart meets that element.  See Emhart, 2019 WL 7631111,
at *2.

### 2. Was BASF's Predecessor Ciba-Geigy an Arranger?

### a. Disposal of Hazardous Substances at the Site

Emhart has shown it is likely that Ciba-Geigy disposed of the
following categories of hazardous substances at Centredale via
residuals in drums it sent to NECC for reconditioning: PCBs
(specifically, Aroclor 1242); VOCs (chlorobenzene, sulfuric acid,
hydrochloric acid, nitric acid, methanol, acetone, toluene, and
xylene); SVOCs (naphthalene); and some other hazardous substances
not categorized as COCs.  See supra Part IV.G.5; 40 C.F.R.
§ 302.4.[61]  Emhart has not shown that Ciba-Geigy sent metals to the
Site, nor has it shown that the pesticides and herbicides Ciba-
Geigy used at that time are hazardous substances under CERCLA.
See supra Part IV.G.2.d-e.  Hazardous substances "of a like kind"
to those sent by Ciba-Geigy were released at Centredale through
NECC's drum reconditioning process, in addition to dioxins,
furans, and PAHs through drum incineration.  Monsanto, 858 F.2d at
169; see supra Part IV.D-E.  Accordingly, the Court finds Ciba-
Geigy sent hazardous substances to the Site and similar kinds of
hazardous substances were present at the Site when there was a

---

[61] Some substances that were in Ciba-Geigy's drums do not
appear to be considered hazardous under CERCLA, e.g., isopropanol
and heptane.

release for which Emhart incurred response costs.  Monsanto, 858
F.2d at 169.[62]

### b. Intent to Dispose

The next question is whether Ciba-Geigy intended to dispose
of hazardous substances by sending used drums to NECC.  Burlington,
556 U.S. at 609-11.  The evidence of intent focuses on Ciba-Geigy's
drum emptying practices and the nature of Ciba-Geigy's
relationship with NECC.  See supra Part IV.G.3-4.

Emhart argues that Ciba-Geigy's intent to dispose of
hazardous substances is apparent from the fact that it had to send
its used drums to NECC for reconditioning, instead of reusing those
drums, due to their residual content.  Emhart Post-Trial Br. 149-
50.  Emhart also argues that Ciba-Geigy's use of drum liners does
not negate its intent to dispose because it used liners
inconsistently, the liners did not eliminate residues from drums,
and liners were sometimes sent in used drums to NECC.  Id. at 150.
Further, Emhart notes that "there is no evidence that Ciba-Geigy
washed or otherwise attempted to clean any used drums before
sending them to NECC for reconditioning."  Id. at 151.

---

[62] TPDs cite Lammers Barrel PRP Grp. v. Carboline Co., No. 17-
cv-00135, 2020 WL 1491487, at *10 (S.D. Ohio Mar. 27, 2020) to
argue that, similar to that case, Emhart has not shown that
hazardous substances were in drums sent to NECC.  Joint Defs.'
Post-Trial Br. 33-34, 36.  But here, unlike in Lammers Barrel,
Emhart presented evidence, including expert testimony, showing
that hazardous substances were more likely than not in TPDs'
predecessors' drums sent to NECC.

BASF counters that Ciba-Geigy had no intent to dispose because it had an economic incentive to salvage the materials in its drums before sending the drums to NECC.  Joint Defs.' Post-Trial Br. 41; BASF Post-Trial Br. 66.  BASF characterizes Ciba-Geigy's relationship with NECC as "purely commercial" in the sense that it sold drums to NECC to make money, rather than to dispose of hazardous waste.  BASF Post-Trial Brief 65; see also id. at 66-67 (describing how Ciba-Geigy maximized profits by working with NECC instead of costly waste haulers and by purchasing cheaper reconditioned drums from NECC instead of brand-new drums); Joint Defs.' Post-Trial Br. 41-42 (describing the competitive market for used drums).  BASF characterizes that commercial relationship as driven by cash transactions as opposed to credit, BASF Post-Trial Br. 67-70, though BASF also acknowledges that the sales "appear[] to have been at times accounted for by an offset against future purchases of reconditioned drums from NECC," id. at 65.  Additionally, selling the used drums freed up space in Ciba-Geigy's buildings, another purpose unrelated to disposal of hazardous wastes.  Id. at 65 n.405.

Ciba-Geigy clearly had commercial economic incentives to engage with NECC, but that was not its sole intent.  See Consolidation Coal Co. v. Ga. Power Co., 781 F.3d 129, 149 (4th Cir. 2015) (finding that Burlington does not "foreclose arranger liability as a matter of law based on a secondary intent").  The

188

parties agree that Ciba-Geigy sold its used drums to NECC and bought reconditioned drums from NECC. See, e.g., Emhart Post-Trial Br. 151; BASF Post-Trial Br. 65-67. Inherent in that "two-way" relationship, Emhart Post-Trial Br. 151, is Ciba-Geigy's understanding that it could not reuse its used drums due to the risk of cross-contamination but could safely use the reconditioned drums from NECC. See supra Part IV.G.3 (citing testimony from former Ciba-Geigy employees reflecting that understanding). Consequently, regardless of whether Ciba-Geigy received its same used drums back after reconditioning, it trusted that NECC's reconditioning process resulted in like-new drums, reusable without the risk of cross-contamination. By purchasing reconditioned drums from NECC, Ciba-Geigy expected that NECC would consistently recondition every drum, including Ciba-Geigy's own, unless the drum was in too poor of condition to recondition. See Joint Defs.' Post-Trial Br. 42 (regarding use of drums for scrap metal). If there was any risk that NECC's reconditioned drums contained hazardous residuals, Ciba-Geigy would not have chosen to purchase them. Thus, by sending drums that previously contained hazardous substances to NECC and then purchasing reconditioned drums from NECC, Ciba-Geigy intended to dispose of the hazardous residuals in its drums. To invoke the parties' "milkman" analogy: a consumer who swaps their used milk bottle for a fresh bottle of

milk would expect that the fresh milk be delivered in a bottle that had been cleaned and rid of residual old milk.

Based on CERCLA's definition of "dispose," the Court understands that an arranger must have intended for its hazardous waste to be deposited into the land, water, or air.  42 U.S.C. § 6903(3); see id. § 9601(29); Burlington, 556 U.S. at 612 ("In order to qualify as an arranger, [the defendant] must have entered into the sale . . . with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3)."). The Court finds the evidence sufficient that, given the state of environmental regulations during the relevant time period and the common understanding of how drum reconditioning worked, Ciba-Geigy had to have intended that at least a portion of the hazardous residuals sent to NECC would be disposed into the environment.  See supra Part IV.B (citing documents, e.g., excerpts of EMH1144, which describes the history of drum reconditioning and development of environmental regulations).

The Court recognizes that Ciba-Geigy tried to minimize the residuals sent to NECC through its use of liners and drainage practices.  However, these mitigation efforts do not suggest a complete lack of intent to dispose, as in Burlington, in which the Supreme Court held that the defendant lacked intent to dispose because it made efforts to reduce the likelihood of accidental

190

spills.    556 U.S. at 612-13.    This case involves purposeful
elimination of residuals, not accidental spills.    For all these
reasons, the Court finds Ciba-Geigy intended for NECC to dispose
of the residual hazardous substances that it could not itself
eliminate.    While Ciba-Geigy's mitigation efforts do not absolve
it of responsibility, they may be considered in the allocation
phase.

### c. Section 9607(b) Defenses

Regarding the COCs that Emhart proved Ciba-Geigy sent to NECC,
BASF has not shown by a preponderance of the evidence that someone
or something else was the sole cause of their release at the Site
and the resulting response costs.    See 42 U.S.C. § 9607(b).    Rather
than completely rebut Emhart's evidence of the hazardous
substances Ciba-Geigy sent to NECC, BASF only seeks to diminish
the impact of Ciba-Geigy's contributions to the contamination by
pointing to other additional possible sources of the contamination
such as fires that occurred on the Site, other NECC customers,
drum peddlers, and Metro Atlantic.    See supra Part IV.E & IV.G.
As for the dioxin, furan, and PAH contamination from open-head
drum incineration, the Court has found that Ciba-Geigy sent both
open- and closed-head drums containing hazardous substances to
NECC, and that NECC converted some of the closed-head drums to
open-head drums that were incinerated; BASF does not otherwise
eliminate Ciba-Geigy as a contributor to that contamination.    See

191

*supra* Part IV.E.1-2 & IV.G.5.  Accordingly, BASF has failed its
burden to disprove Ciba-Geigy's connection to the release of
hazardous substances at the Site that caused Emhart to incur
response costs.  See *Davis*, 261 F.3d at 44.

### 3. Was BNS's Predecessor Brown & Sharpe an Arranger?

#### a. Disposal of Hazardous Substances at the Site

Emhart has not shown it is likely that Brown & Sharpe sent
drums from its Precision Park facility to Centredale.  See *supra*
Part IV.H.1.c.  Because that issue is dispositive of Emhart's claim
that Brown & Sharpe was an arranger, the Court need not go further.

### 4. Was Sequa's Predecessor Warwick Chemical an Arranger?

#### a. Disposal of Hazardous Substances at the Site

Emhart has shown it is likely that Warwick Chemical disposed
of the following categories of hazardous substances at Centredale
via residuals in drums it sent to NECC for reconditioning: VOCs
(benzene, PCE, toluene, and xylene); metals (aluminum and zinc);
and some other hazardous substances not categorized as COCs.  See
*supra* Part IV.I.5; 40 C.F.R. § 302.4.[63]  Emhart has not shown that
Warwick Chemical sent PCBs, 1,2,4-trichlorobenzene, or naphthalene
to the Site.  See *supra* Part IV.I.2.a-c.  Hazardous substances "of
a like kind" to those sent by Warwick Chemical were released at
Centredale through NECC's drum reconditioning process, in addition

---

[63] Some substances that were in Warwick Chemical's drums do
not appear to be considered hazardous under CERCLA, e.g., urea.

to dioxins, furans, and PAHs through drum incineration.  Monsanto,
858 F.2d at 169; see supra Part IV.D-E.  Because TCE and vinyl
chloride — both hazardous substances categorized as COCs — are
degradants of PCE, Warwick Chemical's disposal of PCE at Centredale
likely caused the release of TCE and vinyl chloride at the Site as
well.  See supra Part IV.I.5.  Accordingly, the Court finds Warwick
Chemical sent hazardous substances to the Site and similar kinds
of hazardous substances were present at the Site when there was a
release for which Emhart incurred response costs.  Monsanto, 858
F.2d at 169.

### b. Intent to Dispose

The next question is whether Warwick Chemical intended to
dispose of hazardous substances by sending used drums to NECC.
Burlington, 556 U.S. at 609-11.  The evidence of intent focuses on
Warwick Chemical's drum emptying practices and the nature of
Warwick Chemical's relationship with NECC.  See supra Part IV.I.3-
4.

Emhart argues that Warwick Chemical's intent to dispose of
hazardous substances is demonstrated by its refusal to package its
finished product in used raw-material or customer-returned drums.
Emhart Post-Trial Br. 112.  Instead of reusing drums, Warwick
Chemical sent used drums to NECC and packaged its finished product
in reconditioned drums from NECC because, as one former employee
explained, "we were going to put our clean product in a clean

193

drum." Id. (quoting Sanocki Dep. 159:13-160:9). Like Ciba-Geigy and Teknor, Warwick Chemical thus had a two-way relationship with NECC. Emhart also argues that because Warwick Chemical rinsed its used drums instead of washing them, its drum emptying practices do not negate its intent to dispose. Id.

Sequa contends that Warwick Chemical had no intent to dispose because it emptied and rinsed its used drums "so as not to waste valuable raw materials." Sequa Post-Trial Br. 20-21. There were economic incentives for Warwick Chemical to extract as much raw material or customer-returned product from its drums as reasonably possible. But those economic incentives do not preclude an intent to dispose. See Consolidation Coal, 781 F.3d at 149. When Warwick Chemical tilted or rinsed out its drums (likely with water) into the batch, it was acting in accord with its economic incentives. But Warwick Chemical did not take the further step of cleaning its used drums. Following the same logic as for Ciba-Geigy, the Court finds Warwick Chemical intended for NECC to dispose of the residual hazardous substances that it could not itself extract for use in its manufacturing process.

### c. Section 9607(b) Defenses

Regarding the COCs that Emhart proved Warwick Chemical sent to NECC, Sequa has not shown by a preponderance of the evidence that someone or something else was the sole cause of their release at the Site and the resulting response costs. See 42 U.S.C.

§ 9607(b).   Sequa tries to diminish the impact of Warwick
Chemical's contributions to the contamination at the Site by noting
the more significant contributions of Metro Atlantic and NECC,
particularly with respect to VOCs.   Sequa Post-Trial Br. 36-37.
But Warwick Chemical's relative contributions to the contamination
raises a question of allocation and not liability.   As for the
dioxin, furan, and PAH contamination from open-head drum
incineration, the Court has found that Warwick Chemical sent both
open- and closed-head drums containing hazardous substances to
NECC, and that NECC converted some of the closed-head drums to
open-head drums that were incinerated; Sequa does not otherwise
eliminate Warwick Chemical as a contributor to that contamination.
See supra Part IV.E.1-2 & IV.G.5.   Accordingly, Sequa has failed
its burden to disprove Warwick Chemical's connection to the release
of hazardous substances at the Site that caused Emhart to incur
response costs.   See Davis, 261 F.3d at 44.

### 5. Was Teknor an Arranger?

#### a. Disposal of Hazardous Substances at the Site

Emhart has shown it is likely that Teknor disposed of the
following categories of hazardous substances at Centredale via
residuals in drums it sent to NECC for reconditioning: PCBs
(specifically, Aroclor 1260); VOCs (benzene, toluene, vinyl
chloride, and TCE); SVOCs (di (2-ethylhexyl) phthalate); and
metals (barium, cadmium, and zinc).   See supra Part IV.J.5.

195

Hazardous substances "of a like kind" to those sent by Teknor were released at Centredale through NECC's drum reconditioning process, in addition to dioxins, furans, and PAHs through drum incineration. Monsanto, 858 F.2d at 169; see supra Part IV.D-E.  Accordingly, the Court finds Teknor sent hazardous substances to the Site and similar kinds of hazardous substances were present at the Site at the time of a release for which Emhart incurred response costs. Monsanto, 858 F.2d at 169.

### b. Intent to Dispose

The next question is whether Teknor intended to dispose of hazardous substances by sending used drums to NECC.  Burlington, 556 U.S. at 609-11.  The evidence of intent focuses on Teknor's drum emptying practices and the nature of Teknor's relationship with NECC.  See supra Part IV.J.3-4.

Emhart argues that Teknor had the requisite intent because it knew it could not reuse its used drums without risk of cross-contamination, so it enlisted NECC to clean them out.  Emhart Post-Trial Br. 173.  Emhart sees Teknor's drum drainage practices as "reinforc[ing]" the intent argument because "Teknor knew that the materials it handled were so viscous that . . . the only way to completely clean them was to send them to NECC."  Id. at 174. Further, Emhart notes that "Teknor never washed the drums . . . before sending them out for reconditioning."  Id.

Teknor counters that "any savvy business owner" would understand the reason it drained its drums — to "save money by recouping waste and/or residual materials from drums to be used in the production of garden hose." Teknor Post-Trial Br. 14. Thus, Teknor's "intent was to only sell totally empty drums to NECC." Id.

Following the same logic as for Ciba-Geigy and Warwick Chemical, the Court finds that Teknor intended to dispose of hazardous substances by sending used drums to NECC, given Teknor's two-way relationship with NECC and the commonly understood nature of drum reconditioning at that time. See supra Part IV.J.3 (discussing Teknor's and NECC's two-way relationship and citing testimony from former Teknor employees acknowledging cross-contamination risks); Part IV.B (citing documents, e.g., excerpts of EMH1144). Although Teknor's drum drainage efforts do not absolve it of responsibility, they may be considered in the allocation phase.

### c. Section 9607(b) Defenses

Regarding the COCs that Emhart proved Teknor sent to NECC, Teknor has not shown by a preponderance of the evidence that someone or something else was the sole cause of their release at the Site and the resulting response costs. See 42 U.S.C. § 9607(b). Rather than completely rebut Emhart's evidence of the hazardous substances Teknor sent to NECC, Teknor only seeks to

197

diminish the impact of its contributions to the contamination by pointing to other _additional_ possible sources of the contamination such as fires that occurred on the Site, other NECC customers, drum peddlers, and Metro Atlantic.  See _supra_ Part IV.E & IV.J. As for the dioxin, furan, and PAH contamination from open-head drum incineration, the Court has found that Teknor sent both open- and closed-head drums containing hazardous substances to NECC, and that NECC converted some of the closed-head drums to open-head drums that were incinerated; Teknor does not otherwise eliminate itself as a contributor to that contamination.  See _supra_ Part IV.E.1-2 & IV.J.5.  Therefore, Teknor has failed its burden to disprove its connection to the release of hazardous substances at the Site that caused Emhart to incur response costs.  See _Davis_, 261 F.3d at 44.

**B. Upstream Operator Claim**

**1. Release of Hazardous Substances at Facility and Response Costs**

Hazardous substances (PAHs, PCBs, and metals) were released from one or more facilities at Greystone.  42 U.S.C. §§ 9601(9), 9607(a)(4); _see supra_ Part IV.H.2.b.  Per the Consent Decree, Emhart incurred response costs caused by the release of hazardous substances at Centredale "of a like kind" to those released from Greystone, which sits upstream of Centredale.  See _supra_ Part IV.D-E; EMH1003-0193-0213 (ROD listing hazardous substances requiring

cleanup at the Site); see also supra Part IV.H.2.d.   The parties
do not address (and it appears undisputed) that Emhart's incurred
response costs are necessary and consistent with the national
contingency plan, and the Court has previously held that Emhart
meets that element.   See Emhart, 2019 WL 7631111, at *2.

The hazardous substances requiring cleanup at Centredale
include PAHs (benzo(a)pyrene and dibenz(a,h)anthracene), in the
Allendale Pond Sediment and Lyman Mill Pond Sediment; PCBs (Aroclor
1254), in the Allendale Pond Sediment and Lyman Mill Pond Sediment;
and metals (barium), in the Lyman Mill Pond Sediment Contact. See
EMH1003-0200-0202.  Emhart has shown it is likely that the release
of these same hazardous substances from Greystone contributed to
the contamination downstream at Centredale for which Emhart has
incurred response costs.  See supra Part IV.H.2.c-d.

### 2. Was BNS's Predecessor Brown & Sharpe an Operator?

Brown & Sharpe owned or operated facilities at Greystone when
hazardous substances were released from those facilities and,
moreover, caused those releases through its operations there.  See
42 U.S.C. § 9607(a)(2); see Part IV.H.2.b-c.  These releases
include the discharge, deposit, leaking, and placing of solid waste
or hazardous waste into land or water such that it entered the
environment or was discharged into waters — through outfalls,
stormwater discharge, and the erosion of artificial riverbank
fill.   See 42 U.S.C. § 9601(29); id. § 6903(3); supra Part

IV.H.2.c.  Brown & Sharpe is therefore a former owner and operator under CERCLA.

### 3. Section 9607(b) Defenses

Regarding the hazardous substances that Emhart proved were released from facilities at Greystone, BNS has not attempted to show that someone or something other than B&S was the sole cause of those releases.  Nor has it shown by a preponderance of the evidence that someone or something else was the sole cause of the release of similar hazardous substances at Centredale for which Emhart has incurred response costs.  BNS only seeks to diminish the impact of releases from Greystone to the contamination at Centredale by pointing to other _additional_ sources of the contamination, namely Metro Atlantic and NECC.  BNS Post-Trial Br. 34-42.  But CERCLA does not require a defendant to be the sole or even the predominant cause of contamination at a site.  See supra Part III.E.  BNS has therefore failed its burden to disprove B&S's connection to the release of hazardous substances at the Site that caused Emhart to incur response costs.  See Davis, 261 F.3d at 44.

### VI.  CONCLUSION

For the foregoing reasons, the Court finds that Emhart has proven by a preponderance of the evidence that BASF, Teknor, and Sequa contributed to contamination at the Centredale Site as arrangers under CERCLA.  See 42 U.S.C. § 9607(a).  Emhart has not shown that BNS is liable as an arranger but has shown that it is

liable as an operator.  See id.  None of the TPDs succeed in bringing a 42 U.S.C. § 9607(b) defense.  Each TPD contributed to the COCs as follows:

- BASF:

    o 2,3,7,8-TCDD;

    o Other 2,3,7,8-substituted dioxins and furans;

    o PAHs;

    o Aroclor 1242;

    o VOCs; and

    o SVOCs.

- BNS:

    o PAHs;

    o Aroclor 1254; and

    o Metals.

- Sequa:

    o 2,3,7,8-TCDD;

    o Other 2,3,7,8-substituted dioxins and furans;

    o PAHs;

    o VOCs; and

    o Metals.

- Teknor:

    o 2,3,7,8-TCDD;

    o Other 2,3,7,8-substituted dioxins and furans;

    o PAHs;

     o  Aroclor 1260;

     o  VOCs;

     o  SVOCs; and

     o  Metals.

Inasmuch as this Opinion is rendered at the conclusion of Phase IIIA of this trial, the orders entered in pursuance thereof will not ripen automatically into final judgments and will not be immediately appealable as of right.  Final judgment will not enter until the allocation phase — Phase IIIB — is adjudicated.


IT IS SO ORDERED.

_William E. Smith_

William E. Smith
Senior District Judge
Date: September 8, 2025