```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND
```

| | |
|---|---|
| EMHART INDUSTRIES, INC., ) <br> ) <br>     Plaintiff, Cross-Plaintiff, ) <br>     Third-Party Plaintiff, and ) <br>     Counter-Defendant, ) <br> ) <br>     v. ) <br> ) <br> NEW ENGLAND CONTAINER ) <br> COMPANY, INC., ET AL., ) <br> ) <br>     Defendants, Counter- ) <br>     Plaintiffs, and ) <br>     Third-Party Plaintiffs. ) | C.A. No. 06-218 WES |
| ) <br> EMHART INDUSTRIES, INC., ) <br> ) <br>     Plaintiff, Cross-Plaintiff, ) <br>     Third-Party Plaintiff, and ) <br>     Counter-Defendant, ) <br> ) <br>     v. ) <br> ) <br> UNITED STATES DEPARTMENT OF THE ) <br> AIR FORCE, ET AL., ) <br> ) <br>     Defendants, Counter- ) <br>     Plaintiffs, Cross- ) <br>     Plaintiffs, and Third-Party ) <br>     Plaintiffs, ) <br> ) <br>     v. ) <br> ) <br> BLACK & DECKER INC., ) <br> ) <br>     Counter-Plaintiff, Cross- ) <br>     Plaintiff, Third-Party ) <br>     Plaintiff, and Third-Party ) <br>     Defendant, ) <br> ) <br>     v. ) <br> ) <br> ) | C.A. No. 11-023 WES <br><br> CONSOLIDATED |

```
A. HARRISON & CO., INC.; EASTERN    )
COLOR & CHEMICAL CO.; EASTERN       )
RESINS CORP.; EVANS PLATING         )
CORP.; GREYSTONE INC.; HENKEL       )
CORP.; HEXAGON METROLOGY, INC.;     )
INDUPLATE INC.; INDUPLATE           )
OPERATIONS, LLC; IVAX LLC,          )
                                    )
     Third-Party Defendants,        )
                                    )
     v.                             )
                                    )
BNS LLC; CNA HOLDINGS LLC;          )
CRANSTON PRINT WORKS CO.; DURO      )
TEXTILES LLC; ELI LILLY & CO.;      )
EXXON MOBIL CORP.; ORGANIC          )
DYESTUFFS CORP.; SEQUA CORP.;       )
TEKNOR APEX CO.; THE ORIGINAL       )
BRADFORD SOAP WORKS, INC.; UNION    )
OIL COMPANY OF CALIFORNIA,          )
                                    )
     Cross-Defendants,               )
                                    )
     v.                             )
                                    )
BASF CORP.,                         )
                                    )
     Cross-Defendant and Fourth-    )
     Party Plaintiff,               )
                                    )
     v.                             )
                                    )
ROHM AND HAAS COMPANY,              )
                                    )
     Fourth-Party Defendant.        )
                                    )
```

**MEMORANDUM AND ORDER**

Before the Court are "Emhart's Motion for Reconsideration of the Court's Phase IIIA Findings of Fact and Conclusions of Law on Two Discrete Temporal Issues Relating to Defendants Teknor Apex Company and Sequa Corporation" ("Emhart Motion"), Dkt. No. 1153,

2

and the "Motion of Teknor Apex Company to Reconsider as to Vinyl Chloride Production" ("Teknor Motion"), Dkt. No. 1154. For the reasons below, the Court grants the Emhart Motion and denies the Teknor Motion.

I.  **BACKGROUND**

Relevant here are three aspects of the Court's Phase IIIA Findings of Fact and Conclusions of Law ("Opinion"), Dkt. No. 1150.

First, the Court declined to consider Teknor's liability for the pre-1968 operations of its predecessor, Thompson Apex Company, which was formed in 1964. See Op. 164-65. Emhart asks the Court to reconsider this decision.

Second, the Court declined to consider the prior deposition testimony of Gennaro Zeoli about Sequa's predecessor Warwick Chemical because, pursuant to a pre-trial order, such testimony was inadmissible as defendant-specific evidence. Id. at 146; see also Order 3 (Oct. 2, 2024), Dkt. No. 1099 ("TPD Pre-Trial Order"). Emhart asks the Court to reconsider this decision.

Third, the Court found Teknor liable for the release of vinyl chloride at Centredale though the reconditioning of drums that it sent to New England Container Co. ("NECC"). Op. 195. Teknor asks the Court to reconsider this decision.

II.  **LEGAL STANDARD**

The orders entered pursuant to the Opinion are not immediately appealable as of right, and final judgment will not enter until

the allocation phase is adjudicated.  See Op. 202.  The orders are therefore interlocutory, and the Court has the "inherent power" to reconsider them "as justice requires."  Greene v. Union Mut. Life Ins. Co. of Am., 764 F.2d 19, 22 (1st Cir. 1985).  This standard is consistent with Federal Rule of Civil Procedure 54(b), which provides that, unless otherwise indicated:

> any order or decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

This "interests of justice" standard is more flexible than the standard that applies to post-judgment motions under Federal Rule of Civil Procedure 59(e) or 60(b).  See Greene, 764 F.2d at 22-23; see also Fed. R. Civ. P. 60(b) advisory committee's note to 1946 amendment ("[I]nterlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief as justice requires.").

**III. DISCUSSION**

  **A. Emhart Motion**

    **1. Teknor's Liability for 1964-1968 Period**

The Court finds Teknor liable for the 1964-1968 operations of its predecessor, Thompson Apex Company ("Thompson Apex"), at the

4

Pawtucket and Attleboro facilities. Whether Teknor is equitably liable for the pre-1964 operations of Apex Tire & Rubber Company ("Apex Tire") and Thompson Chemical Company ("Thompson Chemical") is a matter for the allocation phase.

To begin, a brief corporate history. Apex Tire was founded by Alfred Fain in 1924 and headquartered at 505 Central Avenue in Pawtucket, Rhode Island, which is one of two locations collectively known as "the Pawtucket facility." Emhart Post-Trial Br. App. 1 ("Teknor Corp. Hist."), at 1, Dkt. No. 1122-1; Op. 163. Apex Tire later acquired Thompson Chemical, which was headquartered at 90 Mendon Avenue in Pawtucket, Rhode Island (the other part of the Pawtucket facility), and had another location at 330 Oakhill Avenue in Attleboro, Massachusetts (the Attleboro facility). Teknor Corp. Hist. 1. In a multistep process beginning in 1964, Continental Oil Company ("Continental") acquired Apex Tire and Thompson Chemical; assumed all debts and liabilities of the latter; and, before liquidating and dissolving the companies, incorporated a subsidiary: Thompson Apex. Id. Norman Fain, who had since replaced his father at the helm of Apex Tire and Thompson Chemical, "remained to run the new company." EMH4005B-0003; see EMH4005HH-0002.

In 1967, the Federal Trade Commission ordered Continental to divest itself of all the "plants, machinery, equipment, patents, patent rights, know-how and technology, trade names, trademarks,

5

customer lists and good will acquired" from Apex Tire and Thompson Chemical. Teknor Corp. Hist. 3. Continental thus transferred certain assets, including the Pawtucket and Attleboro facilities, to Thompson Apex, and sold that company to Elmgrove Corporation, which belonged to the Fains, who previously owned and operated the facilities as Apex Tire and Thompson Chemical. Id.; see also EMH4005-0003 (noting that "Norman Fain bought the . . . facilities back from Continental"). Thompson Apex then changed its name to Teknor Apex before merging with Elmgrove Corporation. Teknor Corp. Hist. 3; see also Teknor Post-Trial Br. 8; Feb. 11 Trial Tr. 32:18, Dkt. No. 1148 (acknowledging "Thompson Apex became Teknor Apex").

In its Opinion, the Court wrote that "Teknor [did] not advance a position as to its liability for Thompson Apex's operations in its Post-Trial Brief." Op. 164. Instead, regarding the issue of successor liability, Teknor devoted all its energy to arguing that it was not liable for the pre-1964 operations of Thompson Chemical. See Teknor Post-Trial Br. 10; see also Feb. 11 Trial Tr. 32:3-21. Upon review, the Court finds that this was not merely an omission on Teknor's part, but a concession. That is, because "Thompson Apex became Teknor Apex," Feb. 11 Trial Tr. 32:18, Teknor in effect conceded that it was responsible for any liabilities arising from the 1964-1968 operations of Thompson Apex at the Pawtucket and Attleboro facilities. As briefly detailed below, this concession was correct as a matter of law; therefore, the Court erred when it

6

found that Emhart "fail[ed] to make an adequate successor liability argument" for the 1964-1968 period.  Op. 165.

On matters of successor liability in the CERCLA context, the First Circuit applies state law "so long as it is not hostile to the federal interests animating CERCLA." United States v. Davis, 261 F.3d 1, 54 (1st Cir. 2001) (quoting John S. Boyd Co. v. Bos. Gas Co., 992 F.2d 401, 406 (1st Cir. 1993)).  Rhode Island law on the effect of corporate merger provides that a "surviving or new corporation is . . . liable for all the liabilities and obligations of each of the corporations merged or consolidated."  R.I. Gen. Laws § 7-1.2-1005(5).  In this case, Elmgrove Corporation merged with Thompson Apex, which was renamed Teknor Apex after Elmgrove Corporation bought it from Continental.  The surviving entity — Teknor Apex — therefore assumed the liabilities of Thompson Apex arising from that company's 1964-1968 operations at the Pawtucket and Attleboro facilities.  Whether Teknor should also be liable for the pre-1964 operations of Apex Tire and Thompson Chemical at those facilities is a closer question.  As Emhart notes, Thompson Chemical, Thompson Apex, and Teknor Apex conducted "the exact same operations at the exact same facilities, making and selling the same products under the same brand names and logos," all while "under the same direction and control," i.e., the Fains.  Teknor Corp. Hist. 4-5.  But Continental assumed the debts and liabilities of Thompson Chemical when it acquired, liquidated, and dissolved

7

that company in 1964, which complicates the analysis. The parties may address that issue during the allocation phase. For now, it is clear enough that Teknor is liable under CERCLA for the 1964-1968 operations of Thompson Apex at both facilities. The parties may address the implications of this finding during allocation.

### 2. Zeoli's Prior Deposition Testimony

The Court finds the prior deposition testimony of Gennaro Zeoli admissible as evidence that Sequa's predecessor, Warwick Chemical (also known as Sun Chemical Corporation), sent drums to NECC in the mid-1950s from its plant in Wood River Junction, Rhode Island. Zeoli played multiple roles at NECC between 1953 and 1956, including truck driver. Zeoli Dep. 12:1-15. At a deposition on November 8, 2002, Zeoli testified that when he worked for NECC, he picked up drums from "Sun Chemical in Carolina." Id. at 32:5-7, 60:3-6. He almost certainly meant the Wood River Junction plant. As mentioned in the Opinion, Carolina and Wood River Junction are neighboring villages. Op. 146. And the plant was located on a stretch of Route 91 known as the "Alton Carolina Road."[1]

Zeoli's deposition was taken in a different case, and he died before Phase III of this case began. Emhart's Opp'n TPD's Mot. Lim. 6, Dkt. No. 1094. Before trial, TPDs moved to exclude almost all statements obtained before Phase III, including Zeoli's prior

---

[1] See R.I. Dep't of Transp., Rhode Island Highway Map (2020), https://www.dot.ri.gov/documents/maps/RI_Highway_Map.pdf.

deposition testimony, because TPDs were not parties to the earlier proceedings and their interests were not represented when the statements were obtained. TPD's Mot. Lim. 2-6, Dkt. No. 1081; see also id. at 1 n.2 (regarding stipulation to admit certain prior testimony). In response, Emhart argued that any former testimony was admissible under Rule 804(b)(1), and that all or most of the statements at issue were admissible under Rule 106, known as the rule of completeness, or Rule 807, known as the residual exception. Emhart's Opp'n TPD's Mot. Lim. 21-27. However, Emhart's arguments were short on specifics, and when discussing evidence from earlier proceedings about Sequa's predecessors, Emhart failed to mention Zeoli's statement that he picked up drums from Sun Chemical. See id. at 25-27; id. at 17-18.

The Court found the prior deposition testimony of Zeoli and other unavailable witnesses admissible as contextual evidence but not as defendant-specific evidence. TPD Pre-Trial Order 2-4. The parties could thus rely on this testimony for evidence pertaining to NECC's general operations but not for evidence pertaining to the actions of TPDs or their predecessors. Id. The Court did not explicitly consider the admissibility of the prior testimony under Rule 106 or 807, analyzing it only under Rule 804(b)(1), but it found that Emhart had not met the requirements of Rule 807 with respect to other statements because it did "not specify how each piece of evidence [was] sufficiently probative." Id. at 4-5.

9

Seeing as Emhart had not even mentioned Zeoli's statement about picking up drums from Sun Chemical in South Carolina, it follows that Emhart had not met the requirements of Rule 807 with respect to this statement, either.

Emhart ultimately alerted the Court to Zeoli's statement at trial and in its post-trial brief, arguing that it was evidence Warwick Chemical sent drums to NECC in the mid-1950s. See, e.g., Emhart Post-Trial Br. 114, Dkt. No. 1122. Emhart did not, however, argue that the statement should be admitted under Rule 807. See Reply Supp. Emhart Mot. 21, Dkt. No. 1156 ("Emhart acknowledges that the Rule 807 arguments advanced in its motion for reconsideration are 'new.'"). Instead, Emhart contended only that Zeoli's statement should be admitted under Rule 106 to lend context to ambiguous, if not contradictory statements from another witness, Vincent Buonanno, about Warwick Chemical's relationship with NECC. Emhart Post-Trial Br. 114 n.45.

Sequa argued that Zeoli's statement about picking up drums in "Carolina" made no sense, presumably because it thought Zeoli was referring to the state of South Carolina, where Warwick Chemical had two facilities. Sequa Post-Trial Br. 2, 4, Dkt. No. 1119. Sequa also could have noted that the Court, in a pre-trial order, had already found Zeoli's prior deposition testimony inadmissible for Emhart's intended purpose, but it failed to mention that. See id. at 3.

10

In its Opinion, the Court did not entertain Emhart's Rule 106 argument, in part because Emhart's expansive reading of that rule would create an exception to the rule against hearsay large enough to render all other exceptions meaningless.  The purpose of Rule 106 is to let a party correct a misimpression created by an adverse party's introduction of a partial statement.  It reads:

> If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection.

Fed. R. Evid. 106.  The Supreme Court has interpreted this rule to mean "that when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is ipso facto relevant and therefore admissible under Rules 401 and 402."  Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 172 (1988).  Emhart, in contrast, pounced at the words "any other statement" to argue Rule 106 permits the introduction of otherwise inadmissible statements that contradict an adverse party's version of the facts derived from other, unrelated statements — made by a different speaker in a different proceeding — that already exist in evidence.  Emhart Post-Trial Br. 114 n.45; see also Emhart Mot. 12-13.  The unrelated statements at issue here come from the prior testimony of Vincent Buonanno, which is in evidence based on a pre-trial stipulation.  See Stip., Dkt. No. 1112.  Emhart argued

11

at trial that the balance of Buonanno's testimony suggests Warwick Chemical sent drums to NECC in the mid-1950s. Emhart Post-Trial Br. 114. Citing the same testimony, Sequa contended that Warwick Chemical more likely did not send drums to NECC until the 1960s. Sequa Post-Trial Br. 4-5. According to Emhart, Sequa's interpretation of Buonanno's testimony created a misimpression of the facts, and one that should be corrected by the introduction of Zeoli's statement under Rule 106. Emhart Post-Trial Br. 114 n.45. The same argument appears in Emhart's motion to reconsider. See Emhart Mot. 13.

Emhart's interpretation of Rule 106 does violence to the rule, which is principally designed to prevent parties from benefitting from "the misleading impression created by taking matters out of context." Fed. R. Evid. 106 advisory committee's note. That is not what happened here. Rather, the parties agreed to the introduction of Buonanno's prior testimony and, unsurprisingly, the parties had conflicting interpretations of his statements. Just because Sequa argues that Buonanno's statements do not support Emhart's version of the facts does not mean that Emhart should be able to introduce another statement — one the Court has already found inadmissible, made by a different speaker, in a different proceeding — simply because it would bolster Emhart's position. See Fed. R. Evid. 106 advisory committee's note to 2011 amendment ("The mere fact that a statement is probative and contradicts a

12

statement offered by the opponent is not enough to justify completion under Rule 106."). To find otherwise would mean that any out-of-court statement that contradicts another statement in evidence should be admitted over a hearsay objection. This would all but eradicate the rule against hearsay.

Considering the above, the Court did not err when it refused to entertain Emhart's Rule 106 argument. But those are not the only purported grounds for error. Emhart also contends that, even though it did not argue that Zeoli's statement should be admitted under Rule 807 until after the Court issued its Opinion, the Court erred by not admitting the statement under Rule 807. See Emhart Mot. 11-12, 17. Needless to say, the Court does not think that failing to consider an argument for admission that Emhart did not even make was error. But now that Emhart has made the argument, the Court finds that justice requires a reconsideration of its decision to exclude Zeoli's statement.

Rule 807 provides that an otherwise inadmissible hearsay statement is not excluded if —

> (1) the statement is supported by sufficient guarantees of trustworthiness — after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).[2] Zeoli's statement that he picked up drums from "Sun Chemical in Carolina" when he worked for NECC satisfies both requirements.  First, the statement has sufficient guarantees of trustworthiness because it was made in a deposition and there is corroborating evidence.  Along with Sun Chemical in Carolina, Zeoli remembered that he picked up drums from Crown Chemical, which was in fact a supplier of NECC.  Zeoli Dep. 60:3-6; see, e.g., EMH1005-0026.  Zeoli also gave an accurate location for the Wood River Junction plant.  Not only that, but his use of the term "Carolina" — which, as evidenced by Sequa's apparent confusion, is a place name someone unfamiliar with local roads and history is unlikely to know — suggests Zeoli was indeed speaking from memory.  Finally, as Emhart discusses at length in its motion to reconsider, the assertion that Warwick Chemical sent drums to NECC in the 1950s can be reconciled (though it takes some effort) with Buonanno's testimony about NECC's relationship with Warwick Chemical and other evidence about NECC's operations.  See Emhart Mot. 17-25.

Second, Zeoli's statement is more probative on the point for which it is offered, i.e., whether Warwick Chemical sent drums to NECC in the 1950s, than any other evidence that Emhart could have

---

[2] The rule also requires the proponent to give the adverse party "reasonable notice of the intent to offer the statement," and that said "notice must be provided in writing before the trial or hearing" absent good cause.  Fed. R. Evid. 807(b).  Emhart gave TPDs written notice of its intent to offer Zeoli's prior deposition testimony before trial.  See TPD's Mot. Lim. 2.

14

obtained through reasonable efforts. The only other evidence on this point comes from Buonanno, but he "only worked for NECC for a few summers in the early 1960s and then in sales in the late 1960s." Emhart Post-Trial Br. 194. But see Emhart Mot. 18 (citing Buonanno's testimony from another deposition to argue that "he only worked for NECC for a few summers in the late 1950s and early 1960s as a laborer" before returning in the late 1960s). In contrast, not only did Zeoli work at NECC between 1953 and 1956 but also, during that time, he was NECC's "only driver." See Zeoli Dep. 30:24-31:1. It is therefore reasonable to assume that Emhart could have obtained evidence from no one else, and certainly no one still available once Phase III began, who could more reliably state from personal experience whether Warwick Chemical sent drums to NECC in the 1950s.

The Court thus finds Zeoli's statement admissible under Rule 807 and, given that evidence, it also finds that Warwick Chemical sent drums to NECC as early as 1953. The Court sees no reason to assume there was a break in the parties' relationship between the mid-1950s and 1971, and it doubts there is evidence to find that there was, but the Court reserves that issue and other implications of its finding to the allocation phase.

### B. Teknor Motion

Teknor argues that it should not be liable for the release of vinyl chloride because, after 1964, its vinyl chloride production

15

shifted from the Attleboro facility to a different facility that is not at issue here. Teknor Mot. 12-14. But just because Teknor stopped making vinyl chloride at the Attleboro facility does not mean that it stopped using vinyl chloride, whether at that facility or the Pawtucket facility, which is also at issue here.[3] Emhart's expert Dr. Charles Daniels testified that vinyl chloride was used to make polyvinyl chloride ("PVC"), Oct. 21 Trial Tr. 25:11-16, Dkt. No. 1137, and Teknor has acknowledged that PVC compounding occurred at the Pawtucket facility throughout the 1960s and beyond, TPD 607 at EPA010350; see also Nov. 15 Trial Tr. 24:4-7, Dkt. No.

---

[3] Teknor conflates separate lines of deposition testimony from Robert Duarte, a former employee, regarding the "manufacture" and "use" of vinyl chloride. See Teknor Mot. 13-14. Duarte testified that the "production" or "manufacture" of vinyl chloride at the Attleboro facility ceased after 1964. Duarte Dep. 46:9-47:10. He was later asked whether certain materials "were ever used in any of the manufacturing processes that [he] knew of at Teknor Apex while [he] worked there." Id. at 140:24-141:4. When asked about vinyl chloride, he gave a one-word answer: "Yes." Id. at 145:14-15. Duarte gave the same answer for over a dozen other materials, including toluene, naphthalene, and zinc compounds. See generally id. at 140:24-151:21. Teknor states that when Duarte was "asked to list materials that 'were ever used,' he answered in the affirmative for vinyl chloride but vinyl chloride production was ended in 1964." Teknor Mot. 13. But "use" and "production" are different things, and just because Teknor stopped producing its own vinyl chloride in Attleboro does not mean that it stopped using vinyl chloride altogether, whether there or in Pawtucket. If, as Teknor suggests, use and production run together, one can read Duarte's testimony to mean that Teknor produced its own toluene, naphthalene, and zinc compounds, not to mention the several other materials that he said Teknor used during his time there. Surely Teknor would not concede to that.

16

1147 (Teknor's expert Lawrence McTiernan noting that Teknor made PVC compounds).

Furthermore, Teknor does not dispute that it contributed to the release of trichloroethene ("TCE") at Centredale; nor does it dispute that TCE degrades into vinyl chloride. Teknor Mot. 12-14; see Op. 72, 92 (noting that perchloroethylene ("PCE") degrades into TCE, which degrades into vinyl chloride); 162 (finding Warwick Chemical's disposal of PCE at Centredale likely caused the release of TCE and vinyl chloride); 195 (finding Teknor disposed of TCE at Centredale). Teknor's undisputed contribution to the release of TCE at Centredale is therefore an alternative basis of liability for the release of vinyl chloride.

Accordingly, the Court will not reconsider its finding that Teknor contributed to the release of vinyl chloride at Centredale.

**IV.   CONCLUSION**

For the reasons above, the Emhart Motion, Dkt. No. 1153, is GRANTED; and the Teknor Motion, Dkt. No. 1154, is DENIED.

IT IS SO ORDERED.

/s/ WESmith
William E. Smith
Senior District Judge
Date: January 15, 2026